**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TRAVELERS CASUALTY AND )
SURETY CO. OF AMERICA )
and )
FOULGER-PRATT RESIDENTIAL )
CONTRACTING, LLC, )
)
          Applicants, )
)
)   Case No. 1:09- cv-2333
      v. )   Judge Gladys Kessler
)   Next Event: (none scheduled)
)
MADRIGAL CONDOMINIUMS, LLC, )
)
         Respondent. )
_____ )

**MOTION OF MADRIGAL CONDOMINIUMS, LLC
TO VACATE PORTIONS OF INTERIM ARBITRATION AWARD**

      Pursuant to Section 4423 of the District of Columbia Revised Arbitration Act ("DCRAA"),

D.C. Code §§ 16-4423(a)(3) & (4), 16-4423(b), Respondent Madrigal Condominiums, LLC,

respectfully moves to vacate Paragraphs 4(c), 4(d), 14(f), 14(g), and 17 and substantial portions of

Paragraphs 10 and 14(d) of the Interim Award issued by the Arbitration Panel on November 30,

2009.  In the alternative, to the extent that the Court determines that the Federal Arbitration Act

("FAA"), 9 U.S.C. § 10, rather than the DCRAA applies, Madrigal respectfully moves to vacate

these portions of the Interim Award pursuant to Sections 10(a)(3) and 10(a)(4) of the FAA.  As

demonstrated in the accompanying Memorandum of Points and Authorities, these portions of the

Interim Award should be vacated under either the DCRAA or the FAA.

      Specifically, as demonstrated in Madrigal's Memorandum of Points and Authorities:

      1.        Paragraph 17 of the Interim Award, which addresses issues relating to the "exterior

skin" of the building, should be vacated because the Panel exceeded its authority by ruling on issues

beyond its jurisdiction, as established by the February 2, 2009 Agreement of Partial Settlement ("APS") between the parties.  Paragraph 17 should also be vacated because the Panel denied Madrigal a fair hearing on these issues by disregarding its own bifurcation ruling in its May 26, 2009 Order Regarding Hearing Scope and Project Neutral and thereby denying Madrigal the opportunity to present critical expert and fact testimony on the Paragraph 17 issues.

     2.     Paragraphs 4(c), 4(d), 14(f) and 14(g) and the challenged portions of Paragraphs 10 and 14(d) should be vacated because the Panel exceeded its authority both by ruling on issues beyond its jurisdiction, as established by the APS, and by disregarding the clear terms of the Construction Contract.  These portions of the Interim Award should also be vacated under the DCRAA because they are arbitrary and capricious and because it would therefore be manifestly unjust to uphold these findings.

     A proposed form of order is attached.

Respectfully submitted,

  /s/  Andrew H. Marks
Andrew H. Marks, D.C. Bar No. 932269
David E. Bell, D.C. Bar No. 477903
Jeanne V. Sourgens, D.C. Bar No. 978929
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel.:  (202) 624-2500
Fax:  (202) 628-5116
Email:  amarks@crowell.com

Dennis A. Davison, D.C. Bar No. 223982
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Tel.:  (202) 496-7500
Fax:  (202) 496-7756
Email:  ddavison@mckennalong.com

*Counsel for Respondent Madrigal
Condominiums, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the foregoing Motion of Madrigal Condominiums, LLC to Vacate Portions of Interim Arbitration Award and Memorandum of Points and Authorities in Support thereof were served electronically via the Court's electronic filing system, this 15th day of March 2010 upon:

> Richard G. Mann, Esq.
> Watt, Tieder, Hoffar & Fitzgerald, LLP
> 8405 Greensboro Drive, Suite 100
> McLean, VA  22102

_____/s/ Andrew H. Marks_____

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVELERS CASUALTY AND            )
SURETY CO. OF AMERICA             )
and                               )
FOULGER-PRATT RESIDENTIAL         )
CONTRACTING, LLC,                 )
                                  )
        Applicants,              )
                                  )
                                  )     <u>Case No. 1:09- cv-2333</u>
    v.                          )     Judge Gladys Kessler
                                  )     Next Event: (none scheduled)
                                  )
MADRIGAL CONDOMINIUMS, LLC,       )
                                  )
       Respondent.            )
_____)


## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION OF MADRIGAL CONDOMINIUMS, LLC
## <u>TO VACATE PORTIONS OF INTERIM ARBITRATION AWARD</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

BACKGROUND ....................................................................................................... 2

    A.    Project History ......................................................................................... 2

    B.    The Agreement of Partial Settlement .................................................... 5

    C.    The Arbitration Proceedings ................................................................ 6

ARGUMENT ............................................................................................................ 7

I.    STANDARD OF REVIEW ............................................................................. 9

    A.    An Arbitration Award Should Be Vacated When the Arbitrators Exceed Their Authority. ................................................................................... 10

    B.    An Arbitration Award Should Be Vacated When the Hearing Is Fundamentally Unfair. ...................................................................... 11

    C.    An Arbitration Award Should be Vacated Under the DCRAA's "Other Reasonable Ground" Standard When It Is Arbitrary and Capricious. ................. 14

II.    THE COURT SHOULD VACATE PARAGRAPH 17 OF THE INTERIM AWARD. ..................................................................................................... 15

    A.    The Panel Exceeded Its Authority by Ruling on Issues Beyond Its Jurisdiction. ...................................................................................... 16

        1.    The Panel's Authority Is Circumscribed by the APS. .............. 16

            a.    Background of the Gale Report ..................................... 17

            b.    The Gale Report Carve-Out .......................................... 18

            c.    The Panel's May 26 Order ............................................ 19

        2.    The Panel's Rulings in Paragraph 17 Fall Outside Its Jurisdiction. .......... 20

            a.    The Panel Ruled on Gale Report Issues that Had Been Waived. ................................................................. 20

            b.    The Panel Ruled on a Highly Technical Specification Issue that Falls Squarely Within the Project Neutral's Domain. ............ 21

    B.    The Panel Unfairly Prejudiced Phase II by Ruling on Reserved Issues. ............... 22

1.      The Panel Denied Madrigal a Fundamentally Fair Hearing by Excluding Material Evidence....................................................23

2.      Madrigal Was Prejudiced by the Exclusion of Its Material Evidence....................................................27

III.     THE COURT SHOULD VACATE PARAGRAPHS 4(c), 4(d), 14(f) AND 14(g) AND SUBSTANTIAL PORTIONS OF PARAGRAPHS 10 AND 14(d) OF THE INTERIM AWARD....................................................28

A.     The Panel's Grant of Pre-Award Interest Exceeded Its Authority by Nullifying the Express Payment Terms of the APS and was Arbitrary and Capricious. ....................................................28

1.      Pre-Award Interest for Payment Application 29 ......................................29

2.      Pre-Award Interest for Payment Application 28. ......................................31

3.      The Panel Granted Pre-Award Interest in an Arbitrary and Capricious Manner....................................................33

B.     The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Reducing Foulger-Pratt's Contractual Obligations to Pay Attorneys' Fees. ....................................................34

C.     The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Eliminating Foulger-Pratt's Obligations to Provide Warranties and Other Close-Out Deliverables. ....................................................35

1.      The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Nullifying Foulger-Pratt's Obligation to Provide Warranties. ....................................................36

2.      The Panel Exceeded Its Authority by Nullifying Foulger-Pratt's Obligation to Provide Other Required Close-Out Documents and Final Deliverables. ....................................................41

a.      The As-Built Drawings ....................................................41

b.      Extra Materials....................................................42

D.     The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously in Ruling that Foulger-Pratt Was Entitled to Receive the Retainages Agreed to in the APS for the Condominium Association and Unit-Owners Punch List Work. ....................................................43

CONCLUSION....................................................44

# TABLE OF AUTHORITIES

**Cases**

*Ainsworth v. Skurnick*,
   960 F.2d 939 (11th Cir. 1992) ................................................................. 14, 15, 41

*Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.*,
   377 F. Supp. 1208 (S.D.N.Y. 1974) ......................................................... 13

*Bolton v. Bernabei & Katz, PLLC*,
   954 A.2d 953 (D.C. 2008) ....................................................................... 10

*Davis v. Chevy Chase Fin. Ltd.*,
   667 F.2d 160 (D.C. Cir. 1981)................................................................. 10, 16

*Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*,
   889 F.2d 599 (5th Cir. 1989) ................................................................... 11

*Ehrenhaft v. Malcolm Price, Inc.*,
   483 A.2d 1192 (D.C. 1984) ..................................................................... 39

*Executone Info. Sys., Inc. v. Davis*,
   26 F.3d 1314 (5th Cir. 1994) ................................................................... 11

*Henson v. Morgan Stanley DW, Inc.*,
   No. 3:04-0963, 2005 WL 1806426 (M.D. Tenn. June 7, 2005) ............... 14

*Hoteles Condado Beach v. Union de Tronquistas Local 901*,
   763 F.2d 34 (1st Cir. 1985)...................................................................... 12

*Inter-City Gas Corp. v. Boise Cascade Corp.*,
   845 F.2d 184 (8th Cir. 1988) ................................................................... 10, 16, 29

*MacNeal v. Rotfeld*,
   Civ. Action No. 90-0353, 1990 U.S. Dist. Lexis 4371 (E.D. Pa. Apr. 17, 1990)..................... 13

*McDonald v. Rodriguez*,
   184 B.R. 514 (S.D. Tex. 1995) ................................................................ 11

*Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*,
   961 F. Supp. 1 (D.D.C. 1997)................................................................... 12, 13, 27

*Tauber, M.D. & Assocs. v. Trammell Crow Real Estate Servs.*,
   738 A.2d 1214 (D.C. 1999) ..................................................................... 10

*Tempo Shain Corp. v. Bertek, Inc.*,
   120 F.3d 16 (2d Cir. 1997) ...................................................................... 12

*United States Steelworkers of Am. v. Enter. Wheel & Car Corp.*,
    363 U.S. 593 (1960)........................................................................................... 10

*Wedgewood Village Pharmacy v. Drug Enforcement Agency*,
    509 F.3d 541 (D.C. Cir. 2007)........................................................................... 15

**Statutes**

5 U.S.C. § 706 (2)(A)................................................................................................. 15

9 U.S.C. § 10(a)(3) (2006) ................................................................................... 12, 23

9 U.S.C. § 10(a)(4) (2006) ................................................................................... 10, 16

D.C. Code § 12-301(7)............................................................................................... 39

D.C. Code § 16-4423(a) ....................................................................................... 10, 12

D.C. Code § 16-4423(a)(3) ........................................................................................ 23

D.C. Code § 16-4423(a)(4) ........................................................................................ 16

D.C. Code § 16-4423(b)............................................................................................. 14

**Legislative History**

D.C. Council,
    Committee on Public Safety and the Judiciary Committee Report (June 4, 2007) .................. 14

Although courts appropriately accord considerable deference to the substantive decisions of arbitrators, it is well established that the scope of an arbitrator's decision-making authority is constrained by the terms of the contract that embodies the parties' agreement to arbitrate.  Thus, an arbitrator has no power to rule on issues that the parties did not agree to resolve by arbitration. It is also well established that, although arbitrators have broad discretion to structure arbitral proceedings in the manner they deem appropriate, they may not conduct an arbitral proceeding in a manner that denies a party a fair hearing and, therefore, they may not deny a party the right to present critical evidence relevant to the issues before the arbitral body.

The Panel in this case acted in manifest disregard of both of these bedrock principles. Here, the Panel's authority was established by the negotiated *Agreement of Partial Settlement* ("APS") that the parties entered into on February 2, 2009, rather than by a generic arbitration clause of the type often found in commercial contracts.  The APS specifically described the impending arbitration and detailed what was and was not to be a subject of that arbitration.  In disregard of the express limitations of the APS, the Panel's Interim Award purports to decide a number of significant issues that the parties already had settled and documented in the APS.  In addition, the Interim Award purports to decide significant issues relating to the exterior skin of the building that the parties had expressly agreed in the APS were to be resolved by a technically qualified "Project Neutral" rather than by means of arbitration before a panel of lawyers. Furthermore, the Panel denied Madrigal a fair hearing with respect to the parties' disputes regarding the exterior skin of the building by disregarding its own rulings regarding the scope of the initial phase of the arbitration and thereby denied Madrigal an opportunity to present critical evidence on exterior skin issues that the Panel purported to decide in their Interim Award.

For these reasons, and the additional reasons set forth herein, the Court should vacate all of Paragraphs 4(c), 4(d), 14(f), 14(g), and 17 and substantial portions of Paragraphs 10 and 14(d)

of the Panel's Interim Award.

