# EXHIBIT 17

Page 500

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - - -+
                          |
MADRIGAL CONDOMINIUMS, LLC,|
                          |
          Claimant,        |    PANEL:
                          |
     vs.                   |    Andrew Ness, Esq.
                          |    Judith Ittig, Esq.
FOULGER-PRATT RESIDENTIAL  |    Charles Asmar, Esq.
CONTRACTING, LLC           |
                          |
         and               |
                          |
TRAVELERS CASUALTY AND     |
SURETY COMPANY OF AMERICA, |
                          |
         Respondents.      |
- - - - - - - - - - - - - -+


HEARING DAY THREE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Washington, D.C.

Wednesday, May 27th, 2009

9:33 a.m.

Reported by:  Paula Satkin, RPR, CRR

--------------------------------------------------
                 DIGITAL EVIDENCE GROUP
          1111 16th Street, NW Suite 410
               Washington, DC  20036
                  (202) 232-0646

9241603b-4354-4740-91f8-833cf7dd9fab

Page 553

1    but you do have an agreement to relinquish the

2    second year warranty for a credit -- in exchange

3    for a credit of $300,000.

4              MR. DAVISON:  However, Mr. Ness,

5    do you want to find out what the purpose of that

6    is?

7              ARBITRATOR NESS:  Yes.  We are a

8    few days short of June 1st, 2009, you are not

9    going to have a decision by June 1, 2009.  It

10   quickly next week will become a moot issue

11   whether it expired unsigned not issued as of the

12   right date.  Some of these are for longer than a

13   year.  The one-year ones, I'm wondering why

14   we're spending time on them.

15             MR. DAVISON:  Let me explain.

16             ARBITRATOR NESS:  Okay.

17             MR. DAVISON:  If you have a

18   one-year warranty in the District of Columbia

19   and you make a claim under the warranty and the

20   warrantor fails to respond, that warranty

21   obligation continues thereafter as a breach of

22   the warranty and you can bring a claim.  The

9241603b-4354-4740-91f8-833cf7dd9fab

Page 554

1   Owner can bring a claim.  The Owner, if it had a

2   warranty, could say to the manufacturer or to

3   the installer, I have a warranty, you have to do

4   this, okay.

5              ARBITRATOR NESS:  Understood.

6              MR. DAVISON:  Right.  And that

7   that obligation would continue in the future.

8              There are many of these where

9   there are defects in the work that have been

10  identified that if you have given notice to the

11  warrantor and they have failed to correct you

12  can then recover against that warrantor.

13  Foulger-Pratt could recover, we could recover if

14  the warranty is properly issued.  So the ones

15  that are issued in this case, there are many of

16  these products and other warranties that extend

17  two years or beyond.  So with respect to both

18  the one-year, we didn't get a warranty, we paid

19  for a warranty, we didn't get it, okay.

20             ARBITRATOR NESS:  That causes me

21  to ask a further question of the witness.

22             Do you have outstanding warranty

9241603b-4354-4740-91f8-833cf7dd9fab

Page 1058

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - -+
                         |
MADRIGAL CONDOMINIUMS, LLC,|
                         |
            Claimant,    | PANEL:
                         |
    vs.                  | Andrew Ness, Esq.
                         | Judith Ittig, Esq.
FOULGER-PRATT RESIDENTIAL | Charles Asmar, Esq.
CONTRACTING, LLC         |
                         |
        and              |
                         |
TRAVELERS CASUALTY AND    |
SURETY COMPANY OF AMERICA, |
                         |
          Respondents.    |
                         |
- - - - - - - - - - - - -+

--------------------------------------------------
               DIGITAL EVIDENCE GROUP
           1111 16th Street, NW Suite 410
               Washington, DC  20036
                   (202) 232-0646

778a75b4-2070-4c98-8135-f43a425d16a2

Page 1066

1    you have a problem with, particularly one that

2    is newly received, I think it would be a lot

3    more helpful for the panel to deal with it in

4    context.

5              MS. BARNES:  Okay.  I want to ask

6    your permission, I'm prepared to deal with the

7    exhibits and Mr. Brasco is going to Cross

8    Mr. Brungart, so I want to make sure that's

9    okay.

10             ARBITRATOR NESS:  I understand.

11   Mr. Davison, call your next witness.

12             MR. DAVISON:  Ms. Carrigan will be

13   doing the Examination today.

14             MS. CARRIGAN:  We would like to

15   call Mr. Brungart.

