**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC | ) ) ) | |
| and | ) ) | Case No. 1:09-CV-02333-GK Judge Gladys Kessler |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA | ) ) ) | Next-Scheduled Court Deadline: None Scheduled |
| Applicants, | ) ) | |
| v. | ) ) | |
| MADRIGAL CONDOMINIUMS, LLC | ) ) | |
| Respondent. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC'S AND TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S OPPOSITION TO MADRIGAL CONDOMINIUMS, LLC'S MOTION TO VACATE PORTIONS OF INTERIM ARBITRATION AWARD**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  THE RECORD PRESENTED IN THE ARBITRATION PROCEEDINGS FIRMLY
     ESTABLISHES THE BASIS FOR THE PANEL'S AWARD. ...............................2

     A.   Foulger Pratt Presented Considerable Evidence That Madrigal Purposefully
          Evaded Its Contract Administration Responsibilities to Avoid Accepting or
          Paying for the Project. ...................................................................................2

          1.   Madrigal Wrongly Refused to Accept Completed Units Until They Were
               Sold. ...................................................................................................3

          2.   Madrigal Purposefully Delayed Acceptance by Refusing to Define the Work
               Required for Final Completion. ...........................................................3

          3.   Madrigal Improperly Held Foulger-Pratt Responsible for Unit Owner Punch
               Lists for An Indefinite Duration. .........................................................4

          4.   Madrigal Improperly Held Foulger-Pratt Responsible for the Condominium
               Association Punch List for An Indefinite Duration. ............................5

          5.   Madrigal Abused Its Position as Owner and Development Manager to Avoid
               Its Payment Obligation to F-P. ............................................................6

          6.   Madrigal Could Not Avoid Lien Liability by Purposefully Preventing a
               Condition From Occurring That Would Otherwise Fix Its Obligation. .....7

     B.   The Operative Agreements Provide for the Arbitrability of the Disputes That Are
          the Subject of Madrigal's Motion to Vacate. ...................................................8

          1.   The APS Contemplates the Arbitration of Exterior Skin Contract
               Interpretation Issues. ...........................................................................8

          2.   The APS Contemplates the Arbitration of Disputes Pertaining to the
               Condominium Association's and Unit Owner's Punch Lists. ................8

          3.   The APS Contemplates the Arbitration of Disputes Concerning the Accrual of
               F- P's Payment Rights. ........................................................................9

     C.   Addressing the Scope of the Panel's Authority, at the Commencement of
          the  Hearings the Parties Confirmed the Panel's "Plenary Jurisdiction"
          to Address  Disputes Presented Under the Contract and the APS. ...................9

III. GOVERNING LAW AND STANDARD OF REVIEW .......................................10

     A.   Awards Made On Issues Submitted for Arbitration Will Not be Disturbed Based
          On a Challenge to Arbitrability. ....................................................................11

          1.   A Party is Barred From Challenging the Arbitrability of Claims It Freely
               Submitted for Determination During the Arbitration Proceeding. ...........11

          2.   A Party Submitting Claims to Arbitration Consents to the Authority of the
               Arbitrator to Resolve the Matters Presented. .......................................13

# TABLE OF CONTENTS
(continued)

Page

3.  Courts Will Not Review An Arbitrator's Decision Concerning "Procedural" Disputes Incident to Resolving Arbitral Claims, Such as Waiver of the Right to Arbitrate. ..................................................................................14

B.  **Judicial Review Of An Arbitration Award Is Extremely Limited.**...............................15

1.  Courts Defer to An Arbitrator's Interpretation of a Contract and Will Not Substitute a Judicial Resolution of a Dispute for An Arbitral One, Even Where a Court Finds Serious Error. ...............................................15

2.  Even Under the Broadest Construction of the DCRAA, An Arbitration Award Will Only be Set Aside When There Is Absolutely No Basis for the Award That Can be Inferred From the Record....................................................17

3.  A Court's Review of a Challenge to An Arbitration Award for Failure to Hear Evidence is Extremely Narrow...............................................................19

IV.  **ARGUMENT**......................................................................................................21

A.  **Madrigal Is Not Entitled to Evade the Panel's Decision On the Merits and/or Retry the Building Exterior Issues It Freely Submitted to Arbitration.**........................21

1.  Madrigal's Recent Contest to the Panel's Authority to Decide the Exterior Skin Contract Disputes Cannot be Squared With Its Actions During the Arbitration Proceedings. .....................................................................22

2.  Having Been Ensured a Fair Hearing, Madrigal Is Not Entitled to a Re-Hearing of the Exterior Skin Contract Disputes That It Had Raised and Made the Subject of "Considerable Hearing Time." .....................................................31

B.  **Madrigal's Claims for Estimated Costs to Perform Condominium Association and Unit Owner Punch Lists Yet to be Prepared Were Properly Denied and the Panel's Decision Rests Securely on the Contract and Madrigal's Manipulation of the Punch-List Process.** ..................................................................................36

C.  **Madrigal's Claim for Attorneys' Fees Related to F-P's Lien Filing Was Properly Denied and the Panel's Decision Rests Securely On the Record of Madrigal's Abuse of the Payment Process.**...........................................................................37

D.  **Madrigal Cannot Avoid the Panel's Decision On the Merits Awarding Interest On Payment Applications From the Dates Madrigal Should Have Made Payment.**.....39

E.  **Madrigal Is Not Entitled to Retry the Panel's Determinations Defining F-P's Remaining Warranty Requirements and Acknowledging F-P's Discharge of Any Remaining Close-Out Requirements as They Have Ample Support In the Record.**....41

1.  The Panel's Warranty Determinations Reflect Its Studied Deliberations Concerning the Parties' Competing Warranty Claims. ...........................................41

2.  The Panel's Determination That F-P Discharged Its Close-Out Obligations Is Firmly Rooted In the Project Record...............................................................43

## TABLE OF CONTENTS
(continued)

**Page**

**V.      CONCLUSION**......................................................................................................44

# TABLE OF AUTHORITIES

**Page**

**Cases**

Allendale Nursing Home, Inc. v. Local 1115 Joint Bd.,
377 F. Supp. 1208 (S.D.N.Y. 1974) ................................................................... 21

Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.,
362 F. Supp. 2d 284 (D.D.C. 2005) ............................................................. 14, 18

Arrowhead Global Solutions, Inc. v. Datapath, Inc.,
166 Fed. Appx. 39, 2006 WL 278393 (4th Cir. 2006) ..................................... 11

Bolton v. Bernabei & Katz, PLLC,
954 A.2d 953 (D.C. 2008) ....................................................... 15, 18, 20

Brown v. Rauscher Pierce Refsnes, Inc.,
994 F.2d 775 (11th Cir. 1993) ......................................................... passim

Cearfoss Constr. Corp. v. Sabre Constr. Corp.,
1989 WL 516375 (D.D.C. 1989) ...................................................................... 20

Celtech v. Broumand,
584 A.2d 1257 (D.C. 1991) ............................................................................. 19

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) ......................................................................................... 19

Data Mountain Solutions, Inc. v. Giordano,
2010 WL 145100, No. 08-1623 (D.D.C. 2010) ......................................... 11, 12

Davis v. Chevy Chase Fin., Ltd.,
667 F.2d 160 (D.C. Cir. 1981) ......................................................................... 16

Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Assoc.,
889 F.2d (5th Cir. 1989) .................................................................................. 17

Dolton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
935 A.2d 295 (D.C. 2007) ......................................................................... 18, 34

Envt'l Def. Fund, Inc. v. Costle,
657 F.2d 275 (D.C. Cir. 1981) ......................................................................... 19

Executone Info. Sys. Inc. v. Davis,
26 F.3d 1314 (5th Cir. 1994) ........................................................................... 17

Fairman v. D.C.,
934 A.2d 438 (D.C. 2007) ............................................................................... 16

Ficek v. S. Pac. Co.,
338 F.2d 655 (9th Cir. 1964) ........................................................................... 13

Green Tree Fin. Corp. v. Bazzle,
539 U.S. 444 (2003) ........................................................................................ 14

Grynberg v. BP P.L.C.,
585 F. Supp. 2d 50 (D.D.C. 2008) ................................................................... 13

Hammad v. Lewis,
638 F. Supp. 2d 70 (D.D.C. 2009) ................................................................... 20

Henson v. Morgan Stanley DW, Inc.,
2005 WL 1806426 (M.D. Tenn. 2005) ............................................................ 19

# TABLE OF AUTHORITIES
(continued)

**Page**

Hoteles Condado Beach, La Concha & Convention Ctr. v. Union de Tronquistas, Local 901,
   763 F.2d 34 (1st Cir. 1985) ........................................................................................ 21

Howard Univ. v. Metro. Campus Police Officer's Union,
   512 F.3d 716 (D.C. Cir. 2008) ........................................................................ 11, 12, 15

Howsam v. Dean Witter Reynolds, Inc.,
   537 U.S. 79 (2002) ...................................................................................................... 14

Int'l Assoc. of Machinists & Aerospace Workers v. Texas Steel Co.,
   69 F.2d 279 (5th Cir. 1981) ........................................................................................ 45

Inter-City Gas Corp. v. Boise Cascade Corp.,
   845 F.2d 184 (8th Cir. 1988) ...................................................................................... 17

Island Creek Coal Sales Co. v. City of Gainesville,
   729 F.2d 1046 (6th Cir. 1984) .................................................................................... 11

Jaffe v. Nocera,
   493 A.2d 1003 (D.C. 1985)............................................................................ 11, 12, 13

Jarrell v. Wilson Warehouse Co.,
   490 F. Supp. 412 (M.D. La. 1980)............................................................................. 13

John Wiley & Sons, Inc. v. Livingston,
   376 U.S. 543 (1964)................................................................................................... 14

Kanuth v. Prescott, Ball & Turben, Inc.,
   949 F.2d 1175 (D.C. Cir. 1991) ...................................................................... 15, 16, 17

Kurke v. Oscar Gruss & Son, Inc.,
   454 F.3d 350  (D.C. Cir. 2006).................................................................................. 15

Laszlo N. Tauber, M.D. & Assocs.,
   738 A.2d 1214 (D.C. 1999)....................................................................................... 16

Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
   481 F.3d 813 (D.C. Cir. 2007)............................................................................. 19, 20

Lopata v. Coyne,
   735 A.2d 931 (D.C. 1999) ................................................................................... 11, 12

Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO,
   144 F.3d 855 (D.C. Cir. 1998)................................................................................... 16

Major League Baseball Players Ass'n v. Garvey,
   532 U.S. 504 (2001) ................................................................................................... 16

Mastrobuono v. Shearson Lehman Hutton, Inc.,
   115 U.S. 52 (1995)..................................................................................................... 18

McDonald v. Rodriguez,
   184 B.R. 514 (S.D. Tex. 1995)................................................................................... 17

Naing Int'l Enterprises, Ltd. v. Ellsworth Assocs., Inc.,
   961 F. Supp. 1 (D.D.C. 1997).................................................................................... 33

Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union,
   589 F.3d 437 (D.C. Cir. 2009).................................................................................... 16

Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators'
   Warehouse Indep. Truck Drivers Union, Local No. 1,
   611 F.2d 580 (5th Cir. 1980) ........................................................................ 13, 15, 17

# TABLE OF AUTHORITIES

(continued)

**Page**

Publicis Commc'n v. True N. Commcn's Inc.,
  206 F.3d 725 (7th Cir. 2000) ............................................................. 11

Regnery Publ'g, Inc. v. Miniter,
  601 F. Supp. 2d 192 (D.D.C. 2009) ..................................................... 19

Southland Corp. v. Keating,
  465 U.S. 1 (1984) .............................................................................. 18

Teamsters Local Union No. 61 v. United Parcel Serv., Inc.,
  272 F.3d 600 (D.C. Cir. 2001) ............................................................ 14

United Food & Commercial Workers v. Marvel Poultry Co.,
  876 F.2d 346 (4th Cir. 1989) .............................................................. 45

Verizon Washington, D.C. Inc. v. Commc'ns Workers of Am., AFL-CIO,
  571 F.3d 1296 (D.C. Cir. 2009) .......................................................... 16

Wash. Hosp. Ctr. v. Svc. Employees Int'l Union,
  746 F.2d 1503 (D.C. Cir. 1984) .......................................................... 45

Woodland Ltd. P'ship v. Wulff,
  868 A.2d 860 (D.C. 2005) .................................................................. 14

Zeiler v. Deitsch,
  500 F.3d 157 (2d. Cir. 2007) .............................................................. 11

**Statutes**

9 U.S.C. § 10 ................................................................................ 15, 18, 20

9 U.S.C. § 9 ......................................................................................... 11

D.C. Code § 16-4311 ............................................................................ 20

D.C. Code § 16-4423 ....................................................................... 18, 20

D.C. Code § 16-4425 ............................................................................ 45

D.C. Code § 28-3302 ............................................................................ 40

## I.     INTRODUCTION

Applicants Foulger-Pratt Residential Contracting, LLC and Travelers Casualty and Surety Company of America (collectively referred to herein as "Foulger-Pratt" or "F-P") hereby submit their Opposition to Madrigal Condominiums, LLC's ("Madrigal") Motion to Vacate Portions of Interim Arbitration Award ("Motion to Vacate" or "MTV").

Properly understood, Madrigal's Motion to Vacate is contrived to avoid the outcome of having submitted numerous disputes in a lengthy arbitration process that resolved disputes relating to the Madrigal Lofts Condominium building (the "Project" or "Building").  What are now couched as claims beyond the reach of the arbitration panel (the "Panel") are the very same claims for which Madrigal first presented evidence without reservation.  Governing legal principles prevent a party from securing a "second bite at the apple" under these circumstances by barring a challenge to arbitrability after a claim has been submitted for determination.

Madrigal now also complains about the scope of authority exercised by the Panel.  Yet, the scope of the Panel's authority was addressed as a preliminary matter by the Panel, with both parties granting the Panel plenary authority to interpret and resolve disputes concerning the operative agreements.

