EXHIBIT 2

**In the matter of:**

| | |
|---|---|
| MADRIGAL CONDOMINIUMS, LLC )<br><br>Claimant, )<br><br>v. )<br><br>FOULGER-PRATT RESIDENTIAL<br>CONTRACTING, LLC )<br><br>and )<br><br>TRAVELERS CASUALTY AND<br>SURETY COMPANY OF AMERICA )<br><br>Respondents. ) | Arbitration Before:<br><br>Andrew Ness, Esq.<br>Judith Ittig, Esq.<br>Charles Asmar, Esq. |

**FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC'S AND TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S POST-HEARING BRIEF IN SUPPORT OF THEIR CLAIMS AND DEFENSES**

**Submitted by:**

**WATT, TIEDER, HOFFAR
& FITZGERALD, LLP**

**Kathleen O. Barnes, Esq.
Christopher J. Brasco, Esq.
Adam M. Tuckman, Esq.**

*Attorneys for Respondents*

EXHIBIT 2

**Page**

I.  INTRODUCTION ......................................................................................... 1

II.  MADRIGAL CHANGED THE CONTRACT TO SALVAGE INCOME FROM
THE EARLY SETTLEMENT OF PRE-SOLD UNITS.................................... 2

    A.  The Delayed Issuance of the Notice to Proceed and the Potential for
Losing Pre-Construction Sales Led Madrigal to Alter the Contract's
Schedule .................................................................................................. 3

    B.  Madrigal Changed the Contract's Schedule to Facilitate Its Settlement of
Pre-Sold Units......................................................................................... 5

        1.  Madrigal Directed the Contractor to Revise the Sequence for
Completion of Floors In the Building to Floors 1-4, then Floors 9-
12, and Lastly Floors 8-5 .............................................................. 5

        2.  Madrigal's Direction to Change the Floor Sequence Resulted in
Subcontractor Claims and a Delay to the Work of At Least 2.5
Weeks............................................................................................. 8

    C.  Madrigal Changed the Contract Schedule By Requiring the Early Sale and
Settlement of Units ................................................................................. 9

        1.  Foulger-Pratt Expected and Was Entitled to Perform According to
the Contract's Orderly Process for Turnover and Completion of
Punch Lists.................................................................................... 9

        2.  In the Summer of 2007, Madrigal Experienced Cancellations of Its
Pre-Construction Sales and the Effects of a Declining Real Estate
Market .......................................................................................... 12

        3.  With the Cancellations of Pre-Construction Sales and a
Deteriorating Market in Full View, Madrigal Sought to Salvage
Potential Sales by Requiring Foulger-Pratt to Prepare Units for
Settlement Inspections Early and Out of Sequence ................................ 13

        4.  Madrigal's Direction to Prepare Units for Buyer Inspection and
Settlement Earlier Than Anticipated and Outside of Foulger-Pratt's
Planned Sequence Had Several Deleterious Effects On the
Progress of the Work ............................................................................ 18

        5.  Foulger-Pratt Provided Madrigal with Notice of the Disruptions
and  Inefficiencies That Foulger-Pratt Was Experiencing, Yet
Madrigal Continued to Direct Foulger-Pratt to Prepare More Units
for Buyer  Inspection and Settlement...................................................... 23

        6.  The Disruptions and Inefficiencies Caused By Madrigal's Early
Settlement of Units Equates to a Four-Week Delay to the Progress
of the Work ............................................................................................ 24

(continued)

**Page**

7.     Madrigal Presented An Erroneous Interpretation of the Contract to Justify Its Direction in the Fall of 2007 to Prepare Units for Settlement Early and Out of Sequence ................................................... 25

D.     Foulger-Pratt Successfully Delivered Madrigal's Pre-Sold Units Under Circumstances That Amount to a Waiver of Any Right to Recover Liquidated Damages. ...................................................................................... 33

1.     Madrigal's Waiver of Liquidated Damages Includes Its Direction to "Leapfrog" Substantial Completion for Final Acceptance of Units Required for Early Sale and Settlement ......................................... 34

2.     Madrigal Demonstrated Its Intent to Waive Enforcement of the Time Provisions in the Contract in Its Decision to Direct Substantial Changed and Additional Work Immediately Before, and Directly After, the Guaranteed Substantial Completion Date .......... 35

3.     Immediately Following the Guaranteed Substantial Completion Date, Madrigal Continued to Direct Foulger-Pratt to Deliver the Remaining Pre-Sold Units Out of Sequence for Early Settlement .......... 40

4.     Madrigal Allowed the Period from January 1, 2008 to March 17, 2008 to Elapse Without Deciding Whether to Assess Liquidated Damages and Then Notifying Foulger-Pratt of Its Intentions ................. 42

E.     The Panel Should Determine That Foulger-Pratt Timely Achieved Substantial Completion Or Is Otherwise Entitled to a Time Extension/Negation of Liquidated Damages ...................................................... 45

1.     By Settling Units and Establishing the Project as a Residence, Madrigal Was Required By the Contract to Declare the Project Substantially Complete ........................................................................... 45

2.     Madrigal's Election to Move to Final Completion Throughout the Building, Including Settled Units and Related Common Areas, Demonstrates the Parties' Contemporaneous Interpretation That the Building Was Substantially Complete ................................................. 47

F.     Madrigal's Claim for Liquidated Damages Must Be Rejected ............................ 53

III.   MADRIGAL PURPOSEFULLY AVOIDED ITS CONTRACT CLOSE-OUT RESPONSIBILITIES TO AVOID ACCEPTING OR PAYING FOR THE PROJECT IT WAS NOT SELLING. .............................................................................. 54

A.     Madrigal Refused Acceptance of All Unsold Units ............................................. 54

1.     Madrigal Failed to Conduct Inspections In a Timely Manner ................. 57

2.     Madrigal Improperly Issued Multiple Rounds of ("Revolving") Punch- Lists ......................................................................................... 58

EXHIBIT 2

(continued)

**Page**

3.     Failure to Properly Control Access to and Require Careful Conduct in Unsold Units By Its Sales Staff, Residents and the Public .................. 60

B.     Madrigal Wrongfully Resisted the Final Acceptance of Unsold Units in an Attempt to Hold Foulger-Pratt Responsible for Performing Unit Owner Punch Lists from Individual Purchasers Until It Completed the Belated Sale of Its Project. ............................................................................................... 62

C.     Madrigal Refused and Delayed Acceptance of the Building Common Elements ................................................................................................................ 65

1.     Madrigal's Architect Issued Punch Lists for All Common Areas of the Project, and These Were Worked Off by Foulger-Pratt ..................... 65

2.     Madrigal Purposefully Delayed and Maladministered the Exterior Skin Punch-List Process In Order to Avoid Reaching Final Acceptance ....................................................................................... 66

a.     The Architect Issued the Owner's Punch List for the Exterior Skin and Signed Off on its Completion ........................ 66

b.     Madrigal's Belated Acknowledgement of Substantial Completion and Failure to Discharge its Recognized Close-out Responsibilities .................................................................. 68

c.     Madrigal Wrongfully Resisted Final Acceptance of the Exterior   Skin in an Attempt to Hold Foulger-Pratt Responsible for  Performing the Condominium Association Punch List when it is  Belatedly Issued. ...................................... 74

D.     Due to the Delays to Final Completion Caused By Misadministration of the Punch List Process, Madrigal is Responsible for Foulger-Pratt's Extended Management Costs of $492,450 ........................................................... 76

E.     Madrigal's Continuing Efforts to Frustrate Foulger-Pratt's Efforts to Achieve Final Acceptance of the Exterior Skin – the Metal Panel Cladding is  Not Part of Specifications Section 08911 ....................................... 77

IV.     MADRIGAL ABUSED ITS POSITION AS OWNER TO AVOID ITS PAYMENT OBLIGATIONS TO FOULGER-PRATT .................................................. 83

A.     Madrigal Maladministered the Joint Check Process It Initiated ......................... 84

B.     Madrigal Maladministered the Payment Application Process Throughout 2008, Only to Reveal Its Undisclosed Agenda to Retain the Contract Balance ................................................................................................................ 85

C.     Travelers' and Foulger-Pratt's Struggle to Break the Payment Impasse Was Thwarted by Madrigal's Disingenuous Participation in the Process .......... 88

(continued)

**Page**

D.      Madrigal's Purposefully Breached the Contract and Frustrated Foulger-Pratt's Contractual Right to Lien Against the Project .......................... 91

V.    MADRIGAL'S IS NOT ENTITLED TO RECOVERY OF ANY OF ITS CLAIMED DAMAGES................................................................................ 95

A.      Madrigal Cannot Recover Its Claimed Attorneys Fees ....................................... 95

B.      Madrigal Breached the APS and Cannot Maintain Its Improper Withholdings.................................................................................. 100

C.      Respondents' Analysis of Madrigal's Damages .................................. 103

VI.   REMAINING QUESTIONS FROM THE PANEL ......................................... 103

A.      Address Whether There Was Compliance With the Contract Requirement of Lien Releases As a Precondition for Payment, or Excusable Non-Compliance ...................................................................... 104

B.      Describe the Type of Accounting that Is Referenced In the Contract and Explain Whether the Contractor Has Met That Requirement............................ 105

C.      Identify What Special Warranties Are Required By the Contract (meaning Warranties Called Out By the Specs That Exceed the General Warranty Period) and Identify Which Have Been Provided, Which Not Provided, and Any Shortcomings in Those Provided .......................................... 106

D.      Address the Evidence In the Record As to the Extent of Damage Yet to Be Repaired At the Second Baptist Church and the Estimated Costs of Such Repairs .............................................................................. 107

E.      Provide Positions and Identify All Contractual and Factual Support (Entitlement and Quantum) for "Condominium Association Punchlists" and "Unit Owner's Punchlists" and "Unit Owner's Punchlists for Unsold Units" (Count IV C. and D. of Madrigal's Itemization of Damages and Item 9 & 10 of Madrigal's Outstanding Items List, Revised February 2, 2009) .......................................................................... 109

F.      Provide Positions and Identify All Contractual and Factual Support (Entitlement and Quantum) for "Utility Reimbursement" and "Design Team Additional Inspections" (Count IV B. and G. of Madrigal's Itemization of Damages and Items 12 f. & g. of Madrigal's Outstanding Items List, Revised February 2, 2009)............................. 109

1.      Utility Reimbursement.......................................................... 109

2.      Design Team Additional Inspections...................................... 111

G.      Provide Positions and Identify Any Incomplete "Contract Close Out Items" (Count VI a. of Madrigal's Itemization of Damages and Item 15 of Madrigal's Outstanding Items List, Revised February 2, 2009), If Any .......... 116

EXHIBIT 2

**TABLE OF CONTENTS**
(continued)

**Page**

H.   Provide Positions Regarding Legal Ramifications for All Change Orders
     and Lien Waivers and Releases Signed by Madrigal and/or Foulger Pratt ....... 116

     1.   The Change Orders Executed by Foulger-Pratt, Madrigal and the
          Architect Do Not Have Any Legal Effect on Foulger-Pratt's and
          Travelers' Defenses to Madrigal's Claim for Liquidated Damages ...... 116

     2.   Foulger-Pratt's Delivery of Release of Liens and Waiver of
          Claims, Which, By Their Terms Are Conditioned Upon Payment,
          Do Not Have Any Effect on Foulger-Pratt's Defenses to
          Madrigal's Claim for Liquidated Damages, or Foulger-Pratt's
          Extended Performance Claim Commencing on June 1, 2008 .............. 118

I.   Provide Basis for Travelers Casualy and Surety Co.'s Decision to Allow
     Foulger-Pratt "To Reach Substantial Completion of the Remaining Work...
     Within 95 Calendar Days" After the Date of the Assignment Agreement
     (Articles 5 and 10 of the Assignment Agreement) ........................................... 121

EXHIBIT 2

## I.      INTRODUCTION

At the onset of its case, Madrigal Condominiums, LLC ("Madrigal") boldly trumpeted its contract as the license for exacting its will upon the contractor.  As the evidence made clear, however, it was Madrigal that avoided its duties under the construction contract ("Contract") for the Madrigal Lofts ("Project") to hedge its risk in a bad real estate market.  Madrigal dispensed with the Contract's orderly turnover sequence and timeframe in order to maximize the settlement of its pre-construction sales.  Having successfully used the contractor, Foulger-Pratt Residential Contracting, LLC ("Foulger-Pratt"), to achieve this objective, Madrigal then chose to obfuscate and misdirect when contract administration was required to achieve final acceptance.

As the Project developer, Madrigal assumed both the risk and reward of the vitality of the Washington, D.C. ("D.C.") real estate market in the Mount Vernon Triangle.  The Contract neither relieves Madrigal of the inherent risk in the real estate market, nor offers the contractor any benefit from a boom market.  When the D.C. housing market dried up, Madrigal was faced with many hard choices affecting the viability of its investment.  In the fall of 2007, Madrigal first decided to preserve the sale of its "pre-sold" units by requiring the settlement of random units prior to the Contract's Guaranteed Substantial Completion Date.  Madrigal's insistence on the early settlement of units disrupted and delayed Foulger-Pratt's completion efforts at significant cost.  The settlement of pre-sold units was Madrigal's lone priority from mid-October 2008 through March 2008.  Having realized the benefit from the early unit sales and a slump in sales thereafter, Madrigal belatedly assessed liquidated damages against Foulger-Pratt.

As the imperative to settle units subsided, Madrigal abandoned its contract administration responsibilities in what can only be seen as an effort to avoid accepting and paying for the Project it then was not selling.  Madrigal's abdication of its contract administration functions had the direct effect of frustrating Foulger-Pratt's ability to gain final acceptance of its work.  This is

most clearly illustrated by Madrigal's refusal to accept units on any terms other than final sale, and its calculated efforts to avoid defining the parameters for completing the exterior of the building.  Madrigal's refusal to administer the close-out of the Contract is apparent in its issuance of revolving punch-lists for unsold units; in its refusal to define the parameters for final acceptance by failing to attach the Owner's Punch List to its Certificate of Substantial Completion in accordance with its obligations and commitments; and by its improper and undisclosed efforts to hold Foulger-Pratt responsible for future punch-lists it chose not to issue. Madrigal's frustration of Foulger-Pratt's completion efforts became doubly confounding when relied upon by Madrigal as its basis for nonpayment and the assertion of unjustified backcharges. When the evidence in this case is properly viewed, Foulger-Pratt is not only entitled to payment, but it is also entitled to the extended performance costs incurred in chasing Final Completion, and interest on amounts wrongly withheld.

## II. MADRIGAL CHANGED THE CONTRACT TO SALVAGE INCOME FROM THE EARLY SETTLEMENT OF PRE-SOLD UNITS.[1]

Madrigal has frustrated and hindered the construction of the Project by administering the Contract in a manner that has been improperly driven by its decided purpose to shed its real estate development risk and maximize its profitability in a declining housing market.  The record in this case demonstrates that over the course of the Project, Madrigal directed Foulger-Pratt to comply with numerous demands that were motivated by its extra-contractual sales requirements and project financing concerns.  Madrigal's demands, which included the direction to resequence the contract schedule for the completion of floors to coincide with its schedule for settlement of pre-construction sales, the direction to prepare settlement-ready units early and in disregard for the Contract's sequence, and the issuance of several late-arriving changes to the work,

---

[1] For additional legal citations and support for this Section, please refer to Resp'ts Pre-Hearing Brief, §III.

EXHIBIT 2

collectively amounted to substantial alterations to the Contract, all of which were detrimental to Foulger-Pratt's performance.  The facts as presented in the hearing substantiate the conclusion that Foulger-Pratt successfully reached Substantial Completion on or before the Guaranteed Substantial Completion Date even as it achieved the early and out-of-sequence settlement of units and performed the numerous changes to the Work directed by Madrigal.  If it is otherwise found that Substantial Completion was achieved after the Guaranteed Substantial Completion Date, the record also demonstrates that Foulger-Pratt is entitled to both a time extension and a finding that Madrigal's acts and omissions waived and/or negated the right to assess liquidated damages against Foulger-Pratt.  As a result, Respondents respectfully request that the Panel deny Madrigal's claim for liquidated damages.

A. **The Delayed Issuance of the Notice to Proceed and the Potential for Losing Pre-Construction Sales Led Madrigal to Alter the Contract's Schedule.**

The necessity for Madrigal's changes to the sequence for completion of floors and its early demand for settlement-ready units in the later stages of the Project can be attributed in part to its delayed issuance of the Notice to Proceed.  The Contract was initially signed in July 2005. (Knopf, Day 3, R. at 654:20 – 654:22; see also Cl. Ex. 2.)  The original Contract schedule, however, was prepared based upon the issuance of the Notice to Proceed on September 1, 2005 and a Substantial Completion date of September 1, 2007, with Final Completion to occur three months later.  (Resp'ts Ex. 1; Knopf, Day 3, R. at 655:7-655:9.)  Madrigal's purchase agreements were tied to construction progress.  If units were not available for settlement due to reasons within Madrigal's control within twenty-four (24) months of the date when pre-construction purchasers executed their purchase agreements, Section 10 of the Madrigal Lofts Condominium Purchase Agreement permitted these early buyers to cancel their agreements and

EXHIBIT 2

receive refunds of their deposits.  (Resp't Ex. 790; see also Knopf, Day 3, R. at 725:12 – 725:17.)

Any intended symmetry between the construction schedule and the timing of Madrigal's pre-construction sales commitments vanished when Madrigal delayed issuing the Notice to Proceed to the contractor until January 1, 2006.  Madrigal's and QDC's representative in this matter, Mr. Robert Knopf, testified on cross-examination that Madrigal postponed issuance of the Notice to Proceed until January 1, 2006 while it continued to arrange for capitalization, among other reasons.  (Knopf, Day 3, R. at 655:1 – 655:9.)  As noted on the revised construction schedule found in Ex. H of the Contract, the four-month delay in the issuance of the Notice to Proceed correspondingly adjusted the Guaranteed Substantial Complete Date to January 1, 2008.  (Cl. Ex. 2.)  Most importantly to Madrigal, its construction schedule was now divorced from its commitment to buyers that it would have pre-sold units available for settlement within twenty-four months of their execution of purchase agreements.  [See e.g., Resp't Ex. 12 and Resp't Ex. 93 (letter to Madrigal from the purchasers of unit 518 stating, "[f]rankly, we are deeply disappointed by the extraordinary delays that Madrigal Lofts have incurred in delivering the Unit, and we find such circumstances unacceptable and in violation of the provisions of the Purchase Agreement originally executed on June 18, 2005").]  As is also apparent from the record, Madrigal was willing to assume the risk of committing itself to sales contracts as early as June 2005, which would call for unit delivery in June 2007, well ahead of its actual construction schedule.  (Id.)  Confronted with the risk of squandering previously guaranteed income from pre-sold units in a declining real estate market, Madrigal made the decision in early 2007 to serve its own profit goals at the expense of the construction schedule and the contractor's sequence of performance.

EXHIBIT 2

**B.      Madrigal Changed the Contract's Schedule to Facilitate Its Settlement of Pre-Sold Units.**

   *1.      Madrigal Directed the Contractor to Revise the Sequence for Completion of Floors In the Building to Floors 1-4, then Floors 9-12, and Lastly Floors 8-5.*

In the spring of 2007, Madrigal directed the contractor to resequence the progression for completion of the floors in the building as a means to address its perceived sales requirements in an already deteriorating real estate market.  (See Resp'ts Ex. 80; Knopf, Day 1, R. at 245:6 – 246:3.)  Mr. Knopf testified that the Contract's scheduled progression for completion of floors from the bottom of the building to the top was revised to a progression that he deemed "top-down delivery." (Knopf, Day 2, R. at 271:11 – 272:2.) Mr. Knopf also readily acknowledged, however, that the floors were resequenced without a modification to the Contract to reflect the change. (Knopf, Day 3, R. at 659:22 – 660:14.)

Trying to distance itself from the delay impact of its sought after change, Mr. Knopf testified that the progression in the Contract was altered to complete floors from the top floor of the building sequentially downward for the purpose of efficiency and to the benefit of all parties, including the contractor and its key subcontractors.  (Knopf, Day 2, R. at 245:13 – 248:7.) However, Mr. Knopf's own admissions prove that Madrigal's resequencing of the floors was anything but an introduction of a "top-down delivery" method to the Project.  In the same regard, Mr. Knopf's belief that the resequencing "makes a lot of sense" (Knopf, Day 1, R. at 247:1) and his characterization of the subcontractors' response to the resequencing as "a great idea … it will help us expedite the building" (Knopf, Day 1, R. at 247:18) are plainly proven incorrect by the record.

An examination of Mr. Knopf's testimony discredits any notion that Madrigal's direction to resequence completion of the floors for Certificate of Occupancy ("C of O") inspection

EXHIBIT 2

actually introduced an approach that allowed the contractor and its subcontractors to efficiently "move to the top of the building and then start working [their] way down from the top." (Knopf, Day 1, R. at 246:12.)  To the contrary, the "top-down delivery" method as theorized by Mr. Knopf was not in fact the sequence that Madrigal directed.  Indeed, Mr. Knopf admitted during his analysis of the C of O dates in the "Madrigal PSI Schedule 2007" (see Resp'ts Ex. 810), a document he created a month before the hearings in full view of litigation (Knopf, Day 3, R. 658:10 - 659:1), that the modified sequence implementing the "top-down delivery" approach "doesn't necessarily mean you go 12, 11, 10, 9, 8, 7, 6, 5, 4, 3, 2, 1 because that's not how it's done."  (Knopf, Day 1, R. at 249:18 – 249:21.)

According to Mr. Knopf, the third column in the "Madrigal PSI Schedule 2007" charting "the modified sequence for floor turnovers" and the "revised C of O date, which is based on the top-down construction," reveals that the floor sequence directed by Madrigal in fact required the contractor to obtain C of O's for the floors in the following progression – 1, 2, 3, 4, 9, 10, 11, 12, 8, 7, 6, 5.  (Knopf, Day 1, R. at 249:7 – 249:11; see also Resp'ts Ex. 810.)  This sequence plainly fails to allow the contractor to work its way down from the top and out of the building, which is the purported reason Mr. Knopf decided to introduce a "top-down" method to the Project. (Knopf, Day 1, R. at 246:4 – 247:17.)  In sum, Madrigal directed the contractor to obtain C of O's for the floors in a sequence very dissimilar to the hypothesized and purportedly advantageous "top-down delivery" method championed by Mr. Knopf.  Glen and Foulger-Pratt performed the work in accordance with Madrigal's directed sequence and obtained C of O's for the floors in the substantially the same progression – 2, 3, 4, 1, 9, 10, 11, 12, 8, 7, 6, 5.  (See Resp'ts Ex. 51, 52, 71, 87, 94, 100, 119, and 125.)

EXHIBIT 2

As would be expected, the evidence presented shows that Madrigal's direction to complete the bottom one-third (floors 1-4) of the building and the top one-third of the building (9-12) before the middle one-third (8-5) resulted in construction inefficiencies and can only be seen as an attempt by Madrigal to salvage the profitability of its pre-construction sales.  (See MacClary, Day 7, R. at 1734:10 – 1735:12; Norris, Day 10, R. at 2687:7 – 2688:16.)  Not coincidentally, Foulger-Pratt's turnover of floors based upon the progression encompassed in the "revised" C of O schedule (see Resp'ts Ex. 810) reflected Madrigal's general settlement plan to close more valuable units on the higher floors before less valuable units on the middle floors. (MacClary, Day 7, R. at 1739:4 – 1739:12.)

The conclusion that Madrigal changed the sequence for Foulger-Pratt to obtain C of O's for the floors in the building in an effort to maximize profits from its pre-construction sales is further supported by Glen Construction Company's ("Glen") November 19, 2007 letter providing Madrigal with notice of the disruptions and inefficiencies caused by the floor resequencing.  (Resp'ts Ex. 80.)  The November 19, 2007 notice letter was prepared by Glen's Project Manager, Mr. Ben Apfelbaum.  According to Mr. Knopf, Mr. Apfelbaum was the "key person" (Knopf, Day 1, R. at 245:14) present for Glen at the mid-April 2007 meeting where Madrigal discussed its "desire with the subcontractor and the general contractor to alter the sequence for delivery of floors." (Knopf, Day 1, R. at 245:20 - 245:22.)  Mr. Apfelbaum, when recounting the impetus for the floor requencing in the November 19, 2007 notice letter, does not refer to presumed benefits on behalf of the contractor and the key subcontractors.  Rather, Mr. Apfelbaum provides notice to Madrigal that the inefficiencies being experienced in November 2007 are the result of the "current plan [] to obtain Certificates of Occupancy in a sequence consistent with your *general settlement plan*."  [Resp'ts Ex. 80 (emphasis added).]  The general

EXHIBIT 2

settlement plan referred to by Mr. Apfelbaum can be construed as nothing other than Madrigal's plan to settle the previously-sold units on the prioritized floors.

        2.    *Madrigal's Direction to Change the Floor Sequence Resulted in Subcontractor Claims and a Delay to the Work of At Least 2.5 Weeks.*

The uncontroverted evidence in the record demonstrates that Madrigal's directed change to the floor sequence significantly disrupted the Work.  According to Mr. Kevin MacClary, Foulger-Pratt's Director of Multi-Family Operations, the resequencing of the floors caused inefficiencies by requiring the trades to jump ahead of important predicate work such as electrical risers and exterior brick work that would allow framing operations and glazing at building perimeter.  (MacClary, Day 7, R. 1734:13 – 1735:12).  For example, Mr. MacClary and Foulger-Pratt's and Travelers' expert, G. Scott Norris of Norris Construction Consulting, testified that the direction to jump to the upper-level floors before completing the intermediate floors caused disruptions, inefficiencies and problems with 1) vertical construction within the riser shafts – electrical risers, duct risers, piping risers; 2) the drywall contractor's wall framing on the upper floors due to the lack of completion of the exterior walls, as the mason must work from the bottom of the building upward; and 3) relocating the temporary roof at the seventh floor to the twelfth floor to proceed with work at the upper levels of the building  (MacClary, Day 7, R. at 1734:10 – 1735:12; Norris, Day 10, R. at 2682:7 – 2688:16.)  In addition, Mr. MacClary testified concerning the interferences to the staging of work that occurred in the resequenced construction, stating that "[y]ou have to go up and pass the work and bring it back down, so getting materials and manpower in the building becomes problematic and becomes a beehive through the stairwells, using the lifts, things like that, until you get much further along." (MacClary, Day 7, R. at 1738:14 – 1739:2.)  Mr. MacClary further explained that the change "continues to cause out of sequence work" because the resequencing results in "a lot of leave

EXHIBIT 2

outs where you just can't go in and complete the picture in total...you start to get these little things that are left undone.  When an activity isn't sequenced you have to come back and do it again." (MacClary, Day 7, R. 1735:7 – 1735:16.)

Mr. Norris testified that he analyzed these and other disruptions and inefficiencies described by Foulger-Pratt personnel and its electrical subcontractor, Pel-Bern Electric Co., to determine the total impact of Madrigal's directed floor resequencing. (Norris, Day 10, R. at 2683:12 – 2684:3; see also Resp'ts Ex. 1005, p. 11.)  Mr. Norris determined from his interviews of Project personnel that a three to six week delay as explained to him was realistic under the circumstances.  (Norris, Day 10, R. at 2688:17 – 2688:12; see also Resp'ts Ex. 1005, p. 11.)  Mr. Norris also impacted the as-planned schedule to measure the delay to the Project from the floor resequencing and ultimately concluded that Madrigal's change to the Contract, conservatively, resulted in a delay to the Project of at least two and one-half weeks.  (Norris, Day 10, R. at 2689:6 – 2689:17; see also Resp'ts Ex. 1005, p. 11.)

### C. Madrigal Changed the Contract Schedule By Requiring the Early Sale and Settlement of Units

#### 1. *Foulger-Pratt Expected and Was Entitled to Perform According to the Contract's Orderly Process for Turnover and Completion of Punch Lists.*

The Contract afforded Foulger-Pratt the right to expect an orderly and efficient sequence of punch-list operations from turnover to Final Completion.  According to the Contract schedule (Exhibit H of Cl. Ex. 2), the turnover process for each floor begins by obtaining a C of O as of the dates provided in the Exhibit H schedule.  (MacClary, Day 8, R. at 2174:15 – 2174:21.) Although Exhibit H required Foulger-Pratt to garner C of O's for certain floors in October and November of 2007, the Contract allowed Foulger-Pratt to remain in full control of its work flow and means and methods, and contains no obligation to engage in any type of punch-list activity in those months.  (Norris, Day 10, R. at 2573:6 – 2524:13; see also Resp'ts Ex. 1005, pp. 3 – 4.)

EXHIBIT 2

Rather, the Contract provides for the initial step in the punch-list process, the contractor's preparation of its own punch-list, to begin on December 1, 2007.  (Cl. Ex. 2, Agreement ¶ 4.4.1.) ("Contractor shall commence preparing its internal punch lists … for the several portions of the Project at least thirty (30) days prior to the Guaranteed Substantial Completion Date.") Once the punch-list process begins on December 1, 2007, the Contract defines the extent of the close-out process as a period of 120 days.  (Cl. Ex. 2, Agreement ¶¶ 4.3, 4.4.1.)

During the first thirty days of the close-out process, which encompasses December 1, 2007 to December 31, 2007, the Contractor prepares its punch-list and addresses items identified. (Cl. Ex. 2, Agreement ¶¶ 4.4.1, 4.4.2.)  The next stage in the punch-list process is the Architect's inspection and issuance of the Owner's Punch List.   The Contract expressly affords the Contractor the ninety-day period between Substantial Completion and Final Completion during which the Contractor completes the items on the Owner's Punch List.  (Cl. Ex. 2, Agreement ¶ 4.3, 4.4.2.)  Importantly, the Contract does not require the Contractor to work on the Owner's Punch List prior to the Guaranteed Substantial Completion Date.  The Contract only requires the contractor to use its best efforts to completion the Owner's Punch List prior to the Guaranteed Final Completion Date.  (Cl. Ex. 2, Agreement ¶ 4.4.2.)

