EXHIBIT 19

**DISTRICT OF COLUMBIA:**

<div align="center">

**ARBITRATION**

</div>

| | |
|---|---|
| In re Arbitration between:       ) | |
|       ) | |
| **MADRIGAL CONDOMINIUMS, LLC,**   ) | |
|       ) | |
|     **Claimant,**       ) | **PANEL:** |
|       ) | **Andrew D. Ness, Esq. (Chair)** |
|   **v.**       ) | **Charles M. Asmar, Esq.** |
| **FOULGER-PRATT RESIDENTIAL**   ) | **Judith B. Ittig, Esq.** |
| **CONTRACTING, LLC**       ) | |
|       ) | |
|     **Respondent/Counter-Claimant,**   ) | |
| **And**       ) | |
|       ) | |
| **TRAVELERS CASUALTY & SURETY**   ) | |
| **CO. OF AMERICA**       ) | |
|       ) | |
|     **Respondent.**       ) | |

<div align="center">

**CLAIMANT MADRIGAL CONDOMINIUMS, LLC'S
PRE-HEARING BRIEF**

</div>

Claimant Madrigal Condominiums, LLC ("Madrigal") submits this pre-hearing brief regarding the issues identified by Madrigal and Respondent/Counter-Claimant Foulger-Pratt Residential Contracting, LLC ("Foulger-Pratt") and Respondent Travelers Casualty & Surety Co. of America ("Travelers") in their respective Statements of Claims and Defenses, which are incorporated herein by reference. As requested by the Panel, this pre-hearing brief provides a summary of the applicable legal authority and a brief discussion of evidence for this arbitration.

<div align="center">

**Introduction**

</div>

This arbitration arises out of disputes related to the contract, dated July 7, 2005, between Madrigal, as Owner, and Glen Construction Company, Inc. ("Glen"), as Contractor (the "Contract"), for the construction of a 259 unit condominium building (the "Project"). The

EXHIBIT 19

Contract was later assigned to Foulger-Pratt, who assumed all obligations and liabilities of Glen under the Contract.   Travelers provided the Performance and Payment Bonds for the Project (the "Bonds").

In 2007, Glen notified Travelers, who had provided the Performance and Payment Bonds for the Project[1] that it had not paid its subcontractors approximately 2.3 million dollars it had received from the Owner and that it could not continue to pay its own overhead and complete the Project without financial assistance. Travelers decided to pay subcontractors but not fund Glen to continue.   Travelers then caused the Contract to be assigned to Foulger-Pratt pursuant to that certain Consent to Assignment dated December 12, 2007.

In 2008, Madrigal gave Foulger-Pratt notice under the Bonds that the Contractor had not met and was continuing to fail to meet many of its obligations under the Contract.   Madrigal claims that Travelers failed to meet its obligations under the Bonds, and continues to do so. Madrigal claims in this proceeding that Foulger-Pratt and Travelers breached and continue to breach their respective obligations under the Contract and the Bonds, that they have not completed the Project as required by the Contract, that they continue to fail to perform, and that Madrigal has suffered and will continue to suffer damages.   Foulger-Pratt asserts that it was due full and final payment under the Contract in October, 2008.

Pursuant to the Contract provisions regarding disputes, on January 23 and 30, 2009 and February 2, 2009, the parties attended mediation sessions at JAMS before the Honorable Curtis E. von Kann to mediate certain disputes that arose under the Contract and Bonds.   On February

---

[1] Travelers, as Surety, issued both a Performance Bond 104629783 (the "Performance Bond") and Payment Bond 104629783 (the "Payment Bond") (collectively, the "Bonds").

EXHIBIT 19

2, 2009, the parties executed an APS that set forth their agreements on certain issues and deferred other disputes to later resolution. A copy of the APS has been provided to the Panel.

Certain additional disputes have arisen under Section 15 of the APS. Further, additional claims have arisen, which the Panel has stated would not be ripe for adjudication.

### Statement Of The Case

The key documents in this arbitration are (i) the Contract for the construction of the Project; (ii) the Bonds; and (iii) the APS, each of which is discussed herein.

1.    The GMP Construction Contract[2]

Although it would be impracticable to fully outline the Contract in this pre-hearing brief, a summary of some of the key provisions appears below.[3] Madrigal believes that the evidence at the arbitration hearing will clearly show that Foulger-Pratt failed to meet its contractual obligations. Such evidence of breach is discussed more fully in Section I, infra.

(a)    Relationship between the Parties under the Contract

The Contract embodies a strong principle of cooperation between the Owner, Development Manager, Architect and Contractor and requires a "relationship of trust and confidence" and acknowledges that "time is of the essence." (See generally, Agreement 3.1; General Conditions 8.2.1.) In furtherance these principles, Contractor must "diligently" perform the Work, even in the event of a dispute between the parties. (General Conditions 4.3.3.) Specifically, the Contractor must "furnish at all times an adequate supply of workers and materials" and "perform the Work in an expeditious and economical manner consistent with

---

[2] It is undisputed that the Contract was assigned to Foulger-Pratt as Contractor pursuant to that Consent to Assignment dated December 12, 2007.

[3] During the arbitration, Madrigal may rely on provisions of the Contract that are not discussed herein.

Owner's interests." (Id.)  "Such [workers] shall be qualified to perform in a first-class manner, shall be Contractor's 'best team,' and shall be knowledgeable." (Agreement 2.3.4.)

Contractor also has full responsibility for the site, including, inter alia, "supervising, coordinating, managing and performing the Work, including subcontracted work, and the performance of all other acts and services necessary for construction and completion of the Project in strict compliance with the Contract Documents." (See Agreement 2.3.3.)

Contractor also has an absolute duty to "further[] the interests of the Owner." (Agreement 3.1.)  In order to protect said interests, the Contract provides that "in no event shall Contractor at any time file a lien of any kind against the Project." (Agreement 14.6, emphasis added.)  Similarly, to protect the Owner "in the event [that] any Subcontractor files a lien of any kind against the Project, Contractor immediately shall bond off said Subcontractor lien." (Id.) Contractor also must "indemnify, hold harmless and defend Owner . . . from and against any and all claims, damages, losses, costs and expenses, including attorneys' fees" in the event of a "violation of this Agreement, the Contract Documents, or law by Contractor or its agents, officers, employees, or Subcontractors regardless of whether or not it is caused in whole or in part by a party indemnified hereunder." (General Conditions 3.18.)

The evidence will show that Foulger-Pratt violated the spirit of trust by, inter alia, filing its own lien against the Project and failed to meet its other indemnification obligations.

(b)     Scope of the Work under the Contract

The "Work" is a clearly defined term under Article 2 of the Agreement.  Agreement 2.2 provides that the Contractor "shall undertake, manage, perform and complete the Work to construct the Project in strict compliance with the Contract Documents, including, but not limited to, [] the "Drawings and Specifications"[] set forth in Exhibit A and in Exhibit A-1. "The 'Work' includes the construction and completion of the Project and the performance by

Contractor of all its undertakings and obligations under the Contract Documents." (Agreement 2.1.)