## **BACKGROUND**

A.      **Project History**

In July 2005, Madrigal Condominiums, LLC, as "Owner," and Glen Construction Company, Inc., as "Contractor," entered into a guaranteed maximum price ("GMP") Construction Contract ("Contract" or "Construction Contract")[1] for the construction of a 259-unit high-quality residential condominium building called Madrigal Lofts, located at the corner of Fourth Street and Massachusetts Avenue, N.W., in Washington, D.C. (the "Project"). A condition of the Contract was that Glen provide performance and completion guaranties to the Owner.  Accordingly, Glen arranged for its bonding company, Travelers, to provide payment and performance bonds for the Project, for which Madrigal paid substantial additional fees as part of the Contract price.

In the Contract, Glen guaranteed to achieve "Substantial Completion" of the Project by December 31, 2007, and provided for daily liquidated damages if Glen failed to meet this completion date.  Agmt. ¶ 4.3, Exh. 1.  Construction on the Project commenced in January 2006. In June 2007, with the deadline for Substantial Completion just six months away, Glen stopped paying its subcontractors who were working on the Project, even though Madrigal had just paid Glen approximately $2.4 million for that specific purpose.  As a result, many of the subcontractors working on the Project either ceased or slowed work.

Because of Glen's non-performance under the Contract, Travelers elected to engage Foulger-Pratt, one of its long-time bond customers, to take over construction on the Project.

---

[1]      The Contract includes the Modified Standard Form of Agreement Between Owner and Contractor ("Agreement" or "Agmt.") (Exhibit 1 hereto, hereinafter "Exh."), the "Modified General Conditions of the Contract for Construction " ("General Conditions" or "Gen. Conds.") (Exh. 2), and the Reconciled GMP Set of Specifications ("Specifications") (Arb. Exh. 3 & 4)).  Exhibits 1 and 2 were collectively introduced at the arbitration hearing as Arbitration Exhibit 2 (hereinafter "Arb. Exh.").

Foulger-Pratt began to work on the Project in the summer of 2007.  Travelers, Foulger-Pratt, and Glen then entered into an Assignment and Assumption Agreement, pursuant to which Glen formally assigned the Contract to Foulger-Pratt.  Madrigal agreed to this assignment without any modifications of any terms and conditions of the Contract, including the scope of work, the completion date, and the Guaranteed Maximum Price.

Foulger-Pratt failed to achieve Substantial Completion by December 31, 2007.  In February 2008, Foulger-Pratt submitted an application for a partial payment (Application for Payment No. 26), for $752,715.00, and Madrigal made the requested payment without waiving its right to Substantial Completion by the guaranteed date.  After this payment was made, Madrigal discovered that Foulger-Pratt had not submitted lien releases from subcontractors, which were an express condition for the payment.  Over the next several months, the parties engaged in a dispute regarding Foulger-Pratt's requests for additional payments and Madrigal's insistence that Foulger-Pratt provide the required subcontractor lien releases before payment was made.

In late June 2008, the Architect and Development Manager issued a Certificate of Substantial Completion for the Project, dated as of June 1, 2008.  Under the Contract, Foulger-Pratt then had 90 days, or until September 1, 2008, to achieve Final Completion as defined by the Contract.  Agmt. ¶ 4.3, Exh. 1.

In August 2008, two of Foulger-Pratt's subcontractors (Schnabel Foundations and JP Construction) filed mechanics liens against the Project.  The Contract obligated the Contractor to immediately "bond-off" or otherwise cause the Project to be released from any such subcontractor liens.  *Id.* ¶ 14.6.1.  Further, Travelers was obligated under its bonds to assure that the Project would not be the subject of such liens.  Foulger-Pratt and Travelers (hereinafter, collectively, "Foulger-Pratt") failed to meet these obligations.

3

When the lien issues were still not resolved by early October 2008, and Foulger-Pratt continued to breach its performance obligations under the Contract, Madrigal sent formal notices to Foulger-Pratt of its intent to declare a default under the Contract and the bonds.  On October 23, 2008, the parties met to discuss notices, Madrigal's demands that Foulger-Pratt comply with the Contract requirements for lien releases and releases from the Schnabel and JP Construction mechanic's liens, and Foulger-Pratt's requests for payments.  At this meeting, the parties agreed that Foulger-Pratt must comply with the Contract requirements and bond off the liens.  However, disputes regarding the status of the Project, Foulger-Pratt's continued breach of its performance obligations under the Contract, and payment to Foulger-Pratt remained unresolved.

Foulger-Pratt thereafter stopped all work on the Project, including corrective work on the building and punch-list work for condominium units that were sold to unit purchasers and were going to closing.  On December 18, 2008, in contravention of the express prohibition in the Contract against Contractor liens, *id.* ¶ 14.6.1, Foulger-Pratt filed a mechanic's lien on the Project for $2,636,467, the amount it contended would be due to it as Final Payment under the Contract.

In response to Foulger-Pratt's mechanic's lien filing against the Project, Madrigal, pursuant to Paragraph 14.6.1 of the Agreement, filed an emergency motion for a temporary restraining order ("TRO") in D.C. Superior Court.  Madrigal sought such emergency relief to enable it to close on imminent sale transactions on individual condominium units in the Project. Judge Curtis E. von Kann, who presided over the TRO hearing as a retired judge sitting by appointment, held that the Agreement explicitly prohibited Foulger-Pratt from filing any mechanic's liens, and declared the lien null and void.  *See* Dec. 24, 2008 TRO Hearing Transcript ("TRO Hrg. Tr.") at 24:14-22, Exh. 3 (Arb. Exh. C-669 (excerpt)); TRO Order,

4

Exh. 4 (Arb. Exh. C-339).

### B.    The Agreement of Partial Settlement

Following his ruling on Madrigal's request for a TRO, Judge von Kann urged the parties

to engage in a mediation process to resolve the range of disputes concerning the Project.

Ultimately, the parties agreed to such a mediation and engaged Judge von Kann (in his capacity

as a private mediator through JAMS) to serve as the mediator.  The parties exchanged

confidential mediation statements by January 22, 2009, and the formal mediation process

commenced the following day.  Over the next 10 days, the parties and Judge von Kann had three

full-day meetings and conferred extensively by phone and e-mail on a daily basis.  As a result of

Judge von Kann's intensive mediation efforts, and the extensive arms-length negotiations among

the parties, on February 2, 2009, Madrigal and Foulger-Pratt entered into the detailed six-page

(single-spaced) settlement agreement – the APS – that resolved a substantial number of the

disputes and established the parameters of the arbitration that is the subject of this case.  Exh. 5

(Arb. Exh. C-11).

The APS definitively resolved a number of the parties' performance and payment

disputes under the Contract and established specific and binding procedures for addressing other

disputes.  One of the major areas of dispute addressed in the APS was Madrigal's insistence that,

before it was required to make the final payments under the Contract, Foulger-Pratt was

obligated to complete the extensive list of incomplete and/or improperly performed items

contained in a "Madrigal Outstanding Items" binder that the APS refers to by the shorthand

"Items 1-8 Punch-List Work."  APS ¶ 5, Exh. 5.  With respect to the items on this extensive list,

the APS required that Foulger-Pratt complete all items on that list by April 30, 2009, unless

otherwise provided by the APS.  *Id.* ¶ 15.  The APS provided for an architect, designated as a

"Project Neutral," to be selected by the parties to make "final and binding" determinations of all

disputes between Madrigal and Foulger-Pratt concerning those items contained in the Items 1-8 Punch-List Work as well as "any additional items to be addressed." *Id.* ¶ 5.3.

The sole exception to the Project Neutral's authority to issue "final and binding" determinations with respect to disputes between the parties relating to the Items 1-8 Punch List Work is contained in Paragraph 15 of the APS. That provision of the parties' settlement agreement provides for arbitral resolution of certain narrow contractual issues related to one part of one of the Items 1-8 Punch-List Work. Specifically, Paragraph 15 refers to a third-party report on exterior skin issues prepared by Gale Associates, Inc., which was part of Item 6 (the exterior skin list) of the Items 1-8 Punch List Work. This "Gale Report" identified numerous deficiencies in the exterior skin of the building. In Paragraph 15 of the APS, the parties agreed to have an arbitral panel resolve any claims Foulger-Pratt asserted on or before February 3, 2009 that specific portions of the Gale Report were not within Foulger-Pratt's contractual responsibilities under the Construction Contract. This narrow and time-limited issue is the *sole* exception to the parties' agreement, as reflected in the APS, to have the Project Neutral make "final and binding" determinations of all disputes concerning the Items 1-8 Punch List Work as well as "any additional items to be addressed." APS ¶ 5.3, Exh. 5.[2]

## C.     The Arbitration Proceedings

Following the execution of the APS, the parties agreed to proceed to arbitration under the terms of the APS. An initial teleconference between the Panel and the parties took place on March 27, 2009. The parties then filed Statements of Claims, and Defenses to Statements of Claims, on April 3 and April 8, 2009, respectively. On May 13, 2009, Madrigal filed a

---

[2]     In fact, the Panel itself, in Paragraph 3.4 of its May 26 Order Regarding Hearing Scope & Project Neutral ("May 26 Order"), determined that "[a]ll such disputes [*i.e.*, disputes concerning the Items 1-8 Punch-List Work] are to be decided by the Project Neutral." Exh. 6.

Statement of Claims Not Ripe for Arbitration, in which it asserted, *inter alia*, that its claim for damages related to the building's exterior skin was not yet ripe.  Exh. 7.  Madrigal explained that ongoing work on the building exterior prevented its consultant, Construction Systems Group, Inc. ("CSG"), from completing its investigation and preparing its report on the exterior skin problems and the cost of remedying them.  Foulger-Pratt filed a May 15, 2009 letter regarding unripe issues that largely echoed Madrigal's sentiments about the exterior skin damages claim being unready for adjudication.  Exh. 8.

Following the submission of pre-hearing briefs by the parties and the initial hearing conducted on May 20, 2009, the Panel issued its "May 26 Order."  Exh. 6.  This initial Order made specific findings regarding the broad scope of the Project Neutral's responsibilities under the APS.  *Id.* ¶¶ 3.1 – 3.5.  In addition, this Order specifically limited the scope of the pending proceeding by holding that "the potential issue regarding potential defects in the building exterior skin is not ripe for determination at this time."  *Id.* ¶ 1.

The Phase I hearing conducted by the Panel included testimony given on 12 days between May 20 and July 27, 2009.  The parties submitted post-hearing briefs on September 11, 2009, and closing arguments were held on September 21, 2009.  The Panel issued its Interim Award on November 30, 2009.  Exh. 9.

## ARGUMENT

At the outset, it is important to emphasize the unique posture of the arbitration that produced the Interim Award.  In most arbitration cases, the contract governing the parties' dealings contains a broad arbitration clause providing that all disputes "arising under or relating to the contract" (or some similar formulation) will be arbitrated.  In fact, the underlying Construction Contract in the present case includes a broad arbitration provision of this type. Here, however, the arbitration proceeding that produced the Interim Award was established not

pursuant to such a generic commercial arbitration clause, but rather by a carefully negotiated settlement agreement.  This agreement, the APS, was hammered out by the parties over a ten-day period with the help of a skilled mediator and was created to resolve a series of disputes that *otherwise* would have been subject to arbitration under the general arbitration clause contained in the Construction Contract.

Unlike a standard arbitration clause, which is drafted before there is any dispute (and where the potential for arbitration is only a distant possibility), the APS is a *settlement agreement* that was crafted specifically to resolve *already-existing* disputes and to establish the parameters for an arbitration to be conducted soon after the APS was signed.  Further, while a typical arbitration clause effectively *confers* authority to an arbitrator for a broad array of issues (*e.g.*, "any issue arising under the contract"), the APS is starkly different in important respects.  The APS *restricts* the role and the authority of the arbitrator, who will preside over an arbitration that is not speculative, but is expressly contemplated in the APS, *and as a proceeding in which only specifically identified issues will be determined*.  Thus, the APS resolved many of the disputes that had arisen under the Contract already and removed these issues from the arbitrators' domain. In addition, the APS delegated many of the issues left unresolved by the parties' partial settlement to a Project Neutral, thereby removing a number of additional disputes from the arbitrators' domain.  As a result, the APS left only the *remaining* unresolved issues for consideration by the Panel.