16             ARBITRATOR NESS:  As was the rule

17   before, anyone who wants to take their coat off

18   at any time.  I see a number of you have already

19   implemented that.

20   Whereupon--

21

22             MARK BRUNGART

Page 1067

1    a witness, called for Examination, having been

2    first duly sworn, was examined and testified as

3    follows:

4

5                      EXAMINATION

6

7    BY MS. CARRIGAN:

8          Q.    Good morning, Mr. Brungart.  Are

9    you ready?

10          A.    I guess so.  A little awkward

11    sitting behind this.

12          Q.    Understood.  Wait until you're

13    comfortable.

14          A.    I'm fine.  Go ahead.

15          Q.    Could you please state your name

16    and spell it for the court reporter?

17          A.    Mark A. Brungart with a K,

18    B-R-U-N-G-A-R-T.

19          Q.    What's your address?

20          A.    Work address or?

21          Q.    Home address?

22          A.    Home address is 614 Candy Court,

778a75b4-2070-4c98-8135-f43a425d16a2

Complete in December 2007?

A. Absolutely not.

Q. Why not?

A. There were several issues in December 31st -- called January 1st, '07. The building was not watertight. More than 400 panels were missing because they had just ordered 400 panels, plus all the panels on site were not installed, you'll be able to see those in the photographs. Major portions of the building were protected by either plastic or plywood. The fire alarm system was not complete. The building automation system was not complete. The means of egress through the hallways and stairways was obstructed. We did not have free access of the garage nor the roof. Site work wasn't complete.

MS. CARRIGAN: At this time I would just like to draw the attention of the panel to C-351, which is also in your binders. I won't go over this document with this witness, but we do believe it's an important document and

Page 1169

1    roof is still to be installed.

2             Q.    What is a scupper?

3             A.    An emergency overflow in case the

4    main drain in the building gets plugged up.

5                   Also water is able to get in

6    through here and down inside the wall system.

7                   The metal flashing that's required

8    on the contract documents has not been installed

9    in this location or in this location.

10            Q.    Is the caulking complete on this

11   portion of the building?

12            A.    The caulking is not complete.

13            Q.    The caulking was incomplete, was

14   that a typical occurrence throughout the

15   building?

16            A.    Yes.  It was typical throughout

17   the entire facade of the building.

18            Q.    Was there any tier that had

19   complete caulking in January 2008?

20            A.    I'm not aware of any tier that was

21   completed with caulking.  At this time we had

22   over 400 panels still missing, plus the metal

778a75b4-2070-4c98-8135-f43a425d16a2

Page 1170

1    panels we are seeing in the photographs to be

2    installed as of yet.

3            Q.    Where were the metal panels to be

4    installed, what tier?

5            A.    I would say every tier was

6    required to have metal panels on it.

7            Q.    So there wasn't a tier --

8            A.    I'm not aware of a single tier

9    that had all the metal panels.

10           Q.    I would like to draw your

11   attention to jpeg 338, it's also MC 12730.

12                 What does this photograph depict

13   on January 3rd, 2008?

14           A.    This is the other location I was

15   talking to you about where the trellis was to be

16   installed.  Also these are the materials used to

17   install the EIFS walls for the penthouse.  These

18   are their materials.

19           Q.    Approximately how long would it

20   take to install the EIFS system?

21           A.    It was taking them on average

22   about four weeks to install a section.

Page 1344

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - -+

                         |

MADRIGAL CONDOMINIUMS, LLC,|

                         |

          Claimant,      | PANEL:

                         |

  vs.                    | Andrew Ness, Esq.

                         | Judith Ittig, Esq.

FOULGER-PRATT RESIDENTIAL | Charles Asmar, Esq.

CONTRACTING, LLC         |

                         |

       and               |

                         |

TRAVELERS CASUALTY AND    |

SURETY COMPANY OF AMERICA, |
                         |
          Respondents.    |
                         |
- - - - - - - - - - - - -+

    --------------------------------------------------
                   DIGITAL EVIDENCE GROUP
              1111 16th Street, NW Suite 410
                 Washington, DC  20036
                    (202) 232-0646

007cf332-9134-4146-9247-4ac73d5858ac

Page 1517

1

2                    DOUGLAS N. CARTER

3    a witness, called for Examination, having been

4    first duly sworn, was examined and testified as

5    follows:

6

7                    DIRECT EXAMINATION

8

9    BY MR. DAVISON:

10          Q.   Mr. Carter, would you please state

11   your name for the record, please?