Madrigal now also asserts for the first time that it was denied a fair hearing with regard to the contractual interpretation issues it presented concerning the Building's exterior skin.  Generally addressing the conduct of the proceedings, the Panel explained in its Interim Award ("Award") that it "has conducted the arbitration within the ambit of generally accepted principles of due process in arbitration, as reflected in all arbitration rules with which the Panel is familiar, and the requirements of the Federal Arbitration Act." (Ex. 1, Award Preamble 2).  Particularly addressing Madrigal's claims on the exterior skin, the Panel specifically notes its ruling is based on the ample submissions of the parties, emphasizing, "indeed, considerable hearing time was expended on these issues." (Ex. 1, Award ¶17.)

Finally, Madrigal attempts to selectively invade certain substantive determinations made by the Panel as "arbitrary and capricious." Madrigal's challenge represents a stark departure from the record in this matter and thusly, runs afoul of the governing legal principle granting arbitrators broad latitude to make substantive determinations free from all but the narrowest of scrutiny. Madrigal presents a stilted view of the Panel's considerations by ignoring the actual evidence presented at the hearings. Madrigal is reduced to making this type of challenge because even a cursory review of the evidence presented demonstrates that the Panel's decisions are firmly grounded in the record and are not subject to challenge as arbitrary and capricious.

The Panel's Award includes a statement of its studied consideration of the ample argument and evidence presented in the parties' claim submissions, briefs and during thirteen days of hearings. The parties voluntarily participated in what was contractually agreed to be a binding process and Madrigal cannot now avoid the result. (Ex. 1, Award Preamble 2-3.)

## II.   THE RECORD PRESENTED IN THE ARBITRATION PROCEEDINGS FIRMLY ESTABLISHES THE BASIS FOR THE PANEL'S AWARD.

Set forth below is a summary presentation of the evidence and argument presented in the arbitration which is relevant to the matters raised by Madrigal's Motion to Vacate. Even this necessarily brief treatment of the record establishes that the Award issued by the Panel stands on solid ground.

### A.   Foulger Pratt Presented Considerable Evidence That Madrigal Purposefully Evaded Its Contract Administration Responsibilities to Avoid Accepting or Paying for the Project.

Providing the appropriate context for considering the Motion to Vacate, the evidence presented in the arbitration leads to the inescapable conclusion that Madrigal had abandoned its contract administration responsibilities to avoid accepting and paying for the Project it was not selling during a downturn in the real estate market. Madrigal was particularly adept at creating obstacles to completion and payment as the very same individuals administered the Project on behalf of Madrigal and its Development Manager. (See Arb. Tr. 594:22-598:11.)

1.     Madrigal Wrongly Refused to Accept Completed Units Until They Were Sold.

Considerable evidence was provided that Madrigal was unwilling to accept completed but unsold units so that it could keep the contractor on the hook until these units were purchased.  (See Ex. 2, F-P Post-Hr'g Br. 54-61.)   Madrigal's refusal to accept completed work was highlighted by expert testimony juxtaposing the relative ease of the punch-list process for sold units with the unending cycle of punch lists issued for unsold units.  (See Ex. 3, NCC Expert Report 25-28; Arb. Tr. 2712:13-2715:18.)   The evidence presented concerning Madrigal's unit inspection process demonstrated that Madrigal delayed, abused and frustrated the unit punch-list process in each of the following ways: 1) Madrigal failed to conduct inspections in a timely manner (see Ex. 3, NCC Expert Report 25-28); 2) Madrigal improperly issued multiple/revolving punch lists for individual units to varying standards (see Arb. Tr. 1895:16-1896:20); and 3) Madrigal failed to properly control access to unsold units (see Arb. Tr. 735:3-21.)   The evidence showed that Madrigal's abuse of the punch-list process materially delayed final unit turnover and improperly made F-P serve as Madrigal's building maintenance contractor.  (See Ex. 3, NCC Expert Report 25-28.)

2.     Madrigal Purposefully Delayed Acceptance by Refusing to Define the Work Required for Final Completion.

The record in this case demonstrates that Madrigal misled F-P concerning the requirements for final completion. (See Ex. 2, F-P Post-Hr'g Br. 65-75.)  Most telling in this regard was how Madrigal intentionally withheld the necessary punch list that it had promised to provide.  (Id.)  Madrigal declared the Project as substantially complete as of June 1, 2008.  (See Ex. 4.)  Madrigal would then halt any further progress by refusing to provide its understanding of the work necessary to achieve final completion even though the parties' contract (the "Contract")[1] requires such a list.  (Id.; see also Arb. Tr. 1389:18-21.) Madrigal unequivocally took all responsibility for compiling this list.  (See Ex. 5.)  Madrigal, however, chose not to

---

[1] Relevant portions of the voluminous Contract documents including the Modified Standard Form of Agreement Between Owner and Contractor ("Agreement" or "Agmt."), the Modified General Conditions of the Contract for Construction ("General Conditions" or "Gen. Con."), and specific sections of the Reconciled GMP Set of Specifications ("Specifications" or "Spec.") are referenced herein.

provide the list as promised.

Madrigal's breach of its duty to define the requirements for final completion was the subject of extensive and at times dramatic testimony during the proceedings.  [(See Arb. Tr. 1401:4-15 (Mr. Brungart testimony that he knowingly refused to present the list Madrigal had committed to provide); Arb. Tr. 1510:16-20, 1511:8-17 (Mr. Brungart testimony that, despite Madrigal's advice to Foulger-Pratt, it never intended to forward the lists for final completion); Arb. Tr. 1968:3-1969:10, 3203:21-3204:12 (testimony that F-P advised Madrigal that F-P's relationship with its subcontractors would be severely impaired if it did not receive direction from Madrigal concerning the requirements for final completion); see also Ex. 5; Ex. 6.] Upon the weight of the evidence and argument presented (see Ex. 2, F-P Post-Hr'g Br. 65-77; Ex. 7, F-P Pre-Hr'g Br. 16-20), the Panel found that Madrigal breached the Contract by frustrating F-P's completion efforts, awarding delay damages to F-P for Madrigal's hindrance of final completion, and finding that any outstanding prerequisites for final payment were either satisfied or excused as a result of Madrigal's breaches preventing final completion.  (See Ex. 1, Award ¶¶12; 14(f).)   The Panel's determination that Madrigal breached the Contract by frustrating F-P's final completion efforts is not challenged by Madrigal's Motion to Vacate.

> 3.    Madrigal Improperly Held Foulger-Pratt Responsible for Unit Owner Punch Lists for An Indefinite Duration.

The evidence addressing Madrigal's claim for estimated costs to complete future "Condominium Unit Owner's Punch Lists" ("Unit Owner's Punch Lists") made clear that the Contract limited the time frame during which F-P was responsible to perform these lists.  (See Ex. 2, F-P Post-Hr'g Br. 62-65.) Specifically, the Contract affords the Contractor ninety (90) days after substantial completion to achieve final completion of the work. (See Ex. 8, Agmt. ¶4.3.)  During the ninety (90) day period between substantial completion and final completion the contractor is to perform Unit Owner's Punch Lists, but only to the extent such lists exist at that time. (Id. at ¶4.4.4.)

Madrigal declared the Project substantially complete as of June 1, 2008. [2]  (See Ex. 4.)  Madrigal's lead witness, Mr. Knopf, plainly understood that Madrigal was the unit owner of the unsold units and was able to issue the Unit Owner's Punch Lists as it saw fit during the Project.  Nonetheless, Madrigal chose not to designate any of its several punch lists as the Unit Owner's Punch List in an effort to hold F-P responsible as it postponed acceptance and sought buyers.  (See Arb. Tr. 777:15–779:20; see also Ex. 7, F-P Pre-Hr'g Br. 17-23.)

       4.      **Madrigal Improperly Held Foulger-Pratt Responsible for the Condominium Association Punch List for An Indefinite Duration.**

The parties provided extensive testimony concerning the issue of whether or not F-P's obligation to perform the "Condominium Association's Punch List" was unlimited in time or, in fact, expressly limited by the terms of the Contract.  (See Ex. 2, F-P Post Hr'g Br. 74-76; see also Ex. 7, F-P Pre-Hr'g Br. 24-26.)  The Contract adopts the same approach to the Condominium Association's Punch List as it does with the Unit Owner's Punch Lists.  The Contract affords the contractor ninety (90) days after substantial completion to achieve final completion of the work.  (Ex. 8, Agmt. ¶4.3.)  During the ninety (90) day period between substantial completion and final completion, the contractor is to perform the Condominium Association's Punch List but only to the extent such list exists at the time.  (Id.; see also Arb. Tr. 770:18-771:10.)

As was the case with Unit Owner's Punch Lists, Madrigal could have issued the Condominium Association's Punch List anytime after the substantial completion date, but chose not to do so.  (See Arb. Tr. 773:5-775:6.)  Mr. Knopf, as president and member of the condominium association's board of directors, described his role as representing the association, and acknowledged his control of the condominium association and its ability to issue the Condominium Association's Punch List.  (Arb. Tr. 597:1-9.) Testimony was elicited to support the conclusion that Madrigal's strategy was to keep F-P answerable to the building's condominium owners until these separate owners took control of the condominium association

---

[2] Madrigal submitted a liquidated damages claim for delayed substantial completion as part of the arbitration. The Panel, in a separate determination comprising part of its Award, denied two-thirds of that claim. That ruling is not raised as part of Madrigal's Motion to Vacate.

from Madrigal by not issuing a Condominium Association's Punch List.  (See Arb. Tr. 770:11-777:14.)

Based on ample supporting evidence, the Panel denied Madrigal's affirmative claim for estimated costs to complete an expected Condominium Association's Punch List and affirmed F-P's separate argument that the performance of this punch list was either satisfied in the form of other owner punch lists actually issued for each area of the Project or excused by Madrigal's failure to timely issue a punch list designated as the Condominium Association's Punch List.  (Ex. 1, Award ¶¶4(c), 14(f).)

> 5.   Madrigal Abused Its Position as Owner and Development Manager to Avoid Its Payment Obligation to F-P.

Laid bare, the evidence made manifest that Madrigal's refusal to pay any portion of the remaining Contract balance, in excess of $2.6 million, was nothing other than an attempt to hold F-P and the Contract balance captive until it completed its belated sale of the Project.  (See Ex. 2, F-P Post-Hr'g Br. 83-95.) Argument was presented that Madrigal breached its payment certification obligation by failing to provide F-P with the contractually-required written notice of the reasons for withholding funds and why this withholding was "necessary to protect the Owner." (Ex. 9, Gen. Con. ¶¶9.4.1, 9.5.1; see also Ex. 7, F-P Pre-Hr'g Br. 26-33; Ex. 2, F-P Post-Hr'g Br. 83-95.)  F-P also submitted evidence that, for over one year, Madrigal improperly hid behind the pretext of needing lien releases for all money spent on the entire Project as a condition for releasing any further progress payments.  (See Arb. Tr. 923:15-924:9; 3202:8-3203:20; see also Ex. 10, Spec. § 01290.1.5(f).)

The proofs made in the hearings ultimately exposed Madrigal as having an ulterior motive for nonpayment in that Travelers and F-P had proposed a contractually-based offer of indemnity to resolve the lien-release question which Madrigal unreasonably rejected.  (See Arb. Tr. 3208:15-3209:21; 3218:17-3220:6; see also Ex. 11.)  Evidence was also introduced establishing that Madrigal used its own failures preventing final acceptance, including its maladministration of the punch-list process, as an improper basis for withholding funds.  (See Arb. Tr. 925:13-928:4.)

6. <u>Madrigal Could Not Avoid Lien Liability by Purposefully Preventing a Condition From Occurring That Would Otherwise Fix Its Obligation.</u>

The record reveals how F-P was confronted with the specter of continuing to fund work in the untenable circumstance where Madrigal refused to pay, to substantiate its threatened backcharges, and to define the terms for final acceptance. Having tried all else, F-P availed itself to its right under the Contract to file a mechanic's lien on the Building. (<u>See</u> Arb. Tr. 3206:18-3227:8.)

On December 18, 2008, F-P filed a mechanic's lien on the Building in the amount of $2,636,469, which included amounts unpaid pursuant to Payment Application Nos. 27, 28, and 29. The Contract specifically preserves the contractor's lien rights in instances where funds certified by the Development Manager and Architect remain unpaid. (<u>See</u> Ex. 8, Agmt ¶14.6.1.) Madrigal's representatives administered the Contract on behalf of both Madrigal and the Development Manager (<u>see</u> Arb. Tr. 594:22-595:6). Madrigal positioned itself in the belief that its unilateral determinations to withhold certification as the Development Manager could impede payment and stymie F-P lien rights. The Panel found otherwise.

As it was established in the arbitration, F-P was justified in its lien filing as Madrigal had improperly refused to process payment applications. (<u>See</u> Part II.A.5 <u>supra</u> p. 6.) Yet, it was only later determined that Madrigal had mislead F-P concerning its certification actions. Through the arbitration process it came to light that *Madrigal* and the Architect had certified Payment Application No. 27 and that Madrigal received these funds from its lender. (<u>See</u> Ex. 10; <u>see also</u> Arb. Tr. 914:17–916:19.)[3]

Madrigal wrongly prevented certification of the remaining payment applications. Payment Application No. 28 was also certified by the Architect. (<u>See</u> Ex. 14.) Madrigal, however, had improperly refused to further process Payment Application No. 28 and prevented any review or processing of Payment Application No. 29. (<u>See</u> Ex. 15.)

---

[3] Madrigal's certification of Payment Application No. 27 was hidden by Madrigal during the Temporary Restraining Order ("TRO") hearing conducted in D.C. Superior Court, which took place prior to any discovery in the arbitration. During that hearing, Judge von Kann specifically inquired which entities had certified payment application No. 27. Rather than address the obvious import of the question, Madrigal created the impression that only the Architect had certified the payment application. (<u>See</u> Ex. 13, TRO Hr'g Tr. 14:20-15:3.)

At the hearing, F-P argued that Madrigal cannot rightly rely on its own purposeful breach of the Contract's payment provisions as a means to frustrate F-P's lien rights or to escape its own liability. (See Ex. 7, F-P Pre-Hr'g Br. 33-35.) The Panel agreed and denied Madrigal's claim for attorneys' fees.