The ninety-day period between the Guaranteed Substantial Completion Date and the Guaranteed Final Completion Date is also the phase of the close-out process when the Contractor performs any Condominium Unit Owner Punch Lists (PSIs) that have been generated.  Similar to the Contract's provision for the performance of the Owner's Punch List, the Contract does not require the Contractor to work on or complete Condominium Unit Owner Punch Lists before the Guaranteed Substantial Completion Date.  (Cl. Ex. 2, Agreement ¶ 4.4.4.)  Instead, the Contract plainly provides for any Condominium Unit Owner Punch Lists to be performed after Substantial

Completion, with the only requirement that the punch lists be completed during the ninety-day closeout period. [Cl. Ex. 2, Agreement ¶ 4.4.4 ("Contractor shall, using its best efforts, complete all Condominium Unit Owner's Punch Lists, should any exist at that time, *prior to the Guaranteed Final Completion Date.*") (Emphasis Added)].

As is true with the entire close-out process, the Contractor is entitled to complete items on the Condominium Unit Owner Punch Lists in its sequenced floor-by-floor delivery. General Conditions Paragraph 3.3.1 provides the Contractor with "sole responsib[ility] for and [] control over means, methods, techniques, *sequences or procedures* and for coordinating all portions of the Work…" [Cl. Ex. 2, General Conditions ¶ 3.3.1 (emphasis added).] Correspondingly, the "Work" is defined in Article 2 of the Agreement to include performing punch-list work. (Cl. Ex. 2, Agreement ¶ 2.3.15.) The Contract does not contain any other timing requirements for completion of the Condominium Unit Owner Punch Lists that would necessitate deviation from an orderly, planned work sequence controlled by the Contractor. Thus, the Contractor is afforded the opportunity by the Contract to efficiently complete items on the Owner's Punch List and the Condominium Unit Owner's Punch Lists. (Norris, Day 10, R. at 2576:21-2578:14.)

Given the foregoing, the Contract does not contemplate Madrigal's settlement of condominium units prior to the Guaranteed Substantial Completion Date. In his analysis of the Contract's timing and procedures for the punch-list process, Mr. Norris similarly concludes that:

> the Contract contemplates that Owner Punch Lists and PSI Lists did not have to be worked on until overall Substantial Completion. There is no basis in the Contract for the owner to require the Contractor to expend efforts addressing such lists and preparing units for settlement until after Substantial Completion, and even then the Contractor may address them in accordance with its planned sequence for orderly floor-by-floor close-out.

[Resp'ts Ex. 1005, p. 3 (emphasis in original).]

Furthermore, Mr. Norris determined in his expert analysis that, notwithstanding the Contract's clauses allowing for limited occupancy, the Specification provision granting the contractor full use of the premises during the construction period further confirms that the Contract did not contemplate Madrigal's settlement of units until after Substantial Completion, and in the time and sequences determined by the contractor.  (Resp'ts Ex. 1005, pp. 3 and 5; see also Resp'ts Ex. 5, § 01100.1.5.)

> 2.    *In the Summer of 2007, Madrigal Experienced Cancellations of Its Pre-Construction Sales and the Effects of a Declining Real Estate Market.*

The evidence in the record shows that, as the close-out of the Project was approaching in the summer of 2007, Madrigal's projections of upcoming sales appeared bleak.  Pre-construction purchasers whose two-year purchase periods were set to expire as early as June and July of 2007 began notifying Madrigal and its sales agent, The Mayhood Company ("Mayhood"), that they were exercising the cancellation option in their purchase agreements.  (See, e.g., Resp'ts Ex. 12.) On August 15, 2007, Mayhood informed Madrigal that it believed thirty-four pre-sold units would not settle.  (Resp'ts Ex. 13.)  Mr. Knopf understood at this time that the declining market for home buyers was having a substantial effect on Madrigal's ability to settle pre-sold units. Addressing the affect of the market on its ability to actually settle pre-purchased units, Mr. Knopf stated:

> Q.  And in your mind part of the issues affecting cancellation were the change in market forces and decreasing real estate values?
> A.  That was the biggest reason.

(Knopf, Day 3, R. at 740:9 – 740:12.)

Mr. Knopf was also made aware in August 2007 that forecasts extended the sale of the building's inventory for approximately fourteen months beyond the Contract's Guaranteed Final Completion Date.  Mr. Knopf testified that he attended a meeting in August 2007 with Mayhood

EXHIBIT 2

and Madrigal's advertising agency, Redhead, to discuss marketing and sales activity for the fall of 2007.  (Knopf, Day 3, R. at 753:3 – 754:1.)   In conjunction with the meeting, Redhead prepared a report that states, "[d]epending on the market and any other factors, Mayhood anticipates selling out Madrigal Lofts inventory by May 2009."  (Resp't's Ex. 18.)  Mr. Knopf confirmed that the Redhead report accurately reflected sales projections in or about August 2007.  (Knopf, Day 3, R. at 754:12 – 754:19.)  Mr. Knopf further testified that, as of May 2009, sales forecasts further extended full sale of Madrigal's inventory an additional one and one-half years, to approximately November 2010.  (Knopf, Day 3, R. 754:20 – 755:4.)

> 3.    *With the Cancellations of Pre-Construction Sales and a Deteriorating Market in Full View, Madrigal Sought to Salvage Potential Sales by Requiring Foulger-Pratt to Prepare Units for Settlement Inspections Early and Out of Sequence.*

In an attempt to maximize its potential revenues given the poor market conditions and grim sales forecasts, the record shows that Madrigal pursued a strategy of closing on as many pre-construction sales as possible before and immediately after the Guaranteed Substantial Completion Date.  On cross-examination, Mr. Knopf stated:

> Q. Now, prior to December 28, 2007, there had been a push to complete the sale and settlement of pre-purchased units?
> A. I don't know what you mean.
> Q. The project team was focused on settling units to the extent practicable that were sold; correct?
> A. The project team was focused on settling as many units as possible, yes.

(Knopf, Day 4, R. at 805:15 – 806:1.)

Mr. Mark Brungart, Madrigal/QDC's other representative for the Project also testified regarding Madrigal's strategy to maximize settlement of units prior to the Guaranteed Final Completion Date.  During cross-examination on this topic, Mr. Brungart admitted:

> Q. You do remember the direction to concentrate on units in concert with sale forecasts?

EXHIBIT 2

A.  With closings, yes.

(Brungart, Day 6, R. at 1430:3 – 1430:6.)

Madrigal's push to settle pre-construction sales and maximize its revenues came at the expense of the Contract schedule previously guaranteed to Foulger-Pratt.  From October 2007 through February 2008, Madrigal placed extra-contractual demands on Foulger-Pratt to support its sales push.  The evidence shows that Madrigal disregarded the Contract and directed Foulger-Pratt to prepare units for PSI, sale and settlement before the Guaranteed Substantial Completion Date, which "circumvent[ed] the process called turnover" (MacClary, Day 8, R. at 2120:22 – 2121:1) and in effect, amounted to a "direction to leapfrog right over Substantial Completion and go to Final Acceptance." (MacClary, Day 8, R. at 2106:19 – 2106:21.)  In so doing, Madrigal disrupted Foulger-Pratt's planned sequence and timing for performing the Contract's turnover and punch-list procedures (see supra, § II.C.1, p. 11) and replaced those procedures with a chaotic unit-by-unit procedure that was solely based on its ever-changing sales priorities. (MacClary, Day 7, R. at 1754:12 – 1757:6, 1765:10 – 1769:7; Norris, Day 10, R. at 2566:8 – 2569:3; Respt's Ex. 1005, pp. 7 – 8, 12.)  Mr. Knopf testified on cross-examination to Madrigal's amended procedure for the close-out of the Project:

> Q.  For the contractor you prioritized and said when I have somebody who'd looking like they really want to go through with this process, you be there and get it ready?
> A.  No, that's not what I said.
> What I said was if we knew a person was coming and we knew that person was going to walk, then we should tell the contractor that was a priority.
> What I said was if they did show up for a walk they probably went to closing.

(Knopf, Day 3, R. at 680:22 – 681:8.)

EXHIBIT 2

Later in cross-examination, Mr. Knopf again admitted that Madrigal directed Foulger-Pratt to prepare certain units before the Guaranteed Substantial Completion Date for buyer inspection and settlement based upon sales priorities, rather than Foulger-Pratt's planned floor-by-floor sequence.  During testimony concerning one of Madrigal's several communications in the fall of 2007 to Foulger-Pratt that provided a list of Madrigal's scheduled PSIs, Mr. Knopf stated:

> Q.  What is the import of such a schedule at this time in a project?
> A.   So the contractor knows that there is a preference for certain units over other units.

(Knopf, Day 3, R. at 713:16 – 713:20.)

Madrigal informed Foulger-Pratt of its "preference for certain units over other units" (Knopf, Day 3, R. 713:19 – 713:20) in a chaotic manner that disrupted Foulger-Pratt's efforts to maintain any semblance of an orderly work sequence.  Madrigal forwarded varying lists of prioritized units scheduled for PSIs as its requirements shifted.  There were often daily changes to the lists not properly distributed to the construction staff.  (MacClary, Day 7, R. at 1765:21 – 1770:20; Norris, Day 10, R. at 2566:8 – 2570:16; Resp'ts Ex. 1005, pp. 7 – 8, 12.)  Foulger-Pratt's finishes superintendent at the Madrigal Lofts during the Fall/Winter of 2007, Mr. Chris Dugan, sent an e-mail to Mr. Brungart on October 23, 2007 expressing his frustration with Madrigal's daily changes to its lists of units prioritized for buyer inspections.  (Resp'ts Ex. 46.)  Mr. Dugan wrote, in part:

> We have to somehow get a handle on these walk dates and how many changes that we have daily.  I have a set of dates that you gave me, Ben has a different set, and Melissa has a third set…
>
> We all have the original.  Then we received a change on October 17th, then we received another change on units to be ready on October 22nd at 7p.m.
>
> …realize that we were putting all of our efforts into the units that we thought we were walking, and now we have to switch gears and

> there is no time to get ready on the changed units.  I will give an
> example, for this Thursday.  Originally, we were to have 313, 314,
> 315, and 316 ready for that day.  Now, as of this morning, 314,
> 315, 316 are gone, but we've added 403, 415, and 416.

(Resp't's Ex. 46.)

In addition, Madrigal's requirements for settlement preparation were also communicated through its daily updates to an online calendar of PSI and settlement dates established with its buyers.  (Knopf, Day 3, R. at 666:17 – 666:20; Norris, Day 10, R. at 2606:15 – 2609:12; <u>see</u> <u>also</u> Resp't's Ex. 756.)  Mr. Knopf identified this online calendar of PSI dates in the hearings as the "Localendar."  (Knopf, Day 3, R. at 666:14 – 666:16; Resp't's Ex. 756.)  Mr. Knopf testified that Madrigal's sales representatives would input the schedule for unit PSIs and settlements into the Localendar (Knopf, Day 3, R. at 666:18 – 667:3), and Mr. MacClary stated that Foulger-Pratt was given read-only access to the Localendar (MacClary, Day 7, R. at 1766:10 – 1766:11).  Mr. MacClary also testified that Madrigal and its sales representatives would change the PSI calendar two or three times a day depending on its buyers' schedules, so it was necessary for Foulger-Pratt personnel to review the Localendar daily to determine which units were required for PSI and settlement.  (MacClary, Day 7, R. at 1766:11 – 1767:1, 1819:14 – 1820:7.)

The fluidity of the web-based Localendar prevented Foulger-Pratt from establishing an orderly sequence of close-out operations.  Indeed, both Mr. MacClary and Mr. Knopf testified that Foulger-Pratt prepared units for inspections and settlement in accordance with the schedules in the Localendar.  (Knopf, Day 3, R. at 667:12 – 667:17; MacClary, Day 7, R. at 1766:15 – 1766:20.)  Mr. MacClary testified that Foulger-Pratt did not cause Madrigal to miss a single PSI or settlement. (MacClary, Day 7, R. at 1807:6 – 1807:7.)  Mr. Norris, in his expert report and testimony, demonstrated that, in 2007, Foulger-Pratt prepared at least 81 units for PSIs at Madrigal's direction.  (Norris, Day 10, R. at 2639:7 – 2641:4; Resp't's Ex. 1005, p. 8.)  Mr.

EXHIBIT 2

Norris' expert report explains the extensive underlying documentation for his analysis and how it was assembled.  (Resp'ts Ex. 1005, pp. 8 and 23-24; Ex. NCC-02, NCC-03, NCC-04, NCC-05 and NCC-12.)  This underlying documentation includes all of the Project punch list and PSI documents, the Localendar, Madrigal's settlement records and Foulger-Pratt's PSI and settlement log.  (Resp'ts Ex. 1005, p. 8; Resp'ts Ex. 801, Vols. 1-4; Resp'ts Ex. 756 and 628A; and Ex. NCC-12.)  Following his testimony at the hearing, Mr. Norris prepared a summary chart listing the many ways in which Foulger-Pratt's PSI preparation work is documented.  This analysis raised the number of units prepared by Foulger-Pratt in 2007 from 81 to 91.  This chart was presented during the hearings by Respondents' counsel as Respondents' Exhibit 1012.  (Day 12, R. at 3464:19 – 3466:10; Resp'ts Ex. 1012.)   The chart summarizes the documentation corroborating Madrigal's Localendar directives, including Chantilly time and material receipts for specific units and dates, meeting minutes, records showing actual settlements occurring immediately following PSIs, PSI forms signed by unit purchasers, and e-mails.  (Resp'ts Ex. 1012.)  The chart is further explained in Supplement A in this Brief.

Thus, Respondents have demonstrated the preparation of 91 units for pre-settlement inspections in 2007, prior to the Guaranteed Date of Substantial Completion, as directed by Madrigal.  This is more than one-third of the building's 259 units.  Furthermore, by February 15, 2008, Foulger-Pratt prepared an additional 47 units at Madrigal's direction; bringing the total number of units prepared by this date to 138, which is more than half the units in the building.

4.      *Madrigal's Direction to Prepare Units for Buyer Inspection and Settlement Earlier Than Anticipated and Outside of Foulger-Pratt's Planned Sequence Had Several Deleterious Effects On the Progress of the Work.*

The evidence in the record demonstrates that Madrigal's demand to prepare units for pre-settlement inspection early and out-of-sequence caused significant disruptions and impacts to Foulger-Pratt's efforts to timely achieve Substantial Completion. Madrigal's witness and representative for the Architect of the Project, Mr. Douglas Carter of Davis Carter Scott, Ltd., aptly summarized the result of Madrigal's early demand for units when he testified:

> I know that our office was aware that there was a fairly intense scramble that went on to accommodate people who literally had to move in, and so there was a need for the contractor to accelerate certain areas of the building to accommodate that.

(Carter, Day 7, R. at 1565:14 – 1565:19.)

The Respondents' witnesses expanded upon Mr. Carter's testimony that Foulger-Pratt needed to accelerate certain areas of the building to accommodate the early move-in of residents by describing the nature of the acceleration and its effects on completion of the Work. Respondents' witnesses gave perspective to the Owner's early completion demand by explaining those demands as requiring it to "leapfrog right over Substantial Completion and go to Final Acceptance" for units and common areas throughout the building five and one-half months in advance of the construction schedule.  (MacClary, Day 8, 2106:19 – 2106:21; Norris, Day 10, 2641:7: - 2642:5; see also Resp'ts Ex. 1005, p. 7.)  Specifically, punch-list work that the Contract contemplates would be completed during the ninety days following Substantial Completion was required to occur within the two and one-half months preceding the Guaranteed Substantial Completion Date.  (MacClary, Day 7, R. at 1758:14 – 1759:4, 2106:6 – 2106:21, 2134:8 – 2134:15; Norris, Day 10, R. at 2641:7 – 2642:5; Respt's Ex. 1005, p. 7.)  The acceleration of punch-list activities and the early preparation of units for buyer inspection and

EXHIBIT 2

settlement randomly throughout the building prevented Foulger-Pratt from establishing an efficient sequence for the finish trades to complete units and corridors, which the Contract entitled it to perform.  (Norris, Day 10, R. at 2554:2 – 2554:9, 2592:6 – 2596:10; see also Cl. Ex. 2, General Conditions ¶ 3.3.1, infra §II.C.1.)  Foulger-Pratt  could not manage the work of the finish trades in a logical flow and build momentum for the completion of entire floors of units, as work was continually redirected to meet the shifting requirements of Madrigal's sales needs. Ample testimony was presented by the Respondents illustrating how the intended progression of finish trades, which Mr. MacClary characterized in his testimony as a train of activities, became "helter-skelter" when the orderly flow was disrupted to attend to critical activities in the units being prepared for early settlement in disjunct  locations throughout the building.  (MacClary, Day 7, R. at 1754:12 – 1757:6; Norris, Day 10, R. at 2568:4 – 2569:20, 2592:6 – 2595:21.)

Mr. MacClary and Mr. Norris also testified that Madrigal's early demand to ready units for settlement inspections drained valuable management resources.  (MacClary, Day 7, R. at 1756:16 – 1757:6, 1772:16 – 1773:22; Norris, Day 10, R. at 2675:3 – 2676:22.)  Mr. MacClary explained how the direction to prepare units for settlement inspection randomly around the building drained management resources:

> Instead of having all your cars lined up, going from door to door on the floor now your guys have to run up and down the building and find out who is where, who is not where, and during the day, three or four times during the day, to redirect whatever resources are for the day into the area that you think was the critical area for that day.

(MacClary, Day 10, R. at 1756:16 – 1757:4; see also Norris, Day 10, R. at 2675:3 – 2675:22.)

Moreover, Madrigal's decision to move people into the building in the fall of 2007 ahead of the construction schedule interfered with Foulger-Pratt's work access in contravention of the Specifications.  Specification Section 01100.1.5. states that the  "Contractor shall have full

EXHIBIT 2

use of premises for construction operations, including use of the project site, during construction period.  Contractor's use of premises is limited only by Owner's right to perform work or to retain other contractors on portions of Project."  (Resp'ts Ex. 5, §01100.1.5; Norris, Day 10, R. at 2580:9 – 2581:4; see also Resp'ts Ex. 1005, p. 5.)

DCS's Mr. Douglas Carter testified in the hearings regarding his interpretation of §1100.1.5, which DCS drafted in coordination with Madrigal.  (Carter, Day 7, R. at 1653:19 – 1654:1.)  Mr. Carter confirmed that Madrigal abrogated Foulger-Pratt's full use of the premises during the construction period when he acknowledged that the limited exceptions to the Contractor's full use of the premises clause cannot be construed to include moving residents into the building during the construction period.  (Carter, Day 7, R. at 1656:3 – 1656:22.)

Notwithstanding the Specifications grant of full use to the Contractor, Foulger-Pratt no longer could administer the Project as a construction site in the fall of 2007 when Madrigal's early sale and settlement of units converted the Project to a residence.  Respondents presented evidence in the hearings regarding the numerous restrictions and disruptions to the Work that Foulger-Pratt encountered from the presence of residents throughout the building during the construction period, including: 1) early preparation of corridors and other common areas to their finished state, and then continued rework and maintenance of these areas due to resident move-ins and continuing construction operations; 2) consideration for the noise level of the work and the hours of construction; 3) managing insurance concerns and the safety of residents; 4) cleaning up and storing materials and equipment more frequently; 5) consolidating materials on the P3 level of the garage so that residents had full use of the P1 and P2 levels; 6) limiting use of the corridors and the lobby so that residents could have free and clear means of ingress and egress; 7) establishing and maintaining security and unit access restrictions; 8) performing

EXHIBIT 2

customer service and warranty functions earlier than the Contract required.  (MacClary, Day 7, R. at 1740:9 – 1740:19; Norris, Day 10, R. at 2581:12 – 2582:10; see also Resp'ts Ex. 1005, pp. 12 - 13.)

Madrigal's witnesses affirmed that the early transformation of the project to a residence restricted Foulger-Pratt's full access to the Project.  During cross-examination, Mr. Knopf's testimony substantiates the degree to which the sale and settlement of units eliminated Foulger-Pratt's full use of the premises during the construction period:

> Q.  If a unit is sold and settled?
> A.  Yes.
> Q.  Does the contractor preserve exclusive access to that unit?
> A.  Does the contractor?
> Q.  Yeah.
> A.  Preserve exclusive access.
> Q.  Maintain exclusive access to that unit?
> A.  Doesn't maintain any access to that unit.  It's been completed by him, so he has no reason to go into that space, assuming he's done his Punch-List, but probably not.

(Knopf, Day 3, R. at 643:12 – 644:2.)

Respondents' expert, Mr. Norris, testified as to why Madrigal's restriction of Foulger-Pratt's full use of the premises would effect construction operations even though work may have been completed in the units settled and sold.  Mr. Norris explained that Madrigal's settlement of units caused several disruptions to the Work by transforming the construction site to a residence and eliminating Foulger-Pratt's planned sequence:

> Q.  Why would the contractor care if someone settles and moves into a unit early during the closeout process?
> A.  Well, this would create a lot of impacts to his operation.
>     Again, it's easier to work on a construction site than it is in a residential building.  There are so many restrictions and considerations that you to get into when people start moving into a building that it would be very disruptive, which is what happened.

EXHIBIT 2

> You've got noise considerations, you've got more clean up considerations, you have to get more areas ready and completed, cleaned up, polished up for residents to move into the building and this would totally destroy the contractor's anticipated sequence of working the Punch-Lists and PSIs off in an orderly manner, floor by floor as was anticipated in the contact.

(Norris, Day 10, R. at 2581:12 – 2582:10.)

In addition, Mr. Brungart's testimony highlighted how Foulger-Pratt's full use of the premises, in particular the elevators, was limited by Madrigal's early sale and settlement of units.  When questioned regarding the move-in of residents prior to January 1, 2008, Mr. Brungart stated on cross-examination:

> Q.  And they [residents] would be sharing access to the elevators?
> A.  We would all be using the elevators.

(Brungart, Day 5, R. at 1316:20 – 1317:1.)

Mr. MacClary testified that Madrigal's and the residents' use of the elevators during the construction period severely restricted Foulger-Pratt's access to the elevators for construction purposes.  (MacClary, Day 7, R. 1791:12 – 1791:14.)  Foulger-Pratt was therefore compelled to leave the material hoist attached to tier twenty-two of the building longer than Foulger-Pratt intended as "a lifeblood [] to be able to get material into the building" while it worked around Madrigal's and the residents' schedules.  (MacClary, Day 7, R. 1791:14 – 1791:19; see also Resp'ts Ex. 1005, p. 16.)  Foulger-Pratt informed Madrigal that the prolonged presence of the material hoist would effect completion of the skin and the units in tier twenty-two, but Madrigal did not object to its continued use.  (MacClary, Day 7, R. at 1792:5 – 1792:13.)

EXHIBIT 2

> 5.   *Foulger-Pratt Provided Madrigal with Notice of the Disruptions and Inefficiencies That Foulger-Pratt Was Experiencing, Yet Madrigal Continued to Direct Foulger-Pratt to Prepare More Units for Buyer Inspection and Settlement.*

On November 19, 2007, Mr. Apfelbaum forwarded a letter to Madrigal/QDC providing notice that its prioritized unit demands were impacting the performance and cost of the Work. (Resp't's Ex. 80.)  Regarding Madrigal's unit needs, Mr. Apfelbaum wrote,

> we understand that you would like certain units delivered out of sequence from the floor by floor approach.  This is considered necessary for you to meet specific schedule deadlines with your buyers.  Again while sympathetic to your needs, we cannot obtain occupancy on these random units without incurring real costs to accelerate and/or supplement current workforces.

(Resp't's Ex. 80.)

When questioned concerning his understanding of the November 19, 2007 letter, Mr. Knopf testified that it "was obviously an attempt to lay some groundwork for potential future claim." (Knopf, Day 3, R. at 703:8 – 703:17.)  Despite Mr. Knopf's recognition of the letter as notice of a potential claim, Madrigal did not provide a written response.  (Knopf, Day 3, R. at 705:9 – 705:11.)  Instead, in a meeting the next day, Madrigal directed Foulger-Pratt to prepare an additional sixteen units for PSI inspection in the upcoming weeks before the Guaranteed Substantial Completion Date, and "to [not] worry about the impact, these are units that we need." (MacClary, Day 8, R. at 1929:6 – 1929:13.)  Foulger-Pratt memorialized Madrigal's direction to continue the early settlement of units throughout the building in meeting minutes without objection from Madrigal. (Resp't's Ex. 86; Knopf, Day 3, R. at 719:3 – 719:8.)

Mr. MacClary also testified regarding a meeting with Madrigal/QDC in the third week of December 2007 to discuss Madrigal's unit requirements for the end of the month.  (MacClary, Day 7, R. at 1804:2 – 1804:14.)  At this meeting Madrigal did not discuss the approaching

EXHIBIT 2

Substantial Completion date or raise the possibility of assessing liquidated damages if the deadline was not met.  (MacClary, Day 7, R. at 1804:15 – 1804:21.)

        6.     *The Disruptions and Inefficiencies Caused By Madrigal's Early Settlement of Units Equates to a Four-Week Delay to the Progress of the Work.*

Mr. Norris testified in the hearings that the disruptions and inefficiencies resulting from Madrigal's early demand to prepare units for PSI and settlement delayed the progress of Foulger-Pratt's Work by a minimum of four weeks.  (Norris, Day 10, R. at 2561:22 – 2562:12, 2673:17 – 2675:22; see also Resp'ts Ex. 1005, pp. 12-14.)   To reach this conclusion, Mr. Norris interviewed Foulger-Pratt personnel and analyzed Project documents, in particular, the records of Chantilly, a "jack of all trades firm" engaged to assist Foulger-Pratt in the preparation of units for PSIs during the period Foulger-Pratt was disrupted by Madrigal's early sales.  (MacClary, Day 7, R. at 1763:8 – 1764:2; Norris, Day 10, R. at 2590:15 – 2592:5; see also Resp'ts Ex. 1005, pp. 13-14.)  Chantilly had "prepared very detailed T&M [Time & Material] tickets" that Mr. Norris analyzed to determine the magnitude of effort expended for PSI-related work in accordance with Madrigal's early sale and settlement demands.  (Norris, Day 10, R. at 2590:15 – 2590:19, 2599:6 – 2601:2.)  Mr. Norris testified that the quantity of man-hours which Chantilly devoted to early PSIs and settlement was significant for his analysis because Chantilly's production during this period could have been directed toward Foulger-Pratt's Substantial Completion efforts rather than Madrigal's sales needs.  (Norris, Day 10, R. at 2600:9 – 2601:2, 2660:10 – 2661:5; see also Resp'ts Ex. 1005, pp. 13-14.)  Witnesses for the Respondents testified that Foulger-Pratt would have directed all of its efforts to achieving Substantial Completion had Madrigal not required Foulger-Pratt to prepare units for PSI and settlement, even after it received notice of delays and disruptions to the remaining base Contract work.  [see Resp'ts Ex. 80; MacClary, Day 7, R. at 1806:11 – 1806:14; MacClary, Day 8, R. at 2139:22 –

EXHIBIT 2

2140:17; Norris, Day 10, R. at 2600:9 – 2601:2, 2660:10 – 2661:5; see also Resp't Ex. 1005, pp. 13-14.]

Mr. Norris testified that, in total, Chantilly expended 5,127 man-hours exclusively dedicated to preparing units for early settlement inspection from the beginning of November 2007 to February 15, 2008, the date when Madrigal's inventory of pre-sold units had been prepared by Foulger-Pratt for settlement inspections.  (Norris, Day 10, R. at 2661:6 – 2664:22; see also Resp't Ex. 1005, pp. 13-14 and Ex. NCC-07.)  Performing an analysis comparing the 5,127 man-hours Chantilly expended for PSI and settlement-related work to the trade man-power completing unit finishes, Mr. Norris determined that Chantilly's crew could have been redirected to advance Contract work in the interior that Madrigal considered to be impeding Substantial Completion by four weeks.  (Norris, Day 10, R. at 2669:7 – 2670:10, 2673:17 – 2673:20; see also Resp't Ex. 1005, pp. 13-14.)  Supporting this conclusion, Mr. Norris found that the average crew size performing base Contract work in the units from November 1, 2007 to February 15, 2008 would have increased from thirty-seven persons to fifty persons if Chantilly's 5,127 man-hours performing PSI-related work instead supplemented the average unit crew.  (Norris, Day 10, 2669:18 – 2669:21.)  With fifty crew members performing the same amount of base Contract work as thirty-seven crew members, the work could have been completed in eleven weeks rather than fifteen weeks, yielding a net savings of four weeks time.  (Norris, Day 10, R. at 2669:7 – 2673:20; see also Resp't Ex. 1005, pp. 13-14.)

> 7.   *Madrigal Presented An Erroneous Interpretation of the Contract to Justify Its Direction in the Fall of 2007 to Prepare Units for Settlement Early and Out of Sequence.*

Madrigal has relied upon an errant view of the Contract's turnover process to defend its extra-contractual decision to move residents into the building long before the Guaranteed Substantial Completion Date.  (See Ex. H of Cl. Ex. 2.)  Under Madrigal's flawed interpretation

EXHIBIT 2

of the Contract, each floor of the building should have been substantially complete by the staged turnover dates in the schedule, even as the entire building was not required to be substantially complete until January 1, 2008.  (Knopf, Day 1, R. at 197:4 – 197:22.)  By construing the turnover dates in the Contract schedule as individual substantial completion milestones, Madrigal created the fiction that Foulger-Pratt should have had units throughout the building available for sale and settlement upon demand prior to the Guaranteed Substantial Completion Date.