The Work, as specifically defined in Article 2, includes (but is not be limited to) numerous specific requirements, including, inter alia, the requirements that the Contractor: (1) "[P]reserv[e] and protect[] . . . 'adjacent Properties' [including] the Second Baptist Church;" (2) "Supervis[e], coordinat[e], manag[e] and perform[] the Work, including subcontracted work, . . . in strict compliance with . . the Contract Documents . . . (Agreement 2.3.3); (3) "[P]rovide all necessary personnel [that] shall be qualified to perform in a first-class manner, shall be Contractor's 'best team,' and shall be knowledgeable in all applicable industry standards and practices and laws." (Agreement 2.3.4); (4) "Procur[e] and expedit[e] services under Paragraph 2.3.3 in connection with the Work." (Agreement 2.3.7); (5) Mak[e], enter[] into and enforc[e] [] agreements with Subcontractors [and] schedul[e] and coordinat[e] [] the performance of said Subcontracts. (Agreement 2.3.9); (6) Keep[] accounts and cost records [and] provide the Development Manager  with a [monthly] Cost Report Summary . . . . (Agreement 2.3.12); (7) Prepar[e] and perform[] all punch-list Work, including Contractor's Punch List, the Owner's Punch List, the Condominium Unit Owners' Punch Lists and the Condominium Association's Punch List, as defined and as required under Article 4 [of the Agreement]. (Agreement 2.3.15); (8) "Perform[] all warranty work . . . ."  (Agreement 2.3.16); and (9) "Supply[] all labor, materials and services necessary for the proper and complete performance of the Work, including all items that are consistent with and reasonably inferred by the Drawings and Specifications and all Addenda and other Contract Documents . . . ." (Agreement 2.4, emphasis added.)

    (c)    <u>Substantial Completion</u>

Substantial Completion is defined, inter alia, as the "date when the Work has been fully and finally complete, with the only exception being any outstanding Owner's Punch List, or

items thereon, in strict compliance with the Contract Documents, as approved by the Development Manager and Architect," and:

> the state of completion is such that (1) Owner can fully and freely occupy or utilize the Project for the purpose intended without hardship, (i.e. that Owner can use all areas, all elevators, parking spaces, roads, sidewalks, and exercise room; (2) all normal means of ingress and egress are clear of obstruction; (3) all fire life safety systems are complete and operable; (4) the exterior skin of the building is watertight and all site work has been substantially completed; (5) all elevators are in operation, have certificates of use, are in compliance with the requirements of the Drawings and Specifications . . .; and (7) [the Contractor] shall have obtained all final Certificates of Occupancy for the Project . . .

(Agreement 4.5.)

Under the Contract, Contractor is required to "give reasonable advance notice to the Development Manager and Architect as to when it believes the Project will reach Substantial Completion so that the Development Manager and architect can timely inspect the Project so as to determine whether the Project has reached Substantial Completion." (Id.) Additionally, "[p]rior to the Date of Substantial and Final Completion, Contractor shall provide to Development Manager a certified statement of the Final Cost of the Work." (Agreement 12.2.3.) At the time "[w]hen Contractor considers that the Work . . . is substantially, complete, Contractor shall prepare and submit to the Development Manager and Architect a comprehensive list of items to be completed or corrected prior to final payment" -- i.e. a Contractor's Punch-List. (General Conditions 9.8.2.)

Should the Contractor fail to achieve Substantial Completion of the Project by the Guaranteed Substantial Completion Date, the Contractor is liable for liquidated damages in "the sum of $1,000.00 per day for the first fifteen (15) days, $2,000 per day for the 16th day through the 30th day and $3,000.00 per day thereafter" up to and including the certified Substantial Completion Date.

EXHIBIT 19

The Development Manager and Architect certified June 1, 2008 as the date the Project obtained Substantial Completion in accordance with the Contract, 153 days after the Guaranteed Substantial Completion Date. Accordingly, Foulger-Pratt is liable to Madrigal for liquidated from January 1, 2008 through June 1, 2008.

(d)     Final Completion

Final Completion of the Project has not yet occurred. Under Agreement 12.2.1.1, the Contractor has achieved Final Completion of the Project when (1) the "Contractor has fully performed all of the Work and met all of the requirements of the Contract Documents, except for Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of [the General Conditions];" (2) "A final Certificate for Payment has been issued by the Architect and the Development Manager and a Completion Certificate (Exhibit T) has been executed by all parties;" and (3) "The conditions set forth in Article 12.2.6 have been met." Contractor must also submit a "certified statement of the Final Cost of the Work" to the Development Manager prior to the date of Final Completion. (Agreement 12.2.3.) Thus, Final Completion occurs only once the Work is fully performed and Contractor has fully complied with its obligations precedent to Final Payment as set forth in Article 12.2.6 and 12.2.3. (Id.; Agreement 12.2.1.1.) For a more full enumeration of conditions for Final Completion, see Section 1(d)(ii), infra, governing Final Payment.

(e)     Development Manager's Performance and Acceptance of Work

Under the Contract, the Development Manager has the right to inspect and test the Work and to reject non-conforming Work. The Contract provides the Development Manager with the "exclusive authority to reject or accept Work that does not conform to the Contract Documents." (General Conditions 4.2.6.) The Development Manager has the authority to order the Contractor to perform additional "inspection or testing of the Work, however it is not required to exercise

such authority.  (Id.)  In the event the Development Manager decides not to require the Contractor to perform such additional testing and inspection, but assigns such work to another entity, no "duty or responsibility of the Development Manager to Contractor" exists.  (Id.)

The Development Manager has an absolute right to inspect work under the Contract and to enter into separate contracts for the performance of Work.  Agreement 12.1.10 provides that "Contractor shall afford the Development Manager . . . access to the Project Site and shall take such other steps as they deem necessary to timely and completely verify the Work performed . . . ."  The Development Manager must also "determine[] that the Work . . . is fully and finally complete in strict compliance with the Drawings and Specifications and other Contract Documents" and "may at any time take such action as [the Owner] deems appropriate to verify that the conditions precedent to Final Payment have been satisfied."  (Agreement 12.2.6(b), 12.2.7; see also General Conditions 9.10.1.)  The Development Manager may "request to examine" any "portion of the Work [that] has been covered" and once such "request to see such Work [is made] it shall be uncovered by Contractor."  (General Conditions 12.1.2.)  The Contract also expressly provides that the "Owner reserves the right to perform construction or operations related to the Project with Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site."  (General Conditions 6.1.1.)

The evidence will show that the Owner rejected non-conforming Work and exercised its contractual rights to inspect and correct said Work.

(f)    Occupancy of the Project Prior to Substantial and Final Completion

The Contract provides that "Owner[,] its Condominium Unit Purchasers or authorized entities, including the Development Manager, may occupy or use any completed or partially completed portion of the Work at any stage when such portion becomes available . . . Such

- 8 -

EXHIBIT 19

partial occupancy or use may commence whether or not the portion is substantially complete."
(General Conditions 9.9.)