The same policy rationale that, in most arbitration review cases, weighs against judicial disturbance of an arbitration award *requires* the Court here to vacate significant portions of the Interim Award.  Where parties have consented to a non-judicial dispute resolution process, there are strong policy reasons for the courts to uphold and enforce the parties' agreement and largely defer to the substantive decisions reached as a result of the non-judicial dispute resolution

process to which the parties agreed.  The policy in favor of upholding and enforcing parties'

agreements requires the Court in this case to scrutinize the Interim Award to ensure that the

Panel here has decided only those issues that the parties agreed to submit to arbitration.  Because,

as demonstrated herein, the Panel decided issues that the parties (i) had resolved through their

carefully negotiated settlement agreement – the APS – or (ii) agreed in the APS would be

decided by a Project Neutral rather than by means of arbitration, the Court should *enforce the*

*terms of the APS* and vacate those illegitimate portions of the Interim Award that effectively

vitiate the settlement agreement reached by the parties.

## I.       STANDARD OF REVIEW

The parties previously have briefed the issue of whether the review standards established

by the District of Columbia Revised Arbitration Act ("DCRAA") apply to this proceeding (as

Madrigal contends) or whether, instead, the review standards of the Federal Arbitration Act

("FAA") apply (as Foulger-Pratt contends).[3]  The Court has taken this issue under advisement

and indicated it would defer resolution of this issue until the parties have briefed Madrigal's

Motion to Vacate.  As demonstrated below, the Court should vacate Paragraphs 4(c), 4(d), 14(f),

14(g), and 17 and portions of Paragraphs 10 and 14(d) of the Interim Award under either set of

standards.[4]

---

[3]      Madrigal incorporates herein its arguments for the application of the DCRAA to this review
proceeding.  *See* Madrigal's Opp. to the App. To Confirm the Arbitration Award ("Madrigal's Opp.") at
3-6 (Docket No. 22); Madrigal's Surreply at 2-8 (Docket No. 23).

[4]      Madrigal has previously demonstrated that the FAA does not permit judicial review of non-final
awards.  *See* Madrigal's Opp. at 6-7; Madrigal's Surreply at 8-10.  Accordingly, it is Madrigal's position
that *if* the Court concludes that the FAA, rather than the DCRAA, applies to this proceeding, the Court
should then dismiss Applicants' Petition without prejudice to their filing of an action to enforce a final
award by the Panel.

A.      **An Arbitration Award Should Be Vacated When the Arbitrators Exceed Their Authority.**

Both the DCRAA and the FAA provide for vacation of an arbitral award where the arbitrators exceed the authority granted to them under the contract establishing the arbitration process.  Thus, under the DCRAA, "the court shall vacate an award made in the arbitration proceeding if . . . (4) [a]n arbitrator exceeded the arbitrator's powers . . . ."  D.C. Code § 16-4423(a).  Under the FAA, a court "may make an order vacating the award upon the application of any party to the arbitration . . . (4) where the arbitrators exceeded their powers . . . ."  9 U.S.C. § 10(a)(4) (2006).[5]

The cases clearly establish that arbitration awards are to be vacated if the arbitrators decide issues outside the scope of the contractual mandate.  *See, e.g., Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 166 (D.C. Cir. 1981) (finding arbitrator exceeded his authority where the arbitration clause limited his authority to issue of determining value of shares).  This is because "arbitrators are permitted to decide only those issues that lie within the contractual mandate." *Id.* at 165.  Where arbitrators decide issues outside the scope of their contractual authority, the award is unenforceable because it is "made in excess of authority, and a court is precluded from giving effect to such an award." *Id.* (quoting *United States Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)).

The court also should vacate an arbitration award where the award does not respect the express terms of the contract.  *See Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) ("[I]f the arbitrator 'interprets unambiguous language in any way different

---

[5]      Because of the similarities between these portions of the District of Columbia Arbitration Act and the FAA, the D.C. Court of Appeals has indicated that cases interpreting the FAA are persuasive authority in interpreting the corresponding provisions of the D.C. Act.  *Bolton v. Bernabei & Katz, PLLC*, 954 A.2d 953, 960 n.5 (D.C. 2008) (quoting *Tauber, M.D. & Assocs. v. Trammell Crow Real Estate Servs.*, 738 A.2d 1214, 1217 n.6 (D.C. 1999)).

from its plain meaning, [the arbitrator] amends or alters the agreement and *acts without authority*.'" (emphasis added, citation omitted)).  In other words, the "[a]ctions of an arbitrator contrary to express contractual provisions will not be respected on judicial review."  *McDonald v. Rodriguez*, 184 B.R. 514, 517 (S.D. Tex. 1995)[6] (citing *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994)); *see also Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 604 (5th Cir. 1989) ("[A]rbitral action contrary to express contractual provisions will not be respected.").  This is because the arbitrator "may not invalidate the very agreement from which he derives his power."  *McDonald*, 184 B.R. at 517 (quoting *Executone*, 26 F.3d at 1325).

In this case, the Panel exceeded its authority by ruling on issues that had been reserved to the Project Neutral by the APS (*supra* Section II.A), by granting pre-award interest in violation of the payment terms of the APS (*supra* Section III.A), by arbitrarily reducing Foulger-Pratt's contractual obligation to pay attorneys' fees under the Agreement (*supra* Section III.B), by arbitrarily eliminating Foulger-Pratt's contractual obligation to provide warranties and other close-out deliverables under the APS and contract (*supra* Section III.C), and by arbitrarily eliminating the contractual holdback provisions in the APS with regard to Unit-Owner and Condominium Association Punch-Lists (*supra* Section III.D).

## B.   An Arbitration Award Should Be Vacated When the Hearing Is Fundamentally Unfair.

Both the DCRAA and the FAA provide for vacation of an arbitral award where the

---

[6]    The *McDonald* court considered an arbitration agreement that was part of a settlement agreement. 184 B.R. at 515.  The arbitrator issued an award in which he recognized that "none of the claimants met any of the conditions in the settlement agreement."  *Id.* at 515-16.  Despite recognizing that claimants failed to meet the conditions of the agreement, the arbitrator nonetheless issued an award in favor of claimants, which the bankruptcy court confirmed.  *Id.* at 515, 518.  The district court reversed, vacating the award because it "significantly exceeded the essence of the underlying contract which created the arbitration proceeding."  *Id.*

arbitrators refuse to grant a stay or adjournment for good cause shown or refuse to hear evidence

and the failure results in prejudice to a party.  Thus, under the DCRAA,

> the court shall vacate an award made in the arbitration proceeding
> if: . . . (3) [a]n arbitrator refused to postpone the hearing upon
> showing of sufficient cause for postponement [or] refused to
> consider evidence material to the controversy . . . so as to prejudice
> substantially the rights of a party to the arbitration proceeding . . . .

D.C. Code § 16-4423(a).  Under the FAA, a court

> may make an order vacating the award upon the application of any
> party to the arbitration . . . (3) where the arbitrators were guilty of
> misconduct in refusing to postpone the hearing, upon sufficient
> cause shown, or in refusing to hear evidence pertinent and material
> to the controversy; . . . .

9 U.S.C. § 10(a)(3).  Thus, under both statutes, an award should be vacated when there is

fundamental unfairness in the hearing process, such as when one party is denied the opportunity

to present evidence critical to its claims or defenses.  *See, e.g.*, *Tempo Shain Corp. v. Bertek,*

*Inc.*, 120 F.3d 16, 20-21 (2d Cir. 1997); *Hoteles Condado Beach v. Union de Tronquistas Local*

*901*, 763 F.2d 34, 39 (1st Cir. 1985); *Naing Int'l Enters., Ltd. v. Ellsworth Assocs., Inc.*, 961 F.

Supp. 1, 3-5 (D.D.C. 1997) (Sporkin, J.).

Specifically, courts should vacate an arbitral award where the arbitrator refused to

consider one party's evidence, or a portion of one party's evidence, where such evidence is

critical to a claim or defense and the refusal prejudiced a party.  *Tempo Shain Corp.*, 120 F.3d at

20-21; *Hoteles Condado Beach*, 763 F.2d at 39-40.  Thus, the Second Circuit affirmed the

vacation of an award where the arbitration panel refused to hear testimony of a witness who was

the only person available to the party to rebut the opposing side's allegation of fraudulent

inducement.  *Tempo Shain Corp.*, 120 F.3d at 20-21.  Similarly, the First Circuit reversed and

vacated a district court's order confirming an award when the arbitrator refused to consider prior

testimony of a witness in a related criminal proceeding where the witness would not testify at the

arbitration hearing.  *Hoteles Condado Beach*, 763 F.2d at 39-40.

A court should also vacate an arbitral award where the arbitrator schedules hearings or otherwise conducts the proceedings in a manner that has the effect of precluding a party from presenting critical evidence.  *See, e.g.*, *Naing Int'l Enters., Ltd.*, 961 F. Supp. at 3-5; *see also Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.*, 377 F. Supp. 1208, 1213-14 (S.D.N.Y. 1974) (vacating award where arbitrator refused to grant adjournment after a witness became ill and required hospitalization during the hearing).  As Judge Sporkin noted in the *Naing* case, "neither this Court nor the arbitration panel can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one."  *Naing Int'l Enters., Ltd.*, 961 F. Supp. at 5.

In addition, a court should vacate an arbitral award where the arbitrator fails to make clear to the parties that they consider an issue to be under submission because such a process may deny a party the opportunity to present evidence on such an issue.  For example, in *MacNeal v. Rotfeld*, the court vacated an award where the panel had not ruled on the timeliness of a particular count.  Civ. Action No. 90-0353, 1990 U.S. Dist. Lexis 4371, at *6-7 (E.D. Pa. Apr. 17, 1990).  The court concluded that the panel's failure to rule denied a party the opportunity to present evidence related to an issue, thus denying the panel the opportunity to consider material and pertinent evidence.  *Id.*  The court vacated the award because the incomplete presentation of evidence materially prejudiced a party.  *Id.*

As demonstrated below, the Panel here deprived Madrigal of a fundamentally fair hearing by ruling on exterior skin issues that the Panel itself had originally ruled would not be considered during the initial phase of the arbitration, and would instead be reserved for a subsequent phase. As a result, Madrigal was precluded from submitting its expert report and other critical evidence relevant to exterior skin issues that the Panel proceeded to decide in their Interim Award.  *Supra* Section II.B.

**C.     An Arbitration Award Should be Vacated Under the DCRAA's "Other Reasonable Ground" Standard When It Is Arbitrary and Capricious.**

The DCRAA provides an additional and broader standard of review that is not applicable to FAA-governed proceedings.  Specifically, the DCRAA provides for vacation of an award "on other reasonable ground."  D.C. Code § 16-4423(b).  This broad standard, which was added to the D.C. Act in 2009, is not defined in the statute itself.  The legislative history indicates that the Council of the District of Columbia ("D.C. Council") intended to significantly broaden the scope of judicial review of DCRAA-governed arbitration awards to permit vacation of an award on *any* ground that is just.  Council of the District of Columbia, Committee on Public Safety and the Judiciary, Committee Report (June 4, 2007) ("D.C. Committee Report"), Letter from Center for Responsible Lending to Phil Mendelson at 5-6 (Apr. 6, 2007), Exh. 10.  Thus, the committee report on the bill adding this provision to the DCRAA states that this expanded review standard was intended "to give the court flexibility to vacate an award on 'other reasonable ground.'"  D.C. Committee Report at 9, Exh. 10.  In adopting this provision, the D.C. Council deliberately departed from the language of the Revised Uniform Arbitration Act to expand the scope of judicial review of arbitration awards.  *See id.*  The legislative history is clear that, at the very least, the Council intended "other reasonable ground" to include recognized common law grounds for vacating an award.  D.C. Committee Report, Letter from Center for Responsible Lending to Phil Mendelson at 5-6 (Apr. 6, 2007), Exh. 10.

One such common law ground is the requirement that arbitrators not engage in arbitrary and capricious decision making.  *See, e.g.*, *Ainsworth v. Skurnick*, 960 F.2d 939, 939-41 (11th Cir. 1992) (vacating as "arbitrary or capricious" a decision of an arbitration panel that refused to award mandatory statutory damages); *Henson v. Morgan Stanley DW, Inc.*, No. 3:04-0963, 2005 WL 1806426, at *6 (M.D. Tenn. June 7, 2005) (award was arbitrary and capricious where it was not supported by the arbitration submissions and controlling law).  The application of this

14

standard to an arbitral award does not mean that the reviewing court has authority to substitute its substantive judgment for that of the arbitrators, but it does require the court to determine, just as it does when reviewing agency decisions under Section 706(2)(A) of the Administrative Procedures Act, that the panel did not "entirely fail[ ] to consider an important aspect of the problem, [or] offer[ ] an explanation for its decision that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a difference in view." *Wedgewood Village Pharmacy v. Drug Enforcement Agency*, 509 F.3d 541, 549, 552-53 (D.C. Cir. 2007) (citation and quotations omitted).[7]

Here, the Panel's decisions were arbitrary and capricious in a number of key respects, including:  (1) granting pre-award interest to Foulger-Pratt for principal obligations that had not yet accrued, while at the same time refusing Madrigal's legitimate pre-award interest request (*supra* Section III.A); (2) arbitrarily reducing Foulger-Pratt's obligations to pay attorneys' fees by awarding fees for some Contract violations but not others of equal or greater seriousness (*supra* Section III.B); (3) arbitrarily eliminating Foulger-Pratt's obligations to provide some warranties while enforcing its obligation to provide others and arbitrarily eliminating Foulger-Pratt's obligations to provide other "close-out" documents and deliverables (*supra* Section III.C); and (4) arbitrarily eliminating the contractual holdback provisions in the APS with regard to Unit-Owner and Condominium Association Punch-Lists (*supra* Section III.D).