12          A.   My name is Douglas N. Carter.

13          Q.   Are you the founding partner of

14   Davis Carter Scott?

15          A.   I am.

16          Q.   What is your profession?

17          A.   My profession is architecture.

18          Q.   And how long have you been an

19   architect?

20          A.   I graduated from the Leed School

21   of Architecture and Town Planning in England in

22   1963.

Page 1576

1    intention of having a jointly signed warranty by

2    the manufacturer, and the installer, and the

3    contractor?  What was the design -- your intent

4    in doing that?

5          A.    I think simply that there are

6    necessarily the three components.

7                One is a warranty from the people

8    who make the product, in this case the exterior

9    wall.  You need to have a warranty from the

10   installer that it's been installed according to

11   the contract documents, and, lastly, that

12   warranty needs to be organized by, I think

13   supervised by, the contractor who is in overall

14   charge of making sure the project gets built

15   according to the contract documents.  So you

16   need to have everyone agree that they all are

17   doing what's needed and required by the contract

18   documents and, therefore, a required warranty

19   that covers all aspects of the job.

20          Q.    Now, having an integrated warranty

21   signed jointly by the three, those three

22   parties?

Page 1577

1          A.    Uh-huh.

2          Q.    What benefit would that give the

3     Owner in terms of dealing with a problem on the

4     exterior of the building that may not be

5     discernible as to whose fault it would be?

6          A.    Well, I think that it's a joint

7     warranty and so it joins the three parties

8     together to come back and fix what is defective

9     if indeed a defect is uncovered within

10    two years.

11         Q.    Now, would there also be a 20-year

12    warranty from the painting applier, the paint

13    applicator?

14         A.    I think there should be, but I

15    think that the fluoropolymer application

16    actually comes with a 20-year warranty, that's

17    what you buy with that finishing system.

18         Q.    And in your specifications,

19    without rummaging through them, you call for all

20    product warranties to be submitted to your firm?

21         A.    Yes.

22         Q.    Have you received any product

007cf332-9134-4146-9247-4ac73d5858ac

Page 1606

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - - -+
                           |
MADRIGAL CONDOMINIUMS, LLC,|
                           |
          Claimant,        | PANEL:
                           |
   vs.                     | Andrew Ness, Esq.
                           | Judith Ittig, Esq.
FOULGER-PRATT RESIDENTIAL  | Charles Asmar, Esq.
CONTRACTING, LLC           |
                           |
       and                 |
                           |
TRAVELERS CASUALTY AND     |
SURETY COMPANY OF AMERICA, |
                           |
          Respondents.     |
                           |
- - - - - - - - - - - - - -+
------------------------------------------------
              DIGITAL EVIDENCE GROUP
         1111 16th Street, NW, Suite 410
              Washington, DC 20036
                 (202) 232-0646

5400f9b5-bbc9-4925-a527-e2f89df10880

Page 1703

1    whenever you want, but we would like to proceed

2    and get started with your first witness before

3    lunch.

4                   MS. BARNES:  Respondents call

5    Kevin MacClary.

6                   MR. DAVISON:  Just while he's

7    coming up to the table, what time did the panel

8    think about taking lunch?  I have a call that I

9    scheduled during lunch.

10                   ARBITRATOR NESS:  Let me put the

11   question to Respondents.  Would approximately

12   12:45 suit you?

13                   MS. BARNES:  That's fine.

14                   ARBITRATOR NESS:  Take a break

15   point that's convenient to you around that and

16   we'll take a break.  If you get too far behind

17   schedule we'll remind you.

18                   MR. DAVISON:  That's fine.

19   Whereupon--

20

21                   KEVIN MACCLARY

22   a witness, called for Examination, having been

5400f9b5-bbc9-4925-a527-e2f89df10880

Page 1704

1    first duly sworn, was examined and testified as

2    follows:

3

4                    DIRECT EXAMINATION

5

6    BY MS. BARNES:

7           Q.    Mr. MacClary, would you introduce

8    yourself to the panel, please?

9           A.    Kevin MacClary, Director of

10   Multifamily Operations, Foulger-Pratt.

11          Q.    How long have you been with

12   Foulger-Pratt?

13          A.    Almost 19 years.

14          Q.    Would you let the panel know what

15   your responsibilities and duties are as director

16   of Multifamily Operations?

17          A.    I'm responsible for precon, all

18   the way through warranty service for typically

19   multifamily, sometimes, oftentimes maybe some

20   heavy commercial and I manage the administration

21   and people of construction.