> **B.      The Operative Agreements Provide for the Arbitrability of the Disputes That Are the Subject of Madrigal's Motion to Vacate.**

The arbitration provisions of the Contract set forth a procedure for all unresolved claims or disputes arising under or relating to the Contract to be resolved in arbitration.  (Ex. 9, Gen. Con. ¶4.4.1.)  The award rendered in an arbitration held pursuant to these provisions was expressly agreed to be "final, binding and conclusive on all parties involved."  (Id.)  This same provision also provides that "judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof."  (Id.)  Unless expressly provided otherwise, arbitration was the agreed upon means of dispute resolution.  The parties' Agreement of Partial Settlement ("APS") similarly contemplates the arbitration of the parties' claims and disputes which are the subject of Madrigal's Motion to Vacate. (See Ex. 16, APS ¶¶11, 12, 15.)

> 1.      The APS Contemplates the Arbitration of Exterior Skin Contract Interpretation Issues.

APS paragraph 15 specifically addresses the parties' dispute concerning the exterior skin of the building.  Paragraph 15 provides for the arbitration of disputes raised by F-P concerning the Gale Report.  Paragraph 15 then provides a further grant of authority to resolve contractual matters, stating "any dispute regarding the Contract requirements or Foulger-Pratt's obligation to perform any item shall be addressed during the arbitration as set forth in paragraph 11 of this APS."  (Id. at ¶15.)  Madrigal's Motion to Vacate ignores this separate and express grant of authority to the Panel and instead solely focuses on comments made concerning the Gale Report.

> 2.      The APS Contemplates the Arbitration of Disputes Pertaining to the Condominium Association's and Unit Owner's Punch Lists.

The parties also agreed in the APS to submit to arbitration the "Madrigal Claims."  (See Ex. 16, APS ¶11.)  These "Madrigal Claims" included the estimated costs of performing future Condominium

Association's and Unit Owner's Punch Lists, as well as other alleged backcharges.  (Id.; see also Ex. 17, Madrigal Outstanding Items 9 & 10.)  Further demonstrating the parties' intent to arbitrate their ongoing disputes in regards to the Condominium Association's and Unit Owner's Punch Lists, the parties agreed to arbitrate Madrigal's contention that F-P's right to final payment of the Contract balance was conditioned upon performance of these punch lists, and F-P's parallel contention that any obligation to perform the these punch lists were "not unlimited in time."  (Id. at ¶¶11, 12.)  Indeed, Madrigal's Motion to Vacate blithely omits that paragraph 12 of the APS explicitly submits these questions to arbitration.

> 3.   The APS Contemplates the Arbitration of Disputes Concerning the Accrual of F-P's Payment Rights.

The parties also agreed to arbitrate other matters relating to F-P's claim for final payment. Madrigal's contention that F-P's right to full payment was subject to the satisfaction of certain preconditions and its claim that it was entitled to attorneys' fees related to F-P's lien filing, required a finding as to when F-P's payment right accrued.  (Id. at ¶11.)  As F-P's claim for final payment and the Madrigal Claims necessarily involved the issue of when, and if, F-P's right to payment had accrued, F-P's claim necessarily involved interest provided for under the Contract for these delayed payments.  (Id. at ¶11, 17; see also Ex. 8, Agmt. ¶14.2; Ex. 9, Gen. Con. ¶13.6.1.)

Lastly, but no less significant, the parties further agreed to arbitrate "claims of the Parties that arise after the date of this APS".  (See Ex. 16, APS ¶11.)

**C.   Addressing the Scope of the Panel's Authority, at the Commencement of the Hearings the Parties Confirmed the Panel's "Plenary Jurisdiction" to Address Disputes Presented Under the Contract and the APS.**

At the outset of the proceedings the Panel engaged the parties to make certain the breadth of its authority.  In response to inquiry from the Panel as to the scope of its authority under the Contract and the APS, the parties presented their joint understanding of the Panel's expansive jurisdiction over the parties' disputes.  (See Ex. 1, Award Preamble 2; Ex. 18, May 26 Order ¶3.1; Arb. Tr. 23:14-26:18.)  Madrigal and F-P agreed that the parties' agreements granted the Panel "plenary jurisdiction" to resolve their disputes.

(Id.)  It was further recognized by all that the Panel's "plenary jurisdiction" encompassed disputes relating to the interpretation or application of the APS.  (Ex. 18, May 26 Order ¶3.1.)

The only recognized exception to the Panel's plenary jurisdiction is the specific carve out under paragraph 5.3 of the APS for the Project Neutral to resolve "disputes concerning the Items 1-8 Punch List." (Ex. 18, May 26 Order, ¶3.1.)  During the hearings, Madrigal envisioned a very narrow function for the Project Neutral to only resolve punch-list disputes.  (See Arb. Tr. 50:5-52:13; 64:6-65:3; Ex. 19.)  Consistent with its confirmation of the Panel's "plenary jurisdiction," Madrigal construed the APS to confer upon the Panel the authority to define the scope of the punch-list obligations and then for the Project Neutral to simply inspect the punch-list work performed and determine whether it was completed.  (Id.)  This authority, Madrigal believed at the time, prohibited the Project Neutral from addressing or interpreting the Contract's requirements.  (Id.)  Madrigal's post-award position that the Panel did not have authority to reach these issues is diametrically opposed to its prior stance.  Having already compelled the arbitration of these issues, at great expense, Madrigal's recently adopted contrary view should be swiftly dismissed.

## III.      GOVERNING LAW AND STANDARD OF REVIEW

In F-P's briefing in support of its Application to Confirm Arbitration Award, F-P demonstrated that the Federal Arbitration Act ("FAA") (9 U.S.C. §§ 1–16), supplies the rule of law for these proceedings.  (See F-P Reply Br. in Supp. of Application to Confirm Arb. Award, Docket No. 8.)  This conclusion is compelled by the parties' Contract and under the firm legal principle that the FAA is the presumed substantive law governing any arbitration that falls within its jurisdictional boundaries.  As Madrigal contests the applicability of the FAA in favor of the D.C. Revised Uniform Arbitration Act ("DCRAA") (D.C. Code §§ 16-4401-16-4432), and the Court has not yet ruled on this matter, the following is a recitation of the applicable law governing the Court's review of Madrigal's Motion to Vacate under either body of law.   No

matter which body of law the Court applies, arbitrators are afforded great deference in fashioning their award.  Applying this standard of review, the Panel's award must now be confirmed.[4]

> **A.      Awards Made On Issues Submitted for Arbitration Will Not be Disturbed Based On a Challenge to Arbitrability.**
>
> > 1.      A Party is Barred From Challenging the Arbitrability of Claims It Freely Submitted for Determination During the Arbitration Proceeding.

The controlling law in both the District of Columbia Circuit ("D.C. Circuit") and the District of Columbia ("D.C.") holds that a party cannot challenge the authority of an arbitrator to render a decision on a claim that the party had purposefully submitted to the arbitrator for determination.  See, e.g., Howard Univ. v. Metro. Campus Police Officer's Union, 512 F.3d 716, 720-21 (D.C. Cir. 2008); Lopata v. Coyne, 735 A.2d 931, 937-39 (D.C. 1999).   Before bringing any challenge to an arbitrator's authority after fully participating in an arbitration proceeding, courts require a party to demonstrate that it first raised an objection to arbitrability "clearly and explicitly" during the arbitration.  Data Mountain Solutions, Inc. v. Giordano, 2010 WL 145100 at *17, No. 08-1623 (D.D.C. 2010) (Friedman, J.); see also Jaffe v. Nocera, 493 A.2d 1003, 1010 n. 8 (D.C. 1985) ("[t]he objection to arbitrability must be specific").   By participating in an arbitration without objecting to arbitrability, the party is said to have consented to the submission and forfeited any opportunity to contest the issue later in court.  See, e.g., Howard Univ., 512 F.3d at 720.

The rule barring parties from first raising challenges to arbitrability in court prohibits a party from

---

[4] The Award is confirmable as to each separate issue fully disposed of by the Panel.  See cases cited in Section IV of Applicant's Reply Br. In Supp. of Application to Confirm Arb. Award, Docket No. 8, e.g., Zeiler v. Deitsch, 500 F.3d 157, 169 (2d. Cir. 2007) (affirming confirmation of award where it "finally and conclusively disposed of a separate and independent claim"); Island Creek Coal Sales Co. v. City of Gainesville, 729 F.2d 1046, 1049 (6th Cir. 1984), abrogated on other grounds, 529 U.S. 193 (2000) (affirming confirmation of interim order that finally and definitively disposed of discrete self-contained issues); see also Publicis Commc'n v. True N. Commcn's Inc., 206 F.3d 725, 729 (7th Cir. 2000); Arrowhead Global Solutions, Inc. v. Datapath, Inc., 166 Fed. Appx. 39, 2006 WL 278393 (4th Cir. 2006) (unpublished).

> Rather than contest the entirety of the Award, Madrigal only takes issue with Paragraphs 4(c), 4(d), 14(g), 14(g), 17, and portions of Paragraphs 10 and 14(d).  (See MTV 1.)  In challenging only a limited number of the Panel's rulings, Madrigal impliedly concedes that the Panel's Award does in fact fully dispose of numerous, separate issues presented by the parties.  Further, Madrigal concedes that the portions of the Award it does not seek to vacate, particularly in paragraphs 3, 4(b), 4(e), 4(f), 4(g), 5, 6, 7, 8, 12, 13, 14(a), 14(b), 14(c), 14(d), 14(e), 15, 18, and 19, are separate issues fully resolved and ripe for confirmation straightaway.  See 9 U.S.C. § 9 (court must confirm award unless it is vacated or modified).

submitting its claims to arbitration and then recanting its submission because the arbitrator issued an unfavorable award.  See Howard Univ., 512 F.3d at 720-721 (affirming a decision to deny a motion to vacate an arbitration award in part because the movant participated in the arbitration but failed to raise an objection to arbitrability until it filed its motion to vacate in the district court); Data Mountain, 2010 WL 145100 at *16-19 (barring a challenge to arbitrability in a motion to vacate because the objecting party went beyond silence and consented to arbitration); Lopata, 735 A.2d at 937 (holding that the objecting party was precluded from challenging arbitrability in court having sought resolution of his claims through arbitration and participated in the arbitration proceedings, stating that "Lopata cannot now object to the arbitrator's award simply because he disagrees with the result."); Jaffe, 493 A.2d at 1011 (concluding that the objecting party's participation in the arbitration without raising the issue of arbitrability "foreclosed [the party] from contesting the award on the grounds that the arbitrators 'exceeded their powers.'").

Requiring a party to raise a clear and explicit objection to the arbitrator's jurisdiction during the arbitration serves a vital function in the arbitration process.  First, a clear and explicit objection allows the parties to address the issue of arbitrability with the arbitrator before the parties needlessly expend time and resources in an arbitration proceeding.  See Howard Univ., 512 F.3d at 721.  Second, a clear and specific objection also places the other party on notice that it should consider petitioning a court to compel arbitration of the dispute.  Id.  In the absence of such an objection, the non-objecting party will have arbitrated the dispute having justifiably relied on the objecting party's participation in the arbitration, only to find out afterward that the objecting party has now decided to litigate the threshold issue of arbitrability in court.  Id. at 720.

As discussed herein, the record of the arbitration proceeding shows that each of the matters now contested were submitted to the Panel for determination with Madrigal's knowing consent.  Consequently, Madrigal makes no citation to the record noting its objection to arbitrability with respect to any of the claims subject to its Motion to Vacate.  For this reason, Madrigal's Motion to Vacate should be summarily denied.

2.      A Party Submitting Claims to Arbitration Consents to the Authority of the Arbitrator to Resolve the Matters Presented.

The scope of an arbitrator's decision-making authority is defined by the breadth and nature of the issues that the parties submit for decision.  As arbitration is considered a matter of contract, see, e.g., Grynberg v. BP P.L.C., 585 F. Supp. 2d 50, 54 (D.D.C. 2008) (Bates, J.), formation or modification of an agreement to arbitrate may be implied by conduct.  See Jaffe, 493 A.2d at 1010-1011 (party's attendance at hearings, testifying and defending the case on the merits evidenced consent to arbitrate).  Thus, courts have concluded that a party who arbitrates a dispute by offering evidence without reservation has agreed to arbitrate that dispute.  See id. citing Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1, 611 F.2d 580, 584 (5th Cir. 1980) (holding that the arbitrator acted within its jurisdiction to decide all of the disputes submitted for decision because "the grievance submitted to the arbiter defines his authority without regard to whether the parties had a prior legal obligation to submit the dispute"); Ficek v. S. Pac. Co., 338 F.2d 655 (9th Cir. 1964) (concluding that the voluntary submission of a dispute to arbitration evinced a subsequent agreement to arbitrate); Jarrell v. Wilson Warehouse Co., 490 F. Supp. 412, 416 (M.D. La. 1980) (rejecting a challenge to the arbitrability of a dispute because the party took part in the arbitration and offered evidence on the dispute without reservation or protest)).

As demonstrated in Part II.B above, the Contract and the APS expressly provide a basis for the Panel's authority to decide each of the separate determinations that Madrigal now seeks to vacate.  Nevertheless, even under the Madrigal's flawed construction of the operative agreements it was within the Panel's authority to make these independent determinations due to Madrigal's unreserved submission of the issues to arbitration during the proceedings.

3.    <u>Courts Will Not Review An Arbitrator's Decision Concerning "Procedural" Disputes Incident to Resolving Arbitral Claims, Such as Waiver of the Right to Arbitrate.</u>

Along with granting an arbitrator broad latitude to make substantive determinations free from all but the narrowest of judicial scrutiny, it is well-established that arbitrators are entitled to an even greater level of deference to decide whether a party has satisfied the conditions precedent to arbitrating a particular dispute. <u>Green Tree Fin. Corp. v. Bazzle</u>, 539 U.S. 444 (2003); <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79 (2002); <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543 (1964); <u>Teamsters Local Union No. 61 v. United Parcel Serv., Inc.</u>, 272 F.3d 600 (D.C. Cir. 2001); <u>Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.</u>, 362 F. Supp. 2d 284 (D.D.C. 2005) (Lamberth, J.); <u>Woodland Ltd. P'ship v. Wulff</u>, 868 A.2d 860 (D.C. 2005). Sometimes referred to as a question of "procedural arbitrability," the Supreme Court has stated that "allegations of waiver, delay, or a like defense to arbitrability" fall within the province of arbitrators to decide, not courts. <u>See</u> <u>Howsam</u>, 537 U.S. at 592 (internal citations omitted) <u>accord</u> <u>Woodland Ltd. P'ship</u>, 868 A.2d at 864-65 (holding that D.C. courts must defer to the arbitrator to decide whether a party waived the right to arbitrate).