To arrive at its false construct concerning unit delivery, Madrigal compounds its first error by committing the further mistake of re-writing each of its punch-list provisions, which contemplate performance during the period from Substantial Completion to Final Completion, to require that work at Madrigal's demand and prior to Substantial Completion.  (Cl. Ex. 2, Agreement, ¶¶ 4.4.2, 4.4.4.)  The evidence in the record, however, sharply contradicts Madrigal's errant interpretation of the Contract.  When properly construed, the Contract commences the turnover and punch list process on a per-floor basis with the contractor obtaining a C of O for each floor by the individual milestone dates in the schedule.  (See infra, § II.C.1, p. 9.)  In fact, testimony from Mr. Knopf, along with Madrigal's own exhibits, corroborates that the Contract neither entitles Madrigal to units for settlement prior to the Guaranteed Substantial Completion Date, nor permits it to dictate the timing and sequence of PSIs thereafter.

The record illustrates several defects and inconsistencies in Madrigal's construction of the Contract's turnover process.  The Contract does not call for separate substantial completion milestones for the individual floors in the building as Madrigal proposes.  Rather, the Contract, as confirmed by Mr. Knopf during cross-examination, only contains one substantial completion date - the Guaranteed Substantial Completion Date for the entire Project.  (Cl. Ex. 2, Agreement ¶ 4.3.)  (Knopf, Day 3, R. at 639:14 – 639:21, 647:16 – 648:2.)  Madrigal failed to present any

EXHIBIT 2

Contract provision that establishes additional substantial completion milestones for portions of the work, including the individual floors and units.

Madrigal's initial premise in its argument for early unit settlement, that Foulger-Pratt was required to commence its punch lists for the individual floors, and then to complete the items thereon by the turnover dates in the Contract schedule (Knopf, Day 1, R. at 197:2 – 197:13; 203:21 – 204:11), contradicts the express terms of the Contract.  As previously discussed, the Contract only obligated Foulger-Pratt to begin creating its punch-list by December 1, 2007.  (See infra, § II.C.1., pp. 9 - 10.)   The Contractor's Punch List provision, Paragraph 4.4.1 of the Agreement, states in part, "Contractor shall commence preparing its internal punch lists of items … in order to achieve Substantial Completion … at least thirty (30) days prior to the Guaranteed Substantial Completion Date." (Cl. Ex. 2, Agreement, ¶ 4.4.1.)  Mr. Norris explained that any preparation of the Contractor's Punch List prior to December 1, 2007 was within Foulger-Pratt's discretion and not properly subject to any interim milestone dates in the Contract schedule. (Norris, Day 10, R. at 2574:9 – 2574:13.)  Thus, Madrigal's supposition that Foulger-Pratt not only should have begun preparing its punch lists, but also completed items on its lists as early as October 15, 2007 (the "turn over" date in the Contract Schedule for the first floor of the building) (Knopf, Day 1, R. at 201:21 – 202:11), is plainly contradictory to the clear meaning of Paragraph 4.4.1.

Madrigal's presentation of the Contract is also negated by its own analysis examining the relevant provisions.  As recently as a month prior to the start of the hearings in this case, Madrigal's representatives understood that the turnover dates in the Contract schedule were not substantial completion milestones, but instead correlated to milestones for obtaining a C of O for each particular floor.  Madrigal's document entitled "Madrigal PSI Schedule 2007," which was

EXHIBIT 2

prepared in preparation for the hearings, compares the dates of Foulger-Pratt's early PSI efforts to "the proposed turnover of floors." (Resp'ts Ex. 810; Knopf, Day 3, R. at 658:10 – 659:1).  In addition to the fact that the "Madrigal PSI Schedule 2007" was shown during Mr. Knopf's cross-examination (Knopf, Day 3, R. at 664:9 – 689:18) and in Mr. Norris' expert analysis (Norris, Day 10, R. at 2586:17 – 2588:1; see also Resp'ts Ex. 1005, Ex. NCC-08) to entirely disregard numerous units Foulger-Pratt prepared for PSI earlier than Madrigal showed in its schedule, Mr. Knopf admitted that "turn over" in the Contract schedule was the equivalent of obtaining a C of O.  As part of the "Madrigal PSI Schedule 2007" prepared in April/May 2009, Madrigal included a column entitled "Contract C/O"  (Cl. Ex. 35, Tab 14/Resp'ts Ex. 810.)  In response to the Panel's inquiry regarding this exhibit, Mr. Knopf correlated C of O to turnover when he testified that the "Contract C/O" dates referred to the C of O dates that came right out of the Contract schedule.  (Knopf, Day 1, R. at 257:15.)  Indeed, each and every "Contract C/O" date for the corresponding floor in the "Madrigal PSI Schedule 2007" precisely matches the milestone dates for the floors described in the Contract schedule as "turn over."  (Knopf, Day 3, R. at 659:18 – 659:21.)  Thus, any assertion by Madrigal that the Contract Schedule required Foulger-Pratt to achieve milestones other than obtaining a C of O for each floor by the dates listed was disproved by Madrigal's own analysis and testimony.

Another aspect of Madrigal's flawed interpretation of the unit turnover and punch list process is its position that units on a particular floor would be available for moving in buyers immediately upon receiving the C of O for that floor.  Mr. Knopf testified to this theory on the first day of the Arbitration.  (Knopf, Day 1, R. at 201:21 – 202:16.)  Madrigal, having asked the Panel to believe its unfounded assertion that that the C of O/Turnover dates in the Contract schedule represent individual substantial completion milestones for each floor as discussed

above, further asks the Panel to swallow an even more absurd notion:  that significant further contractual close-out efforts be magically completed almost instantaneously, so that buyers could move in immediately.  (Id.)  These efforts would include unit inspection by the Architect, issuance of the Owner's Punch List, the Contractor's work-off of the Owner's Punch List, Architect re-inspection to confirm Owner Punch list completion, and working off any Unit Owner Punch Lists that may exist.  (Cl. Ex. 2, Agreement Sections 4.4.2. and 4.4.4.)  However, the Contract plainly states, again, that the Contractor is only obligated to, "using its best efforts, complete Owner's Punch List prior to the Guaranteed Final Completion Date."  (Id.)  In his report, Mr. Norris noted that "Owner Punch Lists and PSI Lists did not have to be worked on until after overall Substantial Completion" and that "there is no basis in the Contract for the Owner to require the Contractor to expend efforts addressing such lists and preparing units for settlement until after Substantial Completion."  (Resp'ts Ex. 1005, p. 3.)    In his testimony, Mr Norris was asked to give an overview of the close-out process:

> Q:     Okay.  You stated earlier that the process you've concluded exists is over 120 days.  Can you explain that and lay out the steps in the process?
> A:     Yes.  The 120 days includes the Contractor starting to assemble its Punch-List on December 1st, 2007.  So you have one month of that activity and then 90 days between Substantial Completion and Final Completion for completion of Owner's Punch-List, unit owner's Punch-List to the extent they exist.

(Norris, Day 10, R. at 2576:10-20.)

In effect, Madrigal attempts to compress a process that is to be accomplished over 90 days into nearly an instant on each floor, beginning October 15, 2007.  If 259 units were supposed to be available for buyer move-in as of the Guaranteed Date of Substantial Completion and the inspection, punch list and work-off processes could be accomplished almost instantaneously, as Madrigal suggests, then the 90-day period established by the Contract for

EXHIBIT 2

Final Completion of the Owner's and Unit Owner's punch-list is rendered inoperative and superfluous.  Clearly, Madrigal's imagined process cannot be reconciled with the Contract terms.

Foulger-Pratt and Travelers also established that Madrigal's requirement for early unit settlement in the fall of 2007 even exceeded Madrigal's extreme and unsupportable view of its Contract.  Had Madrigal believed in the fall of 2007 that the Contract dictated that all units on each floor would be available for its sale and settlement by the "turn over" date of the floor, every PSI directed by Madrigal should have occurred after the "turn over" date for the floor on which the unit appeared.  The evidence in the record, however, shows that no such correlation exists.  Even if the floor resequencing modified the Contract schedule such that the supposed "Revised C/O" dates listed in the "Madrigal PSI Schedule 2007" were operative, Madrigal instructed Foulger-Pratt to perform PSIs in fifty-one units even earlier than those dates.  (Norris, Day 10, R. at 2586:17 – 2588:1; see also Resp'ts Ex. 1005, p. 14 and Ex. NCC-08.)  The fifty-one PSIs performed prior to the purported "Revised C/O" dates for the floors on which the units appear amounts to approximately sixty-three percent (63%) of all early PSIs Madrigal directed Foulger-Pratt to prepare before the Guaranteed Substantial Completion Date.  The fact that Madrigal directed Foulger-Pratt to perform these fifty-one PSIs even in advance of its proffered interpretation of the Contract schedule leads to the conclusion that, at the very least, Madrigal's direction to prepare settlement-ready units in the fall of 2007 was not associated with any supposed right under the Contract, but rather its own schedule for settlements with purchasers.

Further dispelling Madrigal's position on early unit settlement, Madrigal has erroneously maintained that the Contract's limited occupancy clauses permitted purchasers to take possession of units, move into the building, and freely access the common areas, all in advance of the Guaranteed Substantial Completion Date.  (See Cl. Ex. 2, General Conditions, ¶¶ 3.13.3, 9.9 and

EXHIBIT 2

Resp'ts Ex. 5, § 01100.1.6.A.)  By extracting the term "occupy" from the clauses providing for occupancy in limited circumstances and create for itself a license to establish permanent residency during the construction period, Madrigal asks the Panel to entirely disregard the "Use of Premises" provision as well as the scheduling and punch-list provisions discussed immediately above.  (See Resp'ts Ex. 5, §01100.1.5.A, infra, § II.C.4, pp. 19 – 22.)  The "Use of Premises" guarantees that Foulger-Pratt "shall have full use of [the] premises for construction operations … during the construction period," and that the "full use" will only be limited "by the Owner's right to perform work or to retain other contractors on portions of Project."  The result Madrigal seeks, however, contravenes the commonly-applied maxim of contract interpretation in D.C. that a "writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." See e.g., D.C. v. D.C. Pub. Serv. Comm'n, 963, A.2d 1144, 1155 (D.C. 2006); Wash. Auto. Co. v. 1828 L St. Associates, 906 A.2d 869, 879 (D.C. 2006); see also Intercounty Constr. Corp. v. D.C., 443 A.2d 29, 32 (D.C. 1982) (rejecting an interpretation of a contract provision that rendered a phrase "useless, inexplicable, inoperative, meaningless or superfluous.")

In response to Madrigal's call for the Panel to nullify the unambiguous "Use of Premises" provision, Foulger-Pratt and Travelers offered testimony in the hearings that harmonizes the occupancy provisions with the "Use of Premises" clause.  Mr. Norris testified that the Contract envisions Madrigal's and unit purchasers' right to occupy to be more limited than permanent or exclusive occupancy because each clause contains limitations on their occupancy that do not disturb Foulger-Pratt's right to the full use of the premises during the construction period.  (Norris, Day 10, R. at 2578:15 – 2581:4; see also Resp'ts Ex. 1005, p. 5.)  Constraining Madrigal's occupancy during construction, § 01100.1.6.A of the Specifications limits the right to

EXHIBIT 2

occupy "to place and install equipment in completed areas of the building … provided such occupancy does not interfere with completion of the Work."  (Resp'ts Ex. 5, § 01100.1.6.A.)  Paragraph 3.13.3 of the General Conditions limits the Development Manager's right "to occupy *temporarily* any portion of the project Site," while Paragraph 9.9 of General Conditions states that occupancy or use may commence only "when such portion becomes available."  [Cl. Ex. 2, General Conditions, ¶¶ 3.13.3, 9.9 (emphasis added).]

Since the Contract imposes the foregoing limitations on Madrigal's right to occupy portions of the Project during the construction period, Mr. Norris in his expert testimony offered several examples of ways for Madrigal and unit purchasers to occupy or use areas of the Project even as Foulger-Pratt maintained full use of the premises for construction.  Mr. Norris testified that:

> Well, I can imagine all kinds of things that Owners and buyers might want to do as soon as C of Os are obtained by the contractor. They might want to have their interior decorators go into the unit, take a look at the view outside, measure where windows are. Maybe they want to have somebody come in and do sponge painting on a wall or install special audio cables within walls that I've seen before on residential projects.  Any number – put in a sales office.  Let's put a sales office in, get a sales staff in there and start showing units right at the building.  And just the very process of taking buyers through the building and showing them units, these are all the types of occupancy that I can imagine.

(Norris, Day 10, R. at 2583:7 – 2583:22; see also Resp'ts Ex. 1005, p. 3.)

In sum, Madrigal has advanced an unreasonable interpretation of the Contract that contradicts its plain meaning and fails to give meaningful effect to all of its terms.  D.C. v. D.C. Pub. Serv. Comm'n, 963, A.2d at 1155; Intercounty Constr. Corp. v. D.C., 443 A.2d at 32. Madrigal's arguments that the Contract permits it to settle units and restrict access to the Project both prior to the Guaranteed Substantial Completion date and thereafter, at the times and in the

EXHIBIT 2

sequence it chooses, should be rejected because the turnover dates in the Contract schedule are not the dates by which Madrigal can begin settling units and moving residents into the building. The Contract neither contains discrete substantial completion dates for each floor in the building, nor requires the contractor to complete its punch-lists for the respective floors prior to any turnover date in the schedule. Moreover, the Contract does not obligate the Contractor to perform the Owner and Condominium Unit Owner punch-lists at Madrigal's behest but instead, expressly provides that this work is only to be completed prior to Final Completion.

       **D.**    **Foulger-Pratt Successfully Delivered Madrigal's Pre-Sold Units Under Circumstances That Amount to a Waiver of Any Right to Recover Liquidated Damages.**

Prior to, and immediately following, the Guaranteed Substantial Completion Date, Madrigal engaged in several acts and omissions that manifest an intent to waive any right it had to recover liquidated damages. The record contains evidence of several acts and omissions that amount to Madrigal's waiver, including: 1) its direction to "leapfrog" Substantial Completion and accelerate the Final Completion of units on ten of the twelve floors prior to the Guaranteed Substantial Completion Date, with full knowledge of the delay and disruptions that would result; 2) initiating and embarking upon numerous late arriving change orders during the period of Foulger-Pratt's early completion of units; and 3) failing to alert Foulger-Pratt of its belief that if Substantial Completion was not met that it intended to assess liquidated damages as a result under the circumstances where its insistence on damages would be inconsistent with the actions of the parties at that time. Under District of Columbia law, the foregoing acts and omissions sufficiently demonstrate that Madrigal intentionally relinquished the right to recover liquidated damages. See In re Thomas, 740 A.2d 538, 547 (D.C. 1999) ["A waiver can involve conduct that 'warrants an inference of the relinquishment of such right.'" (internal citations omitted); Nortel Networks, Inc. v. Gold & Appel Transfer, S.A., 298 F. Supp.2d 81, 88 (D.D.C. 2004)

EXHIBIT 2

("Waiver is 'an intentional relinquishment or abandonment of a known right or privilege'" (internal citations omitted); see also Howard J. White, Inc. v. Varian Associates, 178 Cal. App.2d 348, 355, 2 Cal. Rptr. 871 (Cal. Dist. Ct. App. 1960) ["Waiver may be shown by conduct, and it may be the result of an act which, according to its natural import, is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished." (internal citations omitted).]

> 1. *Madrigal's Waiver of Liquidated Damages Includes Its Direction to "Leapfrog" Substantial Completion for Final Acceptance of Units Required for Early Sale and Settlement.*

The evidence presented demonstrates that Madrigal waived the right to insist upon a strict construction of each incident to Substantial Completion when it directed Foulger-Pratt to accelerate the final completion and settlement of pre-sold units throughout the building prior to the Guaranteed Substantial Completion Date. As it appears in the record, Madrigal had elected to have residents inhabit numerous units in the building on ten of the twelve floors by January 1, 2008. (See Knopf, Day 3, R. at 664:22 – 665:4; Resp'ts Ex. 628A, Resp'ts Ex. 810; see also infra, § II.C.) Evidence was also presented that Madrigal maintained five model units on the fourth floor of the building and otherwise used four units on the first floor for sales offices and storage prior to the Guaranteed Substantial Completion Date. (Norris, Day 10, R. at 2636:18 – 2637:19; Resp'ts Ex. 829, 830, 1005.) Madrigal's decision to direct Foulger-Pratt to undertake the extensive efforts necessary to get units settled early and transform the building from a construction site to a residence long before the Guaranteed Substantial Completion Date circumvented the turnover process and amounted to a "direction to leapfrog right over Substantial Completion and go to Final Acceptance." (MacClary, Day 8, R. at 2106:20 – 2106:22; 2120:19 – 2121:1.) As liquidated damages are dependent on achieving Substantial Completion, Madrigal's decision to bypass this milestone in favor of final settlement of units can

EXHIBIT 2

only be viewed as being inconsistent with retaining rights to strict insistence on liquidated damages.

> 2.   *Madrigal Demonstrated Its Intent to Waive Enforcement of the Time Provisions in the Contract in Its Decision to Direct Substantial Changed and Additional Work Immediately Before, and Directly After, the Guaranteed Substantial Completion Date.*

In addition to the interferences and extra work occasioned by its insistence on the early settlement of units, Madrigal further exhibited its waiver of any right to assess liquidated damages by initiating numerous late-arriving change directives (fully documented in Supplement B – "Impact of Late-Arriving Change Orders on Project Completion and Madrigal's Claim for Liquidated Damages").  These "late-arriving change orders" impacted the work during the vital time period that Foulger-Pratt was engaged in the early completion of units.   Numerous construction cases in D.C. and other jurisdictions have found owners in similar circumstances to have waived the right to enforce completion dates and liquidated damages provisions after initiating directives to perform additional or changed work both prior to, and following, the expiration of the completion date in the Contract.  See e.g. Smither & Co. v. Calvin-Humphrey Corp., 232 F. Supp. 204 (D.D.C. 1964) (the owner waived its right to insist upon completion by the target date as a result of its directives after that date to complete change orders and additional work); Allen v. Kowalewski, 239 A.D.2d 879 (N.Y. App. Div. 1997) (the owner waived the condition of timely performance by twice authorizing additional work after the contract's date for substantial completion); Howard J. White, Inc. v. Varian Associates, 2 Cal. Rptr. 871 (Cal. Ct. App. 1960) (explaining that "[i]t would be clearly unconscionable" to require the contractor to perform substantial changed work and meet the contract's completion date when the owner issued the change orders prior to the completion date, but did not contemporaneously notify the contractor that he was expected to adhere to the contract's completion date).

EXHIBIT 2

Howard J. White, Inc. v. Varian Associates is particularly germane to this case because the court there refused to award delay damages to the owner, Varian Associates ("Varian"), after it directed substantial extra and changed work immediately before the contract's deadline.   In affirming the trial court's conclusion that the contractor, Howard J. White, Inc. ("White"), was excused from performance by the substantial completion date, and thus, not liable for delay damages, the court reasoned that "[i]t would clearly be unconscionable under the circumstances to compel White [the contractor] to meet a completion date within which the extra work which he had thus undertaken in reliance on Varian's conduct could not possibly be completed." Howard J. White, Inc., 178 Cal. App.2d at 355.

The result in Howard J. White, Inc. dictates that Foulger-Pratt should be excused from any assessment of delay damages.  As Madrigal similarly directed a significant amount of changed work in close proximity to the Guaranteed Substantial Completion Date which made completing the base Contract work and satisfying Madrigal's extra-contractual early settlement needs by January 1, 2008 exceedingly more difficult.  Madrigal's change directives diverted substantial resources from, and were performed concurrently with, Foulger-Pratt's efforts to timely reach Substantial Completion. (MacClary, Day 7, R. at 1832:19 – 1838:20; Norris, Day 10, 2692:12 – 2700:8; see also Supplement B.)   Many of these changes have been acknowledged in formal change orders to the Contract, including the directive in Change Order 22 to revise the bathroom light fixtures in each unit, the directive in Change Order 23 to add time clocks at the heat pumps in each unit so that climate could be controlled at the condominium owner's discretion, and consolidation of numerous electrical changes throughout the Project in Change Order 25.  (See Resp'ts Ex. 149, 297, 298, 299, 300 and 375; see also Supplement B.)  The Respondents presented evidence that other significant change directives initiated by Madrigal

during Foulger-Pratt's completion efforts have yet to be formally acknowledged.  These changes include Madrigal's revision to the finish details at the loft stairs (MacClary, Day 7, R. at 1832:19 – 1833:11, 1834:14 – 1835:11), an added transition strip under the unit pocket doors (MacClary, Day 7, R. at 1832:19 – 1833:11, 1835:12 – 1836:6), and metal panel and railing alterations at the tier twenty-one balconies (Norris, Day 10, R. at 2695:7 – 2697:7.)

The history of these late-arriving change orders makes clear that much of the changed work was performed in late 2007 and had the effect of redirecting resources of key subcontractors that were necessarily involved in achieving Substantial Completion.  (See Supplement B; Resp'ts Ex. 1005, § IV.C.3, p 14.)  However, some of the changes were not even initiated, and therefore not performed, until 2008, after the passage of the Guaranteed Substantial Completion Date.   (See Resp'ts Ex. 299; 375; see also Supplement B.)   Change directives initiated after the Guaranteed Substantial Completion date include Change orders 20 and 23, portions of Change Order 25, PCO 120, the tier four Kitchen Revision and the tier twenty-one Balcony Railing Conflict.  (Id.)  Even though Madrigal issued several change orders to Foulger-Pratt after the Guaranteed Substantial Completion Date, Madrigal nevertheless invites this Panel to permit a withholding of liquidated damages during the time it took Foulger-Pratt to perform such additional work.   Madrigal's position, however, contravenes well-settled principles of construction law and should be rejected.

It is axiomatic that an owner's issuance of change orders and/or directives to perform additional work after the contractual date provided for substantial completion, without extending the time for performance, will excuse the contractor from liability for liquidated damages during the period of time required to complete the added work.  See, e.g., Sun Shipbuilding & Dry Dock Co. v. United States, 76 Ct. Cl. 641 (1932); Plack & Deal v. United States, 66 Ct. Cl. 641 (1929);

EXHIBIT 2

Stramese Constr. Corp., V.A.B.C.A. No. 1332, 79-2 BCA ¶ 13980 (1979).  The court in Plack & Deal described the notion that an owner could impose liquidated damages after expiration of the original contract time and then deny a time extension commensurate with additional work as "simply absurd."   Plack & Deal; accord Sun Shipbuilding & Dry Dock Co.  The reasoning behind the courts' unambiguous position on this issue is that to hold otherwise would mean that "the contractor would be liable for liquidated damages no matter how promptly he performed the [addition] work."  Id.

The most notable and widely addressed of the changes Madrigal issued after the Guaranteed Substantial Completion Date is Change Order 23, wherein Madrigal directed the addition of time clocks at the heat pumps in the condominium units.  (Resp'ts Ex. 299; see also Supplement B.)  The directive to perform this work was issued on January 16, 2008, and the installation of the time clocks continued well into June 2008.  (See Supplement B; Norris, Day 10, R. at 2693:7 – 2693:16; Resp'ts Ex. 1005, pp. 14.)  Other change orders directed after the Guaranteed Substantial Completion Date required significant efforts to perform but were unduly cast as Contractor delays in Madrigal's case presentation.  These include both formal changes and changes yet to be recognized.  The formal changes include Change Order 20 (Resp'ts Ex. 149), which reconfigured the kitchen layout in the tier twenty-two units, and Change Order 25 (Resp'ts Ex. 375), which covered numerous electrical revisions and added wood flooring.  The changes yet to be recognized include the finish detail change at the loft stairs, the transition strips at the pocket doors, and the tier twenty-one balcony metal panel alterations.  (See Supplement B.)

Setting aside the delay impact owner-directed changes had on Foulger-Pratt's completion efforts, at the very least Madrigal's directives to complete changed work during Foulger-Pratt's

EXHIBIT 2

completion efforts illustrates a classic concurrent delay scenario that results in the denial of liquidated damages where the period of delay attributable to the parties, as here, cannot be apportioned.  See Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000) Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982) [("Where both parties contribute to the delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.") (internal citations omitted)]; Acme Process Equip. Co. v. United States, 347 F.2d 509, 534-45 (Ct. Cl. 1965) rev'd on other grounds, 385 U.S. 138 (1966) (concurrent causes of delay to the same activity entitled the contractor to remission of liquidated damages); Tuller Constr. Co. v. United States, 118 Ct. Cl. 509 (1951); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 238 (2005) (denying an award of liquidated damages because concurrent delays were not shown to be apportionable to the fault of either party); PCL Constr. Services, Inc. v. United States, 53 Fed. Cl. 479 (2002); Young Enter. of Ga., Inc. v. Gen. Services Admin., GSBCA No. 14437, 00-2 BCA ¶ 31,148 (2000) (refusing to award liquidated damages where both parties contributed to delay and the party seeking such liquidated damages failed to provide any basis for apportionment of responsibility).

Courts have consistently found "excusable delay" and disallowed recovery of delay damages in instances where the parties were each responsible for delay events during the same time frame, or, alternatively, jointly responsible for a particular delay event.  See e.g., George Sollitt Constr. Co., 64 Fed. Cl. at 260; R.P. Wallace Inc. v. United States, 63 Fed. Cl. 402, 410 (2004) (explaining that excusable delay results when a period of delay is attributable simultaneously to the actions of both parties); Young Enter. of Ga., Inc. v. Gen. Services Admin. Madrigal's issuance of the change orders after the Guaranteed Substantial Completion Date

EXHIBIT 2

would necessitate a finding of "excusable delay" should the Panel be persuaded that Substantial Completion was not timely met.

Thus, even if the Panel determines that Foulger-Pratt did not achieve Substantial Completion on or before January 1, 2008, and that Madrigal did not delay the progress of the Work by a minimum of 6.5 weeks as the Respondents maintain, assessing liquidated damages remains improper due to the concurrent delay resulting from Madrigal's issuance of late-arriving change orders and directives.  The issuance of Change Order 23 (time clocks) in and of itself should result in full denial of Madrigal's claim, since the work was directed in January 2008 and was performed up to and beyond June 1, 2008, the date Madrigal maintains Substantial Completion was achieved.  This remains the case even if one is persuaded by Madrigal that the parties shared responsibility for this change order.  See George Sollitt Constr. Co. 64 Fed. Cl. 259-60.  Madrigal has consistently maintained that the time clocks were required for Substantial Completion (see Resp'ts Ex. 267 and 348) and by so doing, Madrigal admits full concurrency and negates its own claim for liquidated damages.

> 3.    *Immediately Following the Guaranteed Substantial Completion Date, Madrigal Continued to Direct Foulger-Pratt to Deliver the Remaining Pre-Sold Units Out of Sequence for Early Settlement.*

As further evidence of Madrigal's conduct that is inconsistent with any intention to assess liquidated damages, immediately after January 1, 2008, Madrigal directed Foulger-Pratt to continue its previous effort of delivering the remaining pre-sold (referred to as either "old" or "green") units for final settlement out of Foulger-Pratt's planned Floor by Floor close-out sequence and by the early date of February 15, 2008.  Respondents' witness, Mr. Gregory Daily, representative for Travelers on the Project, testified that he attended a meeting on January 11, 2008 in which the "main purpose" of the discussion was Madrigal's continued need for Foulger-Pratt to prepare "[t]he 51 green units and getting them done in the order they needed them done"

EXHIBIT 2

because "they wanted to close on [sic] in a very short timeframe." (Daily, Day 12, R. at 3194:18 – 3196:1.) Mr. Knopf admitted during cross-examination that Madrigal gave the direction to Foulger-Pratt at a meeting held on January 11, 2008 when he testified:

> Q. Now, immediately following the guaranteed Substantial Completion date of the contract the Owner had requested Foulger-Pratt focus on certain green units in a meeting that took place around January 11?
> A. Yes.

(Knopf, Day 3, R. at 748:5 – 748:10.)

Foulger-Pratt's successful delivery of "green units" was established in the hearings. (Resp'ts Ex. 172; 218.)

The fact that Madrigal was benefited by this effort can be seen in a document entitled "Madrigal Lofts Condominiums: Sales Summary April 27, 2009," which shows 27 additional "old" units closed by the end of the month. (Resp'ts Ex. 812, MC000022922.)

Madrigal's continuing waiver of any right to assess liquidated damages after January 1, 2008 is manifest when examined in the context of Madrigal's silence on the topics of Substantial Completion and liquidated damages at the meeting on January 11, 2008. Mr. Daily testified that Madrigal raised neither topic with Foulger-Pratt and Travelers at this meeting, yet directed Foulger-Pratt to deliver the 51 green units, out of sequence and on an accelerated basis. (Daily, Day 12 R. at 3195:5 – 3195-14.) Madrigal's purposeful silence, so as not to interfere with its desired units, is shown by the fact that in the meantime Mr. Brungart attempted to document with photographs what he perceived as every reason to discredit Foulger-Pratt's performance of the work prior to that date, without ever contemporaneously forwarding these photographs to Foulger-Pratt. (Brungart, Day 5, R. at 1311:22 – 1312:2; Daily, Day 12, R. at 3195:5 – 3195:14.) Foulger-Pratt did not receive Mr. Brungart's January 2008 photographs until after

EXHIBIT 2

litigation was initiated.  (MacClary, Day 7, R. at 1820:13 – 1820:18.)  Madrigal's continuing focus on directing the work to meet its early sales schedule while failing to advise Foulger-Pratt of any alleged shortcomings with regard to Substantial Completion, only serves to support the conclusion that Madrigal's course of conduct throughout late-2007 and early-2008 demonstrates that it waived any alleged right to collect liquidated damages.