      (g)    <u>Payments under the Contract</u>

      Payments under the Contract occur only after both the Development Manager and Architect issue Certificates for Payment and the fulfillment of numerous conditions set forth in Articles 12.1 and 12.2. "The Architect's review and approval [of 'Contractor's Applications for Payment'] shall be advisory and for recommendation purposes only." (General Conditions 4.2.6.) Under General Conditions 4.2.6, the Development Manager has "exclusive authority to reject or accept Work that does not conform to the Contract Documents."

      (i)    <u>Progress Payments</u>

      Agreement 12.1 governs Progress Payments under the Contract. As a condition precedent to payment, <u>inter alia</u>, "[e]ach Application for Payment . . . shall be accompanied by the following (each of which shall be a condition of payment):" "A Contractor's Application for Payment and Cost Certification Statement;" "A monthly schedule update showing in comparison to the original Project Progress Schedule the current progress of all aspects of the Work," "From each Subcontractor to whom payment has been previously made, a fully executed (Partial) Release of Lien and Waiver of Claim form," "Such other documentation as required by the Contract Documents," "Documentation showing the Architect's written approval of the Work for which application for payment is sought" and "Such other documentation that the Development Manager may require." The inability of Foulger-Pratt to meet these enumerated conditions resulted in the rejection of Applications for Payment 26, 27 and 28.

      (ii)    <u>Final Payment</u>

      Agreement Article 12.2.6 and General Condition 9.10.2 specify numerous conditions that must be met prior to Final Payment (<u>i.e.</u> prior to Final Completion under Agreement 12.2.1.1).

EXHIBIT 19

These conditions include the delivery of numerous Contract close-out documents, including, inter alia, (1) "a written, unconditional consent to [Final Payment] by the issuer of the bonds guaranteeing performance and payment under the Contract Documents;" (2) "the Project Manual as set forth in the General Conditions, Article 1, including but not limited to all warranties and operation and maintenance manuals applicable to the Work;" (3) "executed final Release of Lien and Waiver of Claim, (Exhibit K), from Contractor, and each and every Subcontractor;" (4) "'As-Built' Drawings and Specifications showing all of the Work, including all changes, locations and installations for the Development Manager's approval and acceptance;" (5) "a statement  from Contractor that there exist no pending or threatened claims of third parties against Owner or the Development Manager relating to the Work, or for which Owner or Development Manager may be liable, which are unresolved; and (6) the "inspection report [by the 'Inspector engaged by the Project Lender'] that the Work is fully and finally complete in strict compliance with the Drawings and Specifications and other Contract Documents." (Agreement 12.2.6(a), (c)-(g).)  They also include, inter alia, submittal of (1) "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work . . . have been paid or otherwise satisfied;" and (2) "other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract." (See General Conditions 9.10.2.)

Additional conditions that must be met under Agreement 12.2.6 prior to Final Payment (i.e. a determination that the Work is fully and finally complete) also include, inter alia, (1) a determination by the Development Manager and Architect "that the Work (including the existing Condominium Association Punch List, Unit Owner's Punch Lists and Condominium Warranty Items) is fully and finally complete in strict compliance with the Drawings and Specifications

and other Contract Documents;" (2) the extinguishing and returning of "all deposits and bonds posted by Owner;" and (3) that "Contractor shall have met all of its insurance, indemnification and all of its other obligations under Contract Documents." (Agreement 12.2.6(b), (h)-(i).)  Prior to Final Completion, the Contractor must also "provide to Development Manager a certified statement of the Final Cost of the Work." (Agreement 12.2.3.)

The evidence will show that Foulger-Pratt failed to meet numerous conditions precedent to Full and Final Payment, which resulted in the denial of Application for Payment 28.

2.     The Performance and Payment Bonds

As required under the Contract, Travelers issued both a Performance Bond 104629783 (the "Performance Bond") and Payment Bond 104629783 (the "Payment Bond") (collectively, the "Bonds").  These Bonds ensure that Foulger-Pratt comply with its contractual obligations. Despite the issuance of these Bonds, and notice of Contractor default provided by Madrigal, Travelers has failed to ensure that Foulger-Pratt carry out the Work is strict compliance with the Contract Documents.  Accordingly, Travelers is jointly and severally liable to Madrigal for damages caused by Foulger-Pratt's breaches of contract, and that fact will not be repeated herein.

3.     The Agreement of Partial Settlement

Foulger-Pratt agreed "to complete by April 30, 2009, all punch-list items included within Items 1-8 set forth on the 'Madrigal Outstanding Items' list dated February 2, 2009, (said lists being included in the binder provided by Madrigal to Foulger-Pratt on January 23, 2009 and updated on February 2, 2009 . . .)." (APS ¶ 5.)  And, Item 6, entitled "Exterior Skin and Roof," listed the "Gale Reports dated 10/02/2007 and 11/18/2008" as within its scopes of work.  Item 6 also includes numerous deficiencies identified on a CD of photographs provided by the development Manager.  Foulger-Pratt now claims that the completion of certain items (which are specifically identified by the GALE Reports either as "specific" or "general" deficiencies) are

- 11 -

EXHIBIT 19

outside the scope of its obligations under the Contract.  It has not remedied the items identified in

the photographs.  Consistent with the Item 6 punch-list work requirement, Foulger-Pratt agreed

to "complete by April 30, 2009, the items in the Gale report that are within the scope of the

existing Contract Documents and required by the Contract." (APS ¶ 15.)  The parties agreed to

address "[a]ny dispute regarding the Contract requirements or Foulger-Pratt's obligation to

perform any item [in the GALE Reports] . . . during the arbitration as set forth in paragraph 11 of

[the] APS." (Id.)  Paragraph 11 of the APS required the arbitral award be reached by April 20,

2009 -- i.e. 10 days prior to Foulger-Pratt's completion of the "Items 1 - 8 Punch-List Work."

As anticipated, a dispute arose as to Foulger-Pratt's obligation to remedy systemic

deficiencies identified in the Gale Reports as both (i) a requirement under the Contract (as

contemplated by Paragraph 15 of the APS) and (ii) a condition precedent to completion of Item 6

of the "Madrigal Outstanding Items" list dated February 2, 2009 and payment under Section 5 of

the APS for completion of the "Items 1 - 8 Punch-List Work."

<u>**Issues Identified By The Parties**</u>

Madrigal, Foulger-Pratt and Travelers identified issues for this arbitration in their

respective Statements of Claims and Defenses, filed separately with the Panel.  Below, Madrigal

discusses relevant contractual authority, law and expected proof for each issue.