## II.     THE COURT SHOULD VACATE PARAGRAPH 17 OF THE INTERIM AWARD.

Paragraph 17 of the Interim Award relates to what the parties and the Panel have referred to as "exterior skin" issues.  The exterior skin of the building comprises the brick masonry walls, metal panels on the balconies and window assemblies, aluminum window, door and balcony

---

[7]      As the Eleventh Circuit concluded in *Ainsworth*, if the grounds for the arbitrator's decision cannot be inferred from the facts of the case, it should be vacated as arbitrary and capricious.  *See* 960 F.2d at 941.

storefronts, roofing, rooftop and penthouse screen walls, and exterior sealant joints between various building components.

Paragraph 17 should be vacated in its entirety, for two reasons:  (1) the rulings in this paragraph in the Interim Award usurp the function of the Project Neutral established by the APS and thus were outside the Panel's authority to decide; and (2) even if the Panel had jurisdiction to determine the issues delineated in Paragraph 17, all of the rulings in that paragraph relate to Madrigal's exterior skin claim, which the Panel expressly reserved for a subsequent phase of the arbitration – and by deciding theses issues prematurely, the Panel excluded critical evidence that Madrigal had a right to present.

### A.    The Panel Exceeded Its Authority by Ruling on Issues Beyond Its Jurisdiction.

The Panel's rulings in Paragraph 17 of the Interim Award should be vacated because those rulings exceeded the Panel's authority.  D.C. Code § 16-4423(a)(4); 9 U.S.C. § 10(a)(4). Specifically, these rulings contravene the parties' settlement as set forth in the APS by which the parties agreed that – save for one narrow and time-limited carve-out – the Project Neutral, not an arbitration panel, would have the authority to decide all of the technical issues in dispute regarding the exterior skin of the building.  Only by vacating the rulings at issue in Paragraph 17 of the Interim Award can this Court can give effect to the parties' agreement.  *See, e.g.*, *Davis*, 667 F.2d at 166 (arbitrators exceed their authority where the arbitration clause limited his authority to resolving only certain disputes); *Inter-City Gas Corp.*, 845 F.2d at 188-89 (vacating portion of arbitration award that violated "plain and unambiguous" terms of parties' contract).

### 1.    The Panel's Authority Is Circumscribed by the APS.

The Panel derives its authority from the APS, which provides a detailed framework for resolution of the disputes that remained between the parties at the time of its execution, plus any disputes that might later arise.  Specifically, the parties expressly agreed in the APS that the

16

Project Neutral, a licensed architect,[8] would have authority to make final and binding decisions on all disputes relating to technical issues encompassed by the Items 1-8 Punch-List Work (of which Item 6 encompassed the exterior skin issues in dispute). With respect to the claims encompassed by Item 6, the APS provided that Foulger-Pratt would be responsible for addressing all of the items in dispute other than any specific Gale Report items that Foulger-Pratt timely asserted were outside the scope of the Contract. APS ¶¶ 5.3, 11, 15, Exh. 5. The APS required Foulger-Pratt to assert all such contract interpretation issues relating to the Gale Report by no later than February 3, 2009 and delegated to the Panel the authority to resolve such timely asserted contract interpretation disputes. *Id.* ¶ 15. This carve-out conferred authority on the Panel to adjudicate the contractual obligation of Foulger-Pratt to perform any item in the Gale Report by Foulger-Pratt. *Id.*

### a.    Background of the Gale Report

In connection with preparation of its list of outstanding work to be performed on the Project, Madrigal hired Gale Associates, Inc. ("Gale") to review the construction of the exterior and identify any deficiencies. Madrigal Statement of Claims at 3, Exh. 11. Gale examined the exterior panels, caulking, façade, windows and roof of the building, and identified numerous deficiencies in its October 2, 2007 Field Observation Report and subsequent November 18, 2008 Exterior Building Envelope Review Report (collectively, "the Gale Report"). *Id.* The Gale Report was then included – along with other items – in the Madrigal Outstanding Items binder dated January 23, 2009, which functioned as the punch list for the Project. APS ¶ 5, Exh. 5. As a punch list, the Outstanding Items binder included references to all items that were known at the time to be incomplete or unsatisfactory and that Foulger-Pratt was required to complete or

---

[8]    APS ¶ 13 requires that the Project Neutral be "a well-qualified, independent, unbiased [ ] architect licensed in the District of Columbia." Exh. 5.

correct in order to achieve final completion of the Project and thus meet one of the conditions

precedent for receiving its final payment and release of retention under the Contract.

Outstanding Items, Exh. 12 (Arb. Exh. C-11 (excerpt)).  Item 6 of the Outstanding Items binder

described all deficiencies relating to the exterior skin of the Project that were known at the time,

including not only the items contained in the Gale Report, but also a unit-by-unit list of items

that needed correction, numerous photos of non-conforming items, and references to several

other items that needed correction.  *Id.*  Subsequently, the Outstanding Items binder was revised

on February 2, 2009, concurrent with the parties' execution of the APS, and thereafter referred to

by the APS as "Items 1-8 Punch-List Work."  APS ¶ 5, Exh. 5.

### b.    The Gale Report Carve-Out

The APS expressly obligates Foulger-Pratt to complete *all* Items 1-8 Punch-List Work by

April 30, 2009, unless otherwise provided for by the APS.  *Id.*  The APS delegated to a Project

Neutral plenary authority to make "final and binding" determinations of all disputes regarding

the Punch-List.  *Id.* ¶ 5.3.[9]  However, because Foulger-Pratt asserted that certain specific items

from the Gale Report were not contractually required, the APS provided a separate process,

negotiated at arms' length between the parties, for arbitral adjudication of that limited issue.

Specifically, as noted above, the APS conferred authority on the Panel to adjudicate the

contractual obligation of Foulger-Pratt to perform any item in the Gale Report that Foulger-Pratt

timely challenged.  *Id.* ¶ 15.  In order to challenge an item from the Gale Report, Foulger-Pratt

was required to provide notice of specific "items" that it challenged to Madrigal by close of

business on February 3, 2009, and the Panel was then authorized to decide whether or not such

---

[9]      APS ¶ 5.3 provides (in part): "In the event of a dispute concerning the Items 1 – 8 Punch-List
Work, Madrigal and Foulger-Pratt agree to resolution of the dispute by the 'Project Neutral' . . . . [who
will] determine which items, on the Items 1–8 Punch-List Work have been completed, if any, *and identify
any additional items to be addressed*."  Exh. 5 (emphasis added).

specifically and timely disputed items were required by the Contract.  *Id.*  In accordance with

Paragraph 15 of the APS, Foulger-Pratt sent a letter to Madrigal on February 3, 2009 contesting

its obligation to perform certain specific items from the Gale Report.  February 3 letter, Exh. 13.

With the exception of whether insulation was required between the exterior metal panels and the

edge of the floor slabs, Foulger-Pratt did not identify any of the issues decided by Paragraph 17

of the Interim Award in its February 3 letter.

### c.        The Panel's May 26 Order

In response to the preliminary submissions of the parties, the Panel entered the May 26

Order, Exh. 6, which bifurcated the proceedings and reserved all exterior skin issues to a separate

Phase II, as is more fully discussed in Section II.B below.  *Id.* ¶ 1.

In that same Order, the Panel acknowledged its limited jurisdiction per the APS,

describing the Gale Report carve-out of APS ¶ 15 and stating that "there presently exists a

dispute concerning the Items 1-8 Punch-List Work within the meaning of the APS.  *All* such

disputes, with the Gale reports [sic] exception [of Paragraph 15 of the APS], are to be decided by

the Project Neutral."  May 26 Order ¶¶ 3.3 and 3.4, Exh. 6 (emphasis added).  Thus, the Panel

acknowledged that its authority to adjudicate exterior skin issues encompassed by Item 6 of the

Punch-List was limited to those items timely challenged under APS ¶ 15; all other Punch-List

disputes were (and are) the domain of the Project Neutral and therefore outside the Panel's

jurisdiction.  *Id.*  Importantly, the Panel also further limited its own authority in the May 26

Order, stating that if any issues arise such that they are:

> contesting the jurisdiction of the Project Neutral to determine if a
> particular item on the Items 1-8 Punch List is or is not required by the
> contract . . . , they are best determined in their specific context.  Should the
> jurisdiction of the Project Neutral be questioned during the resolution of
> issues regarding Items 1-8 Punch-List Work, we believe that it would be
> appropriate for that question to be determined by the Project Neutral in the
> first instance.

*Id.* ¶ 3.5.

### 2.  The Panel's Rulings in Paragraph 17 Fall Outside Its Jurisdiction.

Interim Award Paragraph 17 addressed four issues relating to the exterior skin of the building, all of which are encompassed in Item 6 of the Punch List.[10]  Specifically, in this paragraph of its Interim Award, the Panel ruled that three Gale Report items were not contractually required and that one technical specification does not apply to a particular building element.  Of those four rulings, three are plainly outside the jurisdiction of the Panel.

### a.  The Panel Ruled on Gale Report Issues that Had Been Waived.

In Paragraph 17 of the Interim Award, the Panel "conclude[d] that Foulger-Pratt has no contractual responsibility to perform the three identified items from the Gale report" – to wit:

> a) whether Foulger-Pratt is responsible for extending beyond the windows the .090 aluminum flashing over certain exterior windows, or providing an end-dam therefore; b) whether Foulger-Pratt is responsible for correcting the gap between the bottom of the exterior metal panels at the roof level and the building structure at the 12th floor; and c) whether Foulger-Pratt needs to install thermal insulation between the panel and edge of the concrete floor slab at each floor.

Interim Award ¶ 17, Exh. 9.  Subparagraphs (a) and (b) of this portion of the Interim Award contravene Paragraph 15 of the APS because these items were not timely disputed by Foulger-Pratt in its February 3 letter.[11]  Indeed, the first time that Foulger-Pratt contended that these

---

[10]     All of the rulings set forth in Paragraph 17 of the Interim Award address Items 1-8 Punch-List Work, a term defined by the APS as "punch-list items included within Items 1-8 set forth on the 'Madrigal Outstanding Items' list dated February 2, 2009, (said lists being included in the binder provided by Madrigal to Foulger-Pratt on January 23, 2009 and updated on February 2, 2009 . . . )."  APS ¶ 5, Exh. 5.  Item 6 on that list is entitled "Exterior Skin and Roof" and specifically includes references to the Gale reports and metal panels.  *See* Madrigal Outstanding Items at 6, 12, 14, 19-43, Exh. 12.  The Panel itself acknowledged that Paragraph 17 relates to Punch-List Work in its opening of that paragraph, which states, "Among the Items 1-8 Punch-List Work . . . ."  Interim Award ¶ 17, Exh. 9.

[11]     In contrast, the issue addressed subparagraph (c) of Paragraph 17 – installation of thermal insulation between the panel edge of the concrete floor slab at each floor – was timely listed by Foulger-Pratt.  *See* Foulger-Pratt's February 3 submission at 2, Exh. 13.  Accordingly, Madrigal does not contest

(continued…)

matters encompassed in the Gale Report were not contractually required was in a post-hearing filing more than seven months after the February 3 deadline established by the APS. *See* Supplement E to Foulger-Pratt's post-hearing brief, Exh. 14; Declaration of Dennis A. Davison in support of Madrigal's Motion to Vacate ("Davison Decl.") ¶ 13. The Panel's authority to adjudicate such contract-interpretation disputes related to the exterior skin issues set forth in the Gale Report was expressly limited to those issues asserted by Foulger-Pratt on or before February 3, 2009, and the Panel therefore lacked authority to rule on Foulger-Pratt's untimely claims that items (a) and (b) in Paragraph 17 were not required under the Contract. For this reason, the Court should vacate subparagraphs (a) and (b) of Paragraph 17.