22          Q.    So how many people directly report

Page 2028

1    the project?

2              A.    We requested a meeting.

3              Q.    Okay.  A meeting with whom?

4              A.    With QDC at the principal level

5    with my company, Travelers, to again try to

6    bring the parties to the table and decide how

7    are we going to correct this.

8              Q.    When did that meeting occur?

9              A.    I think it was in October.

10             Q.    Can you tell the panel what

11   happened at this meeting?

12             A.    At that meeting both firms had

13   engaged counsel, starting to take some direction

14   from counsel.  At the meeting we came together

15   to discuss what items of work needed to be

16   completed and how were we going to get paid,

17   what had to happen with the lien releases to

18   satisfy the problem that they perceived with the

19   lien releases.  With Travelers behind us we

20   offered indemnification, full indemnification of

21   the payments, it's allowable in the contract,

22   and they also found that unacceptable.

Page 2290

1    requisitions.

2          Q.    In Application For Payment 29 that

3    you submitted requesting the entire balance?

4          A.    Yes.

5          Q.    Of the contract, you certified

6    that all work on the project had been done and

7    completed in strict compliance with the plans

8    and specs?

9          A.    Yes.  After eight, nine months of

10   not being paid, probably more of an act in

11   frustration.  What we were looking for was the

12   correspondence response from the Owner as the

13   contract said that he would come back in writing

14   and express to us the deficiencies.  So we did

15   it all in, we threw it all in, yes.

16         Q.    So let's look at now

17   Exhibit C-147, which is from Collin Suckling at

18   Hershocks to Patrick Renzi?

19         A.    Where can I find that?

20         Q.    That's in binder 2.  It's about at

21   least three-quarters of the way back.  If you

22   want me to help you, I'll help you?

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page 2296

1              ARBITRATOR NESS:  I think that's

2    been covered.

3              MS. BARNES:  Assumes facts not in

4    evidence.

5    BY MR. DAVISON:

6         Q.    So we now have a situation out

7    there, Mr. MacClary, where you've got Metal

8    Sales having made some of the panels; right,

9    Hershocks having made some of the panels, GPR

10   having either made some of them or got them from

11   somebody else.  You have a painter that Metal

12   Sales used, a painter that Hershocks used, a

13   second painter that Hershocks used and we don't

14   know, there's a painter I guess with GPR; right?

15        A.    Yes.

16        Q.    Okay.  Now, you remember the

17   specification requires a unified, signed

18   warranty for the exterior of the building;

19   right?  We went over this in your deposition; do

20   you remember that?

21             MS. BARNES:  Objection, assumes

22   facts not in evidence.

Page 2297

1          ARBITRATOR NESS:  Overruled.

2          THE WITNESS:  I've heard other

3     testimony in that regard.  I have not studied

4     those sections individually, but I would assume

5     that to be correct.

6     BY MR. DAVISON:

7          Q.    In your deposition you told me,

8     gee, it's a problem we're working on it?

9          A.    Yes.  We're are working on it.

10         Q.    You're still working on it?

11         A.    Yes.

12         Q.    Now, also, in these documents that

13    I asked the panel to look at, you were writing

14    to Hershocks and asking them to identify for you

15    which panels on the exterior of the building

16    they made and were installed on the building,

17    which were their panels that they provided

18    pursuant to that change order that says get me X

19    number of panels for the outside of the

20    building; right?  You were asking them --

21         A.    Let me see what it is you're

22    reading from.

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page 2299

1    again, we are in the process of trying to pull

2    this together and get an acceptable effective

3    warranty.  Yes, I think we most likely have done

4    that.

5                    ARBITRATOR ASMAR:  For

6    clarification purposes, it's GPR that was the

7    manufacturer; correct, Hershocks was the

8    installer, so the new manufacturer was GPR?

9                    THE WITNESS:  The original

10   manufacturer is Metal Panel Sales.

11                   ARBITRATOR ASMAR:  Right.

12                   THE WITNESS:  They were paid out

13   the fall of '07.

14                   Then Hershocks is the installer of

15   Metal Panel Sales.

16                   When Metal Panel Sales had been

17   paid 100 percent off the purchase order, some

18   reordering came up, again, this is when we were

19   very new to the project.  I believe for whatever

20   reasons they got a little scared, they said

21   we're not doing anymore.  Put us in a

22   perspective where in the November meeting,

Page 2300

1   either November or December, we told the Owner

2   that we were going to have to go to a local

3   fabricator.  We went to a local fabricator that

4   then went to one of two certified painters.