Courts entrust arbitrators with the authority to rule upon an allegation that a party waived the right to arbitrate because such a claim is inexorably linked to the merits of an arbitrable dispute and bears on its final disposition. <u>See</u> <u>John Wiley & Sons</u>, 376 U.S. at 557. By sealing the bond between matters of "procedural arbitrability" and the substantive disputes of the parties, the Supreme Court has obviated the need for courts to engage in the onerous, if not impossible, task of disentangling the procedural and substantive matters of a dispute only for both forums to consider the same questions on the same facts. <u>Id.</u> at 557-58. Thus, affording deference to arbitrators on matters of "procedural arbitrability" has eliminated the risk that courts and arbitrators may reach either duplicative or contradictory conclusions that materially affect the outcome of the arbitrable disputes. <u>Id.</u>

14

Madrigal disregards this rule of law when presenting this court with its contention that F-P waived its right to arbitrate otherwise arbitrable issues pertaining to the building's exterior skin. (See MTV 20.) Notwithstanding Madrigal's mistaken conclusion on this matter, whether F-P preserved its right to arbitrate certain disputes is unquestionably an issue that courts have said should be resolved by arbitrators. For this reason, Madrigal's attempt to raise a question of "procedural arbitrability" before this Court should be rejected.

**B.      Judicial Review Of An Arbitration Award Is Extremely Limited.**

        1.      Courts Defer to An Arbitrator's Interpretation of a Contract and Will Not Substitute a Judicial Resolution of a Dispute for An Arbitral One, Even Where a Court Finds Serious Error.

The strong federal policy respecting dispute resolution through arbitration rests upon the cornerstone principle that judicial review of an arbitral award will be extremely limited. Kurke v. Oscar Gruss & Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006); Bolton v. Bernabei & Katz, PLLC, 954 A.2d 953, 959 (D.C. 2008). Because courts have refused to rigorously scrutinize an arbitration award, a party confronts "a heavy burden" when seeking to set it aside. Bolton, 954 A.2d at 959. A court's review of an arbitration award is particularly narrow where, as here, the parties agreed that the Panel's substantive determinations would be final, binding and conclusive. (See Ex. 8, Agmt ¶4.4.1.); see also Howard Univ., 512 F.3d at 720 (parties agreed to be bound by arbitrator's interpretation of the contract without regard to whether a judge would reach the same result); Piggly Wiggly, 611 F.2d at 585 (explaining that a substantive review of an award is prohibited when the parties' agree that the arbitrator's award would be final).

Courts in this circuit have not afforded any relief from this heavy burden when it is alleged that the arbitrators have exceeded their powers in the award issued. This was made clear when the D.C. Circuit explained that it is "particularly necessary to accord the narrowest of readings to the excess-of-authority provision" of 9 U.S.C. § 10(a)(4). Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1180 (D.C. Cir. 1991) (discussing same provision of the original United States Arbitration Act); see also Fairman v. D.C.,

934 A.2d 438, 442 (D.C. 2007) (explaining that courts will not review an arbitration award on the merits to determine whether an arbitrator has exceeded his powers).  The court in <u>Kanuth</u> emphasized that the excess-of-authority provision does not "confer on courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral one."  <u>Kanuth</u>, 949 F.2d at 1180.

Applying the extremely limited standard of review, the D.C. Circuit and the D.C. Court of Appeals have continually rejected attempts to set aside an award as being made in excess of authority when a party is dissatisfied with the arbitrator's interpretation of the contract.  <u>See</u> <u>Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union</u>, 589 F.3d 437 (D.C. Cir. 2009); <u>Verizon Washington, D.C. Inc. v. Commc'ns Workers of Am., AFL-CIO</u>, 571 F.3d 1296 (D.C. Cir. 2009); <u>Madison Hotel v. Hotel & Rest. Employees, Local 25, AFL-CIO</u>, 144 F.3d 855 (D.C. Cir. 1998); <u>Laszlo N. Tauber, M.D. & Assocs.</u>, 738 A.2d 1214 (D.C. 1999).  Relying on the standard reiterated by the Supreme Court in several cases, <u>see, e.g.</u>, <u>Major League Baseball Players Ass'n v. Garvey</u>, 532 U.S. 504 (2001), the D.C. Circuit has stated that courts in this circuit should conduct a highly deferential review of an arbitrator's decision and confirm the award  "even if the court is convinced the arbitrator committed serious error."  <u>Nat'l Postal Mall Handlers Union</u>, 589 F.3d at 441 (internal quotations omitted); <u>see also</u> <u>Kanuth</u>, 949 F.2d at 1180; <u>Laszlo</u>, 738 A.2d at 1219.

Madrigal improperly attempts to skew the standard of review to be applied by the Court by relying upon a select few, anomalous cases.  In these cases the courts recognized that their review of the arbitrator's award must be limited, yet the courts were nevertheless constrained to vacate the arbitrator's decisions because in each of these exceptional circumstances the arbitrators crafted relief that extended way beyond the scope of the parties' agreement by plainly contradicting or completely ignoring unambiguous contractual terms.  <u>See</u> <u>Davis v. Chevy Chase Fin., Ltd.</u>, 667 F.2d 160 (D.C. Cir. 1981)[5] (ruling on an issue of

---

[5] <u>Davis</u> is also distinguishable from this case because the party seeking to vacate the arbitration award raised two clear objections in the arbitration proceedings challenging the arbitrator's authority to decide whether his stock should be transferred, and he expressly reserved his right to challenge any award on jurisdictional grounds in court.  <u>Davis</u>, 667 F.2d at 166, at 123.  Here, Madrigal failed to raise in the arbitration any clear and specific objection to the Panel's authority to decide any of the issues that Madrigal now claims are non-arbitral, thus barring its challenge to arbitrability in its Motion to Vacate.  <u>See</u> Part III.A.1 and III.A.2 <u>supra</u>, pp. 11-13.

arbitrability and finding that the arbitrator's authority was unambiguously limited to determining the fair market value of shares, yet the arbitrator ordered the conveyance of the shares); Inter-City Gas Corp. v. Boise Cascade Corp., 845 F.2d 184 (8th Cir. 1988) (holding distinguished on its facts in Kanuth because the arbitrator's award subject to review in Boise Cascade "completely ignored the contract" by rejecting the rate specifically stated in the agreement); McDonald v. Rodriguez, 184 B.R. 514 (S.D. Tex. 1995) (arbitrator recognized that he intentionally disregarded his contractual authority in an effort to, as the court described, assist "well-intentioned people who should win notwithstanding the clear language of a settlement agreement").[6]

Madrigal did not, and otherwise cannot, meet the heavy burden of establishing that the Panel completely ignored or plainly contradicted the Contract or the APS when making the separate determinations in the Award that are now subject to Madrigal's challenge.  The Panel's Award faithfully adhered to the Contract and the APS but at the very least, is founded upon a plausible construction of these agreements and is therefore confirmable.  Indeed, as set forth in another case Madrigal relies upon, Executone Info. Sys. Inc. v. Davis, 26 F.3d 1314, 1328-29 (5th Cir. 1994), an award is confirmable as within the arbitrators' scope of authority so long as it is "rationally inferable" from the parties' agreement.[7]

2. Even Under the Broadest Construction of the DCRAA, An Arbitration Award Will Only be Set Aside When There Is Absolutely No Basis for the Award That Can be Inferred From the Record.

The parties' Contract contemplates the FAA as the substantive law to govern these proceedings when it states that "[t]he award rendered by the arbitrators shall be final, binding and conclusive on all parties

---

[6] Madrigal's last case on this point, Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Assoc., 889 F.2d (5th Cir. 1989), similarly involves the unusual circumstance where the arbitrator knowingly disregarded the scope of his authority.  In that case, the arbitrator was only charged with deciding whether the company had "proper cause" to terminate a union member's employment, which by the terms of the agreement, included "carelessness."  Delta Queen, 889 F.2d at 601.  Even though the arbitrator found that the union member was "grossly careless," he nevertheless decided that discharge would be "unfair" under the circumstances and ordered the company to reinstate the union member.  Id.  As a result of this exceptional action taken by the arbitrator, the court found the arbitrator to have acted without authority when he reinstated the union member's employment.  Id. at 604.

[7] Madrigal's reliance on Executone is particularly striking for another reason.  The court in Executone reaffirmed its prior holding in Piggly Wiggly that is also applicable to this case, explaining that, "[i]f the parties go beyond their promise to arbitrate and actually submit an issue to the arbitrator, we look both to the contract and to the scope of the submissions to the arbitrator to determine the arbitrator's authority" Executone, 26 F.3d at 1323 (emphasis in original).

involved, and judgment may be entered upon it in accordance with *the applicable law in any court having jurisdiction thereof*." (See Ex. 9, Gen. Con. ¶4.4.1) (emphasis added). In the parties' briefing on the applicable law, Madrigal did not contest the fact that the Contract and parties' agreement to arbitrate involves a transaction that falls within the jurisdictional boundaries of the FAA.[8]

Nonetheless, Madrigal now seeks to escape the narrow grounds for vacatur that are available under the FAA by expanding the DCRAA's "other reasonable ground" provision (D.C. Code § 16-4423(b))[9], stating that this provision incorporates all "recognized common law grounds for vacating an award," while conceding that this broader standard of review "is not applicable to FAA-governed proceedings." (See MTV 14.)[10] Furthering this proposition, Madrigal challenges the Award as arbitrary and capricious. (Id.) Nonetheless, even if the Court finds that the DCRAA's "other reasonable ground" language allows for such a challenge,[11] Madrigal does not avoid the formidable burden when seeking to vacate an arbitral award.

D.C. courts are aligned with the general common law in expressing a historical distaste for disturbing arbitration awards and uniformly apply onerous standards of review when faced with motions to vacate. See Bolton, 954 A.2d at 960; Dolton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 935 A.2d 295, 298 (D.C. 2007). This is particularly true when a party challenges an award as being arbitrary or capricious, which can

---

[8] The FAA is the applicable body of substantive law because the parties did not expressly opt out of its governance. See Mastrobuono v. Shearson Lehman Hutton, Inc., 115 U.S. 52, 60 (1995) (FAA provides the substantive law when federal jurisdiction is available and the parties have not explicitly opted out by adopting state arbitration law). This Contract does not expressly adopt a state arbitration law. Indeed, the parties agreed at the onset of the arbitration that the Panel would conduct an "ad hoc" arbitration "within the ambit of generally accepted principals of due process in arbitration," rather than an arbitration subject to a particular locality's arbitration law. (See Ex. 1, Award 2.) Because the FAA constitutes the applicable substantive law, see, e.g., Southland Corp. v. Keating, 465 U.S. 1, 16 (1984) (FAA "creates federal substantive law requiring the parties to honor arbitration agreements"), there is simply no need for this court to conduct a choice of law analysis, which by its nature is geared at ascertaining the substantive law applicable to a case.

[9] F-P resists Madrigal's expansive reading of D.C. Code § 16.4423(b). [See F-P's Reply Br. In Support of Application to Confirm Arbitration Award 19-26 (Docket No. 8).]

[10] The FAA does not allow for review under the arbitrary and capricious standard proposed by Madrigal. Am. Postal Workers Union, AFL-CIO, 362 F. Supp. 2d at 290 ("while 9 U.S.C. § 10 (a) outlines cases in which a United States District Court may vacate an arbitration award, the arbitrary and capricious standard is not included in any of the provisions").

[11] Madrigal's treatment of the DCRAA's legislative history concerning the "other reasonable ground" provision is incomplete. A thorough review of the legislative history reveals that the debate is presented in the consumer protection context, and the flexibility sought is to protect consumers from being subject to an unfair dispute process required in circumstances where parties have unequal bargaining power. [See MTV 14 (citing to MTV Ex. 10 and correspondence from Center for Responsible Lending therein).]

18

only be a ground for vacatur when there is absolutely no basis for the arbitrators' decision that can be inferred from the facts of the case.  Brown v. Rauscher Pierce Refsnes, Inc., 994 F.2d 775, 781 (11th Cir. 1993); (award may be vacated as arbitrary and capricious only if the arbitrator's reasoning is so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling); see also Celtech v. Broumand, 584 A.2d 1257, 1258-59 (D.C. 1991) (stating that under the arbitrary and capricious standard, the burden on a party seeking to set aside the award remains a formidable one); Henson v. Morgan Stanley DW, Inc., 2005 WL 1806426, at *6 (M.D. Tenn. 2005) (award is arbitrary and capricious only if it "flies in the face of a clearly established state statute").  Madrigal concedes that a court may not substitute its substantive judgment for that of the arbitrators, and by analogy to the administrative review context, that judicial oversight is only available in extreme circumstances, such as where an arbitrator's decision "is so implausible that it could not be ascribed to a difference in view."  (MTV 15.)  Indeed, Madrigal plainly acknowledges by analogy that a court's review of an arbitration award is extremely narrow, and that a court should presume the award to be valid in all but the most egregious circumstances.  See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("[t]he court is not empowered to substitute its judgment for that of the agency"); Envt'l Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981) (explaining that arbitrary and capricious review is highly deferential, mandating judicial affirmance if there is a rational basis for the decision).

Madrigal cannot satisfy this onerous burden.  As demonstrated herein, the Panel's determinations are firmly rooted in the record, but under any construction, these determinations have a rational basis. Thus, Madrigal cannot simply substitute its preferred outcome from the one it received.