> 4.    *Madrigal Allowed the Period from January 1, 2008 to March 17, 2008 to Elapse Without Deciding Whether to Assess Liquidated Damages and Then Notifying Foulger-Pratt of Its Intentions.*

Throughout the period of October 2007 through March 2008, Madrigal depended upon Foulger-Pratt to deliver units for early settlement to retain the benefit of its pre-sold units.  While Foulger-Pratt concentrated its work on satisfying Madrigal's early unit requirements both immediately before and after the Guaranteed Substantial Completion Date, Madrigal was content to remain silent concerning its position on Substantial Completion and liquidated damages.  Mr. MacClary testified that none of Madrigal's representatives communicated with Foulger-Pratt on or about January 1, 2008 concerning either liquidated damages or a belief that the Project was not substantially complete.  (MacClary, Day 7, R. at 1817:19 – 1818:3, 1820:19 – 1821:1.)  If Madrigal had determined in the January 1, 2008 timeframe that the building was not substantially complete, it could have chosen to refrain from transferring units to purchasers and sat on whatever rights it had to collect liquidated damages.  Instead, Madrigal brazenly sought, and then accepted, the benefit of the revenue stream from its early settlement of pre-sold units that otherwise would not have been available without Foulger-Pratt and Travelers facilitating Madrigal's extra-contractual needs, at their own great expense.  (MacClary, Day 8, R. at 2120:8 – 2120:18.)

Once the exigency of closing the last of its pre-construction sales subsided in March 2008, Madrigal made it be known for the first time that it did not consider the building

EXHIBIT 2

substantially complete on January 1, 2008. (See Cl. Ex. 293; Knopf, Day 4, R. at 834:7 –

834:10; MacClary Day 7, R. at 1906:18 – 1906:21.) As if receiving the benefit from the early

sales was not sufficient, Madrigal notified Foulger-Pratt on March 18, 2008 of its intention to

retroactively assess liquidated damages from January 2, 2008 onward. (See Cl. Ex. 293;

Brungart, Day 6, R. at 1376:3 – 1377:4.) Mr. MacClary testified in the hearings that the March

18, 2008 e-mail communication was in fact the first notice sent by Madrigal advising Foulger-

Pratt and Travelers that liquidated damages were accruing, and he never would have expected

such a notice at that time. (MacClary, Day 7, R. at 1906:18 – 1906:21, 1911:21 – 1912:12.) Mr.

MacClary explained the reason why he was surprised at receiving the March 18, 2008 e-mail

from Mr. Brungart by stating:

> Because we had done all of directives they gave us to do to make
> the early settlements and completion. We got the building with a
> use and occupancy to where they could have gone anywhere in that
> building they wanted to go. Any unit that came up, whether that
> purchaser came for settlement or not, we made that unit ready. We
> were on the third stage of Punch-Lists. We were communicating
> we wanted to go to the final closeout, Final Acceptance position,
> instead we got sent all the way back to January 1st as a late notice
> of liquidated damages.

(MacClary, Day 7, R. at 1911:21 – 1912:12.)

Consistent with Mr. MacClary's testimony, Mr. Brungart also testified that he was unaware of

any communication with Foulger-Pratt and Travelers prior to the March 18, 2008 e-mail which

would have notified Foulger-Pratt and Travelers that Madrigal had indeed made the decision to

assess liquidated damages. (Brungart, Day 6, R. at  1376:16 – 1376:20, 1512:18 – 1513:15.) In

truth, the record demonstrates that the March 18, 2008 e-mail communication was Madrigal's

first notice of its intent to assess liquidated damages, as Madrigal failed to submit any other

evidence to the Panel proving otherwise.

EXHIBIT 2

Travelers and Foulger-Pratt detrimentally relied on Madrigal's silence as Foulger-Pratt continued to perform in accordance with Madrigal's direction to prepare its pre-sold units for settlement throughout the period.  Mr. MacClary testified that, had Madrigal made it known at any time prior to March 18, 2008 that Foulger-Pratt would face liquidated damages even as it "leapfrogged" Substantial Completion to provide settlement-ready units for Madrigal's early sale, Foulger-Pratt would have appropriately turned its attention from satisfying Madrigal's early settlement needs to instead focus more particularly on matters Madrigal later maintained as delaying Substantial Completion.  (MacClary, Day 7, R. at 1806:6 – 1806:20, 1818:15 – 1819:3; MacClary, Day 8, R. at 2140:6 – 2140:17; see also Norris, Day 10, R. at 2600:9 – 2601:2.)  Mr. MacClary testified:

> Q.  Mr. MacClary, if you had known, as we do now, that the Owner was going to claim that there was no Substantial Completion and assess liquidated damages, what, if anything, would you have done differently as of January the 1st, 2008?
> A.  I would have taken the additional resources or any resource that I could have gathered and stayed with the floor by floor concept and pushed the building to the Final Competition [sic].

(MacClary, Day 7, R. at 1818:15 – 1819:3.)

In addition, Mr. MacClary testified during cross-examination:

> Q.  Did you think, Mr. MacClary, that on November 19th that you could get all 256 units in the building full complete, built out, painted, everything done, toilets, sinks, disposals, storefront, absolutely everything on that building done by December 31st, 2007?
> A.  Under which method?  Under the method the Owner put us into, no.
> I testified, I think, if I had control of my own destiny and I put those resources where I needed them, okay, we probably would have been arguing the standard of quality, but yes, I think I could have gotten that building there.  If I was able to freely, means and methods, run that job the way I thought was most sufficient, build my train, run my locomotive, put the

EXHIBIT 2

> caboose wherever I wanted it to be, yes, I think I could get it there.
>
> Q.   Did you add any manpower or any additional subcontractors to try and get the building fully and finally complete even with turning over these floors – I mean these units?
>
> A.   The additional manpower and resources we added I directed towards the Owner's directive of getting early people moved into that building.

(MacClary, Day 8, R. at 2139:22 – 2141:3.)

While stopping short of an express relinquishment, Mr. Brungart's testimony on this point came very close.  In response to inquiry from the Panel, Mr. Brungart stated that Madrigal's position regarding liquidated damages prior to March 18, 2008 was that the matter was under consideration, but had not yet been decided.  (Brungart, Day 6, R. at 1512:3 – 1512:17.)  Indeed, Mr. Brungart surmised that Madrigal did not even make the decision to assess liquidated damages until the day he sent the March 18, 2008 e-mail.  (Brungart, Day 6, R. at 1513:4 – 15:13:15.)  Given the benefits extracted by Madrigal from Travelers and Foulger-Pratt during this long silence, Madrigal waived any right to assess liquidated damages and insist after-the-fact upon completion by January 1, 2008.

### E.   The Panel Should Determine That Foulger-Pratt Timely Achieved Substantial Completion Or Is Otherwise Entitled to a Time Extension/Negation of Liquidated Damages.

> *1.   By Settling Units and Establishing the Project as a Residence, Madrigal Was Required By the Contract to Declare the Project Substantially Complete.*

As previous sections of this brief make clear, the undisputed evidence in this case shows that, beginning in the fall of 2007, Madrigal elected to convert the Project to a residence freely open to purchasers and the public.  Notwithstanding its recent discordant complaints about the state of construction at or around the Guaranteed Substantial Completion Date, the fact that Madrigal permitted residents to live in the building before January 1, 2008 shows that Madrigal

EXHIBIT 2

plainly held the belief that the building was fit to be sold and lived in at that time.  See Green v. Obergfell, 73 App. D.C. 298, 311, 121 F.2d 46, 59 fn. 39 (D.C. Cir. 1941) citing Old Colony Trust Co. v. Omaha, 230, U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); see also Intercounty Constr. Corp. v. D.C., 443 A.2d 29, 32 (D.C. 1982) (the reasonable person standard applied to contract interpretation considers "the course of conduct of the parties under the contract.") Madrigal's election to convert the Project from a construction site to a residence should therefore negate any interpretation of the Contract that would allow Madrigal to benefit from the early sales and marketing opportunities while it collects liquidated damages.   In fact, a proper interpretation of the Contract disallows such an incongruous result.

Having taken the Project and established it as a residence by January 1, 2008, Madrigal was contractually obligated to declare the Project substantially complete.   According to Specification Section 01100.1.6., Madrigal had a limited right to occupy areas of the building so long as it satisfied certain preconditions to its occupancy that are designed to preserve the contractor's full use of the premises during the construction period.  (Resp'ts Ex. 5, §§01100.1.5, 01100.1.6.)   Section 01100.1.6 permits Madrigal to partially occupy and place and install equipment only in "completed areas of [the] building," and when "such occupancy does not interfere with completion of the Work."  [(Resp'ts Ex. 5, § 01100.1.6.A.) The most noteworthy and relevant precondition to Madrigal's occupancy in this context is the Architect's issuance of "a Certificate of Substantial Completion for each specific portion of the Work *to be occupied*" by Madrigal. [Resp'ts Ex. 5, § 01100.1.6.A.1 (emphasis added) (obtaining a C of O from the

jurisdiction, and having fully operational mechanical and electrical systems are other preconditions to Madrigal's occupancy under this provision).]

Disregarding the express limitations to "Owner Occupancy" outlined in § 01100.1.6, Madrigal expanded the narrow form of "Owner occupancy" afforded by the clause when it transformed the Project into a residence before January 1, 2008.  Madrigal's "occupancy" prior to the Guaranteed Substantial Completion Date was anything but "partial," or restricted to the placement and installation of equipment.   (Resp'ts Ex. 5, § 01100.1.6.A.)   Madrigal's representatives, sales staff, and the building's early inhabitants each had unfettered use and access to all areas in the building before January 1, 2008.  Since the Architect was obligated to issue a Certificate of Substantial Completion if Madrigal had simply pursued the more narrow, "partial occupancy" reserved under § 01100.1.6.A.1, the provision certainly required the Architect to certify Substantial Completion when Madrigal broadened the Contract's notion of "occupancy" to include the settlement of units and the free and full use of the entire building by Madrigal and its unit purchasers.  Since Madrigal and its early residents enjoyed this greatly expanded "occupancy" throughout the entire building before the Guaranteed Substantial Completion Date, Foulger-Pratt was at the very least entitled under § 01100.1.6 to receive a Certification of Substantial Completion for the entire building on or before January 1, 2008.

> 2.   *Madrigal's Election to Move to Final Completion Throughout the Building, Including Settled Units and Related Common Areas, Demonstrates the Parties' Contemporaneous Interpretation That the Building Was Substantially Complete.*

Madrigal's ability to have residents move in throughout the building must inform any determination of whether the state of construction on or before January 1, 2008 met the Contract's definition of Substantial Completion.  (See Cl. Ex. 2, Agreement ¶ 4.5.)  As Mr. Norris testified, when such a large portion of the building was directed to reach Final Completion

EXHIBIT 2

even before the Project's Guaranteed Substantial Completion Date, analyzing the nature of any remaining work (minor/major) as of January 1, 2008 and whether Foulger-Pratt met the enumerated items for Substantial Completion set forth in Paragraph 4.5 of the Agreement must be viewed in the context of Madrigal's early sales directives and the resultant impacts to the Work. (Norris, Day 10, R. at 2701:20 – 2704:11, 2711:12 – 2711:19; see also Resp'ts Ex. 1005, pp. 7 – 8.) At the very least, the early conversion of the Project to a residence should negate the hyper-technical focus on certain items to the exclusion of other areas of the Project that Madrigal directed to have readied for final acceptance much earlier than required.

Viewed properly in the context of this Project, Foulger-Pratt and its expert, Mr. Norris, steadfastly maintained that the state of construction met the Contract's seven criteria for Substantial Completion. (MacClary, Day 7, 1808:9 – 1816:20; MacClary, Day 8, R. at 1928:5 – 1928:15; Norris, Day 10, R. at 2704:18 – 2712:12; see also Resp'ts Ex. 1005, pp. 9 – 10.) Mr. MacClary testified that as of January 1, 2008: 1) Madrigal could freely and fully utilize the building and had not communicated any hardship (MacClary, Day 7, R. at 1810:2 – 1810:7); 2) all means of ingress and egress were clear of obstruction, with Foulger-Pratt maintaining a "daily focus on it" to make sure all circulation points were clear of equipment and materials (MacClary, Day 7, R. at 1810:14 – 1811:16); 3) all fire and life safety systems were complete and operable, as confirmed by a series of tests and inspections involved in the C of O process (MacClary, Day 7, R. at 1811:17 – 1812:12; 4) site work was substantially complete and the exterior skin was watertight "when it was approved for close in with the assembly of dens glass [and] Tyvek" (MacClary, Day 7, R. at 1812:13 – 18:14:8; MacClary, Day 8, R. at 2114:20 – 2115:5); 5) all elevators were operational, in compliance with the law, and in use by residents every day (MacClary, Day 7, R. at 1814:9 – 1814:22); 6) all mechanical, plumbing and electrical systems

EXHIBIT 2

were complete and operational, and the building automation system was installed and in control

of the HVAC systems (MacClary, Day 7, R. at 1815:1 – 1816:2); and 7) all final C of O's were

obtained for the Project (MacClary, Day 7, R. at 1816:3 – 1816:20; see also Resp't's Ex. 122).

Mr. Norris, in his expert analysis of the state of construction on January 1, 2008,

concurred with Mr. MacClary's assessment that Foulger-Pratt timely achieved Substantial

Completion.   Mr. Norris provided specific testimony as to how Foulger-Pratt successfully

completed by January 1, 2008 what became the more contentious criterion in the seven-part test

for Substantial Completion.   In his evaluation of the first requirement for Substantial

Completion, that Madrigal could fully and freely occupy the Project for the intended purpose

without hardship, Mr. Norris explained:

> …I believe that was absolutely met.  The Owner had full
> circulation of the building.  He should not, under this contract,
> expect to have unfettered circulation of the building at this point,
> meaning he's free to move around the building anywhere he wants,
> but its not a hardship if there's some contractor's equipment or
> materials laying around.
>     Why is that? The contractor has full use of the premises
> during the construction period, as we saw in Section 1100.  So it's
> a shared occupancy for a while, but they had full and free
> occupancy of that building.

(Norris, Day 10, R. at 2705:4 – 2705:16; see also Resp't's Ex. 1005, pp. 9 and 18.)

In addition, Mr. Norris testified to his conclusions regarding one of the issues garnering

the most attention during the hearing – whether the building was watertight on January 1, 2008.

From his interviews with Foulger-Pratt personnel and a review of Project records, as well as Mr.

Brungart's photographs taken on January 2, 2008 and January 3, 2008, Mr. Norris determined

that the building was watertight and remained so while Foulger-Pratt worked on tier twenty-two

of the building in the days following January 1, 2008.  (Norris, Day 10, 2706:18 – 2711:11; see

also Resp't's Ex. 1005, pp. 9 – 10, 16, and 18 – 19.)  Mr. Norris' conclusion that the building was

EXHIBIT 2

watertight on January 1, 2008 was based upon two sets of observations that are readily available in Mr. Brungart's photographs and in the remainder of the record.  First, Mr. Norris agreed with Mr. MacClary that Foulger-Pratt's previous installation and continuing maintenance of the dens glass and Tyvek system provided a watertight barrier for the exterior skin.  (Norris, Day 10, R. at 2708:2 – 2709:1.)  Mr. Norris testified:

> …Tyvek on a short-term basis will keep water infiltration out of a building.  It is part of the permanent design that way.  Can it stand on its own for a year that way?  Not a good idea.  It is not a durable material meant for a building exterior in the long haul.  The metal panels and caulking on this building provided that protective cover for the Tyvek, but the Tyvek is the ultimate barrier.  I heard Mr. Carter testify while he was here that no building is going to – no exterior skin like these metal panels and caulking is going to prevent water infiltration.  It is the Tyvek behind that provides the absolute seal.

(Norris, Day 10, R. at 2708:2 – 2709:1; see also Resp'ts Ex. 1005, pp. 9 – 10, 18 – 19.)

Second, Mr. Norris testified that metal panel applications covering concrete projections on the exterior skin were unrelated to the building's moisture barrier system.  (Norris, Day 10, R. at 2709:6 – 2710:13; see also Resp'ts Ex. 1005, p. 10.)  Throughout its case, however, Madrigal presented numerous photographs purporting to depict open areas of the exterior skin that would allow water to infiltrate the building.  But as both Mr. MacClary and Mr. Norris revealed, most of the remaining metal panels, other than on tier twenty-two, were for installation atop concrete projections such as the parapet walls and balconies for decorative purposes only.  (MacClary, Day 8, R. at 1813:8 – 1813:22, 1925:13 – 1926:2; Norris, Day 10, R. at 2709:6 – 2709:13.)  (Further analysis concerning Metal Panel Delivery and Installation is presented in Supplement C.)  Therefore, any metal panels missing at the locations identified by Madrigal are irrelevant to determining whether the building was watertight as of January 1, 2008.

EXHIBIT 2

Madrigal also points to ongoing work at tier twenty-two to support its contention the building was not watertight on or about January 1, 2008 any conveyed the mistaken impression that this tier contained a 130 foot by 20 foot hole at that time (Knopf, Day 1, R. at 230:3 – 230:5; Knopf, Day 4, R. at 816:11 – 816:16).  Though Madrigal's photographs from January 2, 2008 and January 3, 2008 depict work-in-progress on tier twenty-two of the building, Respondents presented evidence, including superintendents' daily reports, that the remaining temporary weather protections were replaced with the permanent moisture barrier (dens glass and Tyvek) during the days immediately following the dates when the photographs were taken.  [Norris, Day 10, 2703:15 – 2704:11, 2707:3 – 2708:1; Resp'ts Ex. 800 (FP0061887 – FP0061897).]  This work was made necessary at that time because Madrigal's early move-in of residents restricted full access to the elevators, which forced Foulger-Pratt to leave the material hoist, its "lifeblood" for transporting materials, assembled on tier twenty-two for much longer than Foulger-Pratt anticipated.  (MacClary, Day 7, R. at 1791:7 – 1792:4; Norris, Day 10, 2702:20 – 2704:11; Brungart, Day 5, R. at 1316:20 – 1317:1; see also Resp'ts Ex. 1005, pp. 10, 16, and 19.)  Once removed and replaced with motorized construction scaffolding (known as a "Fraco lift"), Foulger-Pratt had to fill in the bays that had remained open for the material hoist's attachments to the building.  (Brungart, Day 5, R. at 1313:15 – 1313:18; Norris, Day 10, R. at 2703:15 – 2707:3 – 2708:1.)  By January 9, 2008, assembly of the dens glass and Tyvek was complete and tier twenty-two was prepared for installation of masonry and metal panels.  [Norris, Day 10, 2703:15 – 2704:11; Resp'ts Ex. 800 (FP0061897 – FP0061899).]  Thus, even after Madrigal's early sales delayed removal of the material hoist, Foulger-Pratt was able to secure the building with the permanent watertight barrier system within days of the Guaranteed Substantial Completion Date.

EXHIBIT 2

Moreover, Madrigal's complaints in the hearings about the building's water-tightness as of January 1, 2008 cannot be squared with its actions at that time.  The record shows that Madrigal's representatives must have considered tier twenty-two to be in a condition sufficiently advanced enough to settle units immediately before and after the Substantial Completion date: 1) unit 322 ten days prior, on December 21, 2007; 2) unit 1222 on January 17, 2008; 3) unit 522 on January 18, 2008; 4) unit 1022 on January 30, 2008; and 5) unit 822 on February 15, 2008. (Knopf, Day 4, R. at 821:10 – 821:22; see also Resp'ts Ex. 628A.)   Not only were these five units sold and settled within weeks of January 1, 2008, but these units were also subject to a PSI generally one week before settlement. (Knopf, Day 4, R. at 813:16 – 813:21)  The punch-list records for these units do not contain any reference about leaks or problems with the exterior. (Norris, day 10, R. at 2711;20-2712:8.)  Concerning the 130 foot by 20 foot hole alleged by Mr. Knopf as previously mentioned, when pressed on cross-examination whether there truly existed a hole the size of an entire tier of the building on January 1, 2008, Mr. Knopf testified that "[i]t must have recently got filled in."  (Knopf, Day 4, R. at 819:22 – 820:3.)

Interestingly, in a chorus of many voices, the refrain from Madrigal's witnesses was remarkably similar to that of Foulger-Pratt's and Travelers' witnesses – the building as constructed in January 2008 was watertight so long as it was properly maintained as construction proceeded.

The Architect's representative in the hearings, Mr. Carter, testified that no building is waterproof, the meaning Madrigal mistakenly affords to the term "watertight" by insisting that the prospect of any water entering the building prevented it from becoming substantially complete.  (See Carter, Day 6, R. at 1546:14-1547:10, Brungart, Day 5, R. at 1077:1 – 1077:12.)

EXHIBIT 2

Mr. Carter further explains that the Project as designed, anticipated water penetrating the metal

panel system but remain "water tight" by designing a system to get it back out:

> Okay.  But the unfortunate fact of life is that water will penetrate
> almost any building, and the objective of any construction system
> is to actually create ways in which if water does get into the system
> it can be ejected -- actually gravity fed out of the system without
> the water penetrating into the building through that exterior wall
> and, you know what, that's not even technically the sense it's just
> plain common sense.  And so any system that is part of the exterior
> wall system of a building needs to be designed in exactly such a
> way.  It's sort of ironic that we're in 2009 and still the cheapest way
> to build buildings is one brick at a time.  And you think about how
> many joints there are in a brick wall.  And so the wall has to be
> designed and you know for sure water is going to come and you
> got to figure away to get it out.…

(Carter, Day 6, R. at 1546:14 – 1547:17.)

Mr. William Sharabi, former Chief Executive Officer of Glen Construction Company, was

another Madrigal witness to support the conclusion that the building was watertight by January

1, 2008.  Mr. Sharabi testified during his direct examination:

> …Glen's policy was you need to make sure the building was
> completely weather tight before you start your interior finishes,
> especially drywall … we used commercial Tyvek, which is pretty
> good Tyvek … With commercial Tyvek if you do it right then you
> tuck it in where the windows are, you would have a weather tight
> system.  Whether it is brick or metal panels you can do that later
> and still have it weather tight.

(Sharabi, Day 12, R. at 3365:8 – 3366:2.)

### F.    Madrigal's Claim for Liquidated Damages Must Be Rejected.

When appropriately reviewed, the foregoing testimony and evidence in the record leads

to the conclusion that Foulger-Pratt successfully met all of the conditions necessary to achieve

Substantial Completion as of January 1, 2008.  (See infra, §II.E, pp. 43 – 51.)  While the

Project's Substantial Completion should be recognized as of January 1, 2008, if the Panel finds

otherwise, the record also supports a finding that Foulger-Pratt is entitled to a time extension of

at least six and one-half weeks due to the Project delays and disruptions caused by Madrigal's resequencing of the floor turnover schedule, and its abrogation of the Contract's procedure for turnover and close-out so as to settle units early and out of sequence.  (See infra, §II.B.2, pp. 7 - 9 and § II.C.6, pp. 21 – 23.)  Distinct from the foregoing, Madrigal's claim for liquidated damages must also be denied due to its own acts and omissions that demonstrate its intent to waive enforcement of the liquidated damages provision.   In particular, Madrigal's early conversion of the Project from a construction site to a residence, along with its direction to perform concurrent change order work commensurate with the period of time for which it seeks liquidated damages, negates recovery of liquidated damages in its entirety.  (See infra, §§II.D.1, pp. 31 – 32 ,  II.D.2, pp. 32 – 38, and II.D.3, pp. 38 – 39.)  Therefore, for the reasons set forth herein, as well as in Respondents' Pre-Hearing Brief, Madrigal's claim for liquidated damages should be denied by the Panel.

## III.    MADRIGAL PURPOSEFULLY AVOIDED ITS CONTRACT CLOSE-OUT RESPONSIBILITIES TO AVOID ACCEPTING OR PAYING FOR THE PROJECT IT WAS NOT SELLING.[2]

### A.    Madrigal Refused Acceptance of All Unsold Units.

Madrigal's reticence to accept units that were not being purchased is evident very early in the close-out process.  This is clear from Madrigal's response to Foulger-Pratt's October 19, 2007 request for the Owner to inspect the 2nd, 3rd and 4th floors.  (Resp'ts Ex. 44.)  Mr. Brungart directed Foulger-Pratt to instead "concentrate list sent out 10-17-2007."  (Id.)  Mr. Brungart's refusal to engage in the floor-by-floor inspection process was in furtherance of Madrigal's early settlement of units as sales allowed, randomly throughout the Project.  (See Knopf, Day 3, R. at 710:13 – 712:7; MacClary, Day 7, R. at 1745:10 – 17:21.)

---

[2] For additional legal citations and support for this Section, please refer to Resp'ts Pre-Hearing Brief, §IV.A - §IV.C

EXHIBIT 2

In satisfaction of Madrigal's requirements, Foulger-Pratt successfully delivered the balance of Madrigal's pre-sold units by February 15, 2008.   (Resp'ts Ex. 172 and 212; MacClary, Day 7, R. at 1845:8 – 1845:21.)  Madrigal's delays and abuse of the unit inspection process became much more prevalent once Foulger-Pratt had successfully delivered the inventory of "pre-sold" units to the Owner.  (MacClary, Day 7, R. at 1890:15 – 1891:7, 1892:11 – 1893:18; Resp'ts Ex 237.)

As a threshold matter, Madrigal positioned itself to abuse the unit punch list process by removing the Architect from this inspection task.   (Knopf, Day 4, R. at 800:4-800:17.) Mr. Knopf made clear that Madrigal had purposefully removed the Architect from the unit inspection process, stating:

> In this case we told the Architect there was not a need for him to inspect the units, we would be inspecting the units for the Owner, and we would be inspecting with the Unit Owners.

(Id.)

At odds with Madrigal's handling of the unit inspections, Mr. Knopf, elsewhere in his testimony, recognized the Architect's duty to prepare the Owner's Punch List.  (Cl. Ex. 2, Agreement, ¶4.4.2; Knopf, Day 4, R. at 849:16 – 850:18.)  Madrigal's removal of the Architect from the unit inspection process in favor of itself was a breach of Paragraph 4.1.2 of the General Conditions, which states that the "duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of Owner, Contractor and Architect."  (Cl. Ex. 2 General Conditions ¶ 4.1.2.)   The Owner neither sought nor received the Contractor's consent for removing the Architect from its unit inspection and punch-list preparation duties.  (See MacClary, Day 7, R. at 1869:5 – 1869:14.)

EXHIBIT 2

The Architect is the entity designated to determine whether work conforms to the Contract requirements and was, per the Contract, to be the impartial judge of performance by both the Owner and Contractor (Cl. Ex. 2 General Conditions 4.2.12; Norris, Day 10, R. at 2717:21-2718:11.)  Mr. MacClary explained during his testimony how excluding the Architect from the unit punch list process made it a circumstance rife for Owner abuse through the imposition of varying standards.  (MacClary, Day 7, R. at 1869:5 – 1869:14.)

Having used Foulger-Pratt to salvage its sale of pre-sold units by February 2008, Madrigal then adopted a different posture concerning the acceptance of unsold units.  (MacClary, Day 7, R. at 1890:15 – 1891:7 and 1892:11 – 1893:18.)  Madrigal delayed, abused and frustrated the punch-list process for unsold condominium units in an effort to refuse accepting them as complete and assuming responsibility for them.  (MacClary, Day 7, R. at 1853:21 – 1855:7.)  This caused delays of more than one year to Final Completion and significantly extended and increased Foulger-Pratt's supervision costs.  (Resp't Ex. 240; MacClary, Day 7, R. at 1904:10 – 1904:16; Resp't Ex. 1005, pp. 25 – 26.)  See Neal & Co. v. United States, 36 Fed. Cl. 600, 631 (1996) (owner found to have unduly delayed completion of the project by conducting overzealous inspections, providing nit-picking punch-lists that often contained items that could not be fixed short of a redesign, and constantly interrupting the work to require the contractor to quickly address additional items).

Respondents' expert, Mr. Norris, conducted a detailed analysis of these Owner delays, concluding that Madrigal delayed Final Completion of the unsold units from March 31, 2008 to the first day of the Arbitration Hearing (May 20, 2009).  (Resp't Ex. 1005, pp. 25 – 26.)  Mr. Norris' opinion is supported by the contrast between the punch-list/acceptance process in settled and unsold units.  (Resp't Ex. 1005, pp. 25-26 and NCC-Ex. 5 and NCC-Ex. 6; Norris, Day 10,

EXHIBIT 2

R. at 2712:13-2715:18.)   The Contractor's ability to quickly and successfully complete the inspection and punch-list work-off process, typically in one week for units that were being purchased, is starkly contrasted with the long process created by the Owner for unsold units. (Id.; MacClary, Day 7, R. at 1890:15 – 1891:17.)   Madrigal's dissimilar treatment of sold and unsold units instructs that it was not Foulger-Pratt that was delaying the process, but that the Madrigal's actions were the cause.   (Id.)

Specific actions taken by Madrigal that impacted the punch list process for unsold units are described in an April 3, 2008 e-mail from Foulger-Pratt to Madrigal, which challenges Madrigal's practice of issuing multiple punch-lists to varying standards stating, in part:

> Ray Pratt noted that, for units walked, the original punch-list generated by Quadrangle was recognized as complete, with very few exceptions.  However, an additional punch-list was generated.  Also, the wall finishes were scrutinized and marked with blue tape.  As we have generated an internal punch-list, followed by Julian's Quadrangle list, yesterday's list would be the third.

(Resp't Ex. 235.)

After again expressing its expectations to have an orderly flow of inspections and unit delivery, Foulger-Pratt closes this letter by reminding Madrigal that its maladministration of the punch-list process will have a major delay impact on delivering these units.  (Resp't Ex. 235.) Madrigal continued to delay and disrupt the punch-list process for units in the various ways described below.

### 1.    *Madrigal Failed to Conduct Inspections In a Timely Manner.*

Specific Owner delays in inspecting unsold units appear as red bars on the bar charts found in NCC-Ex. 6.  (Resp't Ex. 1005.)  As an example, Mr. Norris noted that Madrigal had cited all units on Floors 2 and 3 as substantially complete by January 15, 2008, yet failed to issue its punch-list for these floors until July 2008.  (Norris, Day 10, R. at 2716:12 – 2717:1; Resp't

EXHIBIT 2

Ex. 137.)  Mr. Brungart acknowledged as much in his testimony, yet he attempted to attribute this extreme delay to the completion status of the units, claiming that it was not until June and July of 2008 that Foulger-Pratt had completed the work to the point that Madrigal could inspect those units.  (Brungart, Day 6, R. at 1455:9 – 1456:18.)  Mr. Brungart's position regarding its punch-list delay cannot be reconciled with his own assessment that the units on these two floors were substantially complete six months earlier.  (Resp'ts Ex. 137; Cl. Ex. 99.)