## II.   FOULGER-PRATT FAILED TO COMPLETE THE WORK IN ACCORDANCE WITH THE GMP CONSTRUCTION CONTRACT[4]

---

[4] Madrigal excluded from this pre-hearing brief all claims associated with Foulger-Pratt's failure to achieve timely Final Completion as work on the Project is ongoing and the issue is not ripe for arbitration (i.e. Count III and VI and portions of Counts IV and X).  Because work is ongoing, Madrigal cannot accurately calculate its expected damages due to this failure.  Foulger-Pratt is required to indemnify Madrigal for its failure to complete the Project within 90 days after Substantial Completion.  (Agreement 4.5.2.)  To date, Madrigal has already incurred substantial costs associated with this failure to achieve timely Final Completion, including, inter alia, the cost of completing unit punch lists and additional testing, management fees, extended interest carry and extended Development Manager Fees.  Documentation substantiating the Development Managers Fees was provided via letter and at MC000022779

*(footnote continued on next page)*

Counts 1 through 9 of Madrigal's Statement of Claims stem directly from Foulger-Pratt's failure to complete the Work, as required, in strict compliance with the Contract Documents. Foulger-Pratt is liable for all resultant damages for their breaches of contract.  See, e.g., Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 736-737 (D.C. 2000) citing Murphy v. O'Donnell, 63 A.2d 340, 342 (D.C. 1948) (quoting Thompson v. Rector, 170 F.2d 167, 169 (D.C. Cir. 1948)); Bacmo Assocs. v. Strange, 388 A.2d 487, 489 (D.C. 1978).  A summary of Madrigal's current damages, which includes a compilation of the Outstanding Items, Madrigal's Itemization of Damages and other damage document provided to Foulger-Pratt and Travelers during discovery, are attached hereto as Exhibit A.

Because Foulger-Pratt breached a valid and enforceable Contract, it is liable for all resultant damages, including indemnification and attorneys' fees.  In the District of Columbia, courts routinely enforce provisions of a contract allocating costs of legal actions arising from the breach of a contract.  See e.g., Central Fidelity Bank v. McLellan, 563 A.2d 358, 360 (D.C. 1989) (reversing trial court's refusal to grant attorneys' fees when contract provided for such fees).  The Contract specifically provides that Foulger-Pratt "indemnify, hold harmless and defend Owner . . . from and against any and all claims, damages, losses, costs and expenses,

---

*(footnote continued from previous page)*

- MC00022793.  And, because Foulger-Pratt has refused to correct systemic deficiencies with the skin and roof, discussed herein, Madrigal anticipates a large cost associated with removing and replacing panels on the exterior of the building.  Further, Foulger-Pratt admitted during the deposition that it has not provided close-out documents required for Final Completion and that the date of numerous warranties must be altered prior to receipt of final payment.  Madrigal reserves the right supplement its pre-hearing brief and damages claim in the event that the Panel determines that the issue of Final Completion (and the damages associated with completion of the skin and roof) is ripe for arbitration.

Madrigal also excluded Count IX because claims related to the Church are also not ripe for arbitration.  (See Madrigal's Statement of Claims Not Ripe for Arbitration filed May 13, 2009.)  Madrigal reserves the right supplement its pre-hearing brief and damages claim in the event that the Panel determines that issues related to the Church are ripe for arbitration.

including attorneys' fees" in the event of a "violation of this Agreement, the Contract Documents, or law by Contractor or its agents, officers, employees, or Subcontractors regardless of whether or not it is caused in whole or in part by a party indemnified hereunder." (General Conditions 3.18; see also Agreement 14.6 (stating that "Contractor shall pay for and indemnify Owner from all damages, losses and expenses (including attorneys' fees) resulting from Contractor's filing a lien, or failing to bond off a Subcontractor lien.").)

In accordance with the plain language of the Contract, therefore, Foulger-Pratt is obligated to pay the costs and attorneys' fees associated with its and its Subcontractors' breaches, including its (i) failure to achieve both timely Substantial Completion and Final Completion, (ii) failure to prepare and provide a "Contractor's Punch List," (iii) failure to complete the Work in accordance with the Contract, (iv) failure to pay subcontractors, obtain lien releases and account for monies disbursed, (v) refusal to indemnify Owner against the Brown and A&A Glass claims; (vi) refusal to immediately bond off the subcontractor liens filed by Schnabel Foundation Company, J.P. Construction, Inc. and Kone, Inc. and/or to enforce Subcontracts prohibiting a Subcontractor's filing of a mechanic's lien, (vii) filing of Foulger-Pratt's own mechanic's lien against the Project, (viii) refusal to preserve, protect and repair the Second Baptist Church, (ix) failure to pay rent, and (x) failure to provide close-out documents. Damages include, but are not limited to, the costs and attorneys' fees that Madrigal has incurred in preparation for and in connection with the mediation before Judge von Kann and this arbitration. (See Madrigal Condominium LLC's Statement of Claims at 10; see also Madrigal's Itemization of Damages and supporting documentation.)

    (a)    <u>Foulger-Pratt Inexcusably Failed to Achieve Timely Substantial Completion and Is Liable for Liquidated Damages under the Contract</u>

EXHIBIT 19

The Project did not achieve Substantial Completion until June 1, 2008, five months after the Guaranteed Substantial Completion Date of December 31, 2007. Foulger-Pratt never mentioned needing an extension of time at the time of assignment, only 20 days prior to the Guaranteed Substantial Completion Date. It assumed the Contract as is. In fact, Foulger-Pratt never filed for an extension of the December 31, 2007 Guaranteed Date for Substantial Completion as required under the Contract. (See General Conditions 4.3.7.1, 8.3.2.) It also never filed a Claim with the Architect contesting the June 1, 2008 date as required under the Contract. (General Conditions 4.4.1.) The time limit for making a claim for an extension of the Guaranteed Substantial Completion Date has expired. (See General Conditions 4.3.2.)

Prior to December 31, 2007, Foulger-Pratt did not provide the requisite notice and documentation to the Development Manager to indicate that Substantial Completion was approaching. Specifically, Foulger-Pratt failed to "notif[y] [] the Development Manager and Architect as to when it believe[d] the Project [would] reach Substantial Completion." (Agreement 4.5.) It also failed to "provide to[the] Development Manager a certified statement of the Final Cost of the Work." (Agreement 12.2.3.) It is obvious that Foulger-Pratt did not provide this notice and statement of Final Cost of the Work because it knew that the Work was not substantially complete.

As numerous photographs taken by both Foulger-Pratt, Madrigal and their representatives will clearly demonstrate, as of December 31, 2007, the Work was not "fully and finally completed, with the only exception being any outstanding [punch list work]." (See Agreement 4.5.) As of December 31, 2007, major construction remained to be completed. For instance, inter alia, the exterior of the building was missing more than 420 panels and numerous glass, which exposed the building to water penetration and prohibited the building from being

"watertight," a condition required to achieve Substantial Completion.  (Id. at (4).)  In fact, Foulger-Pratt's own documents show that such panels were not to be delivered until January 15, 2008, with installation to occur within the following month (which did not occur).  Additionally, the roof table and, thus, Foulger-Pratt failed to meet the contractual requirement that the Owner be able to use all portions of the Project as intended.  (See id. at(1).)  The exterior of the building clearly did not conform with the requirements for Substantial Completion.  (See Agreement 4.5.)