> **b.** **The Panel Ruled on a Highly Technical Specification Issue that Falls Squarely Within the Project Neutral's Domain.**

The Panel further ruled in Paragraph 17 "that Specifications Section 08911 (Glazed Aluminum Curtain Wall) is not applicable to the exterior metal panels." Interim Award ¶ 17, Exh. 9. This dispute was not within the jurisdiction of the Panel.

The unsatisfactory condition of the exterior metal panels is a Punch-List issue, as demonstrated by the "Exterior Punch List" contained within Tab 6 to Items 1-8 Punch-List Work (Outstanding Items binder). That list repeatedly references "metal panel issues." Outstanding Items, Tab 6, Exh. 12. The parties specifically agreed in the APS that *all* disputes between the parties relating to Punch-List issues – save for the narrow exception of the Gale Report carve out – were to be resolved by the Project Neutral. APS ¶¶ 5.3, 15, Exh. 5; *see also*, May 26 Order ¶¶ 3.3, 3.4, Exh. 6. The applicability of Specification 08911 to the exterior metal panels is not an

---

(continued)

the Panel's jurisdiction to decide whether this item was required by the Contract. Madrigal does contend, however, that the Panel's ruling on this issue nevertheless should be vacated because it *intrinsically* concerns Madrigal's exterior skin claim, which the Panel had previously ruled would not be part of the initial phase of the arbitration. *See* Section II.B *supra*.

item timely disputed by Foulger-Pratt under the Gale Report carve-out – nor could it have been, since this issue is not referenced by the Gale Report at all.  *See* Feb 3 letter, Exh. 13; *see also* Gale Report contained with Item 6 of Outstanding Items binder, Exh. 12.  Thus, it is for the Project Neutral, not the Panel, to resolve the parties' technical dispute relating to which Specifications govern the "metal panel issues" on the Punch-List.

It is important to note that this is a *highly* technical issue.  Unlike the Gale Report carve-out items, for which the question is merely whether they are required by the Contract, the Specification 08911 issue requires technical expertise to determine whether a particular set of technical specifications is applicable to the installation of a particular portion of the building exterior.  Unquestionably, this is the type of issue that the APS contemplates would be resolved by the Project Neutral, a licensed architect, not the Panel, all of whom are lawyers.

Furthermore, the Panel itself ruled that disputes regarding the jurisdiction of the Project Neutral should be determined, not by the Panel, but by the Project Neutral "in the first instance." May 26 Order ¶ 3.5, Exh. 6.  The Project Neutral has not yet begun work, and there has been no finding by the Project Neutral addressing the applicability of Specification Section 08911 or his authority to resolve that issue.  Accordingly, the Court should vacate the portion of Paragraph 17 addressing Specification Section 08911.

## B.     The Panel Unfairly Prejudiced Phase II by Ruling on Reserved Issues.

To the extent that the Panel may have had any authority under the APS to determine the exterior skin issues addressed in Paragraph 17 of the Interim Award, the Court should still vacate Paragraph 17 because of the fundamental unfairness of the hearing.  The Panel excluded all exterior skin issues from the initial phase of the arbitration and prevented Madrigal from presenting critical evidence on these issues and then, in the face of those rulings, made determinations on critical issues relating to the exterior skin.   This is the very type of unfairness

22

that is grounds for overturning an arbitral award.

As demonstrated above, vacatur is appropriate both under the DCRAA and the FAA when material evidence is excluded by an arbitrator, or when there is a refusal to grant a postponement after good cause is shown, and prejudice results therefrom.  D.C. Code § 16-4423(a)(3); 9 U.S.C. § 10(a)(3).  Here, the Panel effectively excluded Madrigal's evidence and ignored its own order of postponement by ruling prematurely on exterior skin issues.  As a result, Madrigal was denied the opportunity to present key evidence in support of its exterior skin claims, and therefore was materially prejudiced.

> **1.     The Panel Denied Madrigal a Fundamentally Fair Hearing by Excluding Material Evidence.**

By prematurely ruling on exterior skin issues in its Interim Award, the Panel excluded significant, highly relevant evidence.  Although, as the Panel notes in Paragraph 17, some evidence on exterior skin issues was introduced in Phase I,[12] that was the case only because the Panel had ordered that witnesses who testified in Phase I must be examined on all subjects and could not be recalled in Phase II.  *See* Davison Decl. ¶ 8.  Thus, even though the Panel heard testimony from several witnesses on issues related to Madrigal's exterior skin claims, what was presented was merely a portion of the evidence that Madrigal planned to present in Phase II.  *Id*. ¶¶ 8-11.  Indeed, the Panel ruled on the exterior skin issues addressed in Paragraph 17 without giving Madrigal  the opportunity to introduce its expert report on exterior skin issues and without affording Madrigal the opportunity to adduce testimony from other key witnesses on these issues.  *Id.*

---

[12]     Paragraph 17 states that "all parties have been heard on these [exterior skin] issues (indeed, considerable hearing time was expended on these issues)."  Interim Award, Exh. 9.  The issue presented by this motion to vacate is not how much evidence related to exterior skin issues was heard by the Panel during a phase of the arbitration that the Panel previously had ruled would exclude exterior skin issues.  Rather, the issue is how much relevant evidence was *not* heard by the Panel because of its decision as to the limited scope of the first phase of the proceeding.  *See* May 26 Order.

The exterior skin issues were bifurcated and reserved to Phase II of the arbitration hearing pursuant to the Panel's May 26 Order which states, *inter alia*:

> Both Claimant Madrigal and Respondents Foulger-Pratt and Travelers agree that the potential issue regarding potential defects in the building exterior skin is not ripe for determination at this time.  Investigation of the issue is underway by Madrigal, and the issue will be ripe for determination, if needed, only after Madrigal completes its investigation and discloses the results of that investigation to Respondents. . . . [T]hat dispute will accordingly be the subject of a separate hearing . . . .

May 26 Order at p.1, Exh. 6.

In disregard of the clear mandate of its own May 26 Order bifurcating the proceedings and reserving all exterior skin issues for a subsequent phase of the arbitration, the Panel prematurely made rulings in Paragraph 17 of the Interim Award relating to significant exterior skin issues.  Specifically, Paragraph 17 makes findings related to three Gale Report items and the applicability of Specification Section 08911, all of which are exclusively related to the exterior skin of the building and Madrigal's exterior skin claims.[13]

By addressing exterior skin issues in its Interim Award, the Panel made significant findings without hearing critical and relevant evidence from Madrigal.  Among the evidence that Madrigal was precluded from submitting on exterior skin issues were Madrigal's expert testimony and report on the exterior skin issues, testimony from a rebuttal expert witness on the subject of drafting and interpretation of specifications, and testimony by third-party fact witnesses directed to the exterior issues, all of which was required to understand the integrated building envelope system.  Davison Decl. ¶¶ 9-10.  Specifically, in reliance on the Panel's

---

[13]     Specification Section 08911 is entitled "Glazed Aluminum Curtain Wall" and, by its very terms, applies to the exterior skin of the building (*see* § 08911, Exh. 15).  In addition, the ruling at issue on § 08911 is that it "is not applicable to the *exterior* metal panels."  Interim Award ¶ 17 (emphasis added). The Gale report is entitled "*Exterior* Building Envelope Review Report" (emphasis added) and the specific items at issue are exterior skin issues.  *See, e.g.*, Gale Report at 1-5, Exh. 16.

May 26 Order bifurcating the proceedings and reserving the exterior skin claims to a subsequent

phase of the arbitration proceedings, Madrigal was precluded from presenting the following key

evidence:

- Construction Systems Group ("CSG") testimony and report:  Madrigal was prevented from offering the testimony and report of its designated expert witness on the exterior skin issues during Phase I.[14]  Davison Decl. ¶ 10.a.  Indeed, Madrigal *could not* have offered CSG's testimony or report during Phase I because CSG's work was not complete in time to be offered during that phase – which was a principal reason for the bifurcation of proceedings to begin with.  *See* Madrigal's May 13, 2009 Statement of Issues Not Ripe for Arbitration (Exh. 7), which states that CSG "has been unable to complete its investigation and analysis, prepare its report, prepare a remedial plan and determine the cost and expenses of performing the remedy"; *see also* May 26 Order, which states, "Investigation of the issue is underway by Madrigal, and the issue will be ripe for determination, if needed, only after Madrigal completes its investigation and discloses the results of that investigation to Respondents."  Exh. 6.  Evidence from CSG will demonstrate that (i) the exterior skin of the building is an integrated building envelope that incorporates numerous components, including the roof, metal panels, windows, storefronts, masonry, columns and floor slabs; (ii) none of the elements can be understood without reference to the others, and the Specification sections likewise need to be read together in order for the Contract to be properly interpreted; and (iii) Specification Section 08911 is a performance specification requiring the contractor and its subcontractors for the building exterior to provide systems and details for the "spandrel panels, exterior column and slab covers" (08911 § 2.02 J, Exh. 15) and the window system that will meet these requirements.

- Rebuttal expert witness on specifications:  Madrigal planned to designate and call a rebuttal expert witness in Phase II on the subject of drafting and interpretation of specifications.  This witness would rebut the claims by Foulger-Pratt – made for the first time only *after* the commencement of

---

[14]     Although Madrigal proffered its expert report following the closing arguments, it did so only because the Panel had specifically requested that Madrigal provide the report when it was completed, and Madrigal expressly stated that it was not submitted for the Panel's consideration as part of Phase I. Davison Decl. ¶ 15; *see also* Hrg. Tr., Sept. 21, 2009, 3657:16 - 3659:1, Exh. 17.  Moreover, the Panel specifically indicated that the report would not be considered:  "Well, we'll receive it at this time because you're handing it to us at this time. We don't have a problem with that, but I'm going to say here and now *the panel is not going to look at this and is not going to consider this* as part of this interim award that was the agreement all along and of course Respondents have not had a chance to see it yet, so it's fine, it will go in our collection but it's – that's phase II. That's different."  *Id.* at 3658:5-15 (emphasis added).

Phase I and *not* included in its July 11, 2009 expert report by Robert
Lockhart – that Specifications Section 08911 does not apply to the exterior
metal spandrel panels, column and slab covers at the Project.  *See* Davison
Decl. ¶ 10.b.

- Fact witnesses:  Several fact witnesses with personal knowledge of
exterior skin issues did not testify in Phase I, but will be called by
Madrigal in Phase II.  *See* Davison Decl. ¶ 10.c.  The additional fact
witnesses include Ben Apfelbaum, the original Project Manager under
both Glen and Foulger-Pratt, who will testify to his and his employers'
knowledge and understanding of the applicable Contract requirements as
well as how work was actually performed under his direction; personnel
from Metal Sales & Service, the designer/manufacturer of the metal panels
and exterior skin system, who will testify to the manufacturer's
requirements and recommendations for installation (which the Contractor
is required to follow, per Specification § 01700.3.5.B); and Darryl Casale
and Bruce Werner, the designers hired by Glen to select and present the
panel and window systems, integrate them into the other elements of the
building exterior, and provide details and specifications to be included in
the Contract and Specifications for the Project.  *Id.*  All of this testimony
would be highly relevant to the issues addressed in Paragraph 17 of the
Interim Award.  *Id.*

- General context of exterior skin claim:  Madrigal plans to present evidence
generally in Phase II that will demonstrate that the exterior skin of the
building is an integrated building envelope that includes numerous
components including the roof, metal panels, windows, storefronts and
floor slabs.  *See* Davison Decl. ¶¶ 9-10.  Madrigal will further show that
none of the elements can be understood without reference to the others,
and the Specification sections likewise need to be read together in order
for the Contract to be properly interpreted.  *Id.*

By failing to abide by its own order and entering rulings on significant exterior skin

issues prior to affording Madrigal an opportunity to present all of its evidence relevant to these

issues, the Panel deprived Madrigal of its right to a fundamentally fair hearing.[15]  For this

additional reason, therefore, the Court should vacate the entirety of Paragraph 17 of the Interim

---

[15]     The Panel's explanation for ruling on exterior skin issues disregards its own May 26 Order.  The
Panel stated that "APS Paragraph 15 also contemplates a ruling on these issues in advance of the Project
Neutral's involvement."  Interim Award ¶ 17, Exh. 9.  However, no such requirement – or even any hint
of such notion – appears in APS ¶ 15.  Moreover, the statement is directly contrary to Paragraph 3.4 of the
Panel's May 26 Order which provides, *inter alia*, "We conclude that there are no unsatisfied
preconditions or limitations on the jurisdiction or authority of the Project Neutral, and as such, referral of
the dispute to the Project Neutral at this time is appropriate."  Exh. 6.