5   Hershocks fabricated, one of two guys painted

6   those.  We know who they are, we're putting the

7   warranty in front of them.

8                    Then because Hershocks went sour,

9   we had to get GPR.  We wanted to make the

10  commitment of APS.  We made the commitment in

11  the APS to get it done by a date.  Then I had to

12  engage GPR, who has gone to a fabricator and

13  painter.

14                   We wanted to maintain the timing

15  of the commitment in the APS, not again having

16  to have a fight with Hershocks, we wanted to

17  just get it done.

18                   ARBITRATOR ASMAR:  You're tracking

19  where the panels are either fabricated by Metal

20  Sales, Hershocks, and/or GPR?  I think that was

21  the question Mr. Davison asked.

22                   THE WITNESS:  We are making a

Page 2301

1    strong attempt to try to pull that all together

2    and get it in a satisfactory place to be able to

3    submit it.

4    BY MR. DAVISON:

5          Q.    Have you been able to do it?

6          A.    Not yet, no.

7          Q.    Let's just go back and clear

8    something up, if we could.

9                Back in 2007, okay, when what

10   first appeared to be 425 panels went missing,

11   supposedly, right, you remember that?

12         A.    I remember panels allegedly

13   missing, yes.

14         Q.    Do you remember the number 425?

15   That was the initial count?

16         A.    No.  I remember it was missing

17   then there was 300 left over.  There was 80

18   ordered.  So, yeah, I remember there were panels

19   missing.

20         Q.    You remember there were panels

21   missing and you had a choice to make and the

22   choice was to either go to Metal Sales and pay a

Page 2304

1    whether or not they would expedite the panels;

2    did you?

3              A.    Did I, personally?

4              Q.    No, your company?

5              A.    I think we did.  Yes, we talked to

6    Metal Sales.

7              Q.    You think that's what the records

8    will show in these documents, that you asked

9    Metal Sales that; right?  That's what you think?

10             A.    That's what I think, yes.

11             Q.    So if, in fact, Metal Sales

12   projected delivery was four months faster than

13   Hershocks actual delivery of those panels, it

14   was a bad decision; right?

15             MS. BARNES:  Objection, assumes

16   facts not in evidence.

17             THE WITNESS:  Hindsight is 20/10;

18   isn't it?  I don't know that that's a fact.

19   BY MR. DAVISON:

20             Q.    Let the record speak for itself.

21             Let's move to the next question.

22   You had an assumption at that point in time, in

Page 2305

1    the fall of 2007, that you could get Metal Sales

2    to warrant its panels and Hershocks, it would

3    warrant its panels that it produced; right?

4    That's the way you would solve the warranty

5    problem, you put those two warranty together to

6    give to the Owner.  Isn't that the decision that

7    you made?

8         A.    Yes.

9         Q.    Okay.  That didn't turn out so

10   well because when you went to Hershocks to ask

11   them to tell you which panels they made and put

12   up on the building, Hershocks refused to do it;

13   right?

14        A.    No.  I think Hershocks is waiting

15   for the final outcome of where this is, but they

16   have not given it to me.  I don't know that

17   they're refusing to do it.

18        Q.    There are e-mails in here, several

19   of them, where you're calling Hershocks, where's

20   the elevation drawings, where's the elevation

21   drawings and all of a sudden they stop answering

22   the phone; right?

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page 2326

1          Q.    So now you've got the balance and

2    there's still the issue of responsibility

3    pending.  Whose responsibility are you referring

4    to?

5          A.    On the replacement of the 425

6    panels.

7          Q.    As to --

8          A.    Who's responsible, why they need

9    to be replaced and who should be responsible.

10         Q.    Did you back charge Hershocks for

11   the cost of making these panels?

12         A.    No.  I think I said just a few

13   minutes ago that instead of fighting about it we

14   accepted the proposal and went forward.

15         Q.    Okay.  So did you back charge

16   anyone else?

17         A.    No.

18         Q.    Now, it says that we should be

19   receiving panels next week from Hershocks, Metal

20   Sales is threatening to void the warranty;

21   right?

22         A.    Yes, that's what it says.

Page 2327

1          Q.    So at this point in time you knew

2     there was this warranty problem as between

3     Hershocks and Metal Sales, who's making what;

4     right?