3.    A Court's Review of a Challenge to An Arbitration Award for Failure to Hear Evidence is Extremely Narrow.

Respecting the role of arbitration in the speedy resolution of disputes, Regnery Publ'g, Inc. v. Miniter, 601 F. Supp. 2d 192, 194 (D.D.C. 2009) (Sullivan, J.), courts have been loathe to interject judicial oversight into the manner in which an arbitrator receives evidence in the hearings before them.  See Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 481 F.3d 813, 816-19 (D.C. Cir. 2007); Hammad v. Lewis, 638

F. Supp. 2d 70, 75 (D.D.C. 2009) (Kennedy, J.) ("[a]rbitration panels are afforded broad discretion with respect to evidentiary determinations"). As a result, a party challenging an award based upon an alleged refusal to hear evidence faces a heavy burden. When reviewing these challenges under the similar grounds for vacatur provided for in the FAA[12] and the DCRAA,[13] courts have been unwilling to constrain arbitrators in the receipt or rejection of evidence unless the arbitrator actually *refuses* evidence so as to undermine a party's right to a fundamentally fair hearing. See Lessin, 481 F.3d at 816; Bolton, 954 A.2d at 960.

Arbitrators are afforded great latitude when structuring the proceedings. Courts will find a proceeding to be fundamentally fair when a party received as much as an adequate opportunity to present its case. See e.g., Bolton, 954 A.2d at 960. Accordingly, arbitrators may within the bounds of their discretion decide that sufficient evidence has already been submitted and that further evidence will only prolong the proceedings without affecting the outcome. See Lessin, 481 F.3d at 820 (finding that the panel's decision not to hear from a second expert did not deprive a party from a fair hearing because the panel had previously heard sufficient evidence to conclude that the proffered testimony of the second expert would be immaterial); Cearfoss Constr. Corp. v. Sabre Constr. Corp., 1989 WL 516375 (D.D.C. 1989) (Hogan, J.) (concluding that an arbitrator's decision to receive exhibits into evidence without testimony did not deprive a party of a fair hearing having previously presented its case in full and cross-examined all of the opposing party's witnesses); Bolton, 954 A.2d at 960 (holding that a party had ample opportunity to present her case and received a fair hearing).

The record proves that the Panel afforded Madrigal ample opportunity to present its case; an opportunity well surpassing any threshold requirement for a fair hearing. (See Ex. 1, Preamble 2-3 & ¶17.) Emblematic of its overall approach, the Panel, at Madrigal's behest, accepted for consideration binders of documents collected by Madrigal as germane to a particular issue in dispute, with or without supporting

---

[12] See 9 U.S.C. § 10 (a)(3).
[13] Although D.C. courts have not yet addressed the standard for vacating an award due to an alleged refusal to hear evidence under D.C. Code § 16-4423(a)(3), that provision has remained relatively unchanged from its predecessor in the repealed D.C. Arbitration Act, D.C. Code § 16-4311(a)(4).

20

witness testimony.  (See Arb. Tr. 1226:16-1227:7.)  Given the Panel's indulgence, Madrigal's cases, which involve extraordinary examples of arbitral misconduct for refusing to accommodate the parties, are plainly inapplicable here.  See, e.g., Allendale Nursing Home, Inc. v. Local 1115 Joint Bd., 377 F. Supp. 1208 (S.D.N.Y. 1974) (arbitrator denies an adjournment despite a serious illness of a party representative); Hoteles Condado Beach, La Concha & Convention Ctr. v. Union de Tronquistas, Local 901, 763 F.2d 34, 40 (1st Cir. 1985) (arbitrator refuses to give *any* weight to otherwise relevant evidence).

## IV.    ARGUMENT

By its overtly misleading account of the proceedings, Madrigal seeks to divorce this Court's inquiry from the record that provides the foundation for the Panel's Award.  Madrigal ignores the record because its Motion to Vacate is exposed as wanting when cast in the light of what actually happened.

### A.    Madrigal Is Not Entitled to Evade the Panel's Decision On the Merits and/or Retry the Building Exterior Issues It Freely Submitted to Arbitration.

Some of the more hotly contested disputes during the thirteen days of hearings before the Panel concerned the Contract's requirements for the Building's exterior skin.  The parties' disputes in this regard centered on four issues: (1) whether the Contract documents require Foulger-Pratt to extend .090 aluminum flashing beyond certain exterior windows and to provide end-dams at these locations; (2) whether a two-inch gap between the bottom of the exterior metal panels and the concrete slab at the roof level resulted from a design defect or a construction defect; (3) whether the Contract documents call for thermal insulation between the metal panels and edge of the concrete slab at each floor; and (4) whether Contract specification § 08911 (Glazed Aluminum Curtain Wall) governed the construction and warranty requirements for the metal panel system.  (Ex. 1, Award ¶17.)  The Panel, after duly deliberating on the substantial amount of evidence submitted by the parties on these disputes, ruled against Madrigal.  (Id. at ¶17.)

Despite its unreserved submission of these disputes for determination, Madrigal has responded to the unfavorable result by objecting for the first time in its Motion to Vacate that the Panel never had the authority

to decide three of the four exterior skin contract disputes ("Exterior Skin Contract Disputes").[14]  This belated

challenge should be rejected.

>    1.    Madrigal's Recent Contest to the Panel's Authority to Decide the Exterior Skin Contract Disputes Cannot be Squared With Its Actions During the Arbitration Proceedings.

Madrigal now contends that the Panel does not have jurisdiction to resolve the Exterior Skin

Contract Disputes.  Yet, during the arbitration Madrigal argued for, and offered evidence in accordance with,

a dramatically different view of the Panel's authority.  Indeed, during the arbitration proceedings, Madrigal

introduced extensive evidence on the Exterior Skin Contract Disputes while consistently maintaining that

these disputes must be resolved by arbitration.  Rather than object to the arbitrability of the Exterior Skin

Contract Disputes, Madrigal insisted that they be decided.

>    a.    *Madrigal Argued That the Panel Was to Decide the Exterior Skin Contract Disputes.*

Madrigal initially pressed the Panel to resolve the Exterior Skin Contract Disputes as a condition

precedent to initiating the punch-list review process provided for in the APS.  Expressing its then-

interpretation of the APS as requiring the Panel's resolution of the Exterior Skin Contract Disputes as

opposed to the Project Neutral, Madrigal's Pre-Hearing Brief argues:

> The plain terms of Paragraphs 15 and 11 of the APS require that an arbitral determination regarding any dispute regarding the Contract requirements or Foulger-Pratt's obligation to perform any item identified in the GALE Reports be reached prior to the completion and certification of the punch-list work included in Paragraph 5 of the APS.

(Ex. 19, Madrigal Pre-Hr'g Br. 18) (emphasis in original).

During pre-hearing argument before the Panel, counsel for Madrigal reiterated its position that the

Panel's rulings on the Exterior Skin Contract Disputes were to inform the Project Neutral process.  Counsel

stated:

---

[14] Madrigal does not challenge the Panel's authority to determine that the Contract documents do not require installation of thermal insulation at each concrete floor slab. (MTV 20.)  Since the arbitrability of the thermal insulation dispute is undisputed, it will not be referenced in the following discussion explaining why the Exterior Skin Contract Disputes were arbitrable.

Additionally, in order for the exterior Project Neutral to evaluate whether item 6 of the punch list work has been completed, we have to have a ruling from the panel as to what those obligations are.

(Arb. Tr. 50:22-51:4.)

> b.   *Madrigal's Presentation of Evidence Relating to the Exterior Skin Disputes Comports With Its Previous View of the Project Neutral's Narrow Function.*

Madrigal, in its Motion to Vacate, contradicts its prior interpretation of the APS by offering a new interpretation of paragraph 5.3 which confers plenary authority upon the Project Neutral to determine all disputes regarding the Punch-List.  (See MTV 18.)  Madrigal begins crafting this new argument for the expanded role of the Project Neutral by changing the paragraph 5.3 dispute language from "in the event of a dispute concerning the Items 1-8 Punch-List Work" to *all* disputes concerning the Punch-List.  (Ex. 16, APS ¶5.3.)  Then, under the Project Neutral's supposed plenary authority, Madrigal now asserts that the Project Neutral is to decide all "technical issues" regarding the exterior skin, apparently failing to recognize that this phrase is not found anywhere in the APS.  (See MTV 16.)

Madrigal's new argument contradicts itself, the record, and its prior interpretation of the APS.  As a threshold matter, there would be no conceivable purpose to setting aside any exterior skin issues that were not yet ripe for a subsequent arbitration proceeding had they been within the purview of the Project Neutral.  [See Ex. 1, Award ¶14(a) (noting the parties' *agreement* to reserve an exterior skin claim not yet ripe for determination to a subsequent proceeding to be scheduled before the Panel).]  Moreover, if in Madrigal's view the Project Neutral was given plenary authority over all exterior skin issues, it is inexplicable why Madrigal would submit extensive evidence and argument on matters the Panel had no business deciding. See Part IV.A.1.c infra pp. 24-28.  Moreover, Madrigal's present view ignores paragraphs 15 and 11 of the APS, which cede all exterior skin contract interpretation disputes to the Panel, as well any disputes that arise between the parties after execution of the agreement.  (Ex. 16, APS. ¶¶11,15.)

Finally, Madrigal's new interpretation of the Project Neutral's role must be rejected because Madrigal freely submitted these matters to arbitration in accordance with its previous interpretation.  During

23

the hearings, Madrigal argued vociferously for the Project Neutral's responsibility to be severely restricted. To Madrigal, the division of authority between the Panel and the Project Neutral was clear-cut – the Panel was given broad authority to define the Contract requirements, while the Project Neutral would simply perform the discreet task of determining whether or not punch-list work was completed according to those defined Contract requirements.   See supra, Part II.C, p. 9.   Counsel for Madrigal expressed this understanding in response to questions by the Panel as follows:

> MR. DAVISON:  The Project Neutral was not supposed to go out and make determinations whether or not this item would be in or out of the contract, whether it was a contract obligation, yes or no, but to determine simply is it done.

(Arb. Tr. at 64:6-65:3.)

Madrigal sent a follow-up letter to the Panel again advancing its interpretation that the Exterior Skin Contract Disputes were for the arbitrators to decide, stating:

> The Project Neutral is not tasked with interpretation of the Contract and Contract documents.
> …
> Any dispute regarding 'adjustment or interpretation of the Contract terms' must be resolved in accordance with General Conditions Article 4.  The APS does not change this contract requirement.  (APS ¶17)

(Ex. 20.)

> ### c.   Madrigal Submitted the Exterior Skin Contract Disputes to Arbitration and Cannot Now Be Heard to Contest the Arbitrability of These Claims.

True to its pre-hearing stance, Madrigal submitted the Exterior Skin Contract Disputes to the Panel for resolution.  As the hearings unfolded, the Panel received ample evidence from both parties on the myriad facts underlying these disputes.  Indeed, the Panel professed on the face of the Award that "all parties have been heard on these issues" and that the Exterior Skin Contract Disputes were the subject of "considerable hearing time." (Ex. 1, Award ¶17).

It is important to understand that Madrigal presented extensive evidence on the Exterior Skin Contract Disputes as claimant in the arbitration, without any reservation.  In its case-in-chief, Madrigal elicited testimony from three separate witnesses on these matters.  Madrigal's evidence included expert

testimony given by Mr. Douglas Carter, a principal of Davis Carter Scott, Ltd. – the project architect (the "Architect").  The following compilation of the hearing evidence is presented to provide this Court with a sense for the extent to which the Exterior Skin Contract Disputes were addressed in the arbitration proceedings.

(i)      Madrigal Raised and Fully Arbitrated Its Claim That .090<br>Aluminum Flashing Should Extend to the Masonry Walls.

A dispute arose concerning the Contract's requirements for .090 aluminum flashing at certain exterior windows after the period during which F-P was to provide comment on the Gale Report.  During F-P's efforts to perform the Gale Report corrective work, Madrigal made known its interpretation that the Gale Report's reference to "continuous" flashing meant that the flashing should wrap around the front and the side of the concrete floor slabs above the windows and terminate at the masonry walls.  (See Arb. Tr. 374:19-376:16 (Knopf).)  F-P, on the other hand, had understood "continuous" to mean that flashing on the concrete slabs should be installed in an uninterrupted manner (i.e. not broken) where the referenced detail required it to be installed – on the front of the concrete slabs, above the windows, and not on the sides of the slabs.  (See Arb. Tr. 2950:5-2952:11; Ex. 21.)  Madrigal's interpretation of "continuous" was not evident from the face of the Gale Report and therefore, triggered an "after arising" claim between the parties to be resolved by arbitration.  (See Ex. 16, APS ¶11.)

Madrigal submitted its interpretation of "continuous" to the Panel for resolution during its case-in-chief.  Mr. Knopf and Mr. Brungart testified regarding this issue on numerous occasions.  [Arb. Tr. 374:19-376:16 (Knopf); 389:19-390:20 (Knopf); 983:5-984:3 (Knopf); 1139:14-1140:9 (Brungart); 1182:20-1183:10 (Brungart); 1187:4-1187:22 (Brungart); 1190:3-1192:18 (Brungart); 1269:21-1270:19 (Brungart); 1285:6-1286:6 (Brungart).]

Madrigal incorrectly argues in its Motion to Vacate that F-P did not present its contrary understanding of the meaning of "continuous" until submitting its post-hearing brief.  Foulger-Pratt's expert, Mr. Lockhart, responded to Madrigal's testimony by addressing the Contract drawings and details for the

25

windows at issue and identifying precisely where flashing is indicated as being required. (Arb. Tr. 2950:5-2969:20.) Madrigal cross-examined Mr. Lockhart on the this issue (see Arb. Tr. 3145:21-3150:2) and then offered further testimony during its rebuttal case from Mr. Brungart (see Arb. Tr. 3458:10-3464:16) and from Mr. Sharabi, ex-Chief Executive Officer of Glen Construction Company, the original contractor for the project (see Arb. Tr. 3376:17-3382:16).

(ii)     Madrigal Raised and Fully Arbitrated Its Claim Concerning the Gap Between the Metal Panels and the Concrete Slab At the Roof Level.

As was the case with the aluminum flashing dispute, the question as to which party is responsible for the existence of a gap between the metal panels and the concrete roof slab (the "Parapet") arose after F-P's opportunity to comment on the Gale Report. This issue only became a dispute when Madrigal claimed for the first time in April 2009 that the gap condition was caused by an "overpour" of concrete that required drastic corrective measures. (See Ex. 22.) Based on its misunderstanding, Madrigal then rejected F-P's proposed solution to address the two-inch gap which the Architect had conditionally approved subject to comment by Madrigal. (Id.; see also Ex. 23.) Madrigal's contention of an "overpour" and its extreme position on the type of corrective work necessary to fix the condition could not be inferred from the Gale Report itself.