> 2.    *Madrigal Improperly Issued Multiple Rounds of ("Revolving") Punch-Lists.*

Madrigal also delayed the close-out process by engaging in multiple rounds of punch-lists, employing several tactics to repeatedly avoid accepting units as finally complete.  (MacClary, Day 7, R. at 1895:16 – 1896:20.)  See Neal & Co. v. United States, 36 Fed. Cl. at 631; Harris v. Heskett, 1990 WL 71889 at *3 (Ohio Ct. App. 1990) (unreported) (owner waived the right to assess liquidated damages by issuing successive punch-lists containing additional items not found on the previous lists, leading the court to reason, "if the deficiencies noted in the second and third inspection were of such magnitude to require the enforcement of liquidated damages, these deficiencies should have appeared on the first punchlist.")    Foulger-Pratt's Kevin MacClary described a unit inspection process that can only be characterized as a moving target interposed for delay.  (Id.)  Madrigal's mishandling of the inspection process was typified by:  its refusal to date its multiple punch-lists; its refusal to acknowledge completed items; and its addition of new items based on a sliding scale of acceptance criteria.  (Id.)  Madrigal's abuses of the punch-list process for unsold units are more particularly described below.

> a)    Listing Improper Items that met Contract Requirements.

Mr. MacClary described an inspection process where Madrigal scrutinized drywall and other unit finishes to a degree well beyond industry standards and focused on negligible

blemishes and perceived imperfections.  (MacClary, Day 7, R. at 1898:9 – 1900:9 and 1869:5 – 1869:14.)

    b) Varying the Quality Standards being demanded from Round to Round.

  During his testimony, Mr. MacClary compared successive punch-lists where subsequent lists included maintenance items and generalized references to wood floor glue, scuff marks and scratches and other generalized comments not appearing on previous lists.  (MacClary, Day 7, R. at 1877:12 – 1887:19.)

    c) Citing New Items it perceived as Deficient that could have been cited on the Owner's Initial List.

  During his testimony, Mr. MacClary compared successive punch-lists where items were added in rooms where no deficiencies had been noted on prior punch-lists, such as gaps in kitchen cabinets or the leveling of the washer and dryer, connoting both Madrigal's varying standards and an abuse of the process.  (MacClary, Day 7, R. at 1883:2 – 1884:16.)

    d) Refusing to Acknowledge and Sign Off on Prior Items as having been Completed.

  Mr. MacClary testified how Madrigal's refusal to date and acknowledge completed items on its successive punch lists made administration of the punch-list process and communications with its subcontractors extremely difficult.  (MacClary, Day 7, R. at 1895:16 – 1896:20.)

    e) Applying Blue Tape next to Perceived Deficiencies instead of issuing an Updated Punch List that could be Distributed to Subcontractors.

  Mr. MacClary testified how Madrigal misused a "blue tape process" to mark negligible blemishes on the drywall and floors as part of a cyclical process of over-inspecting the units.  (MacClary, Day 7, R. at 1896:21 – 1902:22.)

EXHIBIT 2

Respondent's expert, Mr. Norris, similarly addressed each of these practices by Madrigal in his expert report and testimony.  (Resp'ts Ex. 1005, p. 25; Norris, Day 10, R. at 2717:2 – 2724:2.)

> 3.      *Failure to Properly Control Access to and Require Careful Conduct in Unsold Units By Its Sales Staff, Residents and the Public.*

Another problem for which Madrigal is responsible and that further impacted the punch-list process for unsold units was its failure to properly control access to, and conduct in, these units by its sales staff, the residents and the public.  This resulted in physical damage that showed up on punch-lists and had to be repaired by Foulger-Pratt.

This problem was particularly acute on this Project because of the very soft nature of the wood flooring specified by Madrigal, as acknowledged and discuss by all parties.  (Resp'ts Ex. 194 and 395; see also Knopf, Day 3, R. at 730:1 – 731:16 and 733:16 – 734:5.)  Mr. Knopf acknowledged that the floors were especially sensitive to high-heeled shoes and that Madrigal did not require potential buyers to remove their shoes in the units.  (Knopf, Day 3, R. at 733:6 – 734:5.)

Mr. MacClary stated that wood floors were damaged by others (parties other than Foulger-Pratt and its subcontractors), that these damages showed up on Madrigal's punch-lists, and that Foulger-Pratt repaired such damage.  (MacClary, Day 7, R. at 1884:17 – 1885:11, 1871:18 – 1871:22.)  In a letter dated June 16, 2008, Foulger-Pratt complained of damage to wood flooring being caused by others.  (Resp'ts Ex. 395.)  Attached to this letter was a written report of an inspection of the floors in the Sales Office (Unit 111), a Model (Unit 411), and an unoccupied unit (Unit 717) by the wood flooring supplier, Arborcraft, stating that the damage was being caused by high heels, moving furniture, and dragging heavy objects.  (Id.)

EXHIBIT 2

Mr. Knopf also admitted that potential buyers were offered beverages in the sales office and that they were allowed to take them into the units.  (Knopf, Day 3, R. at 734:16 – 735:2.)

Another problem was that Madrigal's staff failed to consistently lock the exterior doors of unsold units and allowed the public to go into units unescorted.  Mr. Knopf admitted that there were some instances of uncontrolled access, but inferred it was limited because he issued a policy against uncontrolled public access to the units in late 2007.  (Knopf, Day 3, at R. 735:3 – 735:21.)  However, Mr. Knopf is apparently unaware of the ineffectiveness of his having issued this policy, as the record is clear that uncontrolled access by the public continued well after that time.  In March 2009, Foulger-Pratt's Mr. Larry Toles sent an e-mail to Madrigal's Paula Conley stating:

> Just and FYI!  Kim and I just witnessed Angela from sales give the keys to unit 1217 and told them to go on up to the unit by themselves.

(Resp't's Ex. 680.)

Ms. Conley's response emphasizes the frequent nature of this uncontrolled access:

> WHAT, AGAIN!!!!!!

(Id.)

Madrigal's failure to keep the unsold units locked also allowed access by the building's new residents, resulting in additional damage.  One particular incident involved a domestic dispute in which lobby furniture was taken into an unsold unit (Unit 901) and smashed on the floors.  (Resp't's Ex. Ex. 447.)  This e-mail notes that the damage included the wood flooring, broken granite and a dented refrigerator.  (Id.)

EXHIBIT 2

**B. Madrigal Wrongfully Resisted the Final Acceptance of Unsold Units in an Attempt to Hold Foulger-Pratt Responsible for Performing Unit Owner Punch Lists from Individual Purchasers Until It Completed the Belated Sale of Its Project.[3]**

Madrigal's refusal to accept units on any terms other than their sale and final settlement is also evident in its approach to Condominium Unit Owner Punch Llists for unsold units. The Contract affords the Contractor ninety (90) days after Substantial Completion to achieve Final Completion of the Work. (Cl. Ex. 2, Agreement ¶ 4.3.) The Contractor is required to complete Condominium Unit Owner's Punch-lists, as defined by the law of the District of Columbia, "should any exist at the time" prior to the Guaranteed Final Completion Date. (Cl. Ex. 2, Agreement ¶ 4.4.4.) Setting aside the dispute concerning the appropriate Substantial Completion date, Madrigal and its Architect declared the Project substantially complete as of June 1, 2008. (Resp't's Ex. 436.) Nonetheless, Madrigal, having already issued numerous rounds of punch-lists for unsold units, chose not to designate its lists as Condominium Unit Owner Punch-lists so that Foulger-Pratt could complete its work prior to the Project's Final Completion date. (Knopf, Day 3, R. at 777:15 – 779:20.) Mr. Knopf plainly understood that Madrigal, as the Declarant of the Project's Condominium documents, was the Unit Owner of the unsold units and was able to issue the Condominium Unit Owner Punch-list as it saw fit during the Project. (Id.) As testimony unfolded, Madrigal's extra-contractual intent to shift the financial burden of slow sales to the Contractor became clear. (Id.). Addressing these matters, Mr. Knopf stated:

> Q. And to your understanding as the Declarant, Madrigal Condominiums, LLC is the Unit Owner of all Unsold Units?
> A. Yes.
> Q. And as the Unit Owner of all unsold units there was nothing preventing Madrigal Lofts, LLC from issuing a Unit Owner Punch-list at any point in time during the Project?
> Ms. Carrigan:  Objection, mischaracterizes the terms of the Contract.

---

[3] For further legal citations and support for the positions stated herein, please refer to Resp't's Pre-Hearing Brief, §IV.A - §IV.B.

EXHIBIT 2

> Arbitrator Ness: Overruled.  Go ahead.  You may answer the question.
> The Witness: Nothing except the agreement that we had that they would come back and complete these Punch-lists after the guaranteed completion date.
> BY MR. BRASCO
> Q. You're referring to some – after the Final Completion date?
> A. Yes
> Q. You're referring to your testimony regarding certain conversations with Mr. Sharabi?
> A. That's correct.

(Id.)

Evident in Mr. Knopf's assertion, Madrigal's position that the Contractor retains a continuing obligation to perform Unit Owner punch-lists prepared by purchasers - as distinct from the numerous Owner punch-lists Foulger-Pratt was made to perform for Madrigal, the Unit Owner of unsold units in law and in fact – cannot be supported by the written Contract.  (See Cl. Ex. 2, Agreement ¶¶ 4.3, 4.4.4.)  As de-facto unit owner of all unsold units, Madrigal's Owner punch-lists serve also as Condominium Unit Owner Punch Lists, and Foulger-Pratt and Travelers have no further obligations with regard to these lists.  Likewise, Madrigal's argument concerning the Condominium Unit Owner Punch Lists cannot be salvaged by any conversations not embodied in the Contract.  Courts in D.C. have consistently applied the parol evidence rule to bar consideration of alleged oral agreements which are not reflected within the terms of a completely integrated contract.  See e.g., Stamenich v. Markovic, 462 A.2d 452, 455 (D.C. 1983) (in holding that the trial court erred by considering parol evidence of an alleged oral agreement adding terms to a written contract, the court explained that when parties reduce the entirety of their agreement to a completely integrated writing, "the court will disregard and treat as legally inoperative parol evidence of the prior negotiations and oral agreements").  Consistent with the parol evidence rule in D.C., Madrigal has recognized that its Contract, which it had drafted in consultation with counsel over a period of fifteen (15) years, contains an integration clause that

EXHIBIT 2

limits the parties' agreement to what it set forth in the written contract. (Cl. Ex. 2, Agreement ¶ 1; Knopf, Day 3, R. at 597:10 - 598:2; 601:13 - 602:1.)

It is also worth nothing that Madrigal's reliance on oral understandings is inconsistent with its position taken in the Project record, which courts give significantly greater weight than positions developed for litigation. Green v. Obergfell, 73 App. D.C. 298, 311, 121 F.2d 46, 59 fn. 39 (D.C. Cir. 1941) citing Old Colony Trust Co. v. Omaha, 230, U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."). In August 2008, as Foulger-Pratt labored to get Madrigal to establish the parameters for final acceptance, Foulger-Pratt wrote Madrigal asking that all punch-lists that would be considered incident to Final Completion be produced so as not to interfere with Foulger-Pratt's continuing efforts to gain final acceptance. (Resp'ts Ex. 472.) In response, Madrigal avoided the import of Foulger-Pratt's letter by hiding behind the Contract in general, and without reference to any oral agreements, stating:

> Bill,
>
> I am going to suggest you stop trying to debate contract language regarding punch-lists, since we all know what it says and try spending your time completing the punch-list and furthering the interests of the owner, which is your obligation under the contract.
>
> Bob

(Resp'ts Ex. 498, Knopf, Day 3, R. at 776:22 - 777:13.)

EXHIBIT 2

### C.   Madrigal Refused and Delayed Acceptance of the Building Common Elements[4]

>   1.   *Madrigal's Architect Issued Punch Lists for All Common Areas of the Project, and These Were Worked Off by Foulger-Pratt.*

The Contract's punch-list procedures plainly provide for the Architect to prepare the Owner's punch lists for all areas of the Project.  (Cl. Ex. 2, Agreement ¶ 4.4.2.)  Mr. Knopf acknowledged this duty on behalf of the Architect.  (Knopf, Day 4, R. at 850:5–18.)

In fact, the Architect did prepare Owner's punch lists for every common area of the Project.  (Resp'ts Ex. 105; 111; 204; 220; 341; 396.)  Furthermore, each of these punch lists was worked off by Foulger-Pratt, and the record reflects the Architect's sign-offs memorializing Foulger-Pratt's progress toward achieving final acceptance.  (Resp'ts Ex. 396; 412.)  The Architect's issuance of common area punch-lists began prior to the Contract's Guaranteed Substantial Completion Date, including punch-lists for both the lobby, created by the Architect, and the Mechanical/Electrical systems, created by the Architect's MEP consultant.  (Resp'ts Ex. 105 and Resp'ts Ex. 111.)  On March 11, 2008, the Architect's site work consultant issued the Site Work punch list (Resp'ts Ex. 204).  On March 25, 2008, the Architect issued punch-lists for the roof, the garage, and portions of the façade.  (Resp'ts Ex. 220.)  On May 20, 2008, the Architect issued its final punch-list for the building's exterior.  (Resp'ts Ex. 341.)

The Architect's punch-lists for the roof, parking garage and the building's exterior were each presented during the hearings, complete with the Architect's initials demonstrating its acceptance of the work.  (Resp'ts Ex. 396.)  Mr. Knopf, when addressing Foulger-Pratt's efforts to complete the Architect's punch-lists, verified that these initials were in fact those of the Architect, Mr. Alan Houde.  (Knopf, Day 4, R. at 876:7 – 877:8.)

---

[4] For further legal citations and support for the positions stated herein, please refer to Resp'ts Pre-Hearing Brief, §IV.A.

EXHIBIT 2

Not for lack of trying, but Madrigal cannot credibly deny that these punch lists are what they purport to be – the Owner's punch-lists for the individual common areas of the Project.  By way of example, DCS' Mr. Carter was expressly asked whether he had knowledge of anyone disclaiming that DCS lists for the lobby, roof and garage were in fact punch-lists.  (Carter, Day 7, R. at 1620:4 – 1621:5.)

The conclusion that the punch-lists issued by DCS and its sub-consultants comprise the Owner's common area punch-lists for the Project becomes inescapable when reviewing the punch-lists incorporated in the Agreement of Partial Settlement ("APS").  That agreement presents the very same punch-lists prepared by the Architect and its sub-consultants for each of the common areas excepting the exterior skin.  (Cl. Ex. 1, Tabs 4, 5, 7 and 8.)

The exterior skin was handled by the Architect in the same fashion as the other common areas – with a punch-list generated and signed off.  (Resp'ts Ex. 396).  Madrigal's separate treatment of the exterior skin is the result of its own breach of the Contract and its purposeful failure in the administration of the close-out process.

> 2.     *Madrigal Purposefully Delayed and Maladministered the Exterior Skin Punch-List Process In Order to Avoid Reaching Final Acceptance.*
>
> > a.     The Architect Issued the Owner's Punch List for the Exterior Skin and Signed Off on its Completion.

On March 19, 2008, in response to Madrigal's initial notice that it intended to assess liquidated damages, Foulger-Pratt wrote a letter transmitting to Madrigal its current punch-lists, including that for the exterior skin.  (Resp'ts Ex. 218, pp. FP0000793 – FP0000794.)  Foulger-Pratt noted that "these have been available to you for some time."  (Id.)  Madrigal did not write Foulger-Pratt in response to take issue with the punch-lists that had been forwarded.

By an exchange of correspondence at about this same time in March, 2008 between DCS' Mr. Alan Houde and Madrigal, Mr. Houde determined that, since Foulger-Pratt had completed

most of the exterior work, the Architect would begin its preparation of the Owner's exterior punch list by marking up elevation drawings with Foulger-Pratt's Superintendent, Danny Davis:

> I told Danny that I will have the exterior punch marked up on elevations, now that they are at a point where they have completed most of the exterior work.

(Resp't Ex. 210; see also Brungart Day 6, R. at 1379:18 – 1380:12.)

Mr. Brungart recognized during his testimony that the purpose of marking up exterior elevations would be to identify where there were problems, inconsistencies or other issues on the exterior skin.  (Brungart, Day 6, R. at 1380:6 – 1380:12.)

Mr. Houde, consistent with his advice to Mr. Brungart, proceeded to prepare a punch-list with Foulger-Pratt for the exterior skin of the building.  Prior to issuing DCS' May exterior punch-list, Mr. Houde referenced this earlier punch-list given to Foulger-Pratt months before. (Resp't Ex. 330.)  During his testimony, DCS' Mr. Douglas Carter acknowledged that a joint Owner/Contractor punch walk is an acceptable process.  (Carter, Day 7, R. at 1623:5 – 1623:15.) Following the issuance of this March, 2008 punch list, Foulger-Pratt engaged Hershocks to work off the items raised by the Architect and also, in late April 2008, to issue its own punch-list. (Resp't Ex. 288, 292 and 800.)

Furthering this process being undertaken by all parties, in May 2008, the Architect reinspected the exterior and issued its May punch-list.  (Resp't Ex. 220 and 396.)  On May 20, 2008, Foulger-Pratt distributed this punch-list to the appropriate subcontractors.  (Resp't Ex. 341.)  Foulger-Pratt's letter dated May 23, 2008, addressing Madrigal's belated claim for liquidated damages, advised Madrigal of the progress made concerning the exterior skin. (Resp't Ex. 350, 356 and 357.)  Foulger-Pratt stated:

EXHIBIT 2

> Mr. Alan Houde inspected the exterior of the building on May 20, 2008, and the punch list has been forwarded to the appropriates [sic] subcontractors for correction.

(Resp't Ex. 357.)

At the Hearing, Mr. Brungart wrestled to avoid the import of this advice concerning the Architect's actions on behalf of Madrigal.  Mr. Brungart initially disclaimed having received Foulger-Pratt's letter, claiming it was unsigned.  (Resp'ts Ex. 350; Brungart Day 6, R. at 1386:2 – 1386:7.)  When confronted with Foulger-Pratt's e-mail forwarding a letter bearing this same May 23, 2008 date, Mr. Brungart continued to disclaim receipt of this letter.  (Brungart, Day 6, R. at 1505:8 – 1506:17.)  The record, however, makes clear that Mr. Brungart received this letter and that Madrigal was in fact on notice that Foulger-Pratt was acting in reliance on an exterior skin punch-list generated by its Architect.  (Resp'ts Ex. 357.)

By mid-June, 2008 Foulger-Pratt received the Architect's sign-off on the Owner's exterior punch list.  (Resp'ts Ex. 396.)

> b.   Madrigal's Belated Acknowledgement of Substantial Completion and Failure to Discharge its Recognized Close-out Responsibilities.

In early June, 2008, Madrigal belatedly accepted the Project as substantially complete, with an effective date of June 1, 2008.  (Resp'ts Ex. 436.)  As discussed below, the parties' contemporaneous recognition of their various obligations and responsibilities makes it inescapable that Madrigal was responsible for attaching the Owner's list of remaining work items to the Certificate of Substantial Completion.

The Contract's Substantial Completion form, which is AIA Document G704-2000, requires that a list of items that need to be completed or corrected be attached.  (Cl. Ex. 2, Tab T.)  Mr. Brungart acknowledged in his testimony that the purpose of these lists was to govern the terms of Final Acceptance.  (Brungart, Day 6, R. at 1389:3 – 1389:21.)  Similarly, DCS' Mr.

EXHIBIT 2

Carter testified that the Certificate of Substantial Completion defines outstanding obligations going forward.  (Carter, Day 7, R. at 1652:3 – 1653:2.)

Eager to establish an understanding concerning Madrigal's terms for Final Acceptance, on June 4, 2008, Foulger-Pratt wrote Mr. Brungart addressing the lists to be attached to the Substantial Completion form.  (Resp'ts Ex. 382; MacClary, Day 8, R. at 1968:3 – 1969:3.)  In this correspondence, Mr. MacClary notes Foulger-Pratt's protest regarding the late issuance of Substantial Completion but stresses the importance of defining the terms of Final Acceptance, stating:

> In terms of the date, we maintain that a much earlier Substantial Completion milestone was achieved in the spirit of the agreement with the parties working toward successful final completion.  At this point, I think the important step is to compile the document so that our managers and the subcontractors know the status of outstanding work and requirements for Final Acceptance.  Moving forward with this part of the process is important to all of us.

(Resp'ts Ex. 382.)

To avoid any confusion as to what party would perform the important task of assembling the list of items to be completed for Final Acceptance, Mr. MacClary twice asked Madrigal who it preferred to compile the lists:

> Will Quadrangle be compiling the lists or do you want us to perform this function?

(Resp'ts Ex. 382.)

> Let me know if you are directing us to compile the lists.

(Id.)

EXHIBIT 2

Mr. Brungart's reply was that Madrigal had asked the Architect to compile the punch lists. (Resp'ts Ex. 382.) In furtherance of its direction from Madrigal, on July 7, 2008, the Architect wrote to Foulger-Pratt with a request:

> Please forward me a copy of all the remaining punchlist items for the Madrigal Project. The Owner needs to have this information to attach to the Substantial Completion Form.

(Resp'ts Ex. 412.)

Mr. Brungart's contemporaneous recognition of Madrigal's obligation to compile the punch-list must be given great weight. Green v. Obergfell, 73 App. D.C. 298, 311, 121 F.2d 46, 59 fn. 39 (D.C. Cir. 1941) citing Old Colony Trust Co. v. Omaha, 230, U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence").

Foulger-Pratt met this request the following day by transmitting each of the several punch lists generated by the Architect and distinguished between remaining and completed items, as Mr. Houde requested, by shading those items already done. (Resp'ts Ex. 412.) Foulger-Pratt further noted that most of the items had been signed off by the Architect and that it looked forward to having all other completed items signed off during Mr. Houde's visit to the Project the next day. (Id.) There is no evidence in the record that Mr. Houde questioned the appropriateness of Foulger-Pratt's response to his direction.

Then, unbeknownst to Foulger-Pratt, internal correspondence in August 2008 between Madrigal and the Architect reveal that the Architect was then preparing an additional exterior skin punch-list of either reinstated or additional items in late July 2008. (See Resp'ts Ex. 459.) Apparent from Mr. Houde's August 6, 2008 e-mail to Mr. Mark Brungart, Mr. Houde considered

EXHIBIT 2

the presentation of this additional list as a pre-condition to the proper issuance of the Certificate

of Substantial Completion.  (Resp'ts Ex. 459.)  Disregarding its contractual obligations and its

stated commitment to Foulger-Pratt, Madrigal decided to neither attach this revised punch-list to

the Certificate of Substantial Completion, nor transmit it to Foulger-Pratt.   Mr. Brungart

confirmed this decision in the Hearing:

> Q: So the decision was made by the Owner not to transmit this
> revised Punch-List items either reinstated or additional items that
> was provided by DCS; is that correct?
> THE WITNESS:  The answer is yes.

(Brungart, Day 6, R. at 1401:4-15.)

Mr. Brungart further confirmed that the Certificate of Substantial Completion was issued without

attaching any punch-lists at all.  (Brungart, Day 6, R. at 1395:8 – 1395:11.)

In response to inquiries from the Panel, Mr. Brungart confirmed that it was the Owner's

punch list that was to be attached to the Certificate of Substantial Completion:

> MR. NESS: The Substantial Completion Certificate does talk about an
> attached list which would be the Owner's Punch List; right?
> THE WITNESS:  It does.

(Brungart, Day 6, R. at 1510:16-20.)

In the same colloquy, Mr. Brungart, however, takes the indefensible position that, despite his

advice to Foulger-Pratt that the Architect would be compiling the punch-lists, he never intended

to forward the lists being compiled to Foulger-Pratt:

> ARBITRATOR NESS:   If I'm understanding your testimony
> correctly, you were trying to get a list from Davis Carter Scott, but
> you weren't intending to do what it said in the Substantial Completion
> Certificate – don't answer – you weren't intending to attach an
> Owner's Punch-List to the Substantial Completion?
> THE WITNESS:  No.  We were not in a position to prepare the
> Owner's Punch-List.

(Brungart, Day 6, R. at 1511:8 – 1511:17.)

EXHIBIT 2

Madrigal's purposeful failure to provide the Owner's punch list information necessary to establish the parameters for Final Completion amounts to a material breach of its close-out obligations and frustrated Foulger-Pratt's efforts to gain Final Acceptance of the Project. Madrigal's breach is particularly egregious given both Mr. MacClary's plain effort to gain clarity on the close-out process essential to Foulger-Pratt and its subcontractors, as well as Madrigal's commitment to compile the necessary lists.  (Resp'ts Ex. 382.)

The Contract allows ninety days after Substantial Completion for the Contractor to work off the Owner's punch-lists.  (Cl. Ex. 2, Agreement ¶ 4.5.)  As such, timely receipt of the Owner's punch-lists is a necessary requirement of the Contract.  This is particularly so given the dispute over the timing of Substantial Completion in this case.  The ability to keep the Project moving forward and subcontractors engaged depended on Madrigal's proper administration of the close-out process.  (MacClary, Day 8, R. at 1968:3 – 1969:11.)  Mr. MacClary made this abundantly clear in his correspondence of June 4, 2008.  (Resp'ts Ex. 382.)  Madrigal chose another course at the expense of the Project, Foulger-Pratt and its subcontractors.

In late November, 2008, Madrigal issued the Gale Report, which presented items for correction on the exterior skin.  (Resp'ts Ex. 603.)  Understood in context, Madrigal's late issuance of another punch-list came nearly six months after the effective date of its Certificate of Substantial Completion and the Architect's sign-off on the Owner's exterior skin punch-list. (Resp'ts Ex. 436 and 396.)  Madrigal's decision to hide the ball disrupted Foulger-Pratt's completion efforts and strained its subcontractor relationships.

It is worth noting that the Gale Report states that the metal panels at the exterior skin are generally in fair condition.  (Resp'ts Ex. 603.)  Furthermore, the Gale Report also does not cite Specification Section 08911 as the governing specification for the metal panels.  (Id.)

EXHIBIT 2

The Gale Report was included as the exterior skin punch-list in the Agreement of Partial Settlement.  (Cl. Ex. 1, Tab 6.)   The Gale Report includes a plain statement noting that its purpose was to identify exterior skin problems for correction for Final Completion:

> The purpose of our on-site review of the completed building envelope was to identify and locate incomplete and/or non-conforming items and components of the building *for final completion of the project*.

(Resp'ts Ex. 603, p. 1, emphasis added.)

However, in the Arbitration proceedings, Madrigal resisted the import of this plain language in favor of its notion that Foulger-Pratt is obligated to perform until Madrigal is satisfied.  (Knopf, Day 2, R. at 369:19 – 370:7.)  In his testimony, Travelers' Mr. Daily related Madrigal's intent to abuse the punch-list process as long as it chooses:

> Q: Did Mr. Knopf tell you anything about or did you have any discussion regarding Punch-Lists at this June meeting?
> A: Well, we were asking for – to get the final Punch-Lists so we could complete the project.  We were not given those.  There was a lot of back and forth about those.  We were stating that the contract called for certain Punch-Lists, we needed to have those so we could complete.  And when we were talking about being complete, Mr. Knopf said that basically we would do Punch-Lists for as long as he said we would need to do Punch-Lists.

(Daily, Day 12, R. at 3203:21 – 3204:12.)

Madrigal's intention to prolong and frustrate final acceptance of the exterior skin is transparent in its April 10, 2009 transmittal of the Architect's exterior skin punch-list created in July and August of 2008, which was neither included nor mentioned when the parties entered into the APS in February 2009.  (Respt's Ex. 459; Cl. Ex. 35, Tab 40.)  This is especially disturbing given the site meetings to discuss the Gale Report in February 2009 and Foulger-Pratt's efforts to address issues presented in the Gale Report.  (Resp'ts Ex. 670).

EXHIBIT 2

Madrigal's purposeful and material breach of its close-out responsibilities prevented Foulger-Pratt from gaining final acceptance of the Project and entitles Foulger-Pratt to the delay damages sought in its affirmative claim.

> c.   Madrigal Wrongfully Resisted Final Acceptance of the Exterior Skin in an Attempt to Hold Foulger-Pratt Responsible for Performing the Condominium Association Punch List when it is Belatedly Issued.[5]

The discussions below demonstrate that Madrigal's effort to block Foulger-Pratt from achieving final acceptance of the exterior skin goes hand-in-hand with its decision not to issue the Condominium Association Punch List.  Madrigal's strategy is to keep Foulger-Pratt "on the hook" until the building's condominium owners (other than the declarant) take control of the association, which occurs at seventy-five percent ownership and has been delayed by the slow housing market.  (Knopf, Day 1, R. at 166:18 – 167:4.)  In this way, Madrigal plans to evade liability to the unit owners for any exterior work by making Foulger-Pratt responsible for performing a list long after if had any contractual liability to address it.  At seventy-five percent ownership, Madrigal can longer control the condominium association, so it seeks to control Foulger-Pratt and make it responsible for the punch-list.

Consistent with its approach to the Unit Owner Punch-lists, Madrigal could have issued the Condominium Association Punch-list anytime after the Substantial Completion date, but chose not to do so.  (Knopf, Day Three, R. at 773:5 - 775:6.)  Mr. Knopf, as president and member of the condominium association's board of directors, described his role as "basically representing the Association" and recognized the condominium association's ability to issue the Condominium Association Punch List, stating:

---

[5] For further legal citations and support for the positions stated herein, please refer to Resp'ts Pre-Hearing Brief, §IV.C.

EXHIBIT 2

> Q. And you believe that the Board of Directors is empowered to issue
>    a Condominium Association Punch-list, if it so chose?
> A. If it so chose.