The interior of the building suffered similar deficiencies.  Photographs show that as of January 2, 2008, numerous hallways were without carpeting and drywall and they were littered with construction debris.  Stairwells were also blocked.  The front doors and lobby were not complete.  Such impediments clearly do not comply with the Contract's requirements that "Owner can fully and freely occupy or utilize the Project for the purpose intended without hardship" and that "all normal means of ingress and egress are clear of obstruction." (Agreement 4.5(1)-(2).)  Foulger-Pratt had only delivered 29 completed units (slightly less than 1 of the 12 floors).  Numerous units also were without installed toilets, appliances, lighting and carpet and, like the hallways, were full of construction debris, which rendered them deficient under those same Contract provisions.  The Project clearly could not be used "for the purpose intended without hardship." (Agreement 4.5(1).)  Accordingly, Foulger-Pratt failed to achieve Substantial Completion, as defined by Agreement  4.5, by the Guaranteed Substantial Completion Date of December 31, 2007.

Such a finding is underscored by the fact that the Development Manager and Architect never certified the date of Substantial Completion on December 31, 2007 (a requirement for Substantial Completion) and that Foulger-Pratt never prepared and submitted to the Development manager and Architect "a comprehensive list of items to be completed or corrected

prior to final payment," which is required once the "Contractor considers that the Work . . . is

substantially, complete." (Agreement 4.5.; General Conditions 9.8.2.)

Agreement 4.5 and the modified Exhibit H of the Contract require that the Contractor

ensures that the Project achieve Substantial Completion by December 31, 2007.  In accordance

with Agreement 4.5, the Architect and Development Manager certified the date of Substantial

Completion as June 1, 2008.  Accordingly, pursuant to Agreement 4.3, Madrigal is entitled to

liquidated damages in the amount of $411,000, plus interest.  Courts in the District of Columbia

routinely uphold contractual liquidated damages provisions as "[i]t is well-settled that parties to a

contract may agree in advance to a sum certain to be forfeited as liquidated damages for breach

of contract." Order of AHEPA v. Travel Consultants, Inc., 367 A.2d 119, 126 (D.C. App. 1976);

see also, Burns v. Hanover Ins. Co., 454 A.2d 325, 327 (D.C. App 1982) (enforcing a liquidated

damages clause).

Accordingly, it is obvious that the evidence will show that Foulger-Pratt inexcusably

failed to achieve Substantial Completion by December 31, 2007 and that Madrigal should

recover its liquidated damages.

 (b) Foulger-Pratt is Required to Remedy All Deficiencies (Both "Specific" and
   "General") Identified in the GALE Reports As Part of Its Obligations under the
   Contract and the APS Prior to Release of Retention

Foulger-Pratt mischaracterizes its obligations under the Contract and the APS to repair

deficiencies in the skin and roof.[5]  First, Foulger-Pratt incorrectly argues that the decision to

---

[5] Foulger-Pratt's positions regarding its obligations to correct both specific and general deficiencies identified in the GALE Reports are contradictory and confusing.  In its letters and in oral statements made, Counsel asserts that Foulger-Pratt has no obligation to repair the general deficiencies in the GALE Reports.  This position is at odds with Kevin MacClary's view, who, during the corporate deposition of Foulger-Pratt, stated that he understood Foulger-Pratt has an obligation to correct both the specific and general deficiencies, and that he instructed his Subcontractors to do so.  Madrigal will do its best to address each in turn in this pre-hearing brief.

EXHIBIT 19

certify completion of the "Items 1 - 8 Punch-List Work" incorporated in the APS should be submitted to the Project Neutral prior to an arbitral determination on the scope of Foulger-Pratt's obligations.  Second, Foulger-Pratt erroneously asserts that it is not contractually obligated to remedy general deficiencies in the skin and roof identified in the GALE Reports.  Third, Foulger-Pratt argues that, if it is obligated to correct the general and specific items identified in the GALE Reports, that is the full extent of their obligations under the Contract to repair problems with the skin and roof.  Each of Foulger-Pratt's positions are belied by the terms of the Contract and the APS.

The plain terms of Paragraphs 15 and 11 of the APS require that an arbitral determination regarding any dispute regarding the Contract requirements or Foulger-Pratt's obligation to perform any item identified in the GALE Reports be reached prior to the completion and certification of the punch-list work included in Paragraph 5 of the APS.  This prerequisite is necessary because correction of the deficiencies identified in the GALE Reports dated October 2, 2007 and November 11, 2008 are specifically incorporated in Item 6 of said "Items 1 - 8 Punch-List Work," such item being entitled "Exterior Skin and Roof."  (See "Madrigal Outstanding Items" list.)  Therefore, in accordance with Section 15 of the APS, the Panel must determine the scope of Foulger-Pratt's obligation under the Contract to correct systemic deficiencies identified by the Gale Reports (i.e. the Panel must clarify the scope of the punch-list work identified in Outstanding Item No. 6) prior to submitting the "Items 1 - 8 Punch-List Work" to the Development Manager and Architect and/or the Project Neutral for certification of completion.

Foulger-Pratt has also argued that it is not responsible to repair the general deficiencies identified in the GALE Reports.  The Work must be completed "in strict complaint with the Contract Documents, including, but not limited to, [] the "Drawings and Specifications."  (See,

e.g., Agreement 2.2.)   The GALE Reports noted numerous general deficiencies that must be remedied for the Work to strictly comply with the contractual requirements. (See Exterior GALE Report at App. A.)   Accordingly, Foulger-Pratt has an obligation to inspect the entire building envelope to identify the deficient work and instruct its Subcontractors to fix those deficiencies.   (See, e.g., Agreement 2.2.)   Foulger-Pratt testified that it instructed its Subcontractors that they should fix the general deficiencies as they see them, but that it did not fully examine the building or request its Subcontractors to do so.   In other words, Foulger-Pratt never evaluated the building, measured the caulking or determined which panels were not plumb and level -- each of which Foulger-Pratt is required to do under the Contract and is necessary to determine whether the Work conforms with the Contract Documents. (See General Condition 3.3.3.)  Therefore, the work currently being done on the building exterior is not likely to correct all of the general deficiencies identified in the GALE Reports.

Further, it appears from Foulger-Pratt's statements to Madrigal that Foulger-Pratt claims that the full scope of its obligations to repair deficiencies in the skin and roof can be found in the GALE Reports (i.e. that the GALE Reports function as the Owner's Punch-List for the building exterior).  Such a position is belied by both the Contract and the express statements in the GALE Reports.  The scope of the exterior work is included in, but not limited to, the items outlined in the GALE Reports.

In order for the Panel to evaluate this claim, it must be familiar with the documents which comprise the GALE Reports.  Gale Associates, Inc. ("GALE") examined the exterior panels, caulking, façade, windows and roof of the building, including all related items and elements (the "Building Exterior") and identified both general and specific deficiencies with the Building

EXHIBIT 19

Exterior in its October 2, 2007 Field Observation Report and the subsequent November 18, 2008

Exterior Building Envelope Review Report (collectively the "GALE Reports").