Award.  *See, e.g.*, *Naing Int'l Enters., Ltd.*, 961 F. Supp. at 5  ("[N]either this Court nor the arbitration panel can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one.").

>       2.      **Madrigal Was Prejudiced by the Exclusion of Its Material Evidence.**

The Panel's Paragraph 17 findings are directly at odds with its own statement in Paragraph 14(a) of the Interim Award that "nothing in this Interim Award is intended to affect Madrigal's ability to assert the Reserved Exterior Skin Claim." Exh. 9.[16]  In fact, however, the Paragraph 17 exterior skin rulings significantly undercut Madrigal's ability to pursue its exterior claims issues in Phase II.

The evidence that was excluded (as set forth above in Section II.B.1) bears directly on the applicability of Specification Section 08911 and on Foulger-Pratt's contractual obligations to perform Gale Report items.  Davison Decl. ¶ 12.  Madrigal contends that Specification Section 08911 deals expressly and specifically with the exterior metal panels at the Project.  *Id.* ¶ 11.  To the extent that it is determined that the Panel (not the Project Neutral) has authority under the APS to determine the exterior skin issues in Phase II, Madrigal would plan to call witnesses who have not previously testified to address these specific issues.  *Id.* ¶¶ 9-10.  Moreover, Madrigal's expert report relies in part on Specification Section 08911 and on the Gale Report

---

[16]      In the course of the proceedings, the Panel Chair also indicated that the Panel would not rule with respect to Foulger-Pratt's arguments regarding its contractual obligations for exterior skin issues prior to consideration of Madrigal's expert report.  Panel Chair Ness stated:  "I understand what the panel has said is that we specifically deferred consideration of the exterior skin issues to be – that were being addressed in a report that did not yet exist and the – that we would consider that report once it was received and make sure Foulger-Pratt had an opportunity to respond to it and so I guess implicit in that was that we would at least keep things open to consider that as an additional issue as opposed to issuing an award that says no matter what that report says and no matter what defects it might come up with in that report Foulger-Pratt has no responsibility to deal with this.  I think implicit in our order we weren't going to slam the door before seeing the report and understanding what the defects that were alleged were.  That was my understanding."  Hrg. Tr., Sept. 21, 2009, 3639:8 – 3640:3, Exh. 17.

recommendations at issue.  CSG Report, Exh. 19, at pp. 13-22 (Arb. Exh. C-751 (excerpt));

Davison Decl. ¶ 14.  Hence, the Panel's rulings in Paragraph 17 eliminating Foulger-Pratt's

obligations to perform the disputed Gale Report items and stating that Section 08911 does not

apply to the exterior metal panels will significantly undermine Madrigal's ability to prevail on its

exterior skin claims in Phase II.

　　　　In sum, because the Panel failed to adhere to the procedural limitations set forth in its

own May 26 Order and ruled on significant exterior skin issues without affording Madrigal the

opportunity to present substantial relevant evidence on these issues, the Panel improperly denied

Madrigal a fundamentally fair hearing.  Accordingly, Paragraph 17 of the Interim Award should

be vacated under both the DCRAA and the FAA.

## III.   THE COURT SHOULD VACATE PARAGRAPHS 4(c), 4(d), 14(f) AND 14(g) AND SUBSTANTIAL PORTIONS OF PARAGRAPHS 10 AND 14(d) OF THE INTERIM AWARD.

### A.   The Panel's Grant of Pre-Award Interest Exceeded Its Authority by Nullifying the Express Payment Terms of the APS and was Arbitrary and Capricious.

　　　　The Panel awarded Foulger-Pratt a Final Payment amount of $2,586,259 by tabulating

the purportedly unpaid amounts of the final three payment applications submitted to Madrigal by

Foulger-Pratt – Payment Applications 27, 28 and 29.  The Panel also awarded a total of $171,312

in pre-award interest.  Interim Award ¶ 14(g), Exh. 9.  It is apparent that the Panel arrived at this

interest figure by starting the interest calculation for all three payment applications on *June 15,*

*2008*, notwithstanding that the largest of these Payment Applications – Application 29 – was not

even submitted to Madrigal until October 8, 2008 (*i.e.*, the Panel awarded interest for non-

payment of this Application from a date four months *before the Application was first submitted*

*to Madrigal for payment*).  *See* Interim Award ¶¶ 13, 14(g); Foulger-Pratt's Statement of Claims

at 2, Exh. 20.

By awarding this pre-award interest, the Panel manifestly exceeded its authority by acting contrary to the unambiguous provisions of the APS, signed on February 2, 2009, regarding the Payment Applications.  APS ¶¶ 2-5.2, Exh. 5.  The APS definitively established that as of the date of the APS (February 2, 2009), Foulger-Pratt had *not* yet met the required conditions for receiving payment on Applications 27, 28 and 29.  Thus, it was a direct contradiction of the APS for the Panel to calculate interest from any date prior to February 2009.  Indeed, by entering into the APS, Foulger-Pratt *waived* any possible right to pre-APS interest that it might have had.[17] By contradicting the plain and unambiguous meaning of the APS, the Panel acted "without authority," and its decision on pre-award interest should therefore be vacated under both the DCRAA and the FAA.  *See Inter-City*, 845 F.2d at 187.

### 1.      Pre-Award Interest for Payment Application 29

Foulger-Pratt submitted Application 29 for payment of $2,288,443 on October 8, 2008. Exh. 21 (Arb. Exh. C-443).  Application 29 sought payment of the *final retainage* purportedly owed to Foulger-Pratt for the Project; it was not for any new work completed.  *See id.* at 1; Arbitration Hearing Transcript ("Hrg. Tr."), July 22, 2009, 2352:13-15 (Kevin MacClary)[18], Exh. 17.  Paragraph 12.1.7 of the Agreement, Exh. 1, states that "[t]he balance of the retainage shall be released to Contractor at the time of final payment as provided in Paragraph 12.2.6."  As discussed more below, the Panel itself acknowledged that Foulger-Pratt had not met the requirements for Final Payment.  *See* Interim Award ¶¶ 14(c), 14(d), Exh. 9.

Through the terms of the APS, however, Madrigal agreed to pay *a portion* of the final

---

[17]      Indeed, both parties made concessions and waived rights in the APS sections addressing Payment Applications – *e.g.*, Madrigal waived "its right to challenge the imperfect form of the partial lien releases provided by Subcontractors for Payment Applications 1-25 and for the remainder of the balance of Payment Application 26."  APS ¶ 2, Exh. 5.

[18]      MacClary was the on-site Project Manger for Foulger-Pratt at the Project.

retainage (approximately $1.2 million) sought in Application 29 before it would otherwise have been due in exchange for Foulger-Pratt promptly meeting certain contract obligations. For instance, APS Paragraph 5.2 required Foulger-Pratt to complete its work on the "Items 1-8 Punch-List Work" and provide all required "close-out documents" (per Agmt. ¶ 12.2.6, Exh. 1). This demonstrates conclusively that that these requirements had not yet been met as of February 2009. In fact, they *still* had not been met when the Panel issued the Interim Award in November 2009. Thus, the Interim Award states that Foulger-Pratt had yet to meet a series of required obligations, including completion of Items 4-8 in the "Punch-List Work" and production of a number of warranties. Interim Award ¶¶ 14(c), 14(d), Exh. 9. This resulted in the Panel *withholding* approximately $1 million of Foulger-Pratt's award. *Id.* ¶ 16.

In short, even the Panel recognized that, as of November 2009, Foulger-Pratt had not yet met many of the significant obligations that the Contract required Foulger-Pratt to meet to receive even *a portion* of the final payment sought in Application 29. In spite of this fact, the Panel granted pre-award interest for the *entire $2,288,443* in Application 29, and started the calculation back on *June 15, 2008*, resulting in an award of $143,011 of pre-award interest against Madrigal. *Id.* ¶ 14(g). By ordering payment of the entire amount of Application 29 before Foulger-Pratt had satisfied the requirements under APS ¶ 5.2 for even a partial payment, the Panel nullified the parties' settlement agreement embodied in the APS. Moreover, in its grant of pre-award interest on the funds sought in Application 29, the Panel inexplicably ignored its *own* determination that the payment was not due as of November 30, 2009. Instead, the Panel ordered interest to begin accruing over 17 months earlier. The Panel's grant of pre-award interest even predates the *submission* of Application 29 by almost four months.[19]

---

[19]     Even Foulger-Pratt acknowledged that Application 29 was not yet payable and was submitted merely to get Madrigal "to the table." *See* Hrg. Tr., July 21, 2009, 2028:2-7 (MacClary), Exh. 17; *see*

(continued…)

In sum, the Panel (1) awarded interest on payments that are still not yet due because the requirements for Final Payment have not been met and (2) awarded interest starting June 15, 2008 for money that even the Panel acknowledged was not due as of November 30, 2009. The Panel's grant of pre-award interest on Application 29 contradicted not only the APS, but also its own Interim Award. Thus, the Panel's award of pre-award interest to Foulger-Pratt clearly exceeded its authority and therefore should be vacated under both the DCRAA and the FAA.

## 2.    Pre-Award Interest for Payment Application 28.

Foulger-Pratt submitted the original Payment Application 28 to Madrigal for payment of $296,816 on May 16, 2008. Exh. 22 (Arb. Exh. C-441). Only $131,693, however, was for new work conducted by subcontractors. *See id.* at 3; APS ¶ 4, Exh. 5. The remainder was a premature request for release of retainage before Final Payment. The APS states that Madrigal's Application 28 obligation is to pay $131,693 *after* Foulger-Pratt (a) delivered all of the lien releases for subcontractors for whom payment was sought; and (b) released its mechanic's lien. APS ¶ 4, Exh. 5. And the lien releases were required to be in the form provided in Exhibit K to the Agreement and "properly signed and sealed *and without amendment*." *Id.* (emphasis added).

Thus, at the time the APS was executed, Foulger-Pratt indisputably had not met the requirements for payment. Even Foulger-Pratt acknowledged that Application 28 was submitted without the necessary lien releases and that the requirements for payment of Application 28 were not satisfied at the time the APS was signed. *See* Hrg. Tr., July 22, 2009, 2351:12- 2352:5

---

(continued)

*also id.* at 2290:2-15 (Foulger-Pratt was merely "looking for [ ] the correspondence response" from Madrigal that would "express to [them] the deficiencies" in Application 29.) Application 29 was also unsigned by the Development Manager or Architect and lacked the requisite lien releases required for payment under Agmt. ¶ 12.1.6. *See id.*, July 27, 2009, 3293:2-3294:22 (Greg Daily) (Daily of Travelers "knew some [lien releases] weren't submitted" and acknowledged that in December 2008 he knew "that lien releases had not been submitted for Pay App 29.").

(MacClary), Exh. 17.  Indeed, *to this day*, Foulger-Pratt still has failed to meet the lien release requirements for Application 28.

Four months *after* the APS was signed – on June 18, 2009 – Foulger-Pratt submitted a *Revised* Payment Application 28 ("28-R"), which listed the proper payment request amount of $131,693.  Exh. 23 (Arb. Exh. C-719).[20]  But even this revised application was deficient because, *inter alia*, the attached lien release for Fort Myer Construction Corp. was not in compliance with the APS requirement that it be "without amendment."  APS ¶ 4, Exh. 5.[21]  There were numerous other problems with Application 28-R that were never fixed.  *See* July 10, 2009 letter from M. Brungart to P. Renzi regarding reasons for rejecting Application 28-R, Exh. 25 (Arb. Exh. C-745).

In disregard of the fact that Application 28-R was only for $131,693, was not submitted until June 2009, and was clearly deficient, the Panel nevertheless granted Foulger-Pratt pre-award interest on *the entire $296,816* prematurely sought in the original Application 28 and started the interest calculation on *June 15, 2008* – for $26,005 in interest.  Interim Award ¶ 14(g), Exh. 9.  Therefore, the Panel's interest award for Application 28 exceeded its authority by contradicting the express terms of the APS (as well as the Contract).  This award should therefore be vacated under both the DCRAA and the FAA.[22]

---

[20]     Although Application 28-R is dated April 30, 2009, it was not submitted to Madrigal until June 18, 2009, as evidenced by its fax cover sheet.  Exh. 23 at 1.

[21]     Once this problem was identified, Foulger-Pratt actually whited out the added language, doctored the signature, and sent it back to Madrigal.  July 13, 2009 e-mail from P. Renzi to R. Knopf, Exh. 24 (Arb. Exh. C-749E).  Foulger-Pratt's MacClary admitted that this had been done by his assistant and that was a "serious error in her judgment."  Hrg. Trans, July 22, 2009, 2383:8 – 2384:8 (MacClary), Exh. 17.