5          A.    From Metal Sales, yes.

6          Q.    Yes.  Okay.  Now, did you keep

7     track of what these 169 inside corners were,

8     where they went on the building?  You, being

9     Foulger-Pratt, did you keep a list of those and

10    where they went?

11         A.    I'm not sure.

12         Q.    Have you ever seen one?

13         A.    No.

14         Q.    Now, let me ask you then to put

15    that aside and let's go back to binder number 2,

16    if you would.

17              Okay.  If you would, could you

18    turn to Exhibit C-214, which is an April 1st,

19    2009 e-mail from GPR to Mr. Renzi?

20         A.    Towards the back end?

21         Q.    It's -- yeah.  It's towards the

22    back?

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page 2351

1    time lumped in being directed to go all the way

2    back to anything bought at Home Depot.

3         Q.    You recall, do you not,

4    Mr. Brungart sent you a series of e-mails

5    starting in the spring of 2008 up until

6    September 2008, October, just before the meeting

7    we had in October, a series of e-mails saying we

8    need the lien releases in order to process your

9    applications for payment?  Do you remember

10   those?

11        A.    Generally, yes.

12        Q.    And Application For Payment 28,

13   you told me in your deposition, was submitted

14   and you didn't have lien releases for that;

15   right?

16        A.    That's correct.

17        Q.    Now, as a result of the APS, okay,

18   part of that document, the agreement was you

19   would submit lien releases for Application For

20   Payment 28 to cover a portion of that

21   application, some $131,000; do you remember

22   that?

Page 2352

1          A.    Thereabouts, yes.

2          Q.    Do you want me to give you the

3    APS?

4          A.    No.  I remember there's an

5    agreement in there to that effect, yes.

6          Q.    The balance that had been sought

7    for Application of Payment 28 was for retainage;

8    correct?

9          A.    The balance sought?

10         Q.    There was some $269,000 sought to

11   be paid, requisition in Application For Payment

12   28?

13         A.    I thought retention was in 29.

14   There may be some, but the 29 was more the

15   balance of retention.  28 may have had some.

16         Q.    Well, I don't want to get hung up

17   on this point.  I think the record may refresh

18   your memory on it, but that's not really what

19   I'm after.

20              What I'm after is on the $131,000

21   under the APS, you were to submit a new

22   requisition and submit lien releases; right?

Page 2383

1                  AFTERNOON SESSION

2                        (2:16 p.m.)

3                  ARBITRATOR NESS:  Back on the

4       record.  Mr. Davison, you're on.

5                  MS. BARNES:  Mr. Ness, I think

6       Mr. MacClary would like to say something to the

7       panel.

8                  THE WITNESS:  With where we left

9       off with the lien release, I immediately went

10      back to my office to find out what happened, I

11      contacted Katherine Minor.  With what I saw up

12      there, I was not aware of that.  I asked

13      Katherine Minor what happened, serious error, in

14      her judgment, on my staff has occurred.  She

15      said she had been working with Fort Myer over a

16      long period of time, trying to get that lien

17      release in.  She was trying to get the

18      disclaimer off the lien release.  They had been

19      back and forth multiple times, they submitted a

20      lien release multiple times.  She talked to the

21      principal over there, he said I'll take it off.

22      At that point she did white it out.  She came

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page 2384

1  forward immediately.  She didn't think it was

2  that big a deal.  She then proceeded to go to

3  Fort Myer's office to pick it up, assuming that

4  it was going to be taken off.  What they did was

5  they took it off, but now they had an

6  attachment.  She did not deny it.  It was a

7  judgment error on our part.  I apologize for

8  that, I didn't know it occurred.

9            MS. BARNES:  I think there is an

10 issue we needed to address.  When we called

11 Ms. Minor, what we found out is that the

12 exhibits that have been provided have been

13 provided in a way to misrepresent what happened

14 to the panel.  The exhibits that have been

15 provided of the communication between

16 Mr. Davison and Ms. Minor does not include

17 communications between Mr. Davison and Ms. Minor

18 which occurred outside of the knowledge of

19 counsel.  Ms. Minor is an employee of

20 Foulger-Pratt.  Foulger-Pratt has been

21 represented in this hearing and on this project

22 since August of 2008.  Mr. Davison has had

3cdbe8f2-c6a8-4988-aa44-091ef7190c59

Page  3157

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - - -+

                              |

MADRIGAL CONDOMINIUMS, LLC,|

                              |

            Claimant,     | PANEL:

                              |

  vs.                     | Andrew Ness, Esq.

                          | Judith Ittig, Esq.