The arbitration record demonstrates that Madrigal submitted its "overpour" contention to the Panel for decision. Madrigal first addressed this issue in its pre-hearing brief (Ex. 19, Madrigal Pre-Hr'g Br. 22), and then once the hearings began, it submitted considerable testimony concerning the "overpour" during its case-in-chief. (Arb. Tr. 383:11-384:10 (Knopf); 390:21-392:1 (Knopf); 996:20-998:11 (Knopf); 1274:14-1275:8 (Brungart)). In addition to the testimony elicited from Madrigal's representatives, the Architect testified extensively for Madrigal on the project design and opined that the gap between the metal panels and the Parapet was caused by an "overpour." (Arb. Tr. 1578:15-1597:13 (Carter)).

Foulger-Pratt responded to Madrigal's testimony during cross-examination and Mr. Lockhart's direct examination by offering evidence that the gap condition resulted from Madrigal's design error, not an

overpour of the concrete.  (Arb. Tr. 2969:22-2980:19; 3142:14-3143:5.)  Madrigal offered rebuttal evidence from Mr. Sharabi, who testified concerning the division of responsibility for coordinating the designs and drawings for the Parapet.  (Arb. Tr. 3370:9-3373:22.)

        (iii)     Madrigal Raised and Fully Arbitrated Its Claim That § 08911 Governed The Metal Panels System.

The record also demonstrates that Madrigal sought the Panel's ruling concerning which specification controlled the exterior metal panel installation.  Madrigal argued to the Panel that Contract Specification § 08911 ("Glazed Aluminum Curtain Wall") ("§ 08911") governs the metal panels system installed on the project as opposed to the separate Specification § 07412 ("General Façade/Cladding Specifications Utilizing Alucobond Material").  It is indisputable that Madrigal submitted its claim concerning the applicability of § 08911 as an after-arising claim subject to arbitration under paragraphs 11 and 15 of the APS.  Madrigal essentially concedes this point when it recognizes that the Gale Report never references § 08911 as governing the metal panels system and therefore, F-P could not have waived the right to arbitrate this dispute by failing to provide comment in relation to the Gale Report.  (MTV 22.)

Further exposing Madrigal's arbitrability challenge as a recent construct, if Madrigal really believed that this was a matter for the Project Neutral to decide, then it would not have freely submitted extensive evidence on this point to the Panel.  Madrigal presented its claim concerning § 08911 at the outset of its case. Madrigal's insistence on § 08911 as the governing specification not only affected the standards for reviewing the work (Arb. Tr. 477:10-479:6, 530:13-536:2 (Knopf)), but also created a dispute concerning the applicable warranty for metal panels (Arb. Tr. 523:6-530:12 (Knopf)).  (See also MTV 39.)  When now mischaracterizing its § 08911 claim as a Project Neutral issue, Madrigal entirely disregards its submission of this claim to the Panel for the purpose of establishing warranty requirements, which it never disputes is a matter for the Panel to resolve.  (MTV 39 (arguing for § 08911 to control the warranty requirement for the exterior skin metal panels).)

27

Hoping to gain a foothold for its recent notion that all of this evidence was mistakenly submitted and should have went to the Project Neutral, Madrigal created a "highly technical" issue test not found anywhere in the parties' agreements.   Nonetheless, the simple fact that resolution of Madrigal's § 08911 claim is a matter of contract interpretation dissipates Madrigal's smokescreen that it is a "highly technical issue" for the Project Neutral to decide.  (MTV at 22.)  Indeed, Madrigal's claim was framed as a contract formation issue. In support of its § 08911 argument, Madrigal presented testimony by Mr. Carter and Mr. Knopf recounting the pre-construction phase of the project in 2005 and the decision to incorporate a metal panel system into the project design.  (Arb. Tr. 986:18-995:16 (Knopf); 1530:16-1550:22 (Carter).)   Certainly at the time that Madrigal offered this testimony it did not consider resolution of its claim to require the "technical expertise" beyond the capabilities of the Panel.  If it did believe so, that complaint was never voiced.  F-P countered Madrigal's assertions during the cross-examination of Madrigal's witnesses and through the testimony of its expert, Mr. Lockhart.   [See Arb. Tr. 626:8-631:9 (Knopf), 1645:22-1651:22 (Carter), 2982:9-2992:11 (Lockhart).]

> d.      *The Parties' Agreement and Actions Establish the Panel's Authority to Resolve the Exterior Skin Contract Disputes.*

Contradicting Madrigal's recent challenge to arbitrability, the Exterior Skin Contract Disputes were arbitrable under the plain terms of the APS as further corroborated by the parties' actions during the proceedings.  Madrigal sought to arbitrate the Exterior Skin Contract Disputes under paragraphs 15 and 11 of the APS (conforming to its interpretation of the APS during the hearings, see Part IV.A.1.a and Part IV.A.1.b supra pp. 22-24.).   That notwithstanding, these disputes would otherwise come within the purview of the Panel as a result of the evidence and argument Madrigal presented.  See cases cited supra, part III.A.2, p. 13. Therefore, the Panel's determinations in paragraph 17 cannot be set aside based on Madrigal's belated-challenge to arbitrability.

> **e.**   *Madrigal Is Barred From Raising Any Challenge to the Panel's Authority to Rule On the Exterior Skin Contract Disputes by Failing to Raise a Clear and Explicit Objection When Submitting These Disputes for Decision.*

Madrigal's Motion to Vacate fails to indicate any objection to the arbitrability of the Exterior Skin Contract Disputes before its ample submission of evidence on these points, let alone the clear and explicit objection required by law.  <u>See</u> cases cited <u>supra</u>, Part III.A.1, p. 11.  Therefore, Madrigal is now barred from raising this challenge for the first time because it is dissatisfied with the Award.  <u>See</u> cases cited <u>supra</u>, Part III.A.1, p. 11.  If Madrigal had any misgivings it was required to make a clear and explicit objection prior to submitting the questions for resolution and requiring the parties to expend substantial resources arbitrating these matters.

During pre-hearing discussions, the Panel sought the parties' understanding of its jurisdiction to decide certain disputes.  Rather than raising any objection to arbitrability at this juncture, Madrigal recognized the Panel's plenary jurisdiction to decide all disputes under the Contract and the APS.  (<u>See</u> Arb. Tr. 25:6-26:18.)  Madrigal's acknowledgement of this broad grant of authority certainly contradicts any recent notion that Madrigal had considered certain disputes to be non-arbitrable.  <u>See</u> Part II.C <u>supra</u> p. 9.

On May 26, 2009, the Panel published its order confirming the parties' understanding of Panel's plenary jurisdiction to resolve disputes under the parties' agreements.  (Ex. 18, ¶3.1.; <u>see also</u> Ex. 1, Award Preamble 2.)  Once again, if Madrigal had any contrary understanding, Madrigal was required to clearly and explicitly make an objection to arbitrability.  Instead, Madrigal, as the claimant, introduced all of its evidence on the Exterior Skin Contract Disputes without reservation.  <u>See</u> Part IV.A.1.c <u>supra</u>, pp. 24-28.  As a result of having submitted the Exterior Skin Contract Disputes for resolution without any clear and explicit objection, Madrigal is barred from raising the issue of arbitrability in its Motion to Vacate.  <u>See</u> cases cited <u>supra</u>, part III.A.1, p. 11.

      *f.*        *Madrigal Is Precluded From Arguing That F-P Waived the Right to Arbitrate the Exterior Skin Contract Disputes, As This Assertion Raises An Issue of "Procedural Arbitrability" That Falls Within the Purview of the Panel to Decide.*

Madrigal erroneously seeks vacatur of the Panel's rulings in paragraph 17 of the Award on the grounds that F-P waived the right to arbitrate the Exterior Skin Contract Disputes.  Madrigal's argument does not account for the fact that it had presented new disputes for the Panel's consideration, which were expressly agreed to be arbitrable under paragraphs 15 and 11 of the APS as after-arising claims.  <u>See</u> Part II.B.1 <u>supra</u> p. 8.

    In any event, the question whether otherwise arbitrable disputes were timely raised or waived clearly presents an issue of  "procedural arbitrability," i.e. an "allegation[] of waiver, delay, or a like defense to arbitrability," that has been held to fall within the decision-making authority of arbitrators, not courts.  <u>See</u> cases cited <u>supra</u> Part III.A.3, pp. 14-15.  Thus, Madrigal is foreclosed from obtaining relief from the Panel's rulings in paragraph 17 based on its "procedural arbitrability" challenge.

    In accord with established precedent, the Court should decline Madrigal's invitation to invade the Panel's fact-specific findings undergirding its rulings in paragraph 17.  F-P provided substantial evidence and argument that the Exterior Skin Contract Disputes as presented by Madrigal were arbitrable as after-arising claims. Madrigal's presentation of these matters went well beyond the Gale Report itself, and instead, posited Madrigal's expansive interpretation of the Gale Report for the Panel's resolution.  Madrigal's reading of continuous flashing as referenced in the Gale Report was the subject of much debate during the hearings. Moreover, the Gale Report never mentioned what came to be Madrigal's claim that there was a concrete "overpour" that needed correction.  (<u>Id.</u>)  Madrigal's understanding of the matters was not known to F-P when it provided comment to the Gale Report pursuant to the APS.  Finally, Madrigal has conceded that the dispute concerning specification § 08911 was never mentioned in the Gale Report.  (<u>Id.</u>)  Consequently, F-P's right to counter Madrigal's arguments concerning this specification could not have been waived for any failure to make comment concerning that Report.  <u>See</u> Part IV.A.1.c <u>supra</u> pp. 24-28.

As made clear by the foregoing, whether F-P was obligated to, or ultimately did, preserve the Exterior Skin Contract Disputes, are fact-specific matters that bear on the final disposition of the parties' disputes and cannot be isolated for separate review by the Court.  See cases cited supra Part III.A.3, pp. 14-15.  Consideration of the parties' respective positions on these matters would require a reassessment of the voluminous evidence and argument already proffered in the arbitration as part of the parties' substantive disputes, namely, how and when the Exterior Skin Contract Disputes arose.  Indeed, to refute Madrigal's unfounded arguments for vacating paragraph 17 of the Award, F-P has had to make the same arguments in this Opposition that it had previously asserted in the arbitration – that Madrigal's submissions of the Exterior Skin Contract Disputes to the Panel were new claims that are arbitrable under paragraphs 15 and 11 of the APS which were yet unknown by F-P when providing its comment to the Gale Report.

Such an unnecessary duplication of effort and the potential for conflicting outcomes in two forums are the precise reasons why courts will not hear or retry "procedural arbitrability" matters.  See cases cited supra Part III.A.3 pp. 14-15.  The Court should therefore reject Madrigal's request to vacate paragraph 17 of the Award based on its allegation that the Exterior Skin Contract Disputes were waived.

     2.     <u>Having Been Ensured a Fair Hearing, Madrigal Is Not Entitled to a Re-Hearing of the Exterior Skin Contract Disputes That It Had Raised and Made the Subject of "Considerable Hearing Time."</u>

Undercutting Madrigal's recent complaints to the contrary, the Panel was solicitous in receiving Madrigal's case on the Exterior Skin Contract Disputes to which "considerable hearing time" was devoted. (Ex. 1, Award ¶17.)  Madrigal received a full opportunity to present all of the evidence it chose to submit during a hearing conducted "within the ambit of generally accepted principles of due process."  (Id. at Preamble 2).  In fact, Madrigal's own statements on the record unwind any notion that it did not receive a fair hearing on the Exterior Skin Contract Disputes.  Having tried the issues at great length, to seek vacatur by simply postulating what one might have done in view of the result, is to grossly misuse the process.

a.      *The Panel Deferred Consideration of Madrigal's Newly-Raised and "Vaguely Described" Claim for Alleged "Potential Defects" In the Exterior Skin, Not All Exterior Skin Issues.*

Madrigal's assertion that it received an unfair hearing begins with the errant and unsupported assertion that the Panel's May 26 Order "excluded all exterior skin issues from the initial phase of the arbitration." (MTV 22.) Madrigal's supposition, however, is a gross distortion of the Panel's May 26 Order that is most immediately contradicted by Madrigal's introduction of the Exterior Skin Contract Disputes and the vast evidence it provided in support of those claims. See Part IV.A.1.c supra pp. 24-28. The May 26 Order itself also precludes Madrigal's recent interpretation. In the May 26 Order, the Panel ruled that the subject of a second hearing, *if one became necessary*, would be Madrigal's newly-raised claim involving a "*potential* issue regarding *potential* defects in the building exterior skin." (See Ex. 18, ¶1) (emphasis added.) Madrigal represented that the "potential" claim was based upon "newly discovered defects" that were currently being investigated and could not be presented as evidence in the current hearings. (Ex. 18, ¶1; Arb Tr. 8:10-9:7; 11:5-17.) Naturally, F-P was opposed to Madrigal raising any allegations of "newly discovered defects" without having an opportunity to prepare its defense to an undisclosed claim. (See Ex. 24.) As a result, the Panel ordered with the parties' concurrence that Madrigal's recently-asserted claim of "newly discovered defects" was presently unripe for adjudication. By its May 26 Order, the Panel made the limited provision for Madrigal to assert its new claim at a later date, but did not birfurcate *all* exterior skin issues from the proceedings as Madrigal now suggests. (Ex. 18, ¶1; Arb Tr. 8:10-9:7; 11:5-17.)

Further undermining Madrigal's recent construction of the May 26 Order, the Panel explicitly notes that a subsequent hearing would only take place, if necessary, should the parties have a dispute following the completion of Madrigal's investigation. Had the Panel actually bifurcated the hearing as to all Exterior Skin Contract Disputes as Madrigal now suggests, there would be no question that a second hearing would necessarily occur, and the May 26 Order would not have equivocally discussed the possibility of such a hearing.