(Knopf, Day Three, R at 773:5 - 775:6.)

Mr. Knopf also testified that, other than a single unit owner, the remaining four member of the

board of directors for the condominium association were all investors in the Project.  (Knopf,

Day 3, R. at 597:1 – 597:9.)

      Apparently, Madrigal's reticence to issue the Condominium Association's Punch List

was driven by its slow sales and its potential exposure to the condominium association when it

finally sells seventy-five percent of the units and cedes control of the board of directors to the

individual purchasers.  (Knopf, Day Three, 770:11 - 771:19.)  Madrigal's trigger point for the

issuance of the Condominium Association's Punch List is contrary to the terms of its own

Contract, which called for the completion of any Condominium Association Punch List, "should

any exist at the time, prior to the Guaranteed Final Completion Date."  (Cl. Ex. 2, Agreement

¶4.4.4; see also Knopf, Day 3, R. at 770:11 – 771:19.)  As was the case with the Condominium

Unit Owner Punch Lists, Foulger-Pratt wrote Madrigal in August 2008 recounting its progress in

completing the punch-lists issued by Madrigal for each separate area of the Project and

requesting that Madrigal provide a Condominium Association's Punch List, if one was to be

issued, so that it could achieve Final Completion.  (Resp'ts Ex. 472.)

      Once again, Madrigal avoided the import of Foulger-Pratt's letter.  Without reference to

any sales tipping point that it mentioned in the hearings, Madrigal responded with a generalized

and dismissive reference to its Contract, stating:

> I am going to suggest you stop trying to debate contract language
> regarding punch-lists, since we all know what it says and try spending
> your time completing the punch-lists and furthering the interests of the
> Owner, which is your obligation under the Contract.

(Resp't Ex. 498.)

Yet, Madrigal's Contract does not provide it license to maladminister the close-out process so as to frustrate Final Completion of the Project. As of the close of the proceedings, Madrigal has not sold seventy-five percent of the units in the building and has yet to issue any Condominium Association's Punch List. Foulger-Pratt has no continuing obligation to address punch lists Madrigal chose not to issue within the timeframe required by the Contract.

> **D.** **Due to the Delays to Final Completion Caused By Misadministration of the Punch List Process, Madrigal is Responsible for Foulger-Pratt's Extended Management Costs of $492,450.**

Due to Madrigal's maladministration of the punch-list process and the resulting delays to Final Completion, Foulger-Pratt incurred $492,450 in extended supervision costs for which Madrigal is responsible. Foulger-Pratt's expert, Mr. Norris, analyzed the duration of the extended period and calculated the related increased cost from Foulger-Pratt's actual cost records for the Project. (Resp't Ex. 1005, p. 29; Norris, Day 10, R. at 2735:16 – 2737:20.) Mr. Norris determined that, but for Madrigal's delays to construction and the punch-list process, Foulger-Pratt would have been finally complete by March 31, 2008; however, in order to reach a conservative calculation, Mr. Norris used June 1, 2008 as the beginning of the extended period for calculating Foulger-Pratt's extended supervision costs. (Resp't Ex. 1005, p. 29.)

Mr. Norris determined that Foulger-Pratt's supervisory personnel charged their actual time spent on the Madrigal Lofts Project; thus, he utilized those hours and costs from Foulger-Pratt's cost report as of mid-May 2009 in his calculation. (Resp't Ex. 1005, p. 29; Resp't Ex. 793.) Mr. Norris testified that the rates set forth in Foulger-Pratt's cost report were the actual rates paid by Travelers, and that these rates do not include any fee because, per the agreement between Travelers and Foulger-Pratt, the fee was to applied to the direct costs incurred on the

Project.  (Norris, Day 10, R. at 2738:22 – 2740:2.)  Mr. Norris also testified that these costs should not be reduced by supervisory time spent on lien releases, warranties, O&M manuals, and PSIs after June 1, 2008 because, but for Madrigal's delays and punch-list maladministration, Foulger-Pratt would have been able to accomplish those items by March 31, 2008.  (Norris, Day 10, R. at 2819:19 – 2820:7 and 2821:2-12.)

The record contains Foulger-Pratt's several notices to Madrigal of its responsibility for such delays to Final Completion and related costs.  (Resp'ts Ex. 290, 397 and 470.)

**E.      Madrigal's Continuing Efforts to Frustrate Foulger-Pratt's Efforts to Achieve Final Acceptance of the Exterior Skin – the Metal Panel Cladding is Not Part of Specifications Section 08911.**

Attempting to make certain that Foulger-Pratt will not achieve Final Acceptance, Madrigal has attempted to impose a new set of construction criteria for the exterior skin in these hearings. Hours of hearing were expended in testimony relating to perceived deficiencies with the metal panel cladding system warranties and installation based primarily upon the Owner's eleventh-hour assertion that the metal panel cladding system must comply with Specification Section 08911, "Glazed Aluminum Curtainwall."  This "theory," which was never raised during the Project by Madrigal, QDC or the Architect, is not supported by the Contract or the contemporaneous record on the Project.  As such, Madrigal must not be permitted to rely upon this ruse in order to further delay Final Completion and Acceptance of the work on the Project. Foulger-Pratt has complied fully with the Contract, including the approved metal panel shop drawings, for the manufacture and installation of metal panels on this Project.  Accordingly, Respondents respectfully request the Panel to reject Claimant's new "theory."

The metal panel cladding system on this project is not a "Glazed Aluminum Curtainwall," and therefore, is not governed by Specification Section 08911.  Both Madrigal and the Architect properly define a curtainwall system.  Mr. Carter testified that a cladding system is

EXHIBIT 2

a cover or shield, while a curtainwall system is framed construction that supports its own weight. (Carter, Day 7, R. at 1646:20-1646:21.)  Mr. Knopf agreed, stating that a curtainwall system is a glazing system that extends from multiple floors and is typically hung off the face of the slab edges.  (Knopf, Day 3, R. at 627:20-628:8).  Mr. Knopf testified further that, in his experience, the metal panels are glazed into the curtainwall framing system but for this project the metal panels were built out of individual pieces.  (Knopf, Day 3, R. at 628:13-629:4.)  These definitions are consistent with the Respondent's Expert's definition of a curtainwall system. (Lockhart, Day 11, R. at 2982:15-2983:17.)

Importantly, both Mr. Carter and Mr. Lockhart testified that clear differences exist between a metal panel cladding system and an aluminum curtainwall system.  Mr. Lockhart testified as follows:

> A cladding system is a cladding system where you're basically taking panels and attaching them to the outside of a building.  They don't have structural framing.  On this job the metal cladding, panels in this case, metal panels is attached to the concrete, it's attached to the metal stud and track system on the job.  It's attached to the structural steel.  It's never structurally attached to any of the aluminum curtainwall system on the job.  It's a totally different system.

(Lockhart, Day 11, R. at 2983:18-2984:9.)

Mr. Carter agreed that the curtainwall and metal panels systems are "very different items." (Carter, Day 7, R. at 1646:15-21.)

The Contract, including the technical specifications, also treat the curtainwall and metal panel cladding systems as separate items.  As an initial matter, the Contract does not include any instruction, information or language that would indicate to the Contractor that the metal panel cladding system was to be governed by the glazed aluminum curtainwall specification.  The Contract Drawings call for a curtainwall system that is glazed and has aluminum framing that

EXHIBIT 2

supports the glazed aluminum curtainwall.  (Cl. Ex. 3, Specifications, § 08911.)  The building elevation drawings (A-410 to A-413) show numerous glass/aluminum assemblies on the exterior of the building.  Details on A-530 show numerous cases where the curtainwall interfaces with precast concrete, concrete slabs, masonry and metal panels.  Details 3, 9 and 12 on A-530 show the curtainwall system at the slab edge.  The contract drawings never refer to metal panels as "curtainwall."  Indeed, the glazed aluminum curtainwall Specification Section 08911.1.01.D does not even reference the metal panel Specification Section 07412 as a "related section."  Finally, the specifications setting forth the requirements for special warranties for the curtainwall system also do not include any reference to the metal panel system.[6]  In short, the metal panel cladding system is, and always was, separate from the aluminum glazed curtainwall system, and was treated as such in the Contract.  (Carter, Day 7, R. at 1645:21 – 1546:14.)

The evidence at the hearing also established that, at no time during the Project, did the parties ever agree, intend, or, for that matter, even discuss that the aluminum curtainwall Specification 08911 was to govern the metal panel cladding system.  The specifications were developed over time.  The Architect issued a May 2005 Specification that included section 07412, "Generic Façade/Cladding Specifications Utilizing Alucobond Material" (the "metal panel cladding specification") and Section 08911, "Glazed Aluminum Curtainwall."  Knowing that the specifications were preliminary, the Architect included Section 07412.2.1.A.2 in the metal panel cladding specification, which allowed the Contractor to provide the specified Alucobond material or an approved equal item of the same form and function as the specified

---

[6] The Warranties specified under Specification Section 08911 have been submitted and signed by the Contractor (Foulger-Pratt), the installer (H&B Glass Contracting) and the manufacturer (Accura Systems, Inc.).  (Resp'ts Ex. 1035.)  The firms that are signatories to this warranty are businesses that fabricate and install curtainwall systems. They were not involved in any work to the metal panel cladding system.  This warranty covers all of the work of Specification Section 08911, without exclusion of any part of the work.

EXHIBIT 2

cladding system. (Lockhart, Day 11, R. at 2989:1 – 2989:19.)  The Owner was well aware that the Contractor intended to seek approval to install a different metal panel system.  (Knopf, Day 3, R. at 986:18-989:14; Carter, Day 6, R. at 1531:17-1534:8.)  The Architect also knew that the Contractor intended to seek approval to install a different metal panel system.  (Carter, Day 6, R. at 1547:19-1548:14.)   The Architect participated in numerous meetings regarding the different metal panel system being proposed.  (Carter, Day 6, R. at 1547:19-1548:14.)  Further, the Architect knew that the proposed metal panel system was an entire system, and not just a component of the curtainwall system.  (Carter, Day 6, R. at 1540:16-1541:8.)

Ultimately, a metal panel system different from the Alucobond System was submitted by Metal Sales & Service, a supplier to Glen, and approved by the Architect.  (Resp't Ex. 860.) When the December 12, 2005 GMP Specifications were issued, Specification Section 07412 was included within the specification book, but was noted as "deleted."  Specification Section 08911 remained a part of the specification without <u>any</u> changes, other than the date of issue.  (Resp't Ex. 1006, C-3; Carter, Day 7, R. at 1690:18 – 1690:21; Lockhart, Day 11, R. at 2987:1 – 2987:22.)  During the submittal process, the metal panel submittal was stamped by Metal Sales & Service and noted as a submittal under Specification Section 07412, not Section 08911 (Resp't Ex. 860.) (Knopf, Day 4, R. at 864:13 – 868:18.)  The Architect described in detail the process by which Metal Sales & Service applied Specification Section 07412 in designing the system used on this project.  (Carter, Day 6, R. at 1531:5 – 1534:8.)  The Architect's approval is noted on the submittal as complying with the "Design Intent," without any modifications to the indicated section number.  (Resp't Ex. 860.)  There is also no indication that the Contractor ever was instructed, or even was aware, that the metal panel cladding system was to comply with Specification Section 08911.  (Lockhart, Day 11, R. at 3081:4 – 3081:16.)   In fact, the

EXHIBIT 2

Architect's testimony belies any notion of such a requirement during the submittal process.  Mr. Carter testified as follows regarding the decision to delete Specification Section 07412 following the approval of the Metal Sales & Service shop drawing submittal:

> Glen and Metal Sales & Service actually reached an alternative contract agreement, and what ultimately ended up on the job was designed by Metal Sales & Service and they were using Specification Section 07412 to guide their work.
>
> Once that was done there really wasn't any need because we knew what we were getting, it was specified, it was designed.  We actually, on the advice of Glen, just simply deleted this section because it was no longer applicable.  We knew what we were buying and that is what is on the job today.

(Carter, Day 6, R. at 1533:17 – 1534:6.)

Mr. Carter went on to admit that the Contract includes neither any reference to Specification Section 8911 having been "pulled back" to replace deleted Specification Section 07412," nor any indication that Specification Section 08911 was to control the manufacture and installation of the metal panels.  (Carter, Day 6, R. at p. 1649:15 – 1650:13.)

Notably, the approved metal panel shop drawing submittal does not comply with Specification Section 08911.  For example, the metal panel system is not a stick-built framing system; is not integral with the window wall framing; and, has no hidden weep holes.  (Lockhart, Day 11, R. at 2984:18-2986:22.)  The Architect described the requirement for no visible weep holes, per Specification Section 08911, but failed to mention or, more likely was unaware, that the metal panel design approved by his office failed to require compliance with that requirement. (Carter, Day 6, R. at  1542:19-1548:6.)   The Architect also chose not to mention that the application of the curtainwall specification 08911, to the metal panel cladding system still would leave the soffits and parapet panels of the system without any applicable Specification Section. (Lockhart, Day 11, R. at 1988:1–1988:22.)   The Architect claimed that the basis for the

EXHIBIT 2

application of Specification Section 08911 to the unrelated approved metal panel submittal was, "so there was some integration and coordination standards that we could apply." (Carter, Day 6, R. at 1534:16-1535:11.) When pressed for an example of this "integration," however, Mr. Carter only could refer to the series of meetings between Glen and the Architect, which resulted in the approved Metal Sales & Service metal panel shop drawing submittal as the means to resolve any coordination of integration issues, not the application of Specification Section 08911. (Carter, Day 6, R. at 1535:12-1536:16.)

Claimant also failed to offer any evidence that Madrigal, QDC or the Architect ever informed Foulger-Pratt/Travelers of the Owner's "belief" that the curtainwall Specification 08911 was to govern the manufacture and installation of the metal panels. Indeed, the evidence presented at the hearing establishes that Claimant's never mentioned this "theory" until they believed it would be useful for the arbitration. The Architect's, Alan Houde's, exterior punch-lists dated May 20, 2008 and August 25, 2008 make no mention of the curtainwall Specification Section 08911, or any failure to comply with its requirements. (Resp'ts Ex. 220, 396 and 459.) Further, the Gale Associates' report on the exterior of the building does not include a single reference to Specification Section 08911. (Resp'ts Ex. 603.) In fact, Claimant did not and cannot identify a single piece of project correspondence that informs the Contractor that Specification Section 08911 will govern the metal panel manufacture and installation at any time prior to Mr. Knopf's first mention of the Owner's new "theory" during his testimony in this arbitration in May 2009.

In summary, the evidence proves that the metal panel cladding system is not a curtainwall system. The evidence establishes further that the parties never agreed, or intended, that an entire metal panel cladding system meet the requirements of a previously unrelated specification

EXHIBIT 2

section with out any indication of this new requirement in the drawings, specifications, the actions of the parties or the documentation exchanged during the course of the project.  The truth is that Madrigal's new theory that Specification Section 08911 was to govern the metal panel installation is a creation for the purposes of this arbitration, solely to confuse and delay the resolution of real disputes between the parties.  The Owner's position is yet another tactic in service of its goal to improperly withhold Final Acceptance on the Project and the Contract Balance, which is due and owing to the Contractor.

## IV.   MADRIGAL ABUSED ITS POSITION AS OWNER TO AVOID ITS PAYMENT OBLIGATIONS TO FOULGER-PRATT.[7]

Laid bare, Madrigal's refusal to pay any portion of the remaining Contract balance, in excess of $2.6 million, pursuant to Application for Payment ("Payment Application") Nos. 27, 28, and 29, can be seen as nothing other than the harsh application of its mistaken belief that its Contract allowed it to hold the Contractor captive until it completed the belated sale of the Project.  Madrigal improperly hid, for month after month of non-payment, behind the pretext of needing lien releases for all money spent on the entire Project as a condition for releasing any further progress payments.  (Knopf, Day 4, R. at 923:15 - 924:9; Daily, Day 12, R. at 3202:8 – 3203:11.)   Yet, Madrigal would ultimately be exposed as having an ulterior motive when Travelers and Foulger-Pratt proposed contractually-based solutions to this issue which could not be reasonably rejected.  (Daily, Day 4, R. at 3208:15-3209:21 and Daily, Day 12, 3218:17– 3220:6.)   No longer able to hide, Madrigal would use its own failures preventing final acceptance, including its maladministration of the punch-list process, to support its nonpayment – twice harming Foulger-Pratt in the process.  (Knopf, Day 4, 925:13–928:4.)  Madrigal had

---

[7] For additional legal citations and support for this Section, please refer to Resp'ts Pre-Hearing Brief, §IV.D - §IV.F.

EXHIBIT 2

decided to hold the Contract balance and shift the financial burden of its delayed unit sales to its contractor and surety.

### A.     Madrigal Maladministered the Joint Check Process It Initiated.

In the Spring of 2007, Glen Construction's William Sharabi advised Travelers that funds ear-marked for subcontractors had not been paid.   (Daily, Day 12, R. 3173:5–3174:22.) Travelers then advised Mr. Knopf that it was providing funding to account for this deficit, and by June 2007, it had made payments to project subcontractors in the amount of $2.4 million dollars. (Daily, Day 12 R. 3174:14–3175:15 and Knopf, Day 4, R. 904:12–16.)   During the time that Glen Construction was requesting Travelers' assistance, Madrigal had initiated a joint check process with Glen for paying project subcontractors.   (Daily, Day 12, R. at 3176:3–3176:10.) Despite its payment applications to the Bank certifying otherwise, Madrigal chose not to insist on proper lien releases from project subcontractors during its administration of the joint check process.   (Knopf, Day 4 , R. at 909: 17-911:6.)   Madrigal did not advise Travelers of this fact prior to the parties' signing of the Consent to Assignment.   (Knopf , Day 4 R. at 911:14–912:6.) Fully aware of its failures in this regard, Madrigal obligated itself to pay the remaining contract balance in the exchange of promises set forth in the parties' Consent to Assignment agreement. (Resp'ts Ex. 99, Consent to Assignment, ¶4; Daily, Day 12, R. at 3188:10–3189:11.)

Notwithstanding its failures in the joint check process and promises in the Consent to Assignment, Madrigal later demanded Foulger-Pratt provide lien releases from every project participant as a condition of receiving another penny on the Project.  (Knopf, Day 4, R. at 911:7–912:6.)

EXHIBIT 2

**B.      Madrigal Maladministered the Payment Application Process Throughout 2008, Only to Reveal Its Undisclosed Agenda to Retain the Contract Balance.**

On March 26, 2008, Foulger-Pratt submitted Payment Application No. 27 in the amount of $51,210, which was certified by the Project Architect that same day.  (Resp't Ex. 224.) Consistent with what had been its practice when administering the payment process with Glen Construction, Madrigal certified payment application No. 27 as due and owing as part of its April Request for Disbursement to its lender, Bayerische Landesbank, New York Branch ("Project Lender").  [Resp'ts Ex. 812 (MC000022872); Knopf, Day 4, R. at 914:17–916:13.]

During the pendency of Payment Application No. 27, Madrigal asserted that any further funding was dependent on its receipt of lien releases from certain subcontractors whose invoices had been included in prior payments to Glen Construction.  (Resp't Ex. 294.)  Madrigal's demand for these lien releases ignored Specification Section 01290.1.5(F) and its requirement that pending Payment Applications need only be supported by subcontractor lien releases from subcontractors and suppliers that received payment during the previous construction period. (Resp't Ex. 5, §01290.1.5(F).)   Foulger-Pratt responded by reminding Madrigal that these subcontractors had been closed out during its joint check process with Glen Construction, but that it would endeavor to assist in the process of obtaining the desired lien releases.  (Resp'ts Ex. 294.)   On May 15 2008, Foulger-Pratt forwarded the lien releases from the closed-out subcontracts then at issue.  (Resp'ts Ex. 333.)  As Foulger-Pratt endeavored to satisfy Madrigal's requirements, this impediment to payment would soon morph into a generalized demand for lien releases for all monies spent under the GMP.  (MacClary, Day 8, R. at 2013:2–11; Daily, Day 12, R. at 3202:6–3203:11.)

On May 15, 2008, Foulger-Pratt  submitted Payment Application No. 28 in the amount of $296,816 for Madrigal's review of the progress achieved.  (Resp't Ex. 301.)   Again in

EXHIBIT 2

derogation of Section 01290.1.5(F) Madrigal refused to initiate its review of this progress payment application until its requirement for lien releases covering all monies spent was satisfied. (Knopf, Day 4, R. at 911:6-912:6.)  Mr. Knopf acknowledged that Madrigal's approach to lien releases changed as applied to Foulger-Pratt, stating:

> Q. So during the progress of the work there was a more lax treatment of releases of lien and it became a more prominent concern for you as you as you moved towards final?
> A. I think there were certain key subcontractors that we had to keep working and it was more important to keep them working than arguing with them about their form at the time.

(Knopf, Day 4, 911:14 – 912:6.)

As explained by Mr. Daily, Madrigal imposed a punitive application of its changed payment requirements, insisting on lien releases for every vendor paid, including "entities like Home Depot and Verizon."  (Daily, Day 12, R. 3202:6–3202:11.)

As would be expected, Madrigal's change in payment procedures, payment interferences and maladministration of the punch-list process strained Foulger-Pratt's relationships with subcontractors on this Project.  (Knopf, Day 4, R. at 911:7 – 912:6; MacClary, Day 7, R. at 1895:13 – 1896:11; MacClary, Day 8, R. at 1930:8 – 1930:15, 2021:12 – 2022:14.)  Foulger-Pratt continued to work through these challenges and obtain lien releases from project subcontractors .

On July 21, 2008, Foulger-Pratt submitted its lien reconciliation in support of Payment Application No. 27.  (Resp'ts Ex. 438.)  Madrigal breached its payment obligations concerning this certified progress payment by maintaining its improper precondition on the release of any funds and failing to provide Foulger-Pratt with contractually required written notice, within seven days, of the reasons for withholding funds and why this withholding was necessary to protect the Owner.  (Cl Ex. 2, General Conditions ¶¶ 9.4.1 and 9.5.1.)  Madrigal, apparently,

EXHIBIT 2

chose not to announce its intention of asserting back charges for an amount equivalent to the contract balance and instead to string Foulger-Pratt and its subcontractors along as they continued to work with the hope of being treated fairly and receiving payment.

Attempting to break the payment impasse, on July 29, 2008, Foulger-Pratt provided Madrigal with a subcontractor payment accounting as well as a resubmission of the lien releases supporting Payment Application No. 27.  (Resp't Ex. 448.)  Notwithstanding the difficulties posed by the delay and interruption of the payment steam, on August 8, 2008, Foulger-Pratt obtained and submitted lien releases in support of Payment Application No. 28, and that payment application was certified by the Architect the same day.  (Resp't Ex. 468; Resp't Ex. 301.)  No specific issue was taken by Madrigal concerning the lien releases provided by Foulger-Pratt in support of the then-pending payment applications.  (MacClary, Day 8, R. at 2012:21 – 2013:1; Daily, Day 12, R. at 3203:9 – 3203:16.)  Instead, Madrigal, by e-mail dated August 14, 2008, repeated its demand that lien releases for all monies expended under the GMP be provided before any further funds would be issued.  (Daily, Day 12, R. 3206:4 – 3206:17).  Madrigal's letter failed to satisfy its duties under its Contract in that it did not disclose its yet unasserted back charges which would later be used as a rationale for keeping the entire Contract balance, and it did not provide a basis as to why its actions were "necessary to protect Owner."  (Cl Ex. 2, General Conditions, §§ 9.4.1, 9.5.1.)  Madrigal's decision to block all further payments until its lien release concerns were addressed was not an action that was necessary to protect the Owner. Travelers had already expended $2.4 million to make certain it accounted for subcontractor payment deficits and pledged to address any further shortfall in the Consent to Assignment approved by Madrigal and the Project Lender.  (Resp't Ex. 99; Daily, Day 12, R. at 3174:1 – 3175:15.)

EXHIBIT 2

On September 25, 2008, as it struggled to move forward to final acceptance and resolve the impediments created by Madrigal, Foulger-Pratt submitted a "pencil copy" of Payment Application No. 29 for Madrigal's review and approval.  [Resp'ts Ex. 528 (beginning on FP 0020193).]  Madrigal refused to even initiate the payment review process until a lien release accounting was performed to their satisfaction.  (Resp'ts Ex. 528.)  Foulger-Pratt replied on October 3, 2008, by again requesting a meeting of all concerned, including the Project Lender, to review Payment Application No. 29 and confirming that it had forwarded on several occasions all of the necessary supporting documentation for Payment Application Nos. 26, 27 and 28.  (Id.)  Madrigal neither raised any specific deficiencies in the supporting documentation for the referenced progress payments, nor took any further action with regard to Payment Application No. 29.

C.     **Travelers' and Foulger-Pratt's Struggle to Break the Payment Impasse Was Thwarted by Madrigal's Disingenuous Participation in the Process.**

Intent on reaching a workable solution to the payment impasse, Travelers and Foulger-Pratt requested a meeting with Madrigal, to be attended by counsel for the respective parties, which took place on October 23, 2008.  (Daily, Day 12, R. at 3207:20 - 3208:14.)  At that meeting, and in accordance with the applicable provision of the Contract, Travelers and Foulger-Pratt offered to provide either a hold harmless agreement or a security instrument to obviate any further concerns associated with lien releases that were thought to be missing.  (Cl Ex. 2, Agreement ¶12.2.6(k) and General Conditions ¶9.10.2; Daily, Day 12, 3209:4 – 3209:21.)  A meeting with the Bank was also sought to address any issues it may have regarding the form of security to be provided.  (Daily, Day 12, R. at 3210:12-3210:22.)  Travelers and Foulger-Pratt also asked Madrigal to assert any other basis it had for withholding payment in order to make certain that a solution was in sight and that the parties were moving forward in good faith to end

EXHIBIT 2

the payment impasse.  (Daily, Day 12, R. at 3211:2–12.)  No back charges were asserted at the meeting.  (Id.)  By the close of the meeting, Travelers and Foulger-Pratt had committed: 1) to bond off certain subcontractor liens that had been filed during the payment impasse; 2) to coordinate a meeting with counsel for the CCIP insurer, Westchester Surplus Lines Insurance Co. (the "Insurer"), regarding the damage to the Second Baptist Church; and 3) to have Foulger-Pratt continue to work on the Project, including continued efforts to obtain lien releases from subcontractors and material suppliers that completed their work during Glen's tenure on the Project.  (Resp'ts Ex. 547; Daily, Day 12, R. at 3211:2 – 3215:5.)  Travelers and Foulger-Pratt met each of their commitments to Madrigal.  (Daily, Day 12, R. at 3212:15 – 3215:5.)

Madrigal made reciprocal promises to Travelers and Foulger-Pratt at the meeting on October 23, 2008.  Madrigal agreed to arrange for a meeting with the Project Lender to discuss the particulars of Travelers' and Foulger-Pratt's offer of security concerning the sought after lien releases and to define and quantify any other basis for withholding payment.  (Resp'ts Ex. 547; Daily, Day 12, R at 3215:6 – 3215:12; 3218:5 - 3219:11.)  Of particular import to Travelers and Foulger-Pratt was having Madrigal define and quantify any other reason for nonpayment. (Daily, Day 12, R at 3214:16 – 3215:5.)  Resources continued to be expended on a Project where Madrigal would neither commit to payment nor establish the terms for final acceptance; to continue working, there needed to be a reasonable end in sight.  (Id.)  Madrigal was entreated, yet again, to administer the Contract in accordance with its requirements.

Nonetheless, Madrigal flouted its commitments to Travelers and Foulger-Pratt.  (Daily, Day 12, R. at 3215:14 - 3220:16.)  Meetings with the Project Lender were scheduled and then mysteriously and abruptly cancelled.  (Daily, Day 12, R. at 3215:14 – 3217:12, 3218:17 – 3219:11.)  The first meeting with the Project Lender was to take place at the Project site on

EXHIBIT 2

November 25th, 2008, immediately following the meeting that Travelers had arranged with the Insurer's counsel concerning the Second Baptist Church.  (Daily, Day 12, R. at 3215:14– 3217:12.)  Travelers delivered the meeting it had promised with the Insurer but the subsequent meeting with the Project Lender was cancelled by Madrigal a mere hour and one-half before it was scheduled to begin, purportedly resulting from a phone call just received from the Project Lender's representatives in New York in which they advised they would not be traveling to D.C. for the meeting.  (Daily, Day 12, R. at 3216:18 – 3217:5.)  The circumstances surrounding the cancellation of this scheduled meeting with the Project Lender remain dubious, considering Mr. Knopf's absence; the lack of a planned meeting space; and the timing of the cancellation, given the travel time from New York City to Washington, D.C.  (Daily, Day 12, R. at 3215:14– 3217:15.)

Unwilling to conclude at this time that it was being unfairly dealt with, Travelers and Foulger-Pratt immediately offered to travel to New York City to meet with Madrigal and its Project Lender.  (Daily, Day 12, R. at 3217:13 – 3217:20.)  Nevertheless, Madrigal decided to reschedule the meeting to take place eight days later in Washington, D.C.  (Daily, Day 12, R. at 3217:16 – 3218:4.)  This second attempt at a meeting was halted by Madrigal when it announced on December 2, 2008, the evening before the meeting with the Project Lender, that it was asserting for the first time an indefinite amount of backcharges within the range of the Contract Balance that prevented them from releasing any funds even if the impending meeting with the Project Lender produced Foulger-Pratt's and Travelers' intended result.  (Daily, Day 12, R at 3218:5 –3220:6; Resp'ts Ex. 618.)  As can only be seen properly in retrospect, despite the parties' exchange of promises at the October 23, 2008 meeting, Madrigal never had any intention of releasing any portion of the Contract Balance.