　　The 2007 GALE Field Observation Report states that it is based upon a "cursory review"

and the 2008 Exterior GALE Report is limited to the evaluator's "view of most of the building

envelope, but not all sections."  From that cursory review, GALE identified numerous systemic

deficiencies in areas that are "critical to keeping water out," including the misalignment of

panels and "extremely large [caulk] joints."  (See Exterior GALE Report at 2-3, App. A.)  The

Owners Punch-List, on the other hand, "is intended to consist of minor items, primarily of a

cosmetic nature" that is developed once the substantive Work has been completed by the

Contractor.  (Agreement 4.4.2.)  "The Owner's Punch List may include punch list items

identified by the Architect, by engineers engaged by either the Architect or Owner, by Owner, by

the Condominium Association and by individual Condominium Unit Owners."  (Id.)  The GALE

Report is simply not the Owner's Punch-List and Foulger-Pratt is obligated to complete such

punch-list at the time it is created by Owner -- i.e. after the completion of the substantive

remediation measures.

　　In addition to its obligation to perform items on the GALE Reports and the Owner's

Punch-List, Foulger-Pratt must repair any Work not "conform[ing], in all respects, to the

Contract Documents . . . including substitutions not properly approved and authorized, may be

considered defective."  (See General Conditions 3.5.1.)  Accordingly, in addition to its obligation

to perform items on the GALE Reports and the Owner's Punch-List, Foulger-Pratt is also

contractually required to remedy any and all Condominium Warranty Items.  Specifically,

Foulger-Pratt must "promptly" remedy "any and all defects, structural or otherwise, which are

subject to the warranties (express and implied) . . . prior to and as a condition of Final

Completion." (Agreement 4.4.5.)  As of the date hereof, Foulger-Pratt is over a year late in completing these obligations and has still yet to achieve Final Completion.  The building leaks and the deficiencies identified in the GALE Report have not been repaired.  Accordingly, Foulger-Pratt has not fulfilled its obligations under the Contract, the APS or the GALE Reports to remedy the deficiencies in the building exterior.

It is clear both from the Contract and the APS that Foulger-Pratt is required to complete the Items 1-8 Punch-List Work, which includes repairs to the exterior skin and roof, prior to payment of any retainage on the Contract.  (APS ¶ 5; Agreement 4.4.5.)  It is also clear that the repair of the problems identified in Item 6 of the "Madrigal Outstanding Items" does not encompass Foulger-Pratt's full responsibility under the Contract to repair defects in the building's skin and roof.  (See e.g., Agreement 4.4.2, 4.4.5.)  The arbitration will make these conclusions abundantly clear.[6]

<p style="margin-left:2em;">(c)   <u>Foulger-Pratt Failed to Ensure Completion of the Work in Accordance with the Drawings and Specifications</u></p>

At all critical states of the Project, the Contract specifically requires that Work must be completed "in strict compliance with the Contract Documents" that include the Drawings and Specifications.  (See e.g., Agreement 2.3.3, 4.5, 12.2.6(g); see also General Conditions 3.5.1.)  Foulger-Pratt had an obligation undertake, manage, perform and complete the Work in strict compliance with the Contract Documents, including, but not limited to, the "Drawings and Specifications," and to supply all labor, materials and services necessary for the proper and

---

[6] As stated in Madrigal's Identification of Issues Not Ripe for Arbitration, Foulger-Pratt's claim for full and final payment is premature because the remedial work is ongoing (i.e. the Project has not achieved Final Completion) and Madrigal has not had time to determine the amount of damages that are necessary to bring the condition of the skin and roof of the building in line with the Contract requirements.  That being said, the Development Manager cannot certify that the Work is finally complete "in strict compliance with the Contract Documents," which is a condition precedent to Final Completion and full and final payment.  (Agreement 12.2.6.)

EXHIBIT 19

complete performance of the Work, including all items that are consistent with and reasonably inferred by or in the Drawings and Specifications and all Addenda and other Contract Documents, without any increase in the Contract Sum specified in Article 5.  (Agreement 2.2, 2.4.)  Nevertheless, the evidence will show that in numerous instances the Work does not comply with the Contract requirements.  As just one (but a major) example, the concrete slabs on the twelfth floor are larger than the other floors, causing major caulk gaps and misaligned panels. Such failures in the performance of the Work has caused the building to not be watertight.[7] Nevertheless, Foulger-Pratt has refused to repair such defective work (as it was noted in the GALE Reports) and, as a result, Madrigal has incurred additional major expenses.  Madrigal commissioned the GALE Report.  And, because Foulger-Pratt refused to follow the Report's directives to bring the building exterior into conformance with the Contract Documents, Madrigal hired Clay C. Ewell to carry out that work.  (See General Conditions 2.4.1; see also General Conditions 3.3.3 (requiring that Contractor inspect the Work -- the exact recommendation of the GALE Reports).)  Foulger-Pratt is liable for those damages, which are ongoing, but total $74,600 today.  Foulger-Pratt is also liable for the Management Fee associated with this additional work.  (Agreement 4.5.2.)

      (d)    <u>Foulger-Pratt Failed to Supervise and Correct the Work and Is Liable for Resultant Damages</u>

Foulger-Pratt is required to "[s]upervis[e], coordinate[e], manag[e] and perform[] the Work, including subcontracted work, and the performance of all other acts and services necessary for construction and completion of the Project in strict compliance with the requirements of the Contract Documents, including but not limited to the Drawings and

---

[7] Claims for mold and other damage relating to this failure are currently under investigation and repair.

Specifications." (Agreement 2.3.3.)  Foulger-Pratt failed to meet its obligations by, inter alia, failing to perform previously-identified punch-list work and by not correcting the deficiencies in the exterior of the building at the time they were identified.  Accordingly, it is obligated to indemnify and protect the Owner from all resultant damages.

      (e)    Foulger-Pratt Failed to Diligently Pursue the Work and Is Liable for Resultant Damages

The Contract requires Foulger-Pratt to "perform the Work in an expeditious [] manner consistent with Owner's interests." (Agreement 3.1.)  Disputes over any determination by the Development Manager do not excuse Foulger-Pratt from expeditiously performing the Work. (General Conditions 9.5.3.)  Nevertheless, Foulger-Pratt walked off the job and instructed its Subcontractors not to perform punch list work.  Foulger-Pratt is liable for all resultant damages.