[22]     The interest award of $2,294 on Application 27 should be vacated for reasons similar to Applications 28 and 29.  Foulger-Pratt did not meet the requirements for Application 27 until after the APS was executed, APS ¶ 3, Exh. 5, and the application was promptly paid thereafter.  By still awarding interest for the period of June 15, 2008 to the date of payment, March 20, 2009, Interim Award 14(g), the Panel contradicted the APS and exceeded its authority.  Thus, this award likewise should be vacated.

**3.      The Panel Granted Pre-Award Interest in an Arbitrary and
Capricious Manner.**

The Panel also granted – and denied – pre-award interest in an arbitrary and capricious

manner.  Here, the Panel awarded Madrigal $138,000 in liquidated damages for Foulger-Pratt's

failure to reach Substantial Completion by the required date, Interim Award ¶ 1, Exh. 9, but at

the same time refused to grant Madrigal *any* pre-award interest, which Madrigal requested in its

Statement of Claims, Exh. 11 at 2, Pre-Hearing Brief, Exh. 26 at 17, and Proposed Interim

Award, Exh. 27 at 2.  This decision was arbitrary and capricious because there was no rationale

for granting Foulger-Pratt interest but not for granting Madrigal pre-award interest.

Furthermore, the Panel erroneously granted pre-award interest to Foulger-Pratt on money

it could not ever have been entitled to because of the liquidated damages awarded to Madrigal.

The liquidated damages had to have been accrued at some point before June 1, 2008, the date of

Substantial Completion.  Interim Award ¶ 1, Exh. 9.  Because the pre-award interest awarded to

Foulger-Pratt did not begin to accrue – even under the Panel's mistakenly early start date – until

June 15, 2008, the liquidated damages that Foulger-Pratt owed to Madrigal should have been

*subtracted* from any dollar amount on which Madrigal was assessed pre-award interest.  As such,

the Panel irrationally ordered Madrigal to pay interest on money that could never have been due

to Foulger-Pratt because of the offset for the liquidated damages that the Panel concluded were

owed by Foulger-Pratt.

Finally, the Panel's calculation of Foulger-Pratt's pre-award interest from June 15, 2008

for *all three* Payment Applications was arbitrary and capricious.  Using this date to trigger pre-

award interest would only have made sense if *Final Completion* of the Project occurred on

June 1, 2008, but that is clearly not the case.  In fact, Final Completion had not occurred even as

of November 30, 2009, the date of the Interim Award.  Because there is no support in the record

for starting the interest calculation on June 15, 2008, and it was manifestly irrational to begin the

33

calculation of pre-award interest before even the principal obligations had accrued, the Panel's decision was arbitrary and capricious and should be vacated under the DCRAA's "other reasonable ground" standard.

### B. The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Reducing Foulger-Pratt's Contractual Obligations to Pay Attorneys' Fees.

Paragraph 14.6.1 of the Agreement states that Foulger-Pratt "shall pay for and indemnify Owner from all damages, losses and expenses (including attorneys' fees)" that result from Foulger-Pratt "filing a lien or failing to bond off a Subcontractor lien." Exh. 1. It also states that Foulger-Pratt "agrees that in *no event shall Contractor at any time file a lien of any kind* against the Project." *Id.* (emphasis added). The sole exception listed in Paragraph 14.6.1 is that Foulger-Pratt is "entitled to file liens only for amounts *certified for payment by the Development Manager and Architect* and which remain unpaid by the Owner." *Id.* (emphasis added).

On December 18, 2009, Foulger-Pratt filed a mechanic's lien against the Project for $2,636,469. *See* APS ¶ 8, Exh. 5. There is no argument that this lien fell within the Paragraph 14.6.1 exception because it was *not* for amounts "certified for payment by the Development Manager and Architect." Exh. 1. The vast majority of the $2.6 million covered by the lien was sought by Foulger-Pratt in Payment Application 29, which undeniably was never certified for payment. *See* Application 29 discussion *supra* Section III.A.1. Thus, Foulger-Pratt indisputably violated the express terms of the Agreement when it filed the mechanic's lien. Indeed, when Madrigal brought the issue to D.C. Superior Court to remove the lien, Judge von Kann admonished Foulger-Pratt for filing the mechanic's lien. He noted that "there are remedies available to the contractor, but [a mechanic's lien] is not one of them. In fact, this is one that is *quite explicitly denied* to the contractor . . . ." TRO Hrg. Tr. at 24, Exh. 3.

Accordingly, Foulger-Pratt was required to indemnify Madrigal for the $62,840 in attorneys' fees incurred because of the filing of this lien. Agmt. ¶ 14.6.1, Exh. 1; *see* Madrigal's

Damages Itemization, Exh. 28 (Arb. Exh. C-725).  The Panel, however, inexplicably rejected this

request for fees.  Interim Award ¶ 10, Exh. 9.  By excusing Foulger-Pratt from its clear

obligation under the Contract to pay these fees, the Panel contradicted the express terms of the

Contract and, therefore, exceeded its authority.  The decision was also arbitrary and capricious

and should be vacated under the DCRAA's "other reasonable ground" standard.[23]

### C.   The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Eliminating Foulger-Pratt's Obligations to Provide Warranties and Other Close-Out Deliverables.

Foulger-Pratt's obligation to deliver warranties and other close-out deliverables to

Madrigal is set forth in several different parts of the Contract.  Paragraph 12.2.6 of the

Agreement, Exh. 1, states that Final Payment by Madrigal is "conditioned upon and shall not be

due or owing until" the Contractor meets a series of requirements and delivers various close-out

documents and materials to Madrigal.  General Conditions Paragraph 9.10.2, Exh. 2, lists items

that the Contractor must provide to Madrigal as a condition to final payment.  Examples of

required close-out documents include: all warranties, final "As-Built" Drawings and

Specifications, shop drawings and elevator drawings, and operations and maintenance manuals.

*See id.*  The APS also incorporates these requirements.  *See* APS ¶ 5.2, Exh. 5 (requiring "all of

the close-out documents specified and required in Agreement Paragraph 12.2.6 and General

Conditions Paragraph 9.10.2").  In addition, the Specifications set forth requirements for other

deliverables (*see, e.g.*, Specification § 09680, 1.8.A, Exh. 29, requiring the Contractor to furnish

---

[23]    The Panel's decision is particularly confounding because it *granted* three of Madrigal's other request for attorneys' fees for similar lien-related disputes:  Count X(b), Foulger-Pratt's refusal to immediately bond-off the subcontractor liens filed by Schnabel Foundation Company and J.P. Construction, Inc. ($18,322); Count X(e), Foulger-Pratt's refusal to bond-off the subcontractor lien filed by Kone, Inc. ($2,610.50); and Count X(f), Foulger-Pratt's failure to provide lien waivers in proper form ($9,184.50).  *See* Madrigal's Damages Itemization, Exh. 28.  The Panel's decision to award attorneys' fees for some of Foulger-Pratt's violations of Agmt. ¶ 14.6.1, but not for its improper mechanic's lean filing, is irrational and unsupported by anything in the case record.

extra carpet).

These close-out requirements are not mere technical requirements.  They are standard and essential elements of any construction project and are vital to protect the interests of the third-party unit owners who will be living in the building for years to come.  In order for the residents of the building to address building issues that arise in future years, they *must* have the benefit of all of the required as-built architectural, structural and engineering plans, operations and maintenance manuals, product warranties, and the like.  To deny them these materials, as the Panel has done here, has the same effect as a car dealer selling a car to a purchaser without providing them an owner's manual or any warranties on the components of the car.  It leaves the unit owners without the means to deal with problems that may arise with their units or with the common elements of the building when the Contractor is long gone.

> **1.    The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously by Nullifying Foulger-Pratt's Obligation to Provide Warranties.**

The importance to both Madrigal and the individual unit owners of properly executed and enforceable warranties with accurate dates should not be underestimated.  Anyone who has paid for expensive car or home repairs knows just how valuable an enforceable warranty can be.  A warranty that is promised as part of a purchase becomes factored into the purchase price – *i.e.*, the owner pays for protection from unexpected repair and replacement costs.  Madrigal paid consideration for warranties that covered, *inter alia*, large and expensive aspects of the building, such as the exterior skin.  The unit owners paid consideration for warranties that would cover items in their individual units, as well as their interest in the common elements of the building (including the roof and the skin).  Both Madrigal and the unit owners are entitled to the

warranties for which they paid and that Foulger-Pratt is contractually required to provide.[24]

The obligation to provide warranties does not end with the mere delivery of warranty papers. The actual content of those papers is critical – *i.e.*, Foulger-Pratt is obligated to provide warranties that are *enforceable* and will provide Madrigal and the unit owners the ability to obtain future repairs and replacements from the subcontractors issuing the warranties. Warranties that have incomplete or inaccurate information about the specified project or owner may be unenforceable, and warranties with dates that are wrong will likely short-change the recipient of coverage required under the Contract. Therefore, it is Foulger-Pratt's obligation to ensure that, at a minimum, the warranty papers (i) are signed and have all of their blanks filled in appropriately; (ii) have the correct owner, project name and address information; and (iii) have the correct start date and length of warranty period. Unenforceable warranties are worthless to Madrigal and the unit owners, and they do not satisfy Foulger-Pratt's contractual obligations.

In testimony, Foulger-Pratt admitted that it had failed to provide certain warranties as required by the Contract. For example, when asked if Foulger-Pratt has "provided all of the O&Ms and warranties as required by the contract documents," Foulger-Pratt's Project Manager responded, "No. We're still working on that." MacClary Dep. Tr., May 11, 2009, at 270:1 – 273:4, Exh. 30. Over two months later, during the arbitration hearing, the Project Manager acknowledged that, with regard to providing certain required warranties, Foulger-Pratt was still "working on it." *See* Hrg. Tr., July 22, 2009, 2296:6 – 2297:11 (MacClary), Exh. 17; *see also id.* at 2304:20 – 2305:17.

In addition to Foulger-Pratt's admissions, Madrigal provided the Panel with extensive documentation about the missing and deficient warranties that Foulger-Pratt was required to

---

[24]     *See* Agmt. ¶ 12.2.6(c), Exh. 1 (payment contingent on delivery of "all warranties"); Gen. Cond. ¶ 9.10.2, Exh. 2 (Foulger-Pratt must provide to Madrigal "[a]ll warranties provided by Subcontractors").

provide.  Attachment B to Madrigal's Post-Hearing brief provided the Panel a carefully organized collection of warranties received by Madrigal, with notated place-savers for the warranties that Foulger-Pratt failed to provide.  In addition, Attachment B included a lengthy chart that listed the warranties that were missing and the many deficiencies in the warranties that were provided (*e.g.*, lack of signature, lack of owner name, wrong date, etc.).  *See* Warranty Chart, Exh. 31.

In disregard of this submittal by Madrigal, the Panel excused Foulger-Pratt from providing the missing warranties or fixing the deficient warranties – with the exception of 20 warranties that are for periods in excess of one year ("Special Warranties").  Interim Award ¶ 14(d), Exh. 9.  Attachment A to the Interim Award lists the 20 Special Warranties (13 that are deficient and seven that are missing) that Foulger-Pratt was ordered to remedy.  Outside of the Attachment A requirements, the Panel concluded without explanation that "any other remaining deficiencies in any subcontractor/supplier warranties submitted are excused and Foulger-Pratt has no remaining obligation with respect to providing them."  *Id.*

The Panel's ruling on warranties is flawed in significant respects and plainly conflicts with both the APS and the Contract.  First, the Panel's decision to nullify Foulger-Pratt's obligation to provide *all* one-year warranties was wholly unfounded.  As explained to the Panel by Madrigal's counsel, one-year warranties, even those set to expire on June 1, 2009 (before the end of the arbitration proceedings) have value to the warranty-holder beyond that date.  *See* Hrg. Tr., May 27, 2009, 553:17 – 554:19, Exh. 17.  In the District of Columbia, the statue of limitations for an action for a breach of warranty runs for three years from the (a) date of the breach, (b) the date the subcontractor ceases its efforts to repair, or (c) the date of the failure of

38

the repair.  *See* D.C. Code § 12-301(7).[25]  Madrigal is also entitled to all warranties as required

by the Contract to protect itself against subsequently discovered defects in the work that may

have been fraudulently concealed on the Project.

Thus, Madrigal and the unit owners had a material interest in receiving all of the

warranties required under the Contract, including the one-year warranties.  The Panel

inexplicably nullified Foulger-Pratt's obligation to meet this Contract requirement.  Because this

decision exceeded the Panel's authority, and was arbitrary and capricious, it should be vacated.