FOULGER-PRATT RESIDENTIAL | Charles Asmar, Esq.

CONTRACTING, LLC          |

                              |

        and               |

                              |

TRAVELERS CASUALTY AND    |

SURETY COMPANY OF AMERICA, |

                              |

        Respondents.      |
                          | HEARING DAY TWELVE
- - - - - - - - - - - - - -+
-------------------------------------------------
                DIGITAL EVIDENCE GROUP
          1111 16th Street, NW Suite 410
             Washington, DC  20036
                 (202) 232-0646

a5c3d728-eede-482a-ac1e-a37bd95fd921

Page 3165

1    prepared to start Rebuttal witnesses before

2    lunch, Mr. Davison.

3                    MR. DAVISON:  That's what I'm

4    trying to ascertain.  I'm going to have a

5    Cross-Examination.

6                    ARBITRATOR NESS:  We understand

7    there will be Cross-Examination, yes.

8    Whereupon--

9

10                    GREGORY DAILY

11   a witness, called for Examination, having been

12   first duly sworn, was examined and testified as

13   follows:

14                    ARBITRATOR NESS:  Welcome,

15   Mr. Daily.

16                    THE WITNESS:  Thank you.

17

18                    DIRECT EXAMINATION

19

20   BY MS. BARNES:

21            Q.   Mr. Daily, will you introduce

22   yourself for the panel, please?

a5c3d728-eede-482a-ac1e-a37bd95fd921

Page 3293

1          A.     Okay.

2          Q.     You knew that Mr. MacClary had

3     submitted Pay App 29 without the lien releases

4     for the purpose of trying to get Madrigal to the

5     table to try and get a meeting to discuss the

6     project; right?

7          A.     I know they submitted 29.  The

8     basis of that I wouldn't say was to have a

9     meeting.  Submitted 29 in trying to get this

10    project closed out.

11         Q.     I take it you weren't here during

12    Mr. MacClary's testimony; is that correct?

13              MR. BRASCO:  Objection.

14              THE WITNESS:  That's correct.

15    BY MR. DAVISON:

16         Q.     Now, so when you made the decision

17    to file the lien on the project for

18    $2.6 million, you knew that Foulger-Pratt had

19    not submitted any of the lien releases for Pay

20    App 29 or 28; right?

21              MS. BARNES:  Objection,

22    mischaracterizes the evidence.

Page 3294

1       THE WITNESS:  I didn't know that

2  they had not submitted any.  I knew some weren't

3  submitted.

4  BY MR. DAVISON:

5       Q.    Did you think there were any

6  submitted for Pay App 29?

7       A.    For 29, I did not know.  I wasn't

8  sure about 28.

9       Q.    For 29 you knew at the time you

10 authorized the lien to be filed that lien

11 releases had not been submitted for Pay App 29;

12 correct?

13      A.    That's correct.

14      Q.    You knew at that point in time

15 Foulger-Pratt had not submitted all the O&M

16 manuals and warranties and all the closeout

17 documents.  You knew that, too; didn't you?

18      A.    No, I did not know that.

19      Q.    Did you ask anybody whether or not

20 that had been done?

21      A.    I thought we had submitted them,

22 but had not heard back on them.  Maybe not all

Page 3490

DISTRICT OF COLUMBIA

In re Arbitration between

- - - - - - - - - - - - - -+

MADRIGAL CONDOMINIUMS, LLC,|

                           |

            Claimant,      | PANEL:

                           |

   vs.                     | Andrew Ness, Esq.

                           | Judith Ittig, Esq.

FOULGER-PRATT RESIDENTIAL  | Charles Asmar, Esq.

CONTRACTING, LLC           |

                           |

        and                |
                           |
TRAVELERS CASUALTY AND      |
SURETY COMPANY OF AMERICA,  |
                           |
          Respondents.     |
- - - - - - - - - - - - - -+

HEARING DAY THIRTEEN
REPORTER'S TRANSCRIPT OF PROCEEDINGS
Washington, D.C.
Monday, September 21st, 2009
1:34 p.m.
Reported by:  Paula Satkin, RPR
-----------------------------------------------
DIGITAL EVIDENCE GROUP
1111 16th Street, NW, Suite 410

Washington, DC 20036

(202) 232-0646

9c028d78-aace-466d-bed6-89252ede49e5

Page 3639

1    Punch-List.

2                    ARBITRATOR ITTIG:  So we think

3    there would be no reason for any further

4    proceedings?