Madrigal cannot even credibly equate the reserved "newly discovered defects" claim with the Exterior Skin Contract Disputes that were submitted during the hearings.  Each of the Exterior Skin Contract Disputes presented questions of contract interpretation that were widely understood and separate from any supposed ongoing investigation of the physical structure of the building.  A determination of the Contract's requirements for the exterior skin involved issues of contract formation and interpretation, which proceeded independently from Madrigal's ongoing investigation of the physical structure.[15]

> b.   *The Panel Never Ordered the Parties to Examine Witnesses on Reserved Claims and Never Ordered that Witnesses Could Not be Recalled.*

Madrigal's notion that any subsequent proceedings would necessarily include all exterior skin issues is logically inconsistent with its introduction of the Exterior Skin Contract Disputes during the completed proceedings.  Madrigal recognizes this fact and attempts to reconcile its submission of a "considerable amount of evidence and testimony" on the Exterior Skin Contract Disputes by offering an implausible explanation as to why extensive time and effort were spent on such issues, when, according to Madrigal, no result was expected.  [(See Declaration of Dennis A. Davison In Support of Madrigal Condominiums, LLC's Motion to Vacate ¶8) ("Davison Declaration").]  Specifically, Madrigal devises an explanation that it was forced to submit evidence on the Exterior Skin Contract Disputes because the Panel ordered Madrigal to examine its witnesses on all subjects in the first hearings, including its reserved exterior skin claim (regardless of any ongoing investigation), and that it would be prohibited from recalling them in any subsequent proceeding.  (MTV 23.)  There is no foundation for this statement and it defies common sense.

Madrigal's linchpin in its unfair hearing argument starts with an unsupported declaration from its counsel, which it proceeds to expand upon in its argument.  The Davison Declaration fails to support Madrigal's contention that the Panel compelled Madrigal to elicit all possible testimony from its witnesses in

---

[15]  Madrigal's reliance on Naing Int'l Enterprises, Ltd. v. Ellsworth Assocs., Inc., 961 F. Supp. 1 (D.D.C. 1997) (Sporkin, J.) is therefore misplaced.  The record demonstrates that Madrigal addressed the Exterior Skin Contract disputes in the completed hearings without the completion of its ongoing investigation of the physical structure of the exterior skin.  Thus, the Panel was not uninformed on a critical matter concerning the Exterior Skin Contract Disputes, which the court determined to be the fundamental flaw in the arbitrators' decision in Naing.  See Naing, 961 F. Supp. at 5.

the hearing with respect to the exterior skin, reserved or otherwise, and that these witnesses were not subject to recall.  The Davison Declaration only goes so far as to provide that the Panel chair stated that each witness "should" testify only once "for the sake of efficiency."  (Davison Decl. ¶8.)  Such a statement has no element of compulsion or constraint bearing on any subsequent proceeding and therefore falls far short of what Madrigal knows it needs to argue but cannot find support for in the record – that witnesses were ordered to testify concerning the reserved exterior skin claim and that they could not be recalled in any subsequent proceeding.  If counsel was possessed by such a fundamental misunderstanding of the requirements of the Panel, which in any case was certainly at odds with its submission of its case, counsel should have made his objection known to the Panel on the record during the proceedings.

Madrigal's notion that it submitted evidence under compulsion also cannot withstand the test of reason.  As clearly stated in the May 26 Order, the newly discovered "potential issues regarding the potential defects in the building exterior skin" were the subject of continuing investigation.  It is patently absurd to suggest that a panel of experienced lawyers would have compelled Madrigal to elicit conclusive evidence from witnesses addressing issues still being investigated because these witnesses, once appearing, would be prohibited from testifying in any subsequent proceeding.  Such an order would have, in effect, required the witnesses to be omniscient when providing testimony regarding an undefined claim.

Madrigal does not, and cannot, point to any statement in the record from the Panel that substantiates the supposed order compelling testimony on its reserved claim while excluding further testimony from witnesses.  Madrigal instead relies solely upon unsupported and self-serving hearsay found in an affidavit from Madrigal's counsel to craft this direction from the Panel.  (Davison Decl. ¶8.)  Since Madrigal failed to support the assertions in the Davison Declaration by reference to the record, its challenge to the fairness of the hearings must be summarily dismissed.  See Dolton, 935 A.2d at 299-300 (holding that a party must

provide the arbitration transcript and cannot rely upon an affidavit from counsel who was present in the hearings to recount events that took place).[16]

          c.      *Madrigal Recognized During the Hearings That It Had Received a Fair Hearing Free From Any Prejudice.*

A review of the record makes clear that Madrigal was given every opportunity to present its case. Madrigal does not argue that the Panel refused to hear evidence that was proffered, nor does it refer to any instance where it objected to evidence not being received.  Madrigal's recitation of witnesses and evidence that was supposedly excluded by a premature ruling is nothing more than a wish list of alternative approaches made in light of a negative result.  (MTV 25-26.)

Expressing Madrigal's due process complaint as disingenuous, Madrigal acknowledged on the record that it was given a fair opportunity to address the Exterior Skin Contract Disputes.  Following its rebuttal case, Madrigal suggested that the Panel might want to defer ruling on the Exterior Skin Contract Disputes to consider the physical structure of the building when it resolves the contract interpretation issues already fully presented.  (Arb. Tr. 3477:14-3451:2.)  The Panel was careful to make clear that what was suggested as forthcoming was merely contextual and separate from the contract interpretation issues before it for decision.  (Id.)  Indeed, Madrigal's counsel stated, "I'm not saying that you're incapable of making the decision at this point, and I'm not making this proffer by way of saying, you know, there's any entitlement." (Arb. Tr. 3478:10-14.)  In this colloquy, Madrigal recognized that the Exterior Skin Contract Disputes were submitted for decision and that the Panel had before it what was necessary to resolve these matters.

Madrigal further acknowledged that it was given a full opportunity to present its evidence on the Exterior Skin Contract Disputes at the close of the hearings.  Madrigal, when addressing its submissions on these issues, stated, "[w]e thought we had said enough."  (Arb. Tr. 3660:11-22.)  The Panel chair responded: "[y]ou may not have addressed [the Exterior Skin Contract Disputes] in final argument, but they certainly

---

[16] F-P has separately filed its Motion to Strike the Davison Declaration, which presents further authority for dismissing Madrigal's arguments premised upon this unsupported affidavit.  Should the Court elect to consider the Davison Declaration, F-P respectfully requests that the Affidavit of Christopher J. Brasco be considered in response thereto.

were addressed during the course of the hearing.  We heard lots about all three of those, burned in to my memory." (Id.)  Accordingly, Madrigal's challenge to the fairness of the hearing is directly contradicted by its own statements regarding its submission of the Exterior Skin Contract Disputes and should be rejected. See cases cited supra Part III.B.3, pp. 19-21.

**B.**     **Madrigal's Claims for Estimated Costs to Perform Condominium Association and Unit Owner Punch Lists Yet to be Prepared Were Properly Denied and the Panel's Decision Rests Securely on the Contract and Madrigal's Manipulation of the Punch-List Process.**

Rather than confront what happened in the arbitration, Madrigal hopes to sidestep the evidence presented concerning these punch lists by maintaining that these matters were finally resolved in the APS. Madrigal's recent stance is contradicted by both the terms of the APS and its conduct during the arbitration proceedings.

Far from resolving Madrigal's claims concerning the Condominium Association's and Unit Owner's Punch Lists ("Disputed Punch Lists"), the APS provided for the arbitration of these matters in several separate instances.  Paragraph 11 of the APS begins by defining Madrigal's Claims as those matters enumerated in Madrigal's outstanding items list.  (See Ex. 16, APS ¶11.)  Madrigal's outstanding items list includes the Disputed Punch-Lists as items nine and ten.  (See Ex. 17, Madrigal Outstanding Items.)  The APS immediately follows this definition with the explicit acknowledgement that the Madrigal Claims will be submitted to arbitration.  (Ex. 16, APS ¶11.)  Further in this regard, paragraph 11 proceeds to frame the parties' disputes to be submitted to arbitration as including the resolution of Madrigal's contention that F-P's entitlement to full payment was subject to its performance of the "Condo Association and Unit Owner Punch-Lists." (Id.)  To avoid any uncertainty regarding the existence of an ongoing dispute, paragraph 12 of the APS sets forth the parties competing contentions concerning the Disputed Punch Lists and then specifically states that "these issues shall be decided as part of the arbitration process set forth in paragraph 11." (Id.)  Madrigal sheepishly acknowledges that that F-P reserved the right to assert that its obligations

regarding the Disputed Punch Lists were not unlimited in time but declines to mention that the next sentence of the APS provides that the parties respective contentions on these issues were to be arbitrated.  (MTV 44.)

Consistent with the APS, these matters were submitted to arbitration as Madrigal's Claims and the evidence addressed whether or not F-P's obligation to perform the Disputed Punch Lists was bounded by time.  See Part II.A.3 supra p. 4 and Part II.A.4 supra p. 5.  Hoping to justify its position, Madrigal offered testimony by separate witnesses of its extra-contractual understanding that F-P's obligation to perform these punch lists was not limited in time.  (Arb. Tr. 181:11-182:5 (Knopf); 3349:9-3350:8 (Sharabi).)[17]  F-P separately presented evidence that the Contract limited the duration during which F-P was responsible to accept these punch lists to a ninety-day period when F-P was to perform its completion work.  See Part II.A.3 supra p. 4 and Part II.A.4 supra p. 5.  Furthermore, F-P established that Madrigal was in position to prepare and present each of these punch lists during the timeframe when F-P was to accept them.  Instead, Madrigal chose to withhold these punch lists while requiring F-P to perform repetitious operations on other punch lists Madrigal had prepared addressing all aspects of the Project.  (Id.; see also Part II.A.1 supra p. 3.)  Based on the parties extensive submissions, the Panel denied Madrigal's claims and also found that any obligation F-P had was either satisfied (in the form of Madrigal's punch lists) or excused.  (See Ex.1, Award ¶¶4(c), 4(d) and 14(f).)  The record firmly supports the Panel's resolution of these issues earmarked for arbitration and this determination should now be confirmed.  See cases cited supra, Part III.B.2, pp. 17-19, e.g., Brown, 944 F.2d at 781 (an award should be confirmed so long as there is any support in the record for the arbitrators' decision).

    **C.**    **Madrigal's Claim for Attorneys' Fees Related to F-P's Lien Filing Was Properly Denied and the Panel's Decision Rests Securely On the Record of Madrigal's Abuse of the Payment Process.**

Madrigal's criticism of the Panel's decision denying its claim for attorneys' fees wholly disregards the vast evidence compiled that Madrigal manipulated the completion and payment process to avoid

---

[17] Madrigal expressly acknowledged that the Contract it drafted contains integration clauses which precluded oral understandings from varying its express terms.  (Arb. Tr. 601:10-21 (Knopf).)

accepting and paying for the Project.  See Part II.A.2 supra p. 3 and Part II.A.5 supra p. 6.  Establishing a system prone to abuse, Madrigal acknowledged its representatives administered the payment process on behalf of itself and the Development Manager.  See Part II.A.5 supra p. 6.  Highlighting Madrigal's breach of the payment provisions, the record demonstrates it wrongfully refused to process payment applications and imposed improper back-charges/withholdings. (Id.)

Madrigal acknowledges the Contract preserves the Contractor's lien right for amounts certified and unpaid, but apparently also maintains that Madrigal was entitled to purposefully frustrate that right no matter how egregious its conduct. (MTV 34.)  Based on substantial argument and evidence the Panel rejected Madrigal's notion.  The Panel's rejection of Madrigal's claim finds further support in F-P's argument that a party cannot escape liability by preventing the occurrence of a condition that would otherwise establish its liability.  (See Ex. 7,  F-P Pre-Hr'g Br 33-35.)[18]

Madrigal goes so far to avoid the arbitration record in its argument that it bases its challenge on some initial impressions given by Judge von Kann during a TRO hearing which was held on an emergency basis.  Madrigal, however, is not even true to this separate record.[19]  During the very same TRO hearing, Judge von Kann noted that there would be a "huge battle" during the eventual hearing on the merits to determine whether or not "the Development Manager did improperly fail to certify payment."  (See Ex. 13, TRO Hr'g Tr. 22:6-10.)  F-P won this battle, the record contains substantial support for the Panel's ruling, and the Award should now be confirmed. See cases cited supra, Part III.B.2, pp. 17-19, e.g., Brown, 944 F.2d at 781 (an award should be confirmed so long as there is any support in the record for the arbitrators' decision).

---

[18] Madrigal feigns confusion how the Panel awarded attorneys' fees for the subcontractor liens which were filed but not attorneys' fees related to F-P's lien filing.  (MTV 34.)  Clarity is found in Madrigal's own argument.  Madrigal recognizes that, while the Contract had a blanket prohibition on subcontractor liens, the general contractor's lien right was expressly preserved in certain instances.  (See Ex. 8, Agmt ¶14.6.)

[19] See Part II.A.6 supra p. 7 n.3 (addressing how the court was misled concerning Madrigal's certification of a payment application subject to F-P's mechanic's lien filing).

**D.     Madrigal Cannot Avoid the Panel's Decision On the Merits Awarding Interest On Payment Applications From the Dates Madrigal Should Have Made Payment.**

Madrigal's exception to the Panel's award of interest on overdue payment applications bears the same malady as its previous complaints - it divorces the award from the record that provides its support.  The issue as to when F-P's payment rights accrued was central to the resolution of several of the claims reserved for arbitration.  Madrigal put the accrual of F-P's payment rights squarely at issue.  Madrigal's contention that F-P's right to full payment was subject to the satisfaction of certain preconditions and its claim that it was entitled to attorney's fees incurred as a result of F-P's lien filing, required a finding as to when F-P's payment rights had properly accrued.  (Ex. 16 , APS ¶11.)