EXHIBIT 2

Madrigal's harsh dealings also raised additional concerns regarding the adequacy of its financing for the Project.  (Daily, Day 12, R at 3219:18 - 3220:6.)  Shortly after Madrigal's undocumented assertion of backcharges, Foulger-Pratt exercised its right under the Contract to request reasonable evidence from Madrigal that financial arrangements had been made to fulfill its obligations under the Contract.  (Cl. Ex. 2, General Conditions ¶2.2.1; Daily, Day 12, R. at 3220:7 – 3222:6; Resp'ts Ex. 618.)  In response to Foulger-Pratt's request, Madrigal forwarded financial information from the Project Lender that did not alleviate Foulger-Pratt's and Travelers' concerns about the Project's viability.  (Daily, Day 12, R. at 3220:12 – 3222:6.)  The financial information provided referenced more than the Project at issue and included numerous, extra-contractual cost contingencies that could impede payment due to Foulger-Pratt.  (Daily, Day 12, R. at 3221:4 – 3222:6.)  The inadequacy of this financial information was later confirmed when Madrigal's counsel wrote counsel for Travelers and Foulger-Pratt on December 23, 2008 in which it explained that approximately $2.3 million remained in the loan from the Project Lender for construction costs.  (Resp'ts Ex. 625.)  The $2.3 million in the loan that Madrigal's counsel maintained was reserved for construction was insufficient to satisfy Foulger-Pratt's outstanding invoices which totaled more than $2.6 million dollars, not accounting for monies to become due for the 2nd year warranty required by the Contract.  (Resp'ts Ex. 625 and Daily, Day 12, R. at 3226:6–3227:8).

### D. Madrigal's Purposefully Breached the Contract and Frustrated Foulger-Pratt's Contractual Right to Lien Against the Project.

Travelers and Foulger-Pratt were confronted with the specter of continuing to fund work in the untenable circumstance where Madrigal refused to pay, to specify yet undocumented backcharges, to define the terms for final acceptance, and to provide reliable information concerning the availability of Project financing.  Having tried all else, Foulger-Pratt availed itself

EXHIBIT 2

to its right under the Contract to stop work and to file a mechanic's lien on the Madrigal Lofts property.  (Resp'ts Ex. 618; Daily, Day 12, R. at 3228:15 – 3226:3.)

On December 5, 2008, in the wake of Madrigal's unsupported advice it would have backcharges equivalent to the Contract Balance, it became apparent to Travelers and Foulger-Pratt that Madrigal had no intention of curing its longstanding payment breach.  As such, by letter that same date, Travelers and Foulger-Pratt advised Madrigal that Foulger-Pratt would exercise its rights under the Contract to stop work on the Project.  (Cl Ex. 2 General Conditions ¶9.7.1; Resp'ts Ex. 618).  On December 18, 2008, Foulger-Pratt filed a mechanic's lien on the property in the amount of $2,636,469, which included amounts unpaid pursuant to Payment Application Nos. 27, 28, and 29.

The Contract specifically preserves the Contractor's lien rights in instances where funds certified by the Development Manager and Architect remain unpaid.  (Cl Ex. 2, Agreement ¶ 14.6.1.)  During the hearings it was established that Madrigal and the Architect had certified Payment Application No. 27, that the Project Lender's approval of payment for the amount due under Payment Application No. 27 had been garnered, and that Madrigal received these funds from the Project Lender.  [Resp'ts Ex. 224; Resp'ts Ex. 366; Resp'ts Ex. 812 (Request for Disbursement No. 26, beginning at MC000022872); Knopf, Day 4, R at 914:18 – 916:13.] Foulger-Pratt and Travelers only learned through discovery in this case, however, that Madrigal certified payment due under Payment Application No. 27, received $51,210 from the Project Lender in April 2008, and then returned these funds to the Project Lender in November 2008. [Resp'ts Ex. 366; Resp'ts Ex. 812 (Request for Disbursement No. 26, beginning at MC000022872).]  Recognizing that this certification and receipt of funds triggered Foulger-

EXHIBIT 2

Pratt's lien rights under the Contract, Madrigal tried to un-ring the bell for the first time when presenting its evidence:

> Q. As of this filing of Foulger-Pratt's mechanics lien in December 2008, you indicated that you had not certified for payment the Applications for Payment, the outstanding ones were 27, 28 and 29; right?
> A. Yes.
> Q. Now, with respect to Application For payment 27, you had indicated that you're revoking that certification; is that correct?
> A. That is correct.

(Knopf, Day 2, R. at 344:18–345:4.)

Madrigal's announcement for the first time that it had revoked certification came, of course, after Foulger-Pratt had voluntarily removed the mechanic's lien it had filed on the property as part of the parties' APS.  (Daily, Day 12, R. at 3227:9 – 3227:20.)  As Foulger-Pratt and Travelers were unaware prior to these proceedings Madrigal certified and received funds for Payment Application No. 27, it was similarly that Madrigal had revoked its prior certification.

The Architect had similarly certified Payment Application No. 28.  (Resp'ts Ex. 301). Yet, Madrigal had improperly refused to further process Payment Application No. 28 and prevented any review or processing of Payment Application No. 29.

Madrigal cannot rightly rely on its own purposeful breach of its Contract's payment provisions as a means to frustrate Foulger-Pratt's lien rights or to escape its own liability.[8] Madrigal's breaches of the Contract's payment provisions were manifold:  1) Madrigal never provided timely written advice of the bases for its withholding of all remaining project funds, choosing instead to keep its intended backcharges secret and to lure Foulger-Pratt forward in the hope of receiving payment; 2) Madrigal never provided written advice as to why its disclosed rationale for retaining all remaining project funds – missing lien releases – was necessary to

EXHIBIT 2

protect the Owner, especially in light of Travelers' prior Project funding, its commitment to pay

Glen Construction vendors under the Consent to Assignment, and its offer with Foulger-Pratt to

provide Madrigal with security to dispel any lien release issues; and 3) Madrigal's backcharges,

as belatedly asserted after Foulger-Pratt filed a mechanic's lien, were grossly overstated,

reflective of its refusal to timely inspect work performed, and wholly unjustified as a rationale

for any backcharges.  (Resp'ts Ex. 1007, pp. 23-30; Lockhart, Day 11, R. at 3019:18 – 3037:13.)

Madrigal's illicit purpose in retaining the remaining Contract Balance is apparent from

the evidence presented in these proceedings.  Madrigal has not, and cannot, explain why, on

November 17, 2008, it decided to refund the money it had received from the Project Lender for

Payment Application No. 27.  (Resp'ts Ex. 366 at MC000014600.)  At that juncture, Madrigal

was purportedly working with Travelers and Foulger-Pratt to address the payment impasse and

causing Travelers and Foulger-Pratt to expend substantial resources in reliance on that accord.

(Id.)  Madrigal had retained these monies, since April 2008, making Madrigal's sudden return of

these funds in November, all the more inexplicable.  (Id.)

Madrigal also cannot rightly defend the timing or bases for backcharges it had always

intended to assert as a bar to payment.  Mr. Knopf admitted as much during his testimony,

stating:

> A. I cannot remember the amount, the amount of your Requisition
> 28 or 29.  Are we tying this back to 28 or 29?
> Q. Sure.  What about the exact amount you thought to be your
> back charges? Was it about the same amount or more?
> A. They're pretty close to the same amount, as I recall.
> Q. So had every single lien release been submitted on every perfect
> and pristine form, you still weren't going to pay because you
> thought you had all these back charges?
> A. You mean if the Contractor had complied with the documents
> and the contractor had completed the work?  Hell yeah, I want

---

[8] See Resp'ts Pre-Hearing Brief, §IV.E, pp. 33 – 35, for extended discussion on the legal bases for Foulger-Pratt's
lien filing.

> them out of my hair, I want them off the job.  The problem is I
> can't get them to finish.
>
> Q. You have -- in addition to what you say you are seeking in
> terms of legally, you had back charges you were going to assert
> anyway?
>
> A. As the job drags on there are more and more back charges that
> accrue.  When people walk off jobs and I have to bring other
> people in to replace them, they're not doing they're job' that
> adds back charges.  So every time they walk off, they tell me
> they're not finishing the work, I have to finish the work for
> them, it's my right under the contract to do so at a 20 percent
> mark up.

(Knopf, Day 4, R. at 927:6–928:13.)

For the foregoing reasons, Madrigal's purposeful breach of its payment obligations cannot be countenanced and its claim for damages related to Foulger-Pratt's filing of its mechanic's lien should be wholly rejected.

## V.     MADRIGAL'S IS NOT ENTITLED TO RECOVERY OF ANY OF ITS CLAIMED DAMAGES.

### A.     Madrigal Cannot Recover Its Claimed Attorneys Fees.

In addition to the reasons set forth in §IV.F and §VII of Foulger-Pratt's and Travelers' Pre-Hearing Brief, Madrigal is not entitled to any of the attorneys' fees, costs and expenses claimed in this arbitration because Madrigal has no right to indemnification for the attorneys' fees, costs and expenses allegedly incurred under an indefensible and unreasonable interpretation of the indemnity provision it drafted.  The obligation to indemnify Madrigal for its attorneys' fees is not "plainly evident" upon a strict construction of the Contract's indemnification provision.  (Cl. Ex. 2, General Conditions, ¶3.18.)  Moreover, interpreting the clause to contain such an obligation would create an ambiguity as to which claims brought by what claimants are subject to its terms.   Therefore, D.C. law prohibits Madrigal from being awarded any indemnification that it seeks pursuant to obligations which the Contract does not clearly demonstrate that the Contractor intended to assume.  Am. Bldg. Maint. Co. v. L'Enfant Plaza

EXHIBIT 2

_____, 655 A.2d 858, 861-62 (D.C. 1995) (explaining that the scope of an indemnitor's duty is narrowly construed and that courts will not infer indemnity obligations absent explicit and unambiguous contractual language); Rivers & Bryan, Inc. v. HBE Corp., 628 A.2d 631, 635 (D.C. 1993) (stating that an indemnitee will be denied recovery when the indemnity provision upon which it relies is ambiguous as to the indemnity obligation it believes the indemnitor assumed); D.C. v. Royal, 465 A.2d 367, 369 (D.C. 1983) (reasoning that the parties intent to shift liability "should be plainly evident from the face of the contract").

It is well settled in D.C. that "indemnity provisions are to be strictly construed against the party alleging a right to indemnification." Am. Bldg. Maint. Co., 655 A.2d at 862 (internal citations omitted). Pursuant to this rule, a D.C. court will not conclude that an indemnitor accepted an obligation under an indemnity provision unless it is "firmly convinced that such an interpretation reflects the intention of the parties" and "there is a clear intention to do so that is apparent from the face of the contract." Rivers v. Bryan, Inc., 628 A.2d at 635; Royal, 465 A.2d at 369. Courts will not "read into [indemnity provisions] any obligations which the parties never intended to assume." Am. Bldg. Maint. Co., 655 A.2d at 861. Thus, where an indemnity provision is ambiguous as to the existence or scope of an indemnity obligation, courts will automatically resolve the ambiguity by interpreting the provision against the party seeking indemnification. Am. Bldg. Maint. Co., 655 A.2d at 863. Rivers & Bryan, Inc., 628 A.2d at 635.

The court in Am. Bldg. Maint. Co. v. L'Enfant Plaza Properties, Inc. applied the foregoing rules of interpretation when it held that L'Enfant Plaza Properties, Inc. ("Owner") was not entitled to recover attorneys' fees and costs under a indemnity provision which the court concluded did not clearly define the parameters of American Building Maintenance Company of New York's ("Contractor") indemnity obligation. Am. Bldg. Maint. Co., 655 A.2d at 863-64.

EXHIBIT 2

The indemnity provision at issue in <u>Am. Bldg. Maint. Co.</u> provides, "[c]ontractor shall indemnify and hold harmless Owner from claims for injury, death and property damage due to negligent acts and omissions of Contractor … which arise out of work performed under this Agreement." <u>Id.</u> at 860.  Providing a strict construction to this clause, the court found the language to possess ambiguities that rendered it unenforceable.  <u>Id.</u> at 863.  The court explained that the provision is unclear whether the injury must *in fact* arise from the contractor's negligence, or whether the clause is simply triggered by a claim being brought against the Owner.  <u>Id.</u>  In light of its conclusion that the indemnity provision contained at least one ambiguity, the court construed the indemnity provision against the Owner and held that the Contractor was absolved of any obligation to indemnify the Owner for its attorneys' fees and costs.  <u>Id.</u>

Despite the fact that Madrigal drafted its Contract over a period of at least fifteen years with the assistance of counsel (Knopf, Day 3, R. at 597:10 – 597:22), Paragraph 3.18 of the General Conditions contains ambiguities in the language of the clause such that it fails to clearly define the scope of the Contractor's indemnity obligation.  Paragraph 3.18 states, in part:

> 3.18.1 Contractor agrees, covenants, and warrants to, and shall indemnify, hold harmless and defend Owner, Madrigal Condominiums, LLC, the Development Manager, QDC Development Services of Washington, D.C., LLC, the Architect, each of the Design Team Members, Quadrangle Development Corporation, The Wilkes Company, and the Project Lender and their respective principals, partners, members, agents, offices and employees (the "Indemnities"), from and against any and all claims, damages, losses, costs, and expenses, including attorneys' fees, in respect of any and all claims, damages, loss or expense attributable to bodily injury (including death), property damage and economic harm that is caused by a negligent, reckless, or intentional wrongful act or omission, or a violation of this Agreement, the Contract Documents, or law by Contractor or its agents, officers, employees, or Subcontractors regardless of whether or not it is caused in whole or in part by a party indemnified hereunder.  The foregoing obligation of Contractor to indemnify, hold harmless and defend the Indemnitees shall

EXHIBIT 2

> include, but not be limited to, claims, damages, losses, or expenses arising from or relating to Contractor's obligations or responsibilities, as provided in Subparagraphs 3.3.1 and or 3.3.2.

(Cl. Ex. 2, Agreement, ¶3.18.)

The clause reads as if it is intended to indemnify the Indemnities from claims brought by third parties. Madrigal, however, seeks to apply this clause as a blanket entitlement to attorneys' fees for any claim *Madrigal* may bring against Foulger-Pratt, win or lose. This reading is even more extreme than a one-way prevailing party clause which itself is not evident from the face of clause. Madrigal's interpretation is, at best, based on an ambiguous construction of an indemnity provision which, under the law of D.C., bars it from recovery.

Applying a narrow construction to this indemnity provision, it is uncertain at best whether the scope of the Contractor's indemnity obligation includes, as Madrigal contends, the automatic reimbursement of attorneys' fees and other costs that Madrigal incurs under any circumstance that Madrigal unilaterally conceives as a "claim" to assert against the Contractor. (Id.) The indemnity provision is also ambiguous on its face as to whether or not Madrigal has a right to indemnification for an alleged "violation of this Agreement" when the injury suffered is either expressly compensable or noncompensable under another provision of the Contract, or by operation of law. For example, Madrigal asserts in this arbitration that it should be indemnified against Foulger-Pratt's alleged failure to achieve timely Substantial Completion. Yet, Madrigal is simultaneously claiming the right to assess liquidated damages and to recover additional delay damages for the same alleged harm. (Id.)

Setting aside the requirement that indemnity provisions must be strictly construed, interpreting Paragraph 3.18 in a manner most similar to Madrigal's view allows Madrigal to devise as many claims against the Contractor as possible for perceived "violation[s] of the

EXHIBIT 2

Agreement."  See, e.g., Am. Bldg. Maint. Co., 655 A.2d at 862.  Once asserted, Madrigal then would have the license to prosecute those claims without caution, under the belief that it will not cost Madrigal a single penny to do so.  Exemplifying the senselessness of this interpretation, Madrigal's claim is strewn with instances where Madrigal recklessly and voluntarily incurred unnecessary attorneys' fees which it now seeks to improperly charge to Foulger-Pratt and Travelers.  [See, e.g., Madrigal's Itemization of Damages, Counts X.a (Damage to Second Baptist Church); X.b (Subcontractor Schnabel Foundation and J.P. Construction Liens); X.e (Subcontractor Kone Lien); and X.f (Contractor's Failure to Provide Lien Waivers and Improper Form).]  An interpretation of the indemnity provision that permits such a result is patently unreasonable, but at a minimum, places emphasis on the ambiguities in the language which Madrigal inserted as the drafter.  See Rivers & Bryan, Inc., 628 A.3d at 635 ("Contactual language is ambiguous if it is susceptible to more than one reasonable interpretation.)  Since Paragraph 3.18 is at least ambiguous on its face whether or not the clause supports the interpretation that Madrigal suggests, D.C. law in this instance requires a particular result – that the clause must be strictly construed against Madrigal's interpretation, resulting in the denial of its claims for indemnification.

Madrigal's claim for attorneys' fees and other costs and expenses should also be denied because Madrigal failed to sufficiently prove its damages in the hearings.  Ordinarily in cases before D.C. trial courts, judges are given discretion to award attorneys' fees where statutory or contractual authority permit because "[t]he judge who hears the case has a basis for determining a reasonable fee."  Tyler v. Dixson, 57 A.2d 648, 649 (D.C. 1948).  Since the court is present to witness the result of the legal services rendered, it logically follows that the court need not necessarily require other forms of proof to determine a reasonable fee.  Id.

EXHIBIT 2

Here, however, Madrigal asserts numerous claims for attorneys' fees which have been made impervious to scrutiny because the Respondents and the Panel did not observe the services rendered; were not presented with actual invoices relating to any claim except for Count X.i. Brown and A&A Cases (See Cl. Ex. 28R; Cl. Ex. 30); and were not afforded the chance to cross-examine any fact or expert witness concerning the services rendered or the reasonableness of the fees charged.  Madrigal's prevention of any meaningful inspection of eight of its nine claims for attorneys' fees is particularly alarming given that in only a brief review of the one set of invoices that have been submitted in this arbitration, Respondents were able to discover that Madrigal had included within its claim $12,131.46 of attorneys' fees chargeable to a different matter.  (Knopf, Day 2, R. at 437:2 – 442:15; Cl. Ex. 725.)  Since Madrigal failed to satisfactorily prove its entitlement to, or the amount of, its attorneys' fees, the Panel should deny in its entirety Madrigal's claim under Count X of Madrigal's Itemization of its Damages.

**B.     Madrigal Breached the APS and Cannot Maintain Its Improper Withholdings.**

Madrigal's failure to appropriately administer the Contract continued after the Parties executed the APS in the beginning of February 2009.  Foulger-Pratt urged Madrigal to meaningfully respond to requests for inspections and to acknowledge work completed.  Yet, Madrigal refused to perform its duties as Owner under the Contract.  (MacClary, Day 8, R. at 2031:16 – 2045:20.)  From April 2009 through August 2009, Foulger-Pratt corresponded with Madrigal on numerous occasions, notifying Madrigal in each instance that work identified under the various tabs of the Madrigal Outstanding Items binder was complete.  Foulger-Pratt's correspondence to Madrigal in this regard can most readily be found in the Respondents' exhibit binder entitled, "Rebuttal of Mark Brungart Direct Testimony Binder – Foulger-Pratt Correspondence re: Completion of APS Punch List Work."  In almost every instance, Foulger-

EXHIBIT 2

Pratt's completion of punch-list work remained unreviewed, and its letters did not receive any response.  (MacClary, Day 8, R. at 2045:14 – 2045:20; see also Supplement D, Madrigal's Failure to Address Foulger-Pratt's Completion of APS Obligations.)   Madrigal must not be permitted to benefit from its own failure to comply with the terms of the APS.  (Cl. Ex. 11, APS, ¶18.)

Despite Madrigal's attempt to disregard its contract administration function throughout the Project, Foulger-Pratt is entitled to receive monies withheld against items that were finally acknowledged as complete during the hearings.  Mr. Knopf testified during cross-examination that Foulger-Pratt should receive payments for its completion of items that are identified within the Madrigal Outstanding Items binder.  (Knopf, Day 4, R. at 948:3 – 956:8.)   Once the ramifications of Mr. Knopf's testimony was understood, Madrigal attempted to backtrack in every way possible from Mr. Knopf's movement toward recognizing the Project's completion. Nevertheless, the record clearly reflects that Mr. Knopf recognized that payment for work completed is due to Foulger-Pratt.  (Id.)

Madrigal cannot otherwise hide behind the APS. (Cl. Ex. 11).  Mr. Knopf was intimately involved in negotiating the APS and maintained throughout the entirety of his testimony that he plainly understood how the terms should be applied before testifying that payment was due.

Consistent with the foregoing, it should also be noted that the Parties agreed to the APS in February 2009 as a means to open the payment stream for work completed, not as Madrigal argues, to create additional impediments to Foulger-Pratt's ability to obtain payment of the full Contract Balance.  In particular, Paragraph 5 of the APS outlines a procedure for Foulger-Pratt to receive a substantial portion of the remaining Contract Balance ($1,194,000.) upon completion of the "Items 1-8 Punch-List Work."  (Cl. Ex. 11, APS, ¶5.)  By no means, however, did the

EXHIBIT 2

Parties intend that Madrigal could withhold $1,194,000 while it delays inspections, refuses to acknowledge completed work, and obstructs the Project Neutral process. The Parties intention to make the entire Contract Balance available even if the procedure in Paragraph 5 was curtailed is most evident in the fact that the Parties anticipated arbitrating Foulger-Pratt's right to "full payment of the balance of the Contract Sum," as well as Madrigal's contention that Foulger-Pratt's right to full payment is subject to compliance with Paragraph 5 of the APS. (Cl. Ex. 11, APS, ¶¶ 5, 11.)

The fact also remains that "Items 1-8 Punch-List Work" are complete at this time, and that payment of at least $1,194,000 would be presently due were it not for Madrigal's obstruction of the Project Neutral process. Failing to abide by the Panel's Order of May 26, 2009, Madrigal has thwarted engagement of the Project Neutral by improperly insisting upon an extensive document submission process and a presentation of argument to the Project Neutral as preconditions to the Project Neutral's inspection. Moreover, Madrigal has interposed specious arguments concerning the Specifications section governing the exterior skin of the building, making the Project Neutral process largely unworkable until a ruling from this Panel is received. (See infra, §III.E.) Finally in this regard, Madrigal's refusal to provide any meaningful response to the questions raised by Foulger-Pratt concerning the Gale Report made the necessity of litigating each of these items a foregone conclusion, further complicating the project Neutral process. [Resp'ts Ex. 745 (Madrigal rejecting solution adopted by the Architect); See Supplement E, Gale Report Disputed Items).] Madrigal's obstruction of the Project Neutral process can only be seen as another attempt to block the resolution of the Parties disputes until it is ready to issue either the report of its litigation consultant, Clay C. Ewell, or the Condominium Association Punch List.

EXHIBIT 2

Madrigal's delay in the performance of its duties under the APS entitles Foulger-Pratt to payment for the value of all work it previously has completed.  Madrigal plainly should not benefit from its breach of the APS.  (Cl. Ex. 11, APS, ¶18.)  Moreover, the Parties specifically preserved Foulger-Pratt's right to payment under Paragraph 9.10.3 of the General Conditions, notwithstanding the payment procedures outlined in the APS.  (Cl. Ex. 2, General Conditions, ¶9.10.3; Cl. Ex. 11, APS, ¶17.)  As Paragraph 17 of the APS provides, "nothing in this APS alters or amends the Contract and that neither Foulger-Pratt nor Madrigal have waived any of their respective rights or obligations under the Contract or at law." (Cl. Ex. 11, APS, ¶17.)  Since final completion has been "materially delayed through no fault of Contractor," Madrigal must "make payment of the balance due for that portion of the Work fully completed and accepted." (Cl. Ex. 2, General Conditions, ¶9.10.3.)

### C.    Respondents' Analysis of Madrigal's Damages

For Respondents' analysis of Madrigal's damages, please refer to Supplement F, attached hereto.

## VI.    REMAINING QUESTIONS FROM THE PANEL

The following subparts address the Panel's questions that are applicable to Foulger-Pratt and Travelers, as presented in Mr. Ness' e-mails to the parties on August 7, 2009 and August 14, 2009.  Please note that, while question six in the Panel's first set of questions on August 7, 2009 was addressed to Madrigal, Foulger-Pratt and Travelers provided in their Pre-Hearing Brief the legal justification for rejecting Madrigal's claim that it may recover both actual delay damages and liquidated damages.  See Resp'ts Pre-Hearing Brief, §III.E, p. 13.

Furthermore, the question posed by the Panel concerning Respondent's arguments for extending the Substantial Completion date are set forth in §II, supra, pp. 2 – 53.  Please also refer to Respondents' export report provided by Mr. Norris, Respt's Ex. 1005.

EXHIBIT 2

**A.   Address Whether There Was Compliance With the Contract Requirement of Lien Releases As a Precondition for Payment, or Excusable Non-Compliance.**

In addition to addressing Foulger-Pratt's submission of lien releases to support its progress payment applications, see _infra_, §IV, Foulger-Pratt and Travelers note that Foulger-Pratt has submitted the final lien releases from subcontractors and suppliers to Madrigal that are incident to Final Payment under Paragraph 12.2.6 of the Agreement.  [Resp'ts Ex. 1034; Resp'ts Ex. 816 (FP000060); _see_ _also_ Cl. Ex. 2, Agreement, ¶12.2.6.]  Accounting for the subcontractors and suppliers on the Project, Foulger-Pratt has submitted forty-three out of forty-seven final lien releases in the form prescribed by the Contract.  Of the remaining four, lien releases have been provided, but not fully and finally sealed in the form in the Contract.  The lien release process has been made extremely difficult by Madrigal's refusal to pay and its maladministration of the close-out process.

In a letter to Madrigal on August 13, 2009 enclosing final lien releases, Foulger-Pratt and Travelers reiterated their previous offer from the Parties' October 23, 2008 meeting "to set aside any amounts owed to the Subcontractor in an escrow account controlled by both Owner and Contractor," and to prepare an agreement that will "indemnify and defend Owner and Project Lender from any and all liability resulting therefrom."  (Resp'ts Ex. Resp'ts Ex. 1034; Daily, Day 12, 3209:4 – 3209:21; Cl. Ex. 2, Agreement, ¶12.2.6(k).)  In the August 13, 2009 letter, Foulger-Pratt and Travelers also expressed their willingness to furnish the alternative contractual remedy of a bond to indemnify the Owner and the Indemnities for any liability from any outstanding Subcontractor lien waivers.  (Resp'ts Ex. 1034; Cl. Ex. 2, General Conditions, ¶9.10.2.)  Madrigal has not responded to Foulger-Pratt's and Travelers' offer.

EXHIBIT 2

**B.      Describe the Type of Accounting that Is Referenced In the Contract and Explain Whether the Contractor Has Met That Requirement.**

The Contract requires the Contractor to submit a certified statement of the Final Cost of the Work.  Paragraph 12.2.3 of the Agreement provides, in pertinent part, as follows:

> Prior to the Date of Substantial and Final Completion, Contractor shall provide to Development Manager's accountants a certified statement of the Final Cost of the Work.   The Development Manager's accountants will review and report in writing on Contractor's final accounting to Owner and Project Lender.

(Cl. Ex. 2.)[9]

Foulger-Pratt has complied with the Contract requirement to provide a certified statement of the Final Cost of the Work.

By letter dated July 31, 2009, Foulger-Pratt submitted its statement of the Final Cost of the Work certified by Foulger-Pratt's Director, Multi-Family Operations, Kevin MacClary, to the Development Manager.  (Resp'ts Ex. 1019.)  Foulger-Pratt's certified statement includes an accounting of the disbursements and costs incurred on the Project as of May 31, 2009, which was prepared by Aronson & Company and performed "in accordance with standards established by the American Institute of Certified Public Accountants."  (Resp'ts Ex. 1019, at p. 4.)  The certified statement also includes an "Accounts Payable Detail" report of amounts that will become due to subcontractors upon Final Payment.

Foulger-Pratt certified the cost of the work (as of May 31, 2009) as $69,430.677, exclusive of the Contractor's Fee, additional fees due Foulger-Pratt for change order work and costs incurred for home office overhead.  The addition of the original Contractor's Fee, in the amount of $2,375,000, would increase the Final Cost of the Work to $71,805,677.  Paragraph 5.2 of the Agreement establishes the original "Cost of the Work," or the GMP, including the

---

[9] The Contract includes no further definition or description of the statement that is to be provided by the Contractor.

EXHIBIT 2

Contractor's fee, as $62,000.000.  This amount was increased by the issuance of change orders by Madrigal in the amount of $1,788,834 to $63,481,951.  Thus, the Final Cost of the Work "is $71,805,677 - $63,481,951, or $9,316,843 in excess of the GMP.  Accordingly, Madrigal is not entitled to recover any savings on the Project and Foulger-Pratt has complied fully with all preconditions to Final Payment.

      **C.**      **Identify What Special Warranties Are Required By the Contract (meaning Warranties Called Out By the Specs That Exceed the General Warranty Period) and Identify Which Have Been Provided, Which Not Provided, and Any Shortcomings in Those Provided.**

Please refer to Supplement H, which contains a list of all warranties required by the Contract Documents.  The listing indicates the Specification Section creating the requirement along with a brief description of the specification requirement.  All special warranties required by the Contract have been submitted to Madrigal.  (Cl. Ex.13; Resp't Ex. 700, 1022, 1023 and 1035.)

The Roofing Warranty was transmitted to Madrigal on June 10, 2009. (Resp'ts Ex. 1022.) The Roofing Warranty requires the signature of Madrigal's representative on the warranty prior to it being executed by the roofing manufacturer.  Madrigal has failed to execute the warranty or to respond to Foulger-Pratt's letter.

Warranties that are not required by the Contract Documents, but were received from subcontractors and suppliers were also provided to Madrigal.  Many of these warranties are within the O&M submittal for specification divisions 1 through 15, which were approved by the Architect.   Foulger-Pratt also provided to Madrigal the warranties received from subcontractors/suppliers regarding the metal panel cladding system (Resp'ts  Ex. 1038.)