      (f)    Foulger-Pratt Failed to Pay Subcontractors and Obtain Lien Releases and Is Liable for Resultant Damages

As discussed more fully in Madrigal's Statement of Claims, Foulger-Pratt failed to account for payments made by Madrigal to Foulger-Pratt, which accountings would have evidenced that Foulger-Pratt failed to make payments to Subcontractors that were required under the Contract. (Agreement 12.1.13, 12.1.14.)  Foulger-Pratt also failed to obtain the requisite fully and properly executed (Partial) Release of Lien and Waiver of Claim form (Exhibit K to the Contract) from each Subcontractor with respect to payments to and Work performed by such Subcontractors. (Agreement 12.1.6.)  As a result of the failure to pay the Subcontractors and the resultant inability to obtain lien releases from those Subcontractors, as well as Foulger-Pratt's failure to enforce its Subcontracts (which prohibited filing of liens), Subcontractors, including J.P. Construction, Inc. and Kone, Inc., filed liens against the Project demanding payments of the amount owed to them by Foulger-Pratt.  Schnabel Foundation Company also filed a lien in the amount of retainage that Foulger-Pratt withheld from it.  Madrigal immediately demanded that

Foulger-Pratt bond off these subcontractor liens, as is expressly required by the Contract. (Agreement 14.6.1). Despite the clear and express language of this provision requiring Foulger-Pratt, as Contractor, to immediately bond off these subcontractor liens, Foulger-Pratt refused to do so. Madrigal was forced to seek a Temporary Restraining Order and Amended Temporary Restraining Order and had to compel Foulger-Pratt to bond off these liens. As a result of Foulger-Pratt's breach of these Contract provisions, Madrigal suffered damages in the form of lost services from the Subcontractors (Kone, Inc. refuses to provide service to and critical documents concerning the elevators), expenses to hire additional workers, and attorneys' fees, costs and expenses.

      (g)     <u>Foulger-Pratt Failed to Pay Rent for the Field Office</u>

      Prior to assignment of the Contract through today, Foulger-Pratt admits that it utilized the "Field Trailor" to run its Project operations. The use of this office, located in the townhouse across the street from the Project, is a General Condition of the Contract. (<u>See</u> Contract Ex. E.) During the length of the Project, the cost of the field office was $40,000 as evidenced by Contract Ex. E and the License Agreement with Mount Vernon Place, LLC, an affiliate of the Owner for use of 301 Eye Street, N.W. Because Foulger-Pratt assumed all responsibilities of Glen, and because Foulger-Pratt utilized 301 Eye Street, N.W. as its project headquarters, it is liable to the Owner for back rent totaling $36,000 as of April 10, 2009, and all attorneys' fees, costs and expenses associated with enforcement of this contractual obligation. Cooper <u>v.</u> Cooper, 35 A.2d 921 (D.C. 1944), citing 13 C.J. Contracts, § 682 ("The general rule is that a party cannot affirm a contract in part and repudiate it in part. He cannot accept the benefits on the one hand while he shirks the disadvantages on the other."); 17 C.J.S., Contracts, § 416. (<u>See also</u> Contract Ex. E.)

## II.    RESPONDENTS' DEFENSES TO LIQUIDATED DAMAGES ARE MERITLESS

As will be shown at the arbitration hearing, none of Foulger-Pratt's defenses excuse it from its failure to complete the Work, as required, in strict compliance with the Contract Documents.  However, its defenses to liquidated damages are of particular import because it involves legal authority, in addition to the contractual authority that will be the focus of the hearing.

As discussed in Section I(a), supra, Foulger-Pratt failed achieve Substantial Completion by December 31, 2007 and is therefore liable to Madrigal for liquidated damages.  In an attempt to escape its liability, Foulger-Pratt asserts several defenses, each of which is both factually inaccurate as well as invalid under the Contract and applicable law.

In order to justify their failure to obtain timely Substantial Completion in accordance with Agreement 4.5, Foulger-Pratt attempts to re-write the terms of the Contract.  Foulger-Pratt argues that Madrigal's alleged request for "out-of-sequence" work altered the Contract's definition of Substantial Completion.  The evidence will show that Foulger-Pratt's argument that it achieved "Substantial Completion under the circumstances," as advanced during its deposition, is without merit.  Madrigal never agreed to alter the definition of Substantial Completion.  But, even if it had, such agreement had to be "by an instrument in writing signed by the Owner, the Development Manager and Contractor" to be valid under the Contract.  (Agreement 14.6.10.)  Likewise, the requirements of Substantial Completion in Article 4.5 cannot be waived except by "an express waiver in writing."  (Id.)  No written modification or waiver exists.  Accordingly, evidence will show that both Foulger-Pratt's factual and contractual justifications do not excuse it from the failure to achieve timely Substantial Completion as defined in Agreement 4.5.

Foulger-Pratt also argues Madrigal's alleged request for "out-of-sequence" work wrongfully prohibited it from achieving Substantial Completion under the terms of Agreement

4.5.  Such a defense is equally erroneous.  As a matter of fact, the sequence of the work was carried out in the sequence agreed to by the parties and on schedule for on-time Substantial Completion.  And, contractually, such changes in the construction schedule are permitted under the Contract.  (See Agreement 4.6; General Conditions 3.10.1.)  The Contract also provides that "Owner[,] its Condominium Unit Purchasers or authorized entities, including the Development Manager, may occupy or use any completed or partially completed portion of the Work at any stage when such portion becomes available . . . Such partial occupancy or use may commence whether or not the portion is substantially complete."  (General Conditions 9.9.)  To receive any extension of time, Foulger-Pratt was obligated to submit a request for a Change Order to extend the time and if it was denied to assert a claim.  (See General Conditions 4.3.7.1, 8.3.2.)  Foulger-Pratt never issued a Change Order or filed such a claim.  Accordingly, Foulger-Pratt failed to deliver the Project by the Guaranteed Substantial Completion Date and is liable for liquidated damages.  (Agreement 4.5.)

Foulger-Pratt's equitable defenses to the enforcement of the Contract's liquidated damages provision are without merit.  Contracted-for liquidated damages clauses are valid and enforceable unless such liquidated damages constitute a penalty.  Christacos v. Blackie's House of Beef, 583 A.2d 191, 197 (D.C. 1990) (citing Burns, 454 A.2d at 327).  Foulger-Pratt does not argue that the liquidated damages sum is a penalty, perhaps because it is indisputable that the liquidated damages sum in the Contract bears a reasonable relation to the damages foreseeable at the time of contracting.  Rather, Foulger-Pratt argues that circumstances surrounding the substantial completion of the Project should "negate Liquidated Damages." (Foulger-Pratt Statement of Defenses at p. 5.)  Alternatively, Foulger-Pratt suggests that to the extent Madrigal is awarded liquidated damages, Foulger-Pratt's efforts to timely complete the Project should be

taken into account and "equitably set off from any damage award." (Id. at p. 6.)  Absent fraud or unconscionability at the time the contract was made, D.C. courts have never struck down a liquidated damages provision for equity.  See, e.g., Simms v. Bovee, 68 A.2d 800, 802 (D.C. 1949), citing District of Columbia v. Harlan & Hollingsworth Co., 30 App. D.C. 270 (D.C. Cir. 1908) see also Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 448 (D.C. Cir. 1965). Rather, it is the burden of the party challenging such provision to show that the damages constitute a penalty.  S. Brooke Purll Inc. v. Vailes, 850 A. 2d 1135, 1138 (D.C. App. 2004).

Foulger-Pratt failed to meet its burden of proof and, accordingly, Madrigal is entitled to liquidated damages for Foulger-Pratt's failure to achieve Substantial Completion by the Contract's Guaranteed Substantial Completion Date (Agreement 4.3).  See id.