Second, the Panel also nullified Foulger-Pratt's contractual obligation to provide

enforceable and properly executed warranties with respect to at least some of the more lengthy

Special Warranties.  Two such examples include:

- *OGEP-Vistawall 10-Year Kynar/Hylar Coating Warranty, Specification § 09960*, Exh. 32 (submitted in Attachment B to Madrigal's Post-Hearing Brief).  In its Warranty Chart submitted to the Panel, Exh. 31, Madrigal noted numerous deficiencies with this warranty:  (a) the effective date is incorrectly listed as Dec. 30, 2006 (instead of June 1, 2008); (b) the signature date is Jan. 5, 2006, but the issue date is Aug. 4, 2009; and (c) there is no address listed for the Project to which the warranty applies.  Moreover, Paragraph 5 of the warranty states that it is "extended to the customer alone," and the customer is listed as "Arctec Precision Glazing, Inc."  This warranty is therefore unenforceable by Madrigal.  Yet the Panel did not order Foulger-Pratt to take any remedial action as to this warranty.  *See* Interim Award Attachment A, Exh. 9.

- *Spectrum Metal Finishing, Inc. Warranty, Specification § 08911*, Exh. 33 (submitted in Attachment B to Madrigal's Post-Hearing Brief).  In the Warranty Chart, Madrigal noted that that the warranty (a) has the wrong name and address for the Project, and (b) does not specify which panels were painted by Spectrum and are covered by the warranty.  Furthermore, Paragraph 9 of the warranty states that it "is extended to Customer alone," and the customer is listed as Metal Sales & Services.  This warranty is similarly unenforceable by Madrigal, but the Panel did not order Foulger-Pratt to take any remedial action as to this warranty.  *See* Interim Award Attachment A, Exh. 9.

By disregarding the fact that these warranties were not fully executed and enforceable,

the Panel nullified Foulger-Pratt's obligation under the Contract.  The Panel, therefore, exceeded

---

[25]     *See, e.g.*, *Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1203-04 (D.C. 1984) (finding discovery rule applies to determine when three-year statute of limitations period begins to accrue).

its authority and acted arbitrarily and capriciously.  The decision should be vacated.

Finally, the Panel also nullified Foulger-Pratt's requirement to provide an integrated, joint warranty for the "glazed aluminum curtain wall" (building exterior) as required by Specification § 08911, Exh. 15 (Warranty ¶ 1.09B requires "written warranty in a form acceptable to Owner, *jointly signed* by manufacturer, installer and contractor" (emphasis added)). Because there were multiple subcontractors involved with the manufacturing and installation of the metal panels in the building's exterior, it was critical to have a *joint* warranty from those various subcontractors.  The process became extremely convoluted after 400 panels went missing from the job site, and Foulger-Pratt had to scramble to acquire new panels from a separate manufacturer.  *See* Hrg. Tr., July 14, 2009, 1094:4-8; 1169:20 – 1170:2 (Mark Brungart), Exh. 17.  There were ultimately up to three different subcontractors manufacturing metal panels, with two or three more handling the coating application, installation, and caulking. *See id.*, July 22, 2009, 2296:6-15; 2299:5 – 2301:6 (MacClary).  Foulger-Pratt made a critical supervision mistake, however, by failing to track the installation of the panels so that there would be a record of where each panel ended up on the building.  *See id.* at 2300:18 – 2301:06; 2326:18 – 2327:13.  The result was that individual subcontractors were no longer willing to warranty their work because it was impossible to tell who had done what.  Thus, the only way that Madrigal could be protected by a warranty for the critical work done on the exterior skin of the building was through a joint warranty.  *See id.*, July 15, 2009, 1576:20 – 1577:10 (Douglas Carter); *see also id.*, July 22, 2009, 2296:6 – 2297:11 (MacClary).  Although Madrigal noted that this warranty was missing in the Warranty Chart, the Panel once again inexplicably nullified Foulger-Pratt's obligation to provide this warranty.  *See* Interim Award Attachment A, Exh. 9.

There are numerous other examples of missing and deficient warranties in the Warranty Chart, Exh. 31, which the Panel also ignored.  In so doing, the Panel exceeded its authority by

nullifying the warranty requirements in the APS and the Contract.  By failing to follow the unambiguous terms of the controlling documents, the Panel exceeded its authority, and its decision to excuse Foulger-Pratt's obligation to provide warranties should be vacated.

The Panel also exceeded its authority by issuing an arbitrary and capricious ruling that enforced some, but definitely not all, of Foulger-Pratt's obligations to provide warranties.  In Attachment A to the Interim Award, the Panel ordered Foulger-Pratt to remedy 13 deficient warranties.  Exh. 9.  The three types of deficiencies noted by the Panel were (1) lack of signature; (2) incorrect Substantial Completion date; and (3) lack of owner/project name/address. However, the Panel ignored the *same* problems in other warranties, as noted in the examples above.  Because there was seemingly no logic to the Panel's decision, it was impermissibly arbitrary and capricious under the DCRAA's "other reasonable ground" standard.  *See also Ainsworth*, 960 F.2d at 939-41.

The APS explicitly provides that Foulger-Pratt must provide *all* of the close-out documents, which includes all warranties, not just *some* of the warranties.  APS ¶ 5.2, Exh. 5. The Panel's inexplicable decision to simply excuse "any other remaining deficiencies" did more than just ignore the parties' agreement – it *nullified* the APS.  The Panel clearly exceeded its authority and acted arbitrarily and capriciously.  Thus, Paragraph 14(d) of the Interim Award should be partially vacated and remanded for further consideration in accordance with the requirements that Foulger-Pratt provide all of the warranties.

> **2.    The Panel Exceeded Its Authority by Nullifying Foulger-Pratt's Obligation to Provide Other Required Close-Out Documents and Final Deliverables.**
>
> **a.    The As-Built Drawings**

As a condition for Final Payment, Foulger Pratt was required by the terms of the Contract to provide Madrigal with the final "As-Built" Drawings and Specifications for the Project.  *See*

Agreement ¶ 12.2.6(e), Exh. 1; Gen. Cond. ¶ 9.10.2(1), Exh. 2; APS ¶ 5.2, Exh. 5 (Foulger-Pratt

must deliver "all of the close-out documents," which include As-Built Drawings).  The As-Built

Drawings sent by Foulger-Pratt were rejected by the Project Architect in August 2009 because of

various deficiencies, such as a failure to "mark up" the drawings.  *See* Report from Alan K.

Houde, dated August 26, 2009, attached to September 11, 2009 letter from Dennis Davison, Exh.

34 (Arb. Exh. C-752) ("'As-Built' Project Specifications have no As-Built information included

and are therefore rejected").

      Having proper As-Built Drawings is particularly important to the unit owners and the

Condominium Association because the drawings are most likely to become necessary years into

the future.  If done correctly, As-Built Drawings will show where the Contractor deviated from

the original building plans, and this is information that could be critically important when new

work subsequently needs to be done in or on the building.  For instance, Foulger-Pratt may have

ultimately put electrical wiring or ductwork in places permitted by code but not contemplated by

the original plans.  When the Condominium Association has to do repairs to the building in the

future, proper As-Built Drawings will help the workers avoid accidentally running into the

electrical wiring or ductwork that is not noted in any of the original building plans.

      In Paragraph 14(f) of the Interim Award, the Panel nullified Foulger-Pratt's obligation to

provide As-Built Drawings without providing any justification.  The Panel has exceeded its

authority and acted arbitrarily and capriciously by nullifying the requirements of the Contract

and the APS and, thus, Paragraph 14(f) of the Interim Award should be vacated.

### b.    Extra Materials

      In Paragraph 14(f) of the Interim Award, the Panel similarly nullified Foulger-Pratt's

contractual obligation to deliver extra materials required in the Specifications, including carpet,

paint, high-performance coatings, elastomeric coatings, and horizontal louver blinds.  *See*,

Specification §§ 09680-1.8.A, Exh. 29; 09912-1.8.A, Exh. 35; 09960-1.8.A, Exh. 36; 09963-1.10.A, Exh. 37; 12491-1.8.A, Exh. 38.

Although these items might appear to be relatively insignificant, they are in fact important to ongoing repairs in both the common areas and individual units.  Because creating a color match with custom-mixed paint is nearly impossible, having paint on hand for touch-ups is important.  The same goes for matching carpet that is in the units and the common areas.  And while the price tag on individual items might be small, the cost of having to repaint or re-carpet an entire unit because of the inability to do a matching repair is not insignificant.  Foulger-Pratt was required by the Contract to provide these items, but the Panel excused this performance without any justification.  The Panel contradicted the explicit terms of the Contract and, thus, exceeded its authority.  In Paragraph 14(f) of the Interim Award, the Panel nullified Foulger-Pratt's obligation to provide "other contractor deliverables," such as extra materials.  The Panel has exceeded its authority by contradicting the plain meaning of the Contract and, thus, should be vacated.

### D.   The Panel Exceeded Its Authority and Acted Arbitrarily and Capriciously in Ruling that Foulger-Pratt Was Entitled to Receive the Retainages Agreed to in the APS for the Condominium Association and Unit-Owners Punch List Work.

Two of the significant disputes regarding Madrigal's Outstanding Items List that were resolved in the APS were the parties' disputes regarding the Condominium Association Punch List (Item 10 of the Outstanding Items List, Exh. 12) and the Unit-Owners Punch List (Item 9 of the Outstanding Items List, Exh. 12).  Specifically, the parties agreed in Paragraph 12 of the APS that Madrigal was entitled to hold back $270,000 from the Contract Price for the Condominium Association Punch List work and $260,000 for the Unit-Owners Punch List work.  Exh. 5.  The parties expressly agreed that Foulger-Pratt's right to obtain these retained amounts was dependent on its "completion of said work . . . in accordance with the terms of the Contract."  *Id.*

43

The only issue reserved by Foulger-Pratt was its contention that this obligation was not unlimited in time. *Id.* ¶ 12.

It is undisputed that Foulger-Pratt has not completed either of these punch lists – with the consequence that both the Condominium Association and the individual unit owners have been and are being harmed. Madrigal also is being harmed to the extent that it has had to pay others to do the punch-list work for the unit owners in order to close sales. Nevertheless, in disregard of the express completion requirement for payment for this work in Paragraph 12 of the APS, and without explanation, the Panel excused Foulger-Pratt from having to complete the Condominium Association and Unit-Owner Punch Lists, and directed that the full $530,000 retained for this work should be paid now to Foulger-Pratt. Interim Award ¶¶ 4(c), 4(d) and 14(f), Exh. 9. In so ruling, the Panel reduced the scope of the Work under the Contract, *see* Agmt. ¶ 2.3.15, Exh. 1, without giving Madrigal any corresponding credit in the amount of the agreed hold-backs in APS Paragraph 12. Such an award exceeds the Panel's authority, nullifies the hold-back provisions in the APS, and is arbitrary and capricious. Accordingly, the Court should vacate these aspects of the Interim Award both under the DCRAA and under the FAA.

## CONCLUSION

The Panel in this case acted in manifest disregard of the limitations on its jurisdiction established by the parties' settlement agreement – the APS – despite its own recognition, in its May 26 Order, of the broad role that the parties delegated to the Project Neutral. The Panel also denied Madrigal a fair hearing by deciding exterior skin issues that the Panel, again in its May 26 Order, had ruled would not be the subject of the initial phase of the arbitration proceedings and by precluding Madrigal from presenting critical evidence on those issues. The Panel further exceeded its authority by deciding issues, including pre-award interest, that the parties had resolved in the APS and that, therefore, were not within the scope of the parties' arbitration

44

agreement.  Finally, several sections of the Panel's Interim Award are plainly the result of arbitrary and capricious decision making.  Accordingly, for the reasons set forth herein, Madrigal respectfully requests that this Court vacate Paragraphs 4(c) and 4(d) (punch lists), 14(f) (close-out deliverables), 14(g) (pre-award interest), and 17 (exterior skin issues) and portions of Paragraphs 10 (attorneys' fees) and 14(d) (warranties) of the Interim Award.

Respectfully submitted,

 /s/  Andrew H. Marks
Andrew H. Marks, D.C. Bar No. 932269
David E. Bell, D.C. Bar No. 477903
Jeanne V. Sourgens, D.C. Bar No. 978929
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Tel.:  (202) 624-2500
Fax:  (202) 628-5116
Email:  amarks@crowell.com

Dennis A. Davison, D.C. Bar No. 223982
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Tel.:  (202) 496-7500
Fax:  (202) 496-7756
Email:  ddavison@mckennalong.com

*Counsel for Respondent Madrigal
Condominiums, LLC*