5                    MS. BARNES:  Right.

6                    ARBITRATOR NESS:  I understand

7    that to be Foulger-Pratt's position.

8                    I understand what the panel has

9    said is that we specifically deferred

10   consideration of the exterior skin issues to

11   be -- that were being addressed in a report that

12   did not yet exist and the -- that we would

13   consider that report once it was received and

14   make sure Foulger-Pratt had an opportunity to

15   respond to it and so I guess implicit in that

16   was that we would at least keep things open to

17   consider that as an additional issue as opposed

18   to issuing an award that says no matter what

19   that report says and no matter what defects it

20   might come up with in that report Foulger-Pratt

21   has no responsibility to deal with this.  I

22   think implicit in our order we weren't going to

9c028d78-aace-466d-bed6-89252ede49e5

Page 3640

1    slam the door before seeing the report and

2    understanding what the defects that were alleged

3    were.  That was my understanding.  I'm not

4    speaking for the panel.

5                    MS. BARNES:  Foulger-Pratt does

6    not say it does not continue to have any

7    warranty obligations or latent defect

8    obligations.  If that is what Mr. Ewell has

9    found, Foulger-Pratt will continue with its

10   obligations.  We want to stop a list of adding

11   and adding lists that have nothing to do with

12   completion.

13                    ARBITRATOR NESS:  We understand --

14   we also have a very good understanding where the

15   Owner is coming from, where Madrigal is coming

16   from.

17                    Mr. Davison, you have been quiet,

18   I know you wanted to speak.

19                    MR. DAVISON:  I've been dying to

20   speak.

21                    At the end of the last hearing the

22   panel said we would like a brief 25 to 30 pages,

9c028d78-aace-466d-bed6-89252ede49e5

Page 3657

1    they had amended that exhibit.  It is the same

2    exhibit, but they amended it and gave it to you.

3    I'm a little bit weary of what's being submitted

4    to the panel.

5              MR. BRASCO:  We'll certainly rest

6    on the first submission of 1012 and any

7    amendment.

8              MR. DAVISON:  It's already been

9    presented to the panel, you can't pull it out of

10   their heads, but I will take your

11   representation, Mr. Ness.  I didn't have a

12   chance to look at it, you did, I'll take your

13   representation.

14             ARBITRATOR NESS:  It's not much in

15   that binder.

16             MR. DAVISON:  I would like to hand

17   up now thee Ewell report and say that this is

18   for the next phase.

19             ARBITRATOR NESS:  On the record

20   here.  We have been handed a binder from CSG.  I

21   take it this is the exterior skin report from

22   Mr. Clay Ewell that has been mentioned many

9c028d78-aace-466d-bed6-89252ede49e5

Page 3658

1   times over many months but never seen, just

2   recently been completed?

3                  MR. DAVISON:  Yes.  It's dated the

4   end of last weal.

5                  ARBITRATOR NESS:  Well, we'll

6   receive it at this time because you're handing

7   it to us at this time.  We don't have a problem

8   with that, but I'm going to say here and now the

9   panel is not going to look at this and is not

10  going to consider this as part of this interim

11  award that was the agreement all along and of

12  course Respondents have not had a chance to see

13  it yet, so it's fine, it will go in our

14  collection but it's -- that's phase II.  That's

15  different.

16                 MR. DAVISON:  Right.  Right.  The

17  panel's directive was when you get the report

18  you have to submit it, it to start phase II.

19                 ARBITRATOR NESS:  That is fine.

20                 MR. DAVISON:  That is my

21  understanding of what would happen.  I didn't

22  ask you to rule on this report as part of phase

Page 3659

1      I.

2                  I did, however, suggest on the

3      issues that were raised with respect to

4      Mr. Brasco's February 3rd, 2009 letter, which

5      related to the skin, and I didn't have a chance

6      to address each one of those points, but I do

7      suggest that those be delayed until phase II.

8      If not I would like to speak to those points

9      because I think that they were addressed and

10     neither side really addressed and briefed those

11     issues.

12                 ARBITRATOR NESS:  I think both

13     sides addressed from an evidentiary standpoint,

14     I think there were three exceptions to the Gale

15     report that you're talking about and both sides

16     addressed those in some detail and I remember we

17     noted your request to not rule on those three

18     pending, the CSC report, and dealing with it in

19     phase II and we agreed that we would take those

20     under consideration.  We may rule on those we

21     may not rule on those.  That's where that

22     stands.

9c028d78-aace-466d-bed6-89252ede49e5