Immediately bearing on the award of interest, F-P presented persuasive evidence that Madrigal abused its position as Project owner to avoid final completion and to delay payment to F-P.  (See Part II.A.3 supra p. 3 and Part II.A.3 supra p. 4)  Madrigal's breaches triggered its further obligation under the Contract to pay for all work performed when final completion is delayed through no fault of the contractor.  (Ex. 9, Gen. Con. ¶9.10.3.)  In turn, F-P was also entitled to interest on these delayed payments.  (Ex. 8, Agmt. ¶14.2; Ex. 9, Gen. Con. ¶13.6.1.)  Finally, refuting Madrigal's argument that F-P waived the right to interest under the APS, the APS reaffirms that "neither Foulger-Pratt nor Madrigal have waived any of their respective rights or obligations under the Contract or at law." (Ex. 16, APS ¶17.)  The Panel found that Madrigal improperly delayed final completion to F-P's detriment.  (Ex. 1, Award ¶12.)  Accordingly, there is ample support in the record for the award of interest on the progress payments wrongly delayed by Madrigal.

Madrigal's position that the Panel's interest award is arbitrary and capricious is based on faulty logic.  Madrigal first maintains that, had interest been properly awarded, it would have received interest on its award of liquidated damages in the amount of $138,000.  Madrigal's proposition that it would receive interest on its liquidated damages claim, a small fraction of the amount it is wrongly withholding from F-P, is unsupportable, as these monies were not due and owing.  Illustrative of this point, the Contract provides that any amounts due the owner for liquidated damages would be set off when processing the final payment to

39

the contractor.  (Ex. 10, Spec. § 01290.1.5.I)  In addition, Madrigal's claim to liquidated damages was disputed and was not reduced to a sum certain until the Panel's award, at which time that amount was used as a set off from the substantial sum due F-P.  (Ex. 1, Award ¶16.)  Moreover, there is no provision in the Contract supporting Madrigal's argument that it be paid interest on a *claim* for liquidated damages.

Madrigal next argues that the Panel improperly awarded interest on each payment application based on the full principal amount of the payment sought, accruing from June 15, 2008.  This argument misrepresents the facts.  An interest calculation on the full amount of Payment Application No. 29, from June 15, 2008 until the date of the Award, at the applicable interest rate of six per cent (6%),[20] yields an interest award of $200,505.23.  As the Panel awarded only $143,011.78, it is clear that the Panel made adjustments to account for its specific findings as to: 1) when F-P's payment rights should have accrued but for Madrigal's interferences; and 2) the principal amount of payment Madrigal wrongly withheld.  Otherwise answering Madrigal's challenge, the Panel's Award reducing F-P's interest claim could be appropriately based upon interest calculated on the entire principal amount through the date of the APS, with a principal reduction made thereafter.

Madrigal also wrongly takes issue with the award of interest on Payment Application No. 28.  F-P was awarded interest on the amount of Payment Application No. 28,  $296,816, from June 15, 2008.  (See Ex. 1, Award ¶14(g).)  Supporting this determination, Madrigal acknowledges that Payment Application No. 28, in the amount of $296,816, was submitted by F-P almost one month earlier than the interest accrual date used by the Panel.  (MTV 31.)  Further, the record reflects F-P's evidence and argument that interest was due on all payments improperly delayed, whether Contract balance or retainage, and that Madrigal wrongly abused its position as owner to delay payments otherwise due, by, among other ways, imposing improper lien release requirements.  See Part II.A.5 supra, p. 6.  In addition, no rights to claim interest were waived under the APS.  Paragraph 17 explicitly recognizes that the parties reserved all rights under the Contract and

---

[20] See D.C. Code § 28-3302.

at law.  (Ex. 16, APS ¶17.)  Paragraph 4 of the APS provided a mechanism for the release of funds due under

Payment Application No. 28, not a bar to such payment.  [See Ex. 5, F-P Post-Hr'g Br. 100-103; Ex. 37, F-P

Post-Hr'g Br. Supp. D (both containing F-P's argument that the APS provided a means for payment of funds

wrongly withheld with all rights reserved, and that Madrigal breached the APS by its bad faith administration

of the agreement).]  The parties entrusted the interpretation of the APS to the Panel and these issues were

resolved against Madrigal.

Accordingly, as the Panel's award of interest on overdue payments is grounded in the arbitration

record, it should now be confirmed.  See cases cited supra, Part III.B.2, pp. 17-19, e.g., Brown, 944 F.2d at

781 (an award should be confirmed so long as there is any support in the record for the arbitrators' decision).

**E.     Madrigal Is Not Entitled to Retry the Panel's Determinations Defining F-P's Remaining Warranty Requirements and Acknowledging F-P's Discharge of Any Remaining Close-Out Requirements as They Have Ample Support In the Record.**

Madrigal's Motion To Vacate attempts to create the misimpression that the Panel somehow

whimsically nullified warranty and close-out obligations otherwise required of F-P without any basis in the

record.  Indeed, Madrigal goes so far as to make the facile analogy that the warranty and close-out

submissions made on this project were the equivalent of "a car dealer selling a car to a purchaser without

providing them an owner's manual or any warranties on the components of the car." (MTV 36.)  This

argument represents a gross distortion of the record which includes F-P's voluminous warranty and close out

submissions and the Panel's studied deliberations concerning these issues.

1.     The Panel's Warranty Determinations Reflect Its Studied Deliberations Concerning the Parties' Competing Warranty Claims.

Far from a knee-jerk nullification, the Panel's determination regarding warranty requirements

reflected studied deliberation.  Indicative of its thoroughness, the Panel asked the parties to address in their

post-hearing briefs which warranties were required by the Contract, and which of these requirements have

been satisfied.  (See Ex. 2, F-P Post-Hr'g Br. 106; see also Ex. 25, F-P Post Hr'g Br. Supp. H.)  F-P met the

Panel's query by submitting a table which identified the Contract's special warranty requirements and the

responsive warranties it had submitted. (Id.) F-P's presentation catalogued eighty-two (82) specific warranties it had submitted in evidence. [Id.; see also Ex. 26 F-P Post Hr'g Br. Supp. G (providing exhibit references for warranty submissions); Ex. 27; Ex. 28; Ex. 29.] Madrigal provided the Panel with its own table purporting to define the Contract's warranty requirements and identifying alleged deficiencies in F-P's submissions. (See Ex. 30.) The Panel's Award concerning project warranties recognized F-P's satisfaction of a substantial portion of the Contract's special warranties and identified those warranties that needed to be modified or re-presented. Immediately germane to the present challenge, the Panel explained its deliberative process to include a review of the Contract, the warranties submitted, as well as each parties' argument as to what the Contract required and whether these requirements had been met. (See, Ex. 1, Award Attachment A.) This substantive review of these voluminous warranty submissions is not now subject to rehearing.

While Madrigal is not entitled to a rehearing on the merits, it is important to note that the examples it attempts to cherry-pick from the approximately 150 warranties it hoped to establish are unavailing. (See Ex. 30.) Madrigal complains that the Panel incorrectly concluded that F-P satisfied its obligation concerning general warranty requirements. The evidence presented instructs otherwise. Telling on this point, Madrigal never offered contractual support for its general warranty requirements. (See Arb. Tr. 221: 8-19.) By contrast, F-P provided expert testimony how this general requirement was satisfied by the signing of the contract, with no further submission required. (Arb. Tr. 1009:20-1010:16.)

Madrigal also complains that two special warranty requirements were improperly nullified. Here again, Madrigal improperly ignores the facts, and that the evidence presented supports the conclusion that the warranties it seeks are not required by the Contract. In its argument concerning the OGEP-Vistawall Special Coating Warranty, Madrigal fails to identify where any special warranty is required by its referenced Specification section. (MTV 39.) The Specification section cited by Madrigal, § 09960 - High Performance Coating, does not require that any special warranty whatsoever. (See Ex. 31, Spec. § 09960.) Similarly mistaken, Madrigal argues for a Spectrum Metal Finishing Warranty for paint applied to metal panels under

42

Specification § 08911.  Madrigal submitted the question concerning the application of § 08911 to the building's exterior metal panels for decision and did not prevail.  See Part IV.A.1.c supra pp. 27-28.  To resurrect the argument under the guise of a warranty requirement is disingenuous and should be summarily rejected by the Court as it was by the Panel.  F-P provided evidence that it did, indeed, satisfy the § 08911 warranty requirements as it is properly understood to apply to the project's curtain-wall system. [See Ex. 32 (Excerpt from Ex. 29).]

> ### 2.   The Panel's Determination That F-P Discharged Its Close-Out Obligations Is Firmly Rooted In the Project Record.

Considerable evidence and argument was presented by the parties concerning the Contract's close-out requirements and whether F-P's obligations had been discharged.  Argument was also offered that F-P's substantial close-out efforts should be viewed through the prism of Madrigal's purposeful interference with F-P's completion work.  (See Part II.A.2 supra p. 3; Ex. 7, F-P Pre-Hr'g Br. 16-26.)  The Panel's Award sets forth the express determination, which has not been challenged, that Madrigal breached the Contract by preventing final completion and as a result, caused F-P to sustain extended performance costs. (See Ex.1, Award ¶12.)

Informing its determination, the Panel requested that each party present its position regarding project close-out in their post-hearing briefs. (See Ex. 2, F-P Post-Hr'g Br. 116; Ex. 26, F-P Post-Hr'g Br. Supp. G.) Summarizing its extensive evidence, F-P presented an itemized list of its close-out submissions by exhibit number, addressing obligations such as warranties, operation and maintenance manuals, as-built specifications and drawings, lien releases and waivers of claim. (Ex. 26, F-P Post-Hr'g Br. Supp. G.) Accordingly, substantial credible evidence supports the Panel's conclusion that "with respect to items alleged by Madrigal to be incomplete or deficient and to preclude final payment … such requirements have either been satisfied or excused." (Ex. 1, Award ¶14(f).)

The Panel's substantive determination that F-P discharged its close-out obligations involved the qualitative review of numerous categories of close-out documents. Madrigal, however, argues to vacate the

entire ruling based on two items where it seeks to substitute its judgment for the Panel's. Madrigal is not entitled to a rehearing on the merits.   Nonetheless, it is worth noting that even in these selected examples, Madrigal's complaints ignore significant evidence justifying the Panel's ruling. Madrigal raises the specter of maintenance workers encountering problems because they supposedly have not received sufficient mechanical/electrical ("MEP") as-built drawings. (MTV 42.)  Madrigal's illustration ignores F-P's evidence that the Architect had approved the MEP drawings.  [See Ex. 33; Ex. 34; Ex. 35; Ex. 36 (evidencing the approval of the MEP as-built drawings).]

Madrigal also challenges the Panel for excusing the requirement to submit certain extra materials for building maintenance. (MTV 43.)  What Madrigal fails to mention is that the Panel separately concluded that it had breached the Contract by preventing final completion. (Ex. 1, Award ¶12.)  F-P presented compelling evidence that Madrigal prevented final completion by issuing revolving punch lists and improperly required F-P to serve as its maintenance contractor after its work should have been accepted.  See Part II.A.1 supra p. 3 and Part II.A.2 supra p. 3.  The record in this case plainly supports a determination that F-P discharged any further building maintenance obligations.  See cases cited supra Part III.B.2, pp. 17-19, e.g., Brown, 944 F.2d at 781 (an award should be confirmed so long as there is any support in the record for the arbitrators' decision).

## V.     CONCLUSION

The parties have expended substantial resources in a lengthy and fair binding arbitration process. The Panel, after receiving a vast amount of evidence and argument from the parties in the hearings, rendered a decision that is firmly rooted in the record presented.  Madrigal's Motion to Vacate, which is contradicted by the very record it hopes to avoid, presents no basis for setting aside the Panel's determinations.  Justice therefore demands that Madrigal's attempt to now re-do this arbitration be rebuffed, and the entire Award be confirmed in accordance with the policy objectives supporting final and binding arbitral dispute resolution.[21]

---

[21] Upon confirming the Award pursuant to F-P Application invoking the FAA, F-P is entitled to recover its attorneys' fees under the

DATE: April 30, 2010                    Respectfully submitted,

                                        /s/ Richard G. Mann, Jr.
                                        Richard G. Mann, Jr., Esq.
                                        D.C. Bar No. 412675
                                        Watt, Tieder, Hoffar & Fitzgerald, LLP
                                        8405 Greensboro Drive, Suite 100
                                        McLean, VA 22102
                                        Phone: (703) 749-1000
                                        Fax: (703) 893-8029
                                        E-mail: rmann@wthf.com

                                        Of Counsel:

                                        Christopher J. Brasco, Esq.
                                        (admitted pro hac vice)
                                        Adam M. Tuckman, Esq.
                                        (admitted pro hac vice)

---

common law of this Circuit as a prevailing party forced to respond to an action that was "frivolous, unreasonable, or without foundation." Wash. Hosp. Ctr. v. Svc. Employees Int'l Union, 746 F.2d 1503, 1510 (D.C. Cir. 1984). In the arbitration context, a challenge to an award grounded in disagreement with the arbitrators' substantive determinations, no matter how characterized, has been held to be frivolous and without foundation. See United Food & Commercial Workers v. Marvel Poultry Co., 876 F.2d 346, 352-53 (4th Cir. 1989); Int'l Assoc. of Machinists & Aerospace Workers v. Texas Steel Co., 69 F.2d 279, 284 (5th Cir. 1981). Properly understood, Madrigal's several challenges amount to nothing more than its attempt to substitute its judgment for the substantive determinations made by the Panel. Madrigal made its challenges even after it had expressly recognized the Panel's authority to interpret the parties' operative agreements at the outset of the proceedings. Finally, Madrigal's procedural challenge is improperly based on an unfounded affidavit without citation to the record, which is at odds with Madrigal's own statements on the record.
Should this Court otherwise elect to apply the DCRAA, Applicants are entitled under D.C. Code § 16-4425(c) to recover its attorneys' fees expended to confirm the Award and defend against Madrigal's Motion to Vacate.

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Memorandum and Points and Authorities in Support of Foulger-Pratt Residential Contracting LLC's and Travelers Casualty and Surety Company of America's Opposition to Madrigal Condominiums, LLC's Motion to Vacate Portions of Interim Arbitration Award was served electronically via the Court's electronic filing system, this 30th day of April, 2010 upon:

Dennis A. Davison, Esq.
McKenna Long & Aldridge, LLP
1900 K Street, NW
Washington, DC 20006
ddavison@mckennalong.com

Andrew H. Marks, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
amarks@crowell.com

*Counsel for Respondent Madrigal Condominiums, LLC*

/s/ Richard G. Mann, Jr.
Richard G. Mann, Jr.