EXHIBIT 2

**D.    Address the Evidence In the Record As to the Extent of Damage Yet to Be Repaired At the Second Baptist Church and the Estimated Costs of Such Repairs.**

Madrigal has offered no evidence whatsoever as to the extent of the alleged damage to the Second Baptist Church (the "Church") or the estimated costs of any repairs.  Madrigal also has failed to offer any evidence that the damage to the Church is the result of any improper or negligent act or omission of Foulger-Pratt/Travelers.  Accordingly, Madrigal has failed to meet its burden to prove entitlement to any amount of withholding for future expenditures to repair the Church.

In the Pre-Hearing Brief, Respondents have provided a comprehensive discussion of the Contract provisions governing the responsibility for repair of any alleged damages to adjacent properties.  In short, the Contract provides that any such damage is an insurable risk. (Daily, Day 12, R. at 3196:2 – 3196:14.)   The Contractor's insurer, Westchester Surplus Lines Co. ("Westchester"), has responded to the claims made by the Church. (Id.)  As a result, Madrigal has not incurred any damages for repairs to the Church.  (See, Resp'ts Pre-hearing Brief, pp. 37-40.)  By contrast, Madrigal has failed and refused to make a claim as an additional insured against Westchester and has chosen, instead, to use the claim by the Church as an improper basis for continued withholding of Contract amounts due and owing to Foulger-Pratt/Travelers. (Daily, Day 12, R. at 3198:18 – 3199:9.)

Madrigal has failed to meet its burden to establish the extent of any alleged damage to the Church; the causation of said damage; or, the estimated costs of any necessary repairs.  What limited evidence was offered at the hearing in this matter in support of Madrigal's claims for damages related to the Church was presented during the testimony of Robert Knopf.  The testimony of Mr. Knopf regarding the Church, like the remainder of his testimony, was almost universally lacking in any helpful detail.  Specifically, Mr. Knopf testified generally that QDC

EXHIBIT 2

had received notification of complaints from the Church, notification of cracking and problems with the rear wall of the Church. (Knopf, Day 2, R. at 354:13 – 355:8.)  Madrigal, however, offered no photographs, reports or other evidence to establish the extent of any alleged damage. Madrigal also failed to meet its burden to establish that it has incurred, or will incur, any costs as a result of the alleged damage to the Church.

First, Madrigal did not submit any evidence to establish that Westchester has rejected, or intends to reject, the Contractor's claim or that the Church has taken any action whatsoever against Madrigal.  Mr. Knopf also admitted that Madrigal has neither performed nor authorized the performance of any repairs at the Church.[10]   (Knopf, Day 2, R. at p. 367:18 – 368:1.) Furthermore, Madrigal offered no evidence to establish any negligence, wrongful act or violation of the Contract by Glen, Foulger-Pratt or their subcontractors.  Finally, Madrigal has not submitted any evidence to support its claim for costs associated with work allegedly performed by Fernandez & Associates Structural Engineers.[11]   Thus, Madrigal is not entitled to any withholding for an unknown amount of costs that *may* be incurred at some unknown time in the future should Foulger-Pratt's insurer choose to deny its claim.  Therefore, Madrigal's claim for estimated costs associated with work that may be done at the Second Baptist Church must be denied.

---

[10] Madrigal's Outstanding Items Binder, revised February 2, 2009, includes an estimate for repairs of some unknown scope that was submitted to QDC by Hitt in June 2008.  Madrigal failed, however, to offer any evidence as to the scope of the alleged repairs or to establish that any costs were incurred.

[11] See, Pre-hearing Brief, at pp. 41 to 42 for discussion of Respondent's defenses to Madrigal's improper claim for Owner Time.

EXHIBIT 2

**E.** **Provide Positions and Identify All Contractual and Factual Support (Entitlement and Quantum) for "Condominium Association Punchlists" and "Unit Owner's Punchlists" and "Unit Owner's Punchlists for Unsold Units" (Count IV C. and D. of Madrigal's Itemization of Damages and Item 9 & 10 of Madrigal's Outstanding Items List, Revised February 2, 2009).**

Please see, <u>infra</u>, § III.B; §III.C.2.c; and Supplement F.

**F.** **Provide Positions and Identify All Contractual and Factual Support (Entitlement and Quantum) for "Utility Reimbursement" and "Design Team Additional Inspections" (Count IV B. and G. of Madrigal's Itemization of Damages and Items 12 f. & g. of Madrigal's Outstanding Items List, Revised February 2, 2009).**

*1.    Utility Reimbursement*

The Contract establishes the obligations of the parties regarding payment for utilities during construction.  Generally, the Contract provides that the Contractor is to pay for utilities until Substantial Completion.    (Cl. Ex. 2, General Conditions 3.13.3; Resp't Ex. 5, Specifications, § 01500.1.4.)    Specification § 01100.1.6 provides, however, that "[O]n occupancy, Owner will operate and maintain mechanical and electrical systems serving occupied portions of the building." (Respt's Ex. 5.)  Specification § 01100.1.6.A.1, provides further  that the, "Architect will prepare a Certificate of Substantial Completion for each specific portion of the Work to be occupied before Owner Occupancy."    (<u>Id.</u>)  Therefore, the Contractor is not required to pay for utilities in any portion of the Project that is occupied by the Owner, and thus considered to be substantially complete.

Madrigal's claim for recovery of alleged costs for "utility reimbursement" is insufficient and unsupported and must be denied.  First, the evidence adduced at the hearing establishes that Foulger-Pratt successfully met all of the conditions necessary to achieve Substantial Completion as of January 1, 2008, or is entitled to an extension of time.  Madrigal is not entitled to recover utility costs incurred after the Project was substantially complete or during periods of delay caused by Madrigal.  (<u>See</u>, <u>infra</u>, §§II, III.)  Secondly, Madrigal occupied much, if not all, of the

EXHIBIT 2

Project prior to both the Guaranteed Substantial Completion Date of January 1, 2008 and the Owner-recognized June 1, 2008 certified Substantial Completion date.   By June 1, 2008, Madrigal had sold and settled 89 units.  (Resp'ts Ex. 1005, at NCC-04.)  The homeowners and their guests used the lobby, elevators, exercise room, garage and all other common areas on a daily basis.  Madrigal also had taken the keys for all of the unsold units in February/March 2008 (Knopf, Day 4, R. at 1026:12 – 1027:7), effectively taking control of all units.   Units were actively being shown, sold and ownership was being transferred to Unit Owners.  Madrigal also was occupying Units as model units, storage units, sales offices and rental units prior to June 1, 2008.  (Norris, Day 10, R. at 2636:18 – 3637:19).  Notwithstanding these facts and the clear requirements of the Contract, the Architect did not issue a partial Certificate of Substantial Completion for any of the units that were sold and settled, any of the common areas, including the elevators, the units that were being used and occupied by the Owner until the Certificate of Substantial Completion was issued for the entire project on June 1, 2008.  (Knopf, Day 4, R. at 800:10 – 800:17; 804:13 – 804:21.)  Therefore, Madrigal is not entitled to reimbursement for any alleged utility costs incurred because Madrigal occupied the building prior to June 1, 2008.

Finally, Madrigal failed to meet its burden to establish the amount of the costs claimed for "utility reimbursement."  The sum total of Madrigal's evidence in support of its claim for "utility reimbursement" is the testimony of Mr. Knopf that the claim represents an accumulation of utility bills for all unsold units from January 1, 2008 through June 1, 2008.  (Knopf, Day 2, R. at 460:2 – 460:11..  Characteristically, Madrigal offered no documentary or testimonial evidence to support the amount claimed.  Indeed, Madrigal's single witness on this claim did not even mention the amount of the alleged "utility bills" sought to be recovered.  Madrigal also failed to submit into evidence any of the utility bills on which the claim is based.  Madrigal failed to

identify the "unsold units" or the time periods during which utilities are claimed for each unit. Madrigal failed to establish that the "unsold units" included in its claim do not include model units, storage units and sales offices and rental units occupied by Madrigal prior to June 1, 2008. Therefore, Respondents have been prevented from evaluating whether the claim includes costs incurred for areas already occupied by the Owner; whether the substantial utility costs associated with elevators, chillers and air handling units, which must be run continuously from the first day of occupancy are included in the costs claimed; and, whether the costs claimed are for utility usage or some other cost.  Finally, Madrigal failed to submit any evidence that it actually paid the amount claimed for utilities on the Project during the relevant period.  Therefore, Madrigal wholly failed to meet its burden to establish its entitlement to recover utility costs in any amount. Accordingly, Madrigal's claim for "utility reimbursement" must be denied in its entirety.

2.   *Design Team Additional Inspections*

Madrigal's claim for estimated costs for alleged "Design Team Additional Inspections" in the amount of $100,000 as set for in Count IV(b) of Madrigal's Itemization of Damages and Item 12(g) of Madrigal's Outstanding Items List, revised February 2, 2009, is speculative, overstated and unsupported by any provision in the Contract.[12]  Therefore, Foulger-Pratt and Travelers respectfully request this Panel to deny Madrigal's claim for estimated costs associated with "Design Team Additional Inspections."

A brief history of the changing claims for "Design Team Additional Inspections" asserted by Madrigal demonstrates the lack of merit of its claim.  As an initial matter, Madrigal did not assert any claim for "Design Team Additional Inspections" until December 23, 2008, more than

---

[12] Madrigal's claim for costs associated with "Design Team Additional Inspections" is duplicative, at least in part, of the costs claimed in Count II of Madrigal's Itemization of Damages, dated May 14, 2009.  Therefore, Madrigal's improper claims for the recovery of costs allegedly incurred for the preparation of the Gale Report also will be addressed herein.

EXHIBIT 2

six (6) months after the Madrigal's declaration of Substantial Completion on June 1, 2008.  At that time, Madrigal asserted a backcharge of $100,000, representing that it already had incurred $60,000 of that amount. (Resp'ts Ex. 625, at p. 4).   In support of the backcharge claim for "Design Team Additional Inspections," Madrigal attached "key contract provision," including Contract, Agreement, Paragraph 4.5, which was asserted as the sole basis for the claim for "Design Team Additional Inspections."  Id.  Madrigal did not provide any backup documentation in support of the claim.

On January 23, 2009, Madrigal provided its Outstanding Items binder.  Madrigal again claimed a backcharge of $100,000 for "Design Team Additional Inspections" and represented to Foulger-Pratt/Travelers that it already had incurred $60,000 of that amount.  The binder of documentation provided in support of the backcharge claims included the proposal from Gale & Associates for work to be performed for the amount of $31,600, but did not include any documents evidencing any payment to Gale or any other entity to support Madrigal's representation that  an additional $60,000 already had been incurred.

By Madrigal's February 2, 2009 submission of its Outstanding Items binder, the claim for "Design Team Additional Inspections" had been reduced to $31,600.  Madrigal still failed, however, to provide any documentation of the alleged additional costs incurred on the contractual basis for the assertion that these costs are the responsibility of Foulger-Pratt and Travelers.

Madrigal's evidence of the damages claimed for "Design Team Additional Inspections," as presented at the hearings in this arbitration, was even more inconsistent and insufficient. Accordingly, Respondents requests the Panel to issue an Award denying Madrigal any amount for the damages claimed.

EXHIBIT 2

First, Madrigal's claimed damages for "Design Team Additional Inspections" are duplicative, overstated and do not represent costs actually incurred by the Madrigal or QDC. Specifically, Madrigal has not yet incurred any amount approaching the more than $130,000 in costs related to alleged "Design Team Additional Inspections" claimed in this arbitration. Indeed, Robert Knopf conceded that the damages claimed were duplicative in at least two respects:  1) the $31,600 that Madrigal claims in Count IV as part of its $100,000 claim for "Design Team additional Inspections" is the same amount already claimed in Count II(a) for costs associated with the Gale Report.  (Knopf, Day 4, R. at 959: 11-20); 2) Mr. Knopf conceded further that the $31,600 fixed amount quoted by Gale for the preparation of its report also included an amount for Gale's performance of a post-report inspection.  (Knopf, Day 4, R. at 945:12 – 946:22.)  Therefore, the $7,500 claim in Count II for a post-report inspection also is duplicative and improper; Mr. Knopf also was forced to concede that Gale had failed to complete the work under its proposal by refusing to return to the site for the post-report inspection.[13]

Secondly, Madrigal failed to provide evidence to establish any payment for additional inspections by the Architect.  Following many requests by Mr. Davison for the issuance of invoices to Madrigal in the amount of $14,379.82.  (Cl. Ex. 674.)  During the hearing in this arbitration, however, Madrigal failed to offer any documentary or testimonial evidence to establish that the invoice actually has been or even will be paid.  Indeed, the DCS invoice for work allegedly performed in March and April 2009 also references invoices for additional amounts for work allegedly performed in the same time period that previously had been invoices, but for which Madrigal had not yet chosen to pay. (Id.) Madrigal's presentation of invoices

---

[13] The amounts claimed in Count II(c) of Madrigal's Itemization of  Damages, dated May 14, 2009 in the estimated amount of $35,000 for work allegedly to be performed by Clay C. Ewell have been withdrawn for the purposes of this hearing and the Order to be issued by the Panel.  Therefore, these claims will not be addressed herein.  (Day 11, R. at 2887:18 – 2890:5.)

EXHIBIT 2

obviously prepared and presented solely for the purposes of arbitration, and without any evidence that the invoices actually have been, or would be, paid, is wholly insufficient to establish any amount of damages in support of an award in arbitration.

Finally, Madrigal has not identified any valid contractual basis for recovery of any of the costs claimed in Count II or Count IV for the work performed on the Gale Report or for "Design Team Additional Inspections."  As an initial matter, Madrigal has not and cannot identify any contractual provision to support its claim for damages for work performed by Gale.  The Contract simply does not include any provision which would require the Contractor to reimburse Madrigal for the costs incurred to prepare the Owner's punch-list.  The decision to retain Gale to perform yet another exterior punch-list was Madrigal's, and Madrigal's alone, therefore, the costs associated with such work must be borne by Madrigal.  The Contract will not support Madrigal's decision to abuse the punch-list process by issuing numerous untimely punch-lists on the exterior of the Project.[14]

Madrigal also has not identified any valid basis for recovery of the estimated costs alleged for "Design Team Additional Inspections."  Madrigal has asserted Contract, Agreement, ¶ 4.5 as the sole basis for its "Design Team Addition Inspections" backcharges.

Contract, Agreement, Paragraph 4.5 provides in pertinent part as follows:

> Contractor shall be responsible for the Architect's inspection fees should the project not be Substantially Complete by the date Contractor calls for the Substantial Completion inspection.

This Provision will not support Madrigal's claim.

The costs identified in support of Madrigal's claim for $100,000 as performed by the Architect amount to only $14,379.82 and relate to work allegedly performed in March and April

---

[14] For a full discussion of Madrigal's abuse of the punch-list process for the exterior of the building, see Brief, infra, §III.C.2.

EXHIBIT 2

2009 – more than 9 months following Madrigal's June 1, 2008 issuance of the Certificate of Substantial Completion.   Obviously, whatever work was performed by the Architect in March/April 2009 bore no relation whatsoever to any call for a Substantial Completion inspection by Foulger-Pratt.

Perhaps more importantly, Madrigal has failed to offer any evidence to establish that the work allegedly performed by the Architect in 2009 is the responsibility of Foulger-Pratt/Travelers.   During the hearing, Madrigal failed to offer any evidence describing the work allegedly performed by DCS.   When asked about his invoice, Mr. Carter could only apologize that he had not issued additional invoices and promised to provide further invoices.[15]   Mr. Carter certainly never provided any detail regarding any alleged work performed.   (Carter, Day 6, R. at p. 1597:14 – 1599:12.)   Madrigal also failed to meet its burden to establish that the costs claimed for "Design Team Additional Inspections" actually relate to "additional" work performed by the Architect.   In other words, there is absolutely no specific evidence to establish that any of the work allegedly performed by the Architect was the result of any breach or violation of the Contract by Foulger-Pratt/Travelers.   Moreover, there is no evidence that any of the "inspections" or "reviews" allegedly performed by the  Architect in March/April 2008 are not simply the same inspections already anticipated by the Contract, and requested by Foulger-Pratt, but now performed in 2009 as a direct result of Madrigal's ongoing effort to obfuscate and delay Foulger-Pratt's efforts to reach Final Completion.

Madrigal has not presented any evidence or contractual basis to establish its entitlement to the recovery of any amount for "Design Team Additional Inspections."   Therefore, Respondents respectfully request this Panel to deny Claimant's demand for damages in Counts II and IV of the Itemization of Damages, dated May 14, 2009.

EXHIBIT 2

**G.** **Provide Positions and Identify Any Incomplete "Contract Close Out Items" (Count VI a. of Madrigal's Itemization of Damages and Item 15 of Madrigal's Outstanding Items List, Revised February 2, 2009), If Any.**

As of Sept. 10, 2009 we have not received confirmation from Madrigal that this claim has been withdrawn.  Accordingly, we provide the following:

All close-out documents required by the Contract have been provided.  Please refer to Supplement G – Madrigal Closeout Documents, which contains a listing of the exhibits indicating where, within the records, Foulger-Pratt has complied with each referenced requirement.  See also Resp'ts 1032 (letter regarding satisfaction of indebtedness); Resp'ts Ex. 1033 (letter regarding continuing insurance); Resp'ts Ex. 1034 (letter regarding lien releases/final payment and offer of indemnity/escrow agreement).

**H.** **Provide Positions Regarding Legal Ramifications for All Change Orders and Lien Waivers and Releases Signed by Madrigal and/or Foulger Pratt.**

*1.* *The Change Orders Executed by Foulger-Pratt, Madrigal and the Architect Do Not Have Any Legal Effect on Foulger-Pratt's and Travelers' Defenses to Madrigal's Claim for Liquidated Damages.*

The Change Orders signed by the Foulger-Pratt, Madrigal and the Architect following the Guaranteed Substantial Completion Date (CO's 20–25), which manifested Madrigal's prior directives to perform changed and additional work, have no legal ramifications on Foulger-Pratt's and Travelers' defenses to Madrigal's claim for liquidated damages.  In Change Orders 20 – 25 [Resp'ts Ex. 149, 297, 298, 299, 300, 375 (FP004757)], Foulger-Pratt neither waived its entitlement to a time extension for Madrigal's delays to Substantial Completion, nor waived its right to challenge Madrigal's assertion of liquidated damages.  (See also Resp'ts Binder entitled "Late-Arriving Change Orders.")  As it can be seen on all of the color copies of the change orders at issue, Foulger-Pratt was the first party to sign the documents, containing the phrase:

---

[15] Madrigal did not introduce any further invoices during the hearing.

EXHIBIT 2

> [t]he Contract Time will be changed by TBD (    ) days

(Resp't's Ex. 149, 297, 298, 299, 300, 375 (FP004757).)

In each instance, Madrigal was the last party to sign the change orders, with Mr. Brungart striking the "TBD" and unilaterally entering a zero within the parentheses before days.  (Id.)  By way of example, Mr. Brungart acknowledged his unilateral modification to Change Order 23 during his testimony:

> Q.   Now, again, the contractor had contract time will be changed by and it says TBD and that's struck and zero days is entered?
>
> A.   Yes, You need to back up to the change order in order to talk about the hours and so forth.  Everything was decided on that change order -- it was a three way split between the contractor, the control contractor and the mechanical contractor.
>
> MR. BRASCO:  Again, I'm going to ask for the answer to be struck and ask the witness to attend to the questions.
>
> ARBITRATOR NESS: Let's go on.  Please do answer the question, Mr. Brungart.
>
> THE WITNESS:  Yes.

(Brungart, Day 6, 1424:4 – 1424:18.)

Madrigal's alteration of the change order forms after Foulger-Pratt provided its agreement to execute them was never authorized by Foulger-Pratt.

In addition, Change Orders 20 – 25 were prepared on the standard AIA Change Order form, Document G701-2001, which does not contain any language that limits or waives any of Foulger-Pratt's rights or defenses against Madrigal.  (See Resp'ts Ex. 149, 297, 298, 299, 300, 375 (FP004757).)  Even if the Change Orders with Madrigal's unilateral modifications are found to release Madrigal from affirmative claims for time extensions, the release would not have any impact on Foulger-Pratt's position that Madrigal improperly assessed liquidated damages.  As Foulger-Pratt and Travelers explained in their Pre-Hearing Brief, Foulger-Pratt was not under any obligation to preserve an affirmative claim for delay to maintain its defenses to Madrigal's

EXHIBIT 2

claim for liquidated damages.  <u>E.R. Stone v. City of Arcola</u>, 536 N.E.2d 1329, 1337 (Ill. App. 1989) ("the failure of plaintiff [contractor] to give written notice of the delay may be considered a waiver of a claim for delay, but the waiver of a claim for delay does not correspondingly dictate that the party waiving the delay be held liable for the delay"); <u>see</u> <u>also</u> Resp'ts Pre-Hearing Brief, §III.C.2, pg. 12.

Thus, Foulger-Pratt did not waive any right to challenge Madrigal's claim for liquidated damages by executing Change Orders 20 – 25 after the Guaranteed Substantial Completion Date. Foulger-Pratt's authorization of these Change Orders therefore do not bar consideration of Foulger-Pratt's position that Madrigal is not entitled to recover any liquidated damages.

> 2.   *Foulger-Pratt's Delivery of Release of Liens and Waiver of Claims, Which, By Their Terms Are Conditioned Upon Payment, Do Not Have Any Effect on Foulger-Pratt's Defenses to Madrigal's Claim for Liquidated Damages, or Foulger-Pratt's Extended Performance Claim Commencing on June 1, 2008.*

The General Contractor Partial Release of Lien and Waiver of Claim forms that Foulger-Pratt provided to Madrigal in support of Payment Applications Nos. 27 and 28, cannot be relied upon as a means to find Foulger-Pratt's mechanic's lien filing in December 2008 to be improper, to bar Foulger-Pratt's defenses to Madrigal's claim in this arbitration, or to prevent Foulger-Pratt's recovery of direct extended performance costs.   Several features of the General Contractor Release of Lien and Waiver of Claim (Partial) form ("GC Partial Lien Waiver"), which Foulger-Pratt executed in conjunction with then outstanding payment applications, demonstrate that Foulger-Pratt preserved the right to file a mechanic's lien in December 2008, as well as all of the rights and defenses asserted in this arbitration.  As an initial matter, the GC Partial Lien Waiver provides that the release and waiver of the right to file a mechanic's lien is "conditioned only upon payment" of the amount sought in the "contemporaneous Application for Payment/Cost Certification."  [Cl. Ex. 2, Ex. K (MC000016465).]  Since Madrigal failed and

EXHIBIT 2

refused to release payment to Foulger-Pratt for Application for Payment No. 27 - 29 as of December 2008, Foulger-Pratt did not contemporaneously waive any right to file a mechanic's lien against the property for the total amount sought in those payment requisitions ($2,636,469) by submitting the GC Partial Lien Waiver in support thereof.

With the GC Partial Lien Waiver form being effective upon payment which was not received, Foulger-Pratt also has not waived or released "all actions, debts, claims and demands against owner on account of all work, services, equipment and materials performed and furnished" under the Contract, which would include its present claim for direct extended performance costs. [Cl. Ex. 2, Ex. K (MC000016465).] In addition, Foulger-Pratt has reserved all of its defenses to Madrigal's claims in this arbitration notwithstanding the execution of GC Partial Lien Waiver forms corresponding to Application for Payment Nos. 27 – 29. The GC Partial Lien Waiver form only refers to the General Contractor's waiver and release of affirmative actions against the Owner and the Project, i.e. the right to file a mechanic's lien, actions, debts, claims and demands. [Cl. Ex. 2, Ex. K (MC000016465).] On the other hand, the GC Partial Lien Waiver form is silent regarding the General Contractor's waiver of its defenses, or acquiescence, to "actions, debts, claims and demands" made by the Owner. (Id.) Thus, Foulger-Pratt's submission of GC Partial Lien Waiver forms to support Application for Payment Nos. 27 – 29 cannot preclude Foulger-Pratt from presenting defenses to Madrigal's claims in this arbitration, including its improper assertion of liquidated damages.

The foregoing analysis is unaffected by Madrigal's payment of amounts owed under Application for Payment No. 27 after the Parties executed the Agreement of Partial Settlement in February 2009. By the time Madrigal paid $50,210 under Application for Payment No. 27, the parties had already agreed as part of the APS to arbitrate the Parties' claims and Foulger-Pratt

EXHIBIT 2

had voluntarily removed the mechanic's lien from the property. (Daly, Day 12, R. at 3227:15 –
3227:20.)  In this regard, even if the GC Partial Lien Waiver could be construed otherwise, the
third paragraph of the form excepts claims submitted to Madrigal in accordance with the
Contract.   [Cl. Ex. 2, Ex. K (MC000016465).]   As Madrigal has only challenged in this
arbitration Foulger-Pratt's entitlement to direct extended performance costs, the applicability of
this exception in the GC Lien Waiver could not rightly be challenged.

     Moreover, the GC Lien Waiver previously submitted for Application for Payment No. 27
has no effect on Foulger-Pratt's entitlement to its direct extended performance costs.  The GC
Partial Lien Waiver provided for Application for Payment No. 27 "waives and releases all
actions, debts, claims and demands against Owner … as of and including the last day of the
month of General Contractor's current Application for Payment/Cost Certification for which is
being paid.…"  [Cl. Ex. 2, Ex. K (MC000016465).]  This waiver and release, if effective in this
instance, would therefore only cover the period to March 31, 2008.  (Resp'ts Ex. 224.)  As
Foulger-Pratt has posited its entitlement to direct extended performance costs beginning on June
1, 2008 (Norris, Day 10, 2728:15 – 2728:9), Foulger-Pratt did not waive the right to recover
these costs by accepting payment for Application for Payment No. 27 in March 2009.

EXHIBIT 2

I.      **Provide Basis for Travelers Casualty and Surety Co.'s Decision to Allow Foulger-Pratt "To Reach Substantial Completion of the Remaining Work... Within 95 Calendar Days" After the Date of the Assignment Agreement (Articles 5 and 10 of the Assignment Agreement).**

As a potential completion contractor considering whether to enter a project very late in the construction period, Foulger-Pratt had no reason to take on full liability for liquidated damages.  In fact, Travelers would have been hard-pressed to find any contractor who would step into such liability when undertaking to complete a project.

Traveler's Mr. Greg Daily, who was involved in negotiating the Assignment Agreement and signed the agreement on behalf of Travelers, testified that, in requesting this 95-day period, Foulger-Pratt was taking a conservative view regarding its assumption of risk and that this was a condition of reaching an agreement:

> Q: It appears those negotiations went over a couple months.   Is that the case?
> A: Yes, that is the case.
> Q: I'm going to turn your attention to Article 5 of the agreement?
> A: Okay.
> Q:  What is your understanding of paragraph 5.1 and why was that paragraph in the agreement?
> A: Yes.  Through the negotiations, Foulger-Pratt requested 95 calendar days to complete from this date.  It was done for the purpose of any assumption of risk regarding any liquidated damages.
> Foulger-Pratt was coming into the project late in it, was taking a very conservative view and wanted to establish the rights between the parties regarding any potential liquidated damages.

(Daily, Day 12, R. at 3183:9 – 3184:5.)

However, both Mr. Daily and Mr. MacClary stressed that this did not affect Travelers' or Foulger-Pratt's commitment to strive to satisfy the Substantial Completion requirements of the construction Contract.  Notwithstanding a mischaracterization of the assignment agreement on cross-examination, Mr. MacClary testified that Travelers and Foulger-Pratt have maintained a

EXHIBIT 2

relationship over twenty-five years, and that Foulger-Pratt's obligation was to open the building

on time, according to the construction Contract:

> A:  I don't agree that there was no risk, no.  I have a relationship –
> Q:  If you didn't make the date?
> A:  I have a relationship with Travelers and to not make the date they needed me to make was great risk to me.
> Q:  In your agreement with Travelers?
> A:  Yes.
> Q:  It says expressly, does it not, that if you don't meet the December 31, 2007 date for Substantial Completion, Travelers is going to hold you harmless for liquidated damages; right?
> A:  I would want to read that because, it may say something like that, but when you take on a project like this and you know what the dates are and you're working with your surety, 25-year relationship, it was never my intention as a manager to not make that building opening date on behalf of the guy that I was working for.
> Q:  You remember in your deposition that we went over this, the paragraphs on the fact that your company had no financial risk if you missed the December 31, 2007 date.  Do you want me to go back and read the questions to you?
> A:   If you would like to, but to me, Dennis, financial risk is not the only risk we take as contractors and business people.
> Q:  Let's look at it from the financials.
> A:  Financial is sometimes the smallest risk I take.

(MacClary, Day 8, R. at 2128:8 – 2122:18.)

> Q:  John Barron, Foulger-Pratt, was not going to be held liable if didn't achieve Substantial Completion until February 1, 2008 and the Owner assessed liquidated damages, under your agreement with Travelers you wouldn't be liable; right?
> A:  But again, the agreement says that I would not be liable, but that's not the agreement we were living with Travelers.  We were going to open that building on time.   That was our commitment to Travelers.

(MacClary, Day 8, R. at 2133:7 – 2133:17.)

Mr. Daily also testified that the 95-day period in the agreement did not change the obligations to

meet the Guaranteed Substantial Completion Date:

EXHIBIT 2

> Q: Was it your understanding – what understanding did you have as to whether or not it changed the obligations under the construction contract to meet Guaranteed Substantial Completion?
>
> A: It did not change.

(Daily, Day 12, R. at 3184:6 – 3184:11.)

The evidence presented during the hearings demonstrated Travelers' and Foulger-Pratt's commitment to meet the completion obligations as defined by the construction Contract, and that the 95-day period amounted to nothing more than a risk shifting mechanism for delay as between Travelers and Foulger-Pratt.

DATED: September 11, 2009                    Respectfully Submitted,

Kathleen Olden Barnes, Esq.
Christopher J. Brasco, Esq.
Adam M. Tuckman, Esq.
Watt, Tieder, Hoffar
 & Fitzgerald, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, VA  22102
Telephone:  703-749-1000
Facsimile:  703-893-8029
kbarnes@wthf.com
cbrasco@wthf.com
atuckman@wthf.com