## II     CONCLUSION

Madrigal performed under the Contract, whereas Foulger-Pratt continually breached numerous contractual obligations.  Therefore, the Panel should award Madrigal its damages in the amount proven during the arbitration hearing.

Respectfully submitted,

Dennis A. Davison (D.C. Bar No. 223982)
Elisabeth L. Carrigan (D.C. Bar No. 982704)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
Tel.:  (202) 496-7500
Fax:  (202) 496-7756
*Counsel for Claimant*
*Madrigal Condominiums, LLC*

EXHIBIT 19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Claimant Madrigal Condominiums, LLC's Pre-Hearing Brief was served this 14th day of May, 2009 by electronic mail, upon:

> Christopher Brasco, Esq.
> Kathleen O. Barnes, Esq.
> Adam M. Tuckman, Esq.
> Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
> 8405 Greensboro Drive, Suite 100
> McLean, Virginia 22102
> *Counsel for Respondents/Counter-Claimant*
> *Foulger-Pratt Residential Contracting, LLC and*
> *Travelers Casualty & Surety Co. of America*

> Dennis A. Davison, Esq.
> D.C. Bar No. 223982
> Elisabeth L. Carrigan, Esq.
> D.C. Bar No. 982704
> McKENNA LONG & ALDRIDGE LLP
> 1900 K Street, N.W.
> Washington, D.C. 20006
> Tel.:  (202) 496-7500
> Fax:  (202) 496-7756

> *Counsel for Claimant Madrigal Condominiums, LLC*

DC:50619832.1

- 28 -

EXHIBIT 19

# EXHIBIT A

EXHIBIT 19

In re Arbitration between:
MADRIGAL CONDOMINIUMS, LLC, Claimant
and
FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC, Respondent/Counter-claimant
and
TRAVELERS CASUALTY & SURETY CO. OF AMERICA, Respondent

# MADRIGAL'S ITEMIZATION OF ITS DAMAGES
## May 14, 2009

| Description | Amount |
|---|---|
| **COUNT I:** Foulger-Pratt Failed to Achieve Timely Substantial Completion | |
| a.  Liquidated Damages | $ 411,000 + interest |
| **COUNT II:** Foulger-Pratt Failed to Prepare/Provide Contractor's Punch List - Building Exterior | |
| a.  November 18, 2008 Gale Report | $  31,600.00 |
| b.  Fees for Gale post-report site inspections | $   7,500.00 |
| b.  Clay C. Ewell - Examination, Testing,  Report, and Remedial Specifications on Building Exterior (Estimated) | $  35,500.00 |
| c.  Management Fee - 20% | $  11,760.00 |
| **COUNT III:** Foulger-Pratt Failed to Achieve Timely Final Completion | |
| a.  Cost of completing Unit Punch Lists | $  52,921.00 |
| b.  Management Fee - 20% | $  10,584.00 |
| **COUNT IV:** Foulger-Pratt Failed to Complete the Work in Accordance with the Contract Documents | |
| a.  Failure to perform punch list work  Insert Items 1-8 | $1,064,000.00[1] |
| b.  Design Team Additional Inspections | $ 100,000.00 |
| c.  Condominium Association Punch List (Expected) | $ 460,000.00 |
| d.  Unit Owner Punch Lists (unsold units - expected) | $ 270,000.00 |
| e.  Management Fee 20% | Tbd |
| f.  Direct damages due to failure to meet milestone and completion  dates - Accrued Developers Fees - 9/1/08 - 4/30/09 | $1,472,187.50 |
| g.  Utility Reimbursement | $ 276,649.00 |
| **COUNT V:** Contractor Failed to Pay Subcontractors and Obtain Lien Releases | |
| a.  Failure to provide lien release from all Subcontractors | $2,595,326.00[2] |
| **COUNT VI:** Foulger-Pratt Failed to Provide Close-Out Documents | |
| a.  Direct Damages (Replacement Costs) | $ 100,000.00 |
| b.  Kone Elevator | $   4,071.00 |
| **COUNT VII:** Foulger-Pratt Filed a Lien in Direct Violation of the Contract Terms | |
| a.  Legal fees | $ see below |
| b.  Owner's time | $ 10,000 |
| **COUNT VIII:** Foulger-Pratt Failed to Pay Rent for Field Office | |

---

[1] Per 5.2 of Agreement of Partial Settlement.

[2] Subtract C.O. 25 if Foulger-Pratt's assertion for extension is considered.  This amount is the Contract Balance after payment of App. 27, and the Contractor's failure to provide close-out documents, lien releases, and meet other requirements entitles the Owner to retain the "retention."

\* Damages are continuing and the numbers reflected herein are subject to change. The damages stated herein are through April 30, 2009.

EXHIBIT 19

In re Arbitration between:
MADRIGAL CONDOMINIUMS, LLC, Claimant
and
FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC, Respondent/Counter-claimant
and
TRAVELERS CASUALTY & SURETY CO. OF AMERICA, Respondent

## MADRIGAL'S ITEMIZATION OF ITS DAMAGES
### May 14, 2009

| | |
|---|---|
| a.  Back Rent | $ 36,000 + interest |
| **COUNT IX:**  Foulger-Pratt Breached its Obligations to Protect and Repair the Second Baptist Church | |
| a.  Repair of Church | $ 250,000.00 |
| b.  Fernandez & Associates Structural Engineers | $ 19,871.48 |
| c.  Owner's time | $ 25,000.00 |
| **COUNT X:**  Madrigal's Right to Indemnification, Defense and Attorneys' Fees | |
| a.  Attorneys' Fees - Damage to Second Baptist Church | $ 28,780.50 |
| B.  Attorneys' Fees - Subcontractor Schnabel Foundation and J.P. Construction Liens | $ 18,322.00 |
| c.  Attorneys' Fees - Notices of Default to Foulger-Pratt and Travelers Under Contract and Bonds | $ 5,192.00 |
| d.  Attorneys' Fees - Foulger-Pratt Lien - TRO/Amended TRO/P.I. | $ 62,840.00 |
| e.  Attorneys' Fees - Subcontractor Kone Lien | $ 2,610.50 |
| f.  Attorneys' Fees -  Contractor's Failure to Provide Lien Waivers and Improper Form | $ 9,184.50 |
| g.  Attorneys' Fees Contractor's and Traveler's Breach of Contract and Bond Obligations and Enforcement of Owner's Rights (Mediation) | $ 60,332.00 |
| h.  Attorneys' Fees Contractor's and Traveler's Breach of Contract and Bond Obligations and Enforcement of Owner's Rights (Arbitration) | $ 64,106.50 |
| i.  Begal Fees:  Brown and A&A Cases | $ 95,192.84 |
| **Total Fees - COUNT X** | **$346,560.84** |
| **Total Expenses** | TBD |
| JAMS Mediation Invoices | $ 13,865.72 |

DC:50615844.3

* Damages are continuing and the numbers reflected herein are subject to change. The damages stated herein are through April 30, 2009.