**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FOULGER-PRATT RESIDENTIAL CONTRACTING, LLC | ) ) ) |
| and | ) ) |
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA | ) ) ) |
| Applicants, | )  **Case No. 1:09-cv-02333 (GK)** ) ) |
| v. | ) ) |
| MADRIGAL CONDOMINIUMS, LLC | ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION

This matter is presently before the Court on Foulger-Pratt
Residential Contracting, LLC ("Foulger-Pratt") and Travelers
Casualty and Surety Company of America's ("Travelers") Application
to Confirm Arbitration Award [Dkt. No. 1], under 28 U.S.C. § 1332,
pursuant to 9 U.S.C. § 9 against Respondent Madrigal Condominiums,
LLC ("Madrigal"), and Respondent Madrigal's Cross-Motion to Vacate
Portions of Interim Arbitration Award [Dkt. No. 27]. Upon
consideration of the Application, Motion, Oppositions, Replies,
Surreply, and entire record herein, Foulger-Pratt's Application to
Confirm Arbitration Award is **granted** and Madrigal's Motion to
Vacate is **denied** in its entirety.

## I.  Procedural Background[1]

The dispute in this case arises out of a construction contract ("Contract"), consisting of the Modified General Conditions of the Contract for Construction, ("Modified Contract Conditions")[Dkt. No. 27-4] , as well as the Modified Standard Form Agreement Between Owner and Contractor, ("Modified Form Agreement")[Dkt. No. 27-3], and the Reconciled GMP Set of Specifications ("GMP Specifications").[2] In 2005, Madrigal entered into these agreements with Glen Construction Company, Inc. ("Glen"), the-then general contractor, for the construction of Madrigal Lofts condominiums, located at 811 4th Street, N.W. in Washington, D.C. Applicant Travelers acted as Glen's bonding company, providing the performance and payment bonds for the project.

The parties' Contract included an arbitration provision providing that claims and disputes with a value exceeding $100,000 be submitted to a three-member Panel of arbitrators, and that any award be considered as final, binding, and conclusive. Modified Contract Conditions § 4.4.1. The Contract also contained a provision directing the parties to first attempt mediation of their

---

[1] The undisputed facts included in this section are based upon the parties' submissions, as well as the entire record in this case.

[2] According to Foulger-Pratt and Travelers, and undisputed by Madrigal, Madrigal drafted the Contract. Foulger-Pratt Reply to App. 20 n.4.

dispute, before proceeding to arbitration. Modified Contract Conditions § 4.5.2.

In June 2007, Glen stopped paying its subcontractors who were working on the Project. As a result of Glen's non-performance under the Contract, Travelers engaged Foulger-Pratt, one of its long-time bond customers, to assume control over the project. In mid-2007, Glen assigned the Contract and its accompanying documents to Foulger-Pratt, which assumed the role of general contractor and agreed to achieve substantial completion of the project by December 31, 2007. Although Foulger-Pratt allegedly failed to meet this completion date, it did achieve substantial completion by early June 2008, as reflected in the Certificate of Substantial Completion issued by the project's Architect and Development Manager, effective as of June 1,2008 [Dkt. No. 30-4].

Beginning in early 2008, a variety of disputes arose between the parties regarding payments to Foulger-Pratt and various subcontractor liens on the project. The disputes came to a head in December 2008, when Foulger-Pratt filed a mechanic's lien for $2,636,467 against the project. In response, Madrigal filed an emergency motion for a temporary restraining order ("TRO") in D.C. Superior Court, which resulted in a court order vacating the lien.

Shortly thereafter, in January 2009, the parties engaged in mediation to resolve several claims and disputes related to their underlying written agreements and the project. As a result of these

efforts, on February 2, 2009, the parties executed a partial settlement agreement, ("APS") [Dkt. No. 27-7], resolving a number of these issues. As a part of this settlement agreement, the parties agreed to designate a "Project Neutral," who would be a licensed architect and would certify Foulger-Pratt's completion of a punch-list of outstanding construction-related items ("Items 1-8 Punch-List"). APS ¶ 5.3. The Punch-List had been previously designated in an expert report, The Exterior Building Envelope Review Report ("Gale Report") [Dkt. No. 27-18]. The parties further agreed to submit to arbitration their remaining unresolved claims, with the exception of those items reserved in the APS for the Project Neutral, as well as any future disputes that might arise between them. Id. ¶ 11.

During the arbitration proceedings, Madrigal brought ten claims against Foulger-Pratt, relating to its work as general contractor. Interim Award ¶¶ 1-10 [Dkt. No. 27-11]. Foulger-Pratt, in turn, brought three cross-claims: (1) for damages for extended direct supervision costs due to Madrigal's alleged failure to permit final completion of the project; (2) for entitlement to payment for final completion of the contract or, alternatively, for recusal from completing the project due to Madrigal's actions or inactions; and (3) for payment to Foulger-Pratt of the entire contract balance, plus pre-award interest. Id. ¶¶ 12-13.

From May to July 2009, the parties participated in hearings on these issues before the Arbitration Panel, consisting of three lawyers who were experienced in handling construction contract disputes ("Panel"). On May 26, 2009, the Panel issued an Order, ("May 26, 2009 Order") [Dkt. No. 27-8], resolving several matters raised by the parties. The Order noted that Madrigal had potentially discovered and was investigating additional defects in the project's exterior skin and that it might wish to bring claims pertaining to such "potential" defects before the Panel; the Order stated that such claims were not ripe and the Panel postponed ruling on those claims if, and when, they became ripe, to a second hearing. May 26, 2009 Order ¶ 1.

On September 11, 2009, the Panel received post-hearing briefs and heard post-hearing argument on September 21, 2009. The Panel issued an "Interim Award" on November 30, 2009. In this award, the Panel concluded that Foulger-Pratt was obligated to complete Items 4-8 of the Punch-List and to cure certain deficiencies in special warranties. Interim Award ¶ 14(c)-(d). The Panel also held that Foulger-Pratt was entitled to final payment as it had either satisfied, or was excused from performance of, the remaining obligations alleged by Madrigal. Id. ¶ 14(f). In connection with this ruling, the Panel ordered Madrigal to pay $1,694,655 to Foulger-Pratt within 15 business days and to deposit $1,113,000 into an interest-bearing escrow account, for payment to Foulger-

Pratt upon completion of its remaining obligations. Id. ¶ 16. The Panel also granted some, but not all, of Madrigal's requests for attorneys' fees, although it reserved final determination of the amount for an "additional Interim Award" regarding such fees. Id. ¶¶ 10, 11. In calculating the amount owed to Foulger-Pratt, the Panel subtracted $175,920 in damages awarded to Madrigal, and also permitted Madrigal to retain $30,117, pending the Panel's issuance of an interim award regarding Madrigal's claims to attorneys' fees.[3] Id. ¶¶ 11, 16.

On December 8, 2009, Foulger-Pratt[4] filed an Application to this Court requesting confirmation of the November 30, 2009 Interim Award ("Foulger-Pratt App."), and the entering of a judgment consistent with the findings and determinations of the Panel. The Panel's conclusions included: (1) an award to Foulger-Pratt of $1,694,655 on or before December 21, 2009; (2) a direction to Madrigal that it must deposit $1,113,000 into an interest-bearing escrow account to be established by the parties; (3) an interpretation of the contract documents; and (4) the Panel's

---

[3] On January 18, 2010, the Panel issued a "Second Interim Award" [Dkt. No. 23-1], addressing the parties' dispute regarding attorneys' fees. In this award, the Panel determined Madrigal was entitled to $30,117 in attorneys' fees, the same amount the Panel had previously ordered Madrigal to retain for such fees pending this further decision. Second Interim Award ¶¶ 3,5.

[4] For the remainder of this Memorandum Opinion, references to Foulger-Pratt shall be understood as also constituting reference to Travelers.

rulings limiting Foulger-Pratt's remaining contractual obligations. Foulger-Pratt App. 5. Foulger-Pratt also sought pre-judgment interest, costs, and attorneys' fees. Id.

On December 22, 2009, Madrigal filed an Opposition to the Application and Cross-Motion to Enter Scheduling Order for its Motion to Vacate parts of the arbitration award ("Madrigal Opp'n to App.")[Dkt. No. 4]. On January 12, 2010, Foulger-Pratt filed its Reply brief opposing Madrigal's attempt to submit a vacatur motion ("Foulger-Pratt Reply to App.")[Dkt. No. 8]. Madrigal filed its Surreply on January 29, 2010 ("Madrigal Surreply")[Dkt. No. 23]. Briefing on vacatur began in March 2010, with Madrigal filing a Motion to Vacate parts of the arbitration award on March 15("Madrigal Mot. to Vacate"). On April 30, 2010, Foulger-Pratt filed its Opposition to the Motion, ("Foulger-Pratt Opp'n") [Dkt. No. 30], with Madrigal submitting its Reply brief on May 26, 2010 ("Madrigal Reply") [Dkt. No. 37].

The pending Motions raise two main issues: (1) the law governing judicial review of the arbitration award; and (2) the substantive merits of the Vacatur Motion. Foulger-Pratt asserts that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, applies, while Madrigal claims that the D.C. Revised Uniform Arbitration Act ("DCRAA"), D.C. Code §§ 16-4401 - 16-4432, governs this Court's consideration of the dispute. Foulger-Pratt also challenges Madrigal's claims for vacatur of portions of the

-7-

arbitration award, which include: (1) claims that the Panel lacked jurisdiction to rule on certain issues; (2) allegations that Madrigal was deprived of a full and fair hearing; (3) claims that the Panel exceeded its powers; and (4) arguments that the Panel acted arbitrarily and capriciously in rendering its award.[5]

## II. Jurisdiction

Foulger-Pratt brings its Application for Confirmation under the federal diversity statute, 28 U.S.C. § 1332.[6] The parties do not challenge the Court's jurisdiction in this matter, nor is there any indication that this claim does not satisfy the federal diversity statute.[7]

---

[5] In their Joint Praecipe Regarding Arbitration Proceedings (Apr. 21, 2011) [Dkt. No. 42], the parties informed the Court that the Panel has issued the following five orders since the Second Interim Award: (1) Order Regarding Escrow Account and Status Conference (Jan. 21, 2010); (2) Order Regarding Project Neutral (May 12, 2010); (3) First Supplemental Order Regarding Special Warranties (May 20, 2010); (4) Second Supplemental Order Regarding Special Warranties (July 27, 2010); and (5) Order Regarding Motion to Strike (Dec. 10, 2010).

[6] Although Foulger-Pratt seeks confirmation of the arbitration award pursuant to Section 9 of the FAA, the FAA is not a jurisdictional statute, "bestowing no federal jurisdiction but rather requiring an independent jurisdictional basis." Hall St. Assocs. v. Mattel, Inc., 552 U.S. 576, 582, 128 S. Ct. 1396 (2008).

[7] According to Foulger-Pratt's Application for Confirmation, Foulger-Pratt is a limited liability company, organized under the laws of Maryland with its principal place of business in that state, while Madrigal is a limited liability company organized under Delaware law conducting business in the District of Columbia. Foulger-Pratt App. ¶¶ 1,3. Travelers is a corporation organized under the laws of Connecticut where its principal place of business
(continued...)

**III. Analysis**

    **A.    Governing Law**

Foulger-Pratt and Madrigal dispute whether the FAA or the DCRAA applies to judicial review of the arbitration award.

As noted above, Foulger-Pratt originally filed its Application to Confirm the Arbitration Award pursuant to the FAA. In response to Madrigal's Opposition to Confirmation and Cross-Motion to Vacate, Foulger-Pratt argues that the FAA applies to the Vacatur Motion, as well as its confirmation application, based upon the statute's purported preemption of state law, as well as the parties' Contract.

Madrigal counters, however, that the parties expressly agreed to have all matters respecting "[t]his [a]greement to arbitrate . . . specifically enforceable pursuant to and interpreted under the laws of the District of Columbia," thereby making the FAA inapplicable in this instance. Modified Contract Conditions § 4.4.1.

As the analysis below demonstrates, Madrigal is correct that District of Columbia law applies to this Court's review of the arbitration award.[8] In response to Foulger-Pratt's alternative

---

(...continued)
is also located. <u>Id.</u> ¶ 2. In this case, the arbitration award in question exceeds the diversity statute's $75,000 minimum. <u>Id.</u> ¶ 4.

[8] The relevant parts of the parties' underlying construction
(continued...)

argument that this Court should apply the previous District of Columbia arbitration statute, the D.C. Uniform Arbitration Act ("D.C. Uniform Act"), D.C. Code §§ 16-4301 - 16-4319, Madrigal also correctly argues that the DCRAA, which became fully effective on February 27, 2008, governs this dispute.

### 1. The FAA and the D.C. Arbitration Statute

The FAA applies to the review of arbitration disputes involving interstate commerce and maritime matters. 9 U.S.C. §§ 1-2. The statute reflects a federal policy "favoring arbitration" and supersedes any state laws that conflict with this preference. See Preston v. Ferrer, 552 U.S. 346, 359, 128 S. Ct. 978 (2008) ("When parties agree to arbitrate all questions arising under a contract, the FAA supersedes state laws lodging primary jurisdiction in another forum, whether judicial or administrative.").

The Supreme Court's decisions in Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University, 489 U.S. 468, 109 S. Ct. 1248 (1989) and Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S. Ct. 1212 (1995) directly address the issue of whether a contract's choice of law provision trumps the FAA with respect to arbitration agreements. According to

_____

(...continued)
agreements, which are also cited in their briefs, are as follows: Modified Contract Conditions §§ 4.4.1, 4.6.3, 4.6.4, 4.6.5, and 4.6.6.

Volt, the FAA "'create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act,' which requires that 'questions of arbitrability . . . be resolved in favor of arbitration.'" 489 U.S. at 475 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927 (1983)). The federal policy underlying the FAA "is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate . . . . Arbitration under the [FAA] is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." Volt, 489 U.S. at 476, 479.

Volt firmly establishes that the FAA does not preempt state arbitration laws if freely chosen by the parties. See Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1395-96 (D.C. Cir. 1995) (relying on Volt in deciding that the FAA does not preempt parties' choice of state rules of arbitration that are consistent with the FAA's goals of protecting private arbitration agreements). See also Hall St. Assocs. v. Mattel, Inc., 552 U.S. 576, 590, 128 S. Ct. 1396 (2008) (noting in dicta that the "FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable").

In _Mastrobuono_, the Court further described the circumstances in which either state arbitration rules or the FAA may apply to parties' arbitration agreements. _Mastrobuono_ involved a contract, with a general choice of law provision selecting New York law, as well as an arbitration provision setting forth certain procedural rules governing future arbitration proceedings. 514 U.S. at 58-59. Petitioner sought a ruling that the FAA preempted a New York common law rule, which prohibited arbitration awards of punitive damages. _Id._ at 55-56. Emphasizing its continued support for _Volt_, the Supreme Court found that the contract at issue did not evince the parties' specific intent to exclude punitive damage awards. Moreover, the parties' selection of New York state law conflicted with their simultaneous selection of specific arbitration rules governing the arbitration proceeding. _Id._ at 56, 61-62. Relying on principles of contract construction as well as its decision in _Volt_, the Court concluded that the resulting ambiguity demanded that it interpret the contract so as to permit the arbitration Panel's award of punitive damages. _Id._ at 62-64.

As noted in _Jung v. Association of American Medical Colleges_, 300 F. Supp. 2d 119, 152 (D.D.C. 2004), "[n]umerous courts of appeals have concluded that _Mastrobuono_ requires that the intent of the contracting parties to apply state arbitration rules or law to arbitration proceedings [] be explicitly stated in the contract and that . . . a general choice of law provision does not evidence such

intent."[9] Cf. Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 298 n.6 (3d Cir. 2001), overruled on other grounds by Hall St. Assocs., 552 U.S. 576.

In Jung, the District Court concluded that Mastrobuono stands for the proposition that the FAA trumps a general choice of law provision. 300 F. Supp. 2d at 153. Other D.C. District Court decisions have also agreed with this interpretation of Mastrobuono. See Contech Const. Prods., Inc. v. Heierli, Nos. 09-01483, 09-02204, 2011 WL 453236 at *7 (D.D.C. Feb. 4, 2011)(citing to Mastrobuono in holding that FAA and not D.C. arbitration law applied to arbitration because reference in arbitration clause to Washington, D.C. merely constituted agreement as to location of arbitration proceedings); Khan v. Parsons Global Servs., Ltd., 480 F. Supp. 2d 327, 338 (D.D.C. 2007), rev'd on other grounds, 521 F.3d 421 (D.C. Cir. 2008)(relying on Mastrobuono and a line of

---

[9] See Sovak v. Chugai Pharmaceutical Co., 280 F.3d 1266, 1270 (9th Cir. 2002)(citing to Mastrobuono in holding that a general choice of law clause does not trump the presumption favoring the FAA's application); Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 288-89 (3d Cir. 2001), overruled on other grounds by Hall St. Assocs., 552 U.S. 576 (same); UHC Mgmt. Co. v. Computer Scis. Corp., 148 F.3d 992, 996-97 (8th Cir. 1998)(referencing Mastrobuono in holding that the court would not "interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear"); Ferro Corp. v. Garrison, Indus., Inc., 142 F.3d 926, 937 (6th Cir. 1998)(relying on Mastrobuono in concluding that contract's general choice of law provision selecting Ohio law did not evidence parties' unequivocal selection of Ohio law to determine the scope of their arbitration agreement).

circuit court cases in holding that "a generic choice-of-law clause, by itself, is insufficient evidence to prove that the parties intended to opt out of the default federal standards").[10]

This case, however, presents a different scenario from those cases, following Mastrobuono, holding that a generic choice of law clause is insufficient to displace the FAA's default rules. In this case, even though there is a general choice of law provision applying to the Contract as a whole, Modified Contract Conditions § 13.1.1, the parties included a specific clause stating that "[t]his [a]greement to arbitrate shall be specifically enforceable pursuant to and interpreted under the laws of the District of Columbia." Id. § 4.4.1.

As Volt made clear, the FAA demands that private agreements to arbitrate be upheld and that the parties' choice of substantive law governing those arbitrations generally be respected. Despite Foulger-Pratt's claims to the contrary, the choice of law clause contained in the parties' Contract, Modified Contract Condition §

---

[10] In Ekstrom, our Court of Appeals held that the parties' general choice of law provision selecting Connecticut law did apply to the arbitration. However, that holding is not relevant to this case because the parties in Ekstrom did not challenge the general applicability of Connecticut law to their arbitration agreement, but rather disagreed as to whether a particular provision within that law was applicable to the arbitration. 69 F.3d at 1395-96. See Jung, 300 F. Supp. 2d at 153 (noting that Ekstrom decision was in line with Mastrobuono, as parties in Ekstrom did not challenge general applicability of Connecticut law to their arbitration agreement). But see Int'l Techs. Integration, Inc. v. Palestine Liberation Org., 66 F. Supp. 2d 3, 9 (D.D.C. 1999).

4.4.1, specifically and unambiguously evidences their clear choice of D.C. law rather than the FAA to govern their agreement to arbitrate. It is an axiom of contract interpretation that, in interpreting a contract, the court should determine "what a reasonable person in the position of the parties would have thought the disputed language meant." <u>Steel Founds., Inc. v. Clark Constr. Group, Inc.</u>, 937 A.2d 148, 154 (D.C. 2007) (internal quotations and citations omitted). In pursuing this inquiry, the court should "tak[e] into account the contract as a whole, so as to give effect, if possible, to all of the provisions in the contract." <u>Id.</u> (quoting <u>Akassy v. William Penn Apartments, Ltd. P'ship</u>, 891 A.2d 291, 303 (D.C. 2006)). Moreover, there is nothing in the D.C. arbitration law that conflicts with the policy behind the FAA. <u>Masurovsky v. Green</u>, 687 A.2d 198, 204 n.3 (D.C. 1996).

Foulger-Pratt's argument that D.C. law applies only to the <u>actual</u> agreement to arbitrate (in other words, only to the issue of arbitrability) is not persuasive. Foulger-Pratt Reply to App. 13-14. As Madrigal correctly argues, a reasonable reading of the provision would apply D.C. law to all aspects of the arbitration, and not just to the act of entering into the arbitration agreement itself.[11]

---

[11] Foulger-Pratt also argues that, under the Contract, the party seeking confirmation of an arbitration award has the right to determine the applicable law. In making this claim, Foulger-Pratt
(continued...)

Foulger-Pratt also fails in its claim that the Contract's lack of specific reference to the D.C. arbitration statute demonstrates that the parties did not contemplate application of D.C. arbitration laws. As observed by the Third Circuit Court of Appeals in Roadway, parties may employ various means of evidencing their clear and unambiguous intent to apply state arbitration laws and are not limited in this respect to specifically invoking the state's arbitration provision. 257 F.3d at 297 n.5.

Given the emphasis in Mastrobuono and Volt on upholding private agreements to arbitrate and the parties' clear choice of law governing arbitration in this case, the Court concludes that D.C. law governs its review of the arbitration award.

## 2. The DCRAA and the D.C. Uniform Act

The DCRAA went into effect in the District of Columbia on February 27, 2008, although full repeal of the D.C. Uniform Act did

_____

(...continued)
relies upon language found in Modified Contract Conditions §§ 4.4.1 and 4.6.6. Section 4.4.1 states that, "[t]he award rendered by the arbitrator(s) shall be final, binding and conclusive on all parties involved, and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof." Similarly, Section 4.6.6 states that "[t]he award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." Foulger-Pratt's claim that the Modified Contract Conditions "contemplates that the party seeking confirmation of an award is given the right to select the forum and concomitantly, the governing body of law," Foulger-Pratt Reply to App. 9., is simply not in accord with established case law. Volt, 489 U.S. at 476,479; Steel Founds. Inc., 937 A.2d at 154.

not take place until July 1, 2009. In brief footnotes, Foulger-Pratt argues that should the Court apply D.C. law then it is the D.C. Uniform Act, and not the DCRAA, which should be applied. Foulger-Pratt Reply to App. 13 n.1, 20 n.4.

Section 16-4403 of the DCRAA generally governs its applicability. According to this section, the statute applies to "an agreement to arbitrate made on or after February 27, 2008" as well as to "an agreement to arbitrate made before February 27, 2008 if all the parties to the agreement or to the arbitration proceeding so agree in a record." D.C. Code § 16-4403 (a)-(b). The provision goes on to state, however, that "[o]n or after July 1, 2009, this chapter governs an agreement to arbitrate <u>whenever</u> made." D.C. Code § 16-4403(e)(emphasis added). The statute also contains a Savings Clause, stating that the DCRAA "does not affect an action or proceeding commenced or right accrued before the effective date of this chapter. Subject to § 16-4403, an arbitration agreement made before the effective date of this chapter is governed by §§ 16-4301 to 16-4319 [the D.C. Uniform Act]." D.C. Code § 16-4432.

While there are few federal or D.C. cases that discuss the DCRAA in any significant depth, the D.C. Court of Appeals recently examined the import of this new statute in <u>Menna v. Plymouth Rock Assurance Corp.</u>, 987 A.2d 458 (D.C. 2010). According to <u>Menna</u>, after July 1, 2009, the DCRAA repealed the D.C. Uniform Act in its

-17-

entirety. Thus, any arbitration agreement entered into before or after that date, as well as any pending arbitration hearing, would be governed by the DCRAA. Id. at 462. Quoting commentary on the Revised Uniform Arbitration Act, on which the DCRAA is based, the court in Menna observed that the DCRAA's "savings clause is 'subject to' the provision that, after the date on which the old Act is repealed, the revised Act governs all arbitration agreements whenever made." Id. at 463 n. 14 (citation omitted).

It is well-settled that on issues of D.C. law, this Court defers to the rulings of the D.C. Court of Appeals. Williams v. Martinez, 586 F.3d 995, 1001 (D.C. Cir. 2009). Morever, the Menna court's reading of the DCRAA is persuasive and utilizes traditional tools of statutory construction. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296-97, 126 S. Ct. 2455 (2006) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the statutory language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.")(internal quotations and citations omitted).

Furthermore, federal as well as D.C. law regarding statutory retroactivity establish that where the legislature has made clear that a law shall apply retroactively, the court shall uphold such effect, even in cases involving private, contractual rights. See

-18-

Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S. Ct. 1483 (1994)("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules."); District of Columbia v. Beretta USA Corp., 940 A.2d 163, 176 (D.C. 2008)("'When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly.'")(quoting Plaut v. Spendthrift Farm Inc., 514 U.S. 211, 226, 115 S. Ct. 1447 (1995)).

It is true that under D.C. law legislatively-mandated retroactivity will be limited where "manifest injustice" would occur or "substantial due process concerns" are raised. Menna, 987 A.2d at 463 n.15. In order to evaluate whether a litigant is likely to suffer manifest injustice from the retroactive application of a law, courts must consider "(1) the nature and identity of the parties, (2) the nature of their rights, and (3) the nature of the impact of the change in law upon those rights." Holzsager v. District of Columbia Alcoholic Beverage Control Bd., 979 A.2d 52, 57 (D.C. 2009), citing Bradley v. Richmond Sch. Bd., 416 U.S. 696, 717, 94 S. Ct. 2006 (1974). Foulger-Pratt's decidedly brief challenge to application of the DCRAA does not raise a due process

challenge to the law's application or any claims that manifest injustice would occur as a result of its use in this case. Nor does anything included in Foulger-Pratt's motion papers or in the DCRAA raise such concerns.

For all the forgoing reasons, the Court concludes that the DCRAA applies to this case.[12]

**B.    Vacatur of the Arbitration Award**

Pursuant to DCRAA § 16-4423(a)-(b), Madrigal moves to vacate five portions of the November 30, 2009 arbitration award.[13] Motion accompanying Madrigal Mot. to Vacate 1. Under Section 16-4423, a court can vacate an arbitration award on seven general grounds, three of which are invoked here: (1) <u>denial of a full and fair hearing</u> - "an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to § 16-4415, so as to prejudice substantially the

---

[12] Because the DCRAA applies to this case, the Court will not address parties' arguments regarding whether the arbitration award is interim or final in nature. As reflected in the parties' briefs, this dispute would be material only if the Court concluded that the FAA was the applicable law. Madrigal Opp'n to App. 8-10; Foulger-Pratt Reply to App. 29-32; Madrigal Surreply 8-10. As both parties agree, under the DCRAA, the Court may review an arbitration award, regardless of whether it is interim or final. Madrigal Opp'n to App. 9 n.9; Foulger-Pratt Reply to App. 29-32.

[13] In the alternative, Madrigal moves to vacate portions of the award pursuant to FAA § 10(a)(3) -(4). Motion accompanying Madrigal Mot. to Vacate 1.

rights of a party to an arbitration hearing" (§ 16-4423(a)(3)); (2) <u>exceeding its authority</u> - "[a]n arbitrator exceeded the arbitrator's powers" (§ 16-4423(a)(4)); and (3) <u>other reasonable ground</u> - "[t]he court may vacate an award made in the arbitration proceeding on other reasonable ground"(§ 16-4423(b)).

Pursuant to those subsections of the DCRAA, Madrigal challenges the following five portions of the award: (1) the portion of the award dealing with the building's "Exterior Skin"[14] (Interim Award ¶ 17);[15] (2) the Panel's decision to grant pre-award

---

[14] The "Exterior Skin" of the building "comprises the brick masonry walls, metal panels on the balconies and window assemblies, aluminum window, door and balcony storefronts, roofing, rooftop and penthouse screen walls, and exterior sealant joints between various building components." Madrigal Mot. to Vacate 15-16.

[15] Because of its central importance to this case, the Panel's holding in Paragraph 17 is set out in full below:

> Among the Items 1-8 Punch List Work, Paragraph 15 of the APS provides that the Panel is to determine Foulger-Pratt's obligation to perform Gale report items that Foulger-Pratt contends are not required by the Contract Documents. This is a specific-carve out agreed [to] by the parties to what would otherwise be the Project Neutral's responsibilities. There are three such issues that were identified by Foulger-Pratt: a) whether Foulger-Pratt is responsible for extending beyond the windows the .090 aluminum flashing over certain exterior windows, or providing an end-dam therefore; b) whether Foulger-Pratt is responsible for correcting the gap between the bottom of the exterior metal panels at the roof level and the building structure at the 12th floor; and c) whether Foulger-Pratt needs to install thermal insulation between the panel and edge of the concrete floor slab at each floor. <u>Madrigal has requested that the Panel defer ruling on these issues, but the Panel rejects</u>

(continued...)

interest to Foulger-Pratt (<u>Id.</u> ¶ 14(g)); (3) the Panel's decision to excuse Foulger-Pratt from its obligation to provide certain warranties and close-out requirements for the building (<u>Id.</u> ¶ 14(d),(f)); (4) the Panel's decision to deny Madrigal's claims for estimated costs for expected Condominium Association and Unit Owner Punch-Lists (<u>Id.</u> ¶ 4(c)-(d)); and (5) the Panel's denial of some of Madrigal's claims for attorneys' fees (<u>Id.</u> ¶ 10).

Madrigal's challenge to the Panel's decision on the Exterior Skin claims is based on the Panel having exceeded its jurisdiction in considering the issue and having prevented Madrigal from receiving a fair hearing on the matter. Madrigal challenges the Panel's decision on the remaining four claims under the DCRAA provisions on "excess authority" and "other reasonable ground."

### 1. The Judicial Standard of Review for Arbitration Awards

As both the Supreme Court and our Court of Appeals have recognized, judicial review of arbitration awards is extremely limited. <u>Major League Baseball Players Ass'n v. Garvey</u>, 532 U.S.

---

[15](...continued)
<u>this request, noting that all parties have been heard on these issues (indeed, considerable hearing time was expended on these issues), and APS Paragraph 15 also contemplates a ruling on these issues in advance of the Project Neutral's involvement</u>. The Panel concludes that Foulger-Pratt has no contractual responsibility to perform the three identified items from the Gale report. Additionally, the Panel finds that Specifications Section 08911 (Glazed Aluminum Curtain Wall) is not applicable to the exterior metal panels. (emphasis added).

504, 506, 121 S. Ct. 1724 (2001); <u>Kurke v. Oscar Gruss and Son,</u> <u>Inc.</u>, 454 F.3d 350, 354 (D.C. Cir. 2006). Because of this "extremely limited" standard of review, the court will not sit "to hear claims of factual or legal error by an arbitrator as [it would] in reviewing decisions of lower courts." <u>Kurke</u>, 454 F.3d at 354 )(internal quotations and citations omitted).

The local D.C. courts have similarly held that "'[j]udicial review of an arbitrator's decision is extremely limited, and a party seeking to set it aside has a heavy burden.'" <u>Bolton v.</u> <u>Bernabei & Katz, PLLC</u>, 954 A.2d 953, 959 (D.C. 2008), quoting <u>Lopata v. Coyne</u>, 735 A.2d 931, 940 (D.C. 1999). <u>See</u> <u>Celtech, Inc.</u> <u>v. Broumand</u>, 584 A.2d 1257, 1258-89 (D.C. 1991)("[T]he burden on a party seeking to set aside the result of an arbitration proceeding remains a formidable one."); <u>Lopata</u>, 735 A.2d at 940 ("[T]his court [] will not review an arbitration award on the merits.")(internal quotations and citations omitted). Such extremely limited review "serves to attain a balance between the need for speedy, inexpensive dispute resolution, on the one hand, and the need to establish justified confidence in arbitration among the public, on the other." <u>Bolton</u>, 954 A.2d at 959 (internal quotations and citation omitted).

Thus, the Supreme Court, the D.C. Circuit, and the D.C. Court of Appeals have all concluded that the standard of review for arbitration awards is extremely limited.

## 2. Claims

### a. The Exterior Skin Claims - Jurisdiction/Excess Authority

Madrigal initially relies on the principle of "excess authority" to argue that the Panel was barred from hearing claims related to the building's Exterior Skin. Madrigal Mot. to Vacate 16-17. However, as Madrigal subsequently admits in its briefs, it is arguing that, in fact, the Panel lacked jurisdiction to hear these claims. See e.g. id. at 20 ("The Panel's Rulings in [Interim Award] Paragraph 17 Fall Outside Its Jurisdiction"); Madrigal Reply 7-11. In essence, Madrigal claims that the Panel decided issues that were expressly reserved in the APS for consideration by the Project Neutral. Madrigal Mot. to Vacate 16-22; Madrigal Reply 7-11.[16]

The parties do not disagree that the Panel's jurisdiction is based upon the APS, although they disagree as to the scope of jurisdiction given to the Panel by this agreement. Madrigal Mot. to Vacate 16-22; Foulger-Pratt Opp'n 9-10.[17] Paragraph 11 of the APS

---

[16] Although the D.C. Circuit has noted that "[b]y necessary implication, an arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority," it has nonetheless analyzed the issue as a jurisdictional one. Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 165-67 (D.C. Cir. 1981).

[17] While Foulger-Pratt appears to agree that Madrigal's claim is jurisdictional, it attempts to interpret Madrigal's allegations as a challenge to procedural, rather than substantive, arbitrability. (continued...)

sets forth the parties' agreement to arbitrate certain matters left unresolved by the APS, stating, in part, that "[b]y February 2, 2009, Madrigal shall provide to Foulger-Pratt and Travelers an updated list of the Madrigal Claims. The Parties agree that the Madrigal Claims shall be submitted to arbitration. . . . The arbitration shall also cover claims of the Parties that arise after the date of this APS." Paragraph 15 of the APS further clarifies the Panel's jurisdiction:

> Foulger-Pratt shall complete by April 30, 2009, the items in the Gale report that are within the scope of the existing Contract Documents and required by the Contract. By the close of business on February 3, 2009, Foulger-Pratt shall deliver to Madrigal a list of those items in the Gale report it contends are not required by the Contract Documents and the Contract. Any dispute regarding the Contract requirements or Foulger-Pratt's obligation to perform any item shall be addressed during the arbitration . . . .

Both the parties and the Panel refer to Paragraph 15 as the "Gale Report Carve-Out," a provision that essentially removed Item

---

[17](...continued)
Foulger-Pratt Opp'n 14-15, 30-31. The Supreme Court has described procedural arbitrability as including "prerequisites such as <u>time limits</u>, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 85, 123 S. Ct. 588 (2002)(emphasis in original). Foulger-Pratt claims that Madrigal's challenge amounts to a procedural claim that Foulger-Pratt waived its right to bring some of the Paragraph 17 issues to the Panel's attention, as it did not submit these claims until after the February 3, 2009 date contained in APS ¶ 15. However, Madrigal's briefs clearly demonstrate that its challenge is to the Panel's substantive jurisdiction over the Paragraph 17 issues. Given this conclusion, the issue must be considered under the extremely limited standard of review discussed above.

6 from the Items 1-8 Punch-List otherwise assigned to the Project Neutral. May 26, 2009 Order ¶ 3.3; Madrigal Mot. to Vacate 18-19. Madrigal does not dispute that Paragraph 15 created such a carve-out. In fact, in its Motion papers, Madrigal acknowledges that the Panel's jurisdiction "to adjudicate exterior skin issues [is] encompassed by Item 6." Madrigal Mot. to Vacate 19. However, Madrigal also claims that the items contained in Paragraph 17 of the Interim Award were not covered by this carve-out because they were submitted by Foulger-Pratt to Madrigal after the February 3, 2009 date noted in APS ¶ 15. Id. 20-21.

In order to determine whether Madrigal can bring this jurisdictional challenge, the Court must analyze whether Madrigal first brought its jurisdictional objections to the arbitration Panel.

As the D.C. Circuit has held, "[a]bsent excusable ignorance of a predicate fact, a party that does not object to the arbitrator's jurisdiction during the arbitration may not later do so in court." Howard Univ. v. Metro. Campus Police Officer's Union, 512 F.3d 716, 720 (D.C. Cir. 2008). This rule serves two key functions. First, "arbitration is a matter of consent; if a party submits to arbitration without objecting to the arbitrator's jurisdiction, then it may fairly be said to have consented to the arbitration, and the other party, having gone forward with the proceeding, may fairly be said to have relied upon that consent." Id. (citation

omitted). Second, "requiring a party to object to the arbitrator's jurisdiction during the arbitration conserves resources. If a party objects to the arbitrator's jurisdiction and the arbitrator sustains the objection, then the parties can go directly to court and, if the court affirms, avoid an unnecessary arbitration proceeding." Id. at 721.

In order to preserve an objection to an arbitrator's jurisdiction, a party must raise it "clearly and explicitly," and at a minimum before a decision or award is issued. Envt'l Barrier Co. v. Slurry Sys, Inc., 540 F.3d 598, 606 (7th Cir. 2008). As long as a party "has presented its objection to arbitrability to the arbitrator and has not thereafter clearly indicated its willingness to forego judicial review . . . the issue is sufficiently preserved for [] subsequent judicial inquiry." Davis, 667 F.2d at 168 (citation omitted).

To corroborate its claim that it did in fact object to the Panel's consideration of the Paragraph 17 items, Madrigal has submitted to the Court excerpts from the arbitration hearing transcripts. These excerpts demonstrate that Madrigal did resist the Panel's consideration of at least some of the Paragraph 17 issues, namely subsections 17(a) and (b):[18]

_____

[18] Madrigal's jurisdictional objection to the Panel did not cover all Paragraph 17 items. As reflected in footnote 15, supra, Paragraph 17 decided four issues. Subsections (a),(b), & (c) relate
(continued...)

> Under the [APS] it required a statement of problems with
> – that they had with the Gale Report to be submitted and
> that is a February 2nd or 3rd 2009 letter from Mr. Brasco,
> okay, and that is what I understand this witness ought to
> be talking about. If he's now going to quarrel with other
> aspects of the Gale Report, costs or whatever, that's not
> an issue that's here. That should go to the Project
> Neutral. That's the procedure.

Parties' Arbitration Hearing (July 24, 2009)[Dkt. No. 37-1], Arb.

Tr. 2944:7-18. See id. Arb. Tr. 2952:21-2953:22, 2970:5-21(during

discussion of issues relating to February 3, 2009 letter, Madrigal

objects to items being addressed that were not included in that

document).

---

(...continued)
to Gale Report items, while the fourth issue concerns
"Specifications Section 08911" ("Section 08911").

First, Madrigal concedes that it does not bring a
jurisdictional challenge with respect to 17(c), although it does
argue that the award should be vacated because it is in essence an
Exterior Skin matter. Madrigal Mot. to Vacate 20 n.11. Second,
while Madrigal's hearing transcript excerpts demonstrate its
jurisdictional objections to the remaining Gale Report items (i.e.
¶ 17(a)-(b)), they do not evidence Madrigal's objection to the
Panel's jurisdiction over the Section 08911 issue. Madrigal Mot. to
Vacate 21-22. In fact, it appears that Madrigal did present
evidence on Section 08911 during the hearing, although it attempts
to couch it as "an incidental presentation of evidence" that
"cannot plausibly be deemed a waiver of its right to insist that
the Panel lacked jurisdiction to decide an issue that was
specifically reserved for the Project Neutral." Madrigal Reply 10
n.12. However, as case law discussed below establishes, where a
party participates fully on an issue in an arbitration hearing and
does not register its objection to the Panel's jurisdiction over
the matter, the party is deemed to have waived its right to later
bring a judicial challenge to the Panel's jurisdiction over that
issue.

In addition, Foulger-Pratt's claim that Madrigal "presented extensive evidence on the Exterior Skin Contact Disputes . . . without any reservation" also fails. While Foulger-Pratt presents case law demonstrating that jurisdiction over a matter is established where a party fully participates in an arbitration <u>without</u> raising any jurisdictional objection, it proffers no authority to support the view that a party waives its properly raised jurisdictional challenge to a matter by merely submitting evidence which is related to the issue. Foulger-Pratt Opp'n 13, 21-28. <u>See</u> <u>Davis v. Prudential Secs., Inc.</u>, 59 F.3d 1186, 1194-95 (11th Cir. 1995)(submission of some evidence relating to attorney's fees alone was insufficient to demonstrate that party had submitted issue of his entitlement to such fees to arbitrators).

Where a jurisdictional objection has been so preserved, the courts are empowered to determine the question of arbitrability, unless there is "clea[r] and unmistakabl[e]" evidence that the parties intended the arbitrator to determine it. <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944, 115 S. Ct. 1920 (1995)(internal quotations and citations omitted). To rule otherwise, "might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." <u>Id.</u> at 945.

Where there is no clear and unmistakable evidence that the parties intended the arbitrator to resolve the issue, "courts

generally . . . should apply ordinary state-law principles that govern the formation of contracts" to determine the jurisdictional issue. Id. at 944. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 82, 123 S. Ct. 588 (2002)("[T]he presumption is that a court, not an arbitrator, will ordinarily decide an 'arbitrability' question."); Masurovsky, 687 A.2d at 204 (relying on First Options in holding that presumption in favor of arbitration is reversed when considering question of arbitrability). However, where resolution of the arbitrability issue is within the Panel's jurisdiction, "a court must defer to an arbitrator's arbitrability decision." First Options, 514 U.S. at 943.

Based on the parties' APS, as well as the Panel's May 26, 2009 Order, there is clear and unmistakable evidence that the parties intended the Panel to decide issues of arbitrability relating to the Item 6 Carve-Out. As noted in the May 26, 2009 Order ¶ 3.1:

> Paragraph 11 of the APS specifically provides that 'the arbitration [i.e., this arbitration] shall also cover claims of the parties that arise after the date of this APS, which encompasses disputes regarding the interpretation or application of the APS. Additionally, all parties agreed at the hearing, in response to the Panel's question, that this Panel has plenary jurisdiction to determine all disputes among the parties relating to this contract, other than whatever disputes were agreed to be determined by the Project Neutral per the APS (emphasis added).

The May 26, 2009 Order ¶ 3.3 goes on to say:

> Item 6 of the Items 1-8 Punch-List Work, which relates to the Exterior Skin and Roof, includes among other references, a reference that reads: "See Gale Reports

dated 10/02/2007 and 11/18/2008." This is significant because Paragraph 15 of the APS specifically confers upon this arbitration the responsibility to determine "any dispute regarding the Contract requirements or Foulger-Pratt's obligation to perform any item [in the Gale reports that Foulger-Pratt contends is not required]." As such, disputes on that subject are for the Panel, effectively creating a carve-out from the Project Neutral's responsibility under Paragraph 5.3 for that portion of Item 6.

Madrigal has not objected to the Panel's rulings in its May 26, 2009 Order. Moreover, in its Motion papers, Madrigal implicitly suggests that its challenge to the Paragraph 17 issues amounts to a dispute regarding the scope of the Item 6 Carve-Out.[19] See Madrigal Reply 5 ("The parties . . . disagree about the scope of this 'carve out.'"). Contrary to Madrigal's claim, questions about the Project Neutral's jurisdiction over these issues do not place them beyond the purview of the Panel. Id. at 6 n.8. According to the clear language of the May 26, 2009 Order, disputes concerning Item 6 are not to be resolved by the Project Neutral, since the item is not one that is "to be determined by the Project Neutral per the APS." As such, whether the Panel had jurisdiction over the Paragraph 17 claims is an issue for the Panel itself to decide based upon its authority "to determine all disputes among the parties relating to this contract." May 26, 2009 Order ¶ 3.1.

---

[19] While the Item 6 Carve-out does not include the Section 08911 issue, Madrigal has waived its jurisdictional challenge with respect to this claim and cannot now raise it for the first time before this Court.

Foulger-Pratt also correctly argues that Madrigal's statements during the course of the arbitration proceedings demonstrated its belief that the Panel had jurisdiction over these issues. <u>Lopata</u>, 735 A.2d at 936-37 (concluding that "it [was] unmistakable that the parties agreed to submit all claims between them to arbitration, not only from their agreement, but also from the positions taken by them during arbitration). <u>See</u> Parties' Arbitration Hearing (May 20, 2009)[Dkt. No. 31-1], Arb. Tr. 50:22 - 51:4 ("[I]n order for the exterior Project Neutral to evaluate whether item 6 of the punch list work has been completed, we have to have a ruling from the Panel as to what those obligations are."); Madrigal Pre-Hearing Brief 18 (May 14, 2009)[Dkt. No. 30-19] ("[I]n accordance with Section 15 of the APS, the Panel must determine the scope of Foulger-Pratt's obligation under the Contract to correct systemic deficiencies identified by the Gale Reports (<u>i.e.</u> the Panel must clarify the scope of the punch-list work identified in Outstanding Item No. 6) prior to submitting the 'Items 1-8 Punch-List Work' to the Development Manager and Architect and/or the Project Neutral for certification of completion."); Parties' Arbitration Hearing (May 20, 2009), Arb. Tr. 64:20-65:3 ("The Project Neutral was not supposed to go out and make determinations whether or not this item would be in or out of the contract, whether it was a contract obligation, yes or no, but to determine simply is it done.") <u>See also</u> Interim Award ¶ d ("The Panel's interpretation of [the

Contract and APS] is that its jurisdiction under the [Contract] and the APS encompasses all disputes arising under either of these agreements, and the parties have confirmed that they all share this same understanding.").

Since the question of arbitrability was properly before the Panel for resolution, this Court may not disturb the Panel's jurisdictional decision on the merits. Lopata, 735 A.2d at 940. Therefore, Madrigal's jurisdictional challenge is **denied.**

### b.  Denial of Full and Fair Hearing Claim

In addition to its jurisdictional challenge, Madrigal claims it was denied a full and fair hearing on its Exterior Skin claims, based on DCRAA § 16-4423(a)(3). Madrigal argues that the Panel, after expressly delaying consideration of issues relating to the Exterior Skin to a later hearing, ruled on some of the issues relating to those claims in its Interim Award. Madrigal Mot. to Vacate 22. In essence, Madrigal claims that by ruling on the Paragraph 17 issues, the Panel disregarded "the clear mandate of its own May 26 [,] [2009] Order bifurcating the proceedings and reserving all exterior skin issues for a subsequent phase of the arbitration . . . ." Id. at 24. Madrigal also argues that the Panel's consideration of these issues deprived it of "an opportunity to present all of its evidence relevant to these issues," evidence which it planned to present during the second

hearing. Id. at 26.[20] As is demonstrated below, Madrigal's arguments

on these points largely fail, as the May 26, 2009 Order does not

contemplate postponing all Exterior Skin issues to a second

hearing.

In general, courts accord deference to an arbitrator's

decision regarding postponement or adjournment of matters, except

when the decision prevents a party from presenting "pertinent and

material evidence." Naing Int'l Enterp., Ltd. v. Ellsworth Assocs.

961 F. Supp. 1, 3 (D.D.C. 1997)(internal quotations and citations

omitted). Madrigal is correct that the Panel's May 26, 2009 Order

¶ 1 reserved certain Exterior Skin issues for adjudication during

a later hearing "if needed." (emphasis added):

> Both Claimant Madrigal and Respondents Foulger-Pratt and
> Travelers agree that the potential issue regarding
> potential defects in the building exterior is not ripe
> for determination at this time. Investigation of the
> issue is underway by Madrigal, and the issue will be ripe
> for determination, if needed, only after Madrigal
> completes its investigation and discloses the results of
> that investigation to Respondents. If a dispute exists
> once the investigation is completed and disclosed, that
> dispute will accordingly be the subject of a separate
> hearing to be scheduled as promptly as possible after the
> current hearing concludes. The Panel is sensitive to the
> fact that any award issued and relief granted in advance
> of the follow-on hearing will need to take this potential
> open issue into consideration.

---

[20] Madrigal does not deny that it submitted "significant" evidence
to the tribunal on these issues. Madrigal Mot. to Vacate 23;
Madrigal Reply 13. Rather, it contends that it was prevented from
presenting evidence "critical" to the matters decided in Paragraph
17 of the Interim Award. Madrigal Mot. to Vacate 23; Madrigal Reply
13.

Id. (emphasis added).

While Madrigal repeatedly asserts that this clause postponed consideration of all Exterior Skin issues, Foulger-Pratt argues that only some issues, namely those that were not yet "ripe" for consideration were covered by this provision. Foulger-Pratt Reply 32-33. In its brief, Foulger-Pratt argues that "[h]ad the Panel actually bifurcated the hearing as to all Exterior Skin Contract Disputes as Madrigal now suggests, there would be no question that a second hearing would necessarily occur, and the May 26, 2009 Order would not have equivocally discussed the possibility of such a hearing." Foulger-Pratt Opp'n 32.

Foulger-Pratt's reading of this clause is correct and accords with the Item 6 Carve-Out. First, Madrigal does not contest the Panel's jurisdiction in the initial hearing over at least one of the Exterior Skin issues included in Paragraph 17, namely subsection (c). Second, Madrigal does not deny that this issue was ready and ripe for review before the May 26, 2009 Order. Third, the Panel never issued any Order to "bifurcate" the hearing or to hold a "Phase II" hearing. The "Bifurcation Order" to which Madrigal refers in its Motion papers is simply a figment of a legal imagination. Madrigal Mot. to Vacate 24-26; Madrigal Reply 11-18. As to the "Phase II hearing," noted supra, the Panel made it clear that certain Exterior Skin issues were not ripe, that Madrigal was

investigating those issues, that no claim had yet been made by Madrigal, and that a hearing would be held only "[i]f a dispute exists once the investigation is completed and disclosed." May 26, 2009 Order ¶ 1. The unsubstantiated and misleading claims about the Panel's alleged bifurcation of the hearing made in the affidavit of Dennis Davison, Madrigal's attorney during the arbitration, cannot undo the plain language of the Panel's May 26, 2009 Order.[21] See

---

[21] The Davison Declaration contains a number of vague and conclusory statements. See e.g. ¶ 4. Paragraph 5 of the Declaration simply misstates what is contained in the Panel's May 26, 2009 Order. As discussed supra, that Order made no reference to a "Phase I" and "Phase II" hearing nor did it specifically divide the arbitration. In Paragraph 7 of his Declaration, Davison describes the Panel's May 26, 2009 Order as "bifurcat[ing] [the] hearing, with the exterior skin issues reserved for Phase II." Again, this is a misrepresentation of the Panel's May 26, 2009 Order, which did not rule that there would definitively be a second hearing on the Exterior Skin issues or that all the Exterior Skin issues would be addressed in that hearing. In Paragraph 8, Davison claims that "the Panel chair stated that each witness should testify only one time during the course of the proceedings for the sake of efficiency, and that while there may be some overlap between the two phases, the Panel would wait and rule on the reserved issues until Phase II." (emphasis in original). The Davison Declaration does not, however, contain citations to the hearing transcripts or any other part of the record to substantiate this statement. Moreover, an affidavit from Foulger-Pratt's attorney, Christopher Brasco, clearly contradicts this claim. See Affidavit of Christopher J. Brasco ¶ 6 (Apr. 30, 2010) [Dkt. No. 34]("At no time did the Panel issue a statement or ruling that required the parties to present witness testimony or other evidence during the initial phase of the arbitration proceedings relating to unripe exterior skin claims that were reserved for any potentially-subsequent proceedings. Likewise, at no time did the Panel issue a statement or ruling that precluded witnesses who had already testified in the initial phase of the proceedings from being re-called to testify regarding reserved exterior skin claims in any potentially-subsequent proceedings."). Significantly, Madrigal never filed an affidavit
(continued...)

Declaration of Dennis A. Davison in Support of Madrigal Condominiums, LLC's Motion to Vacate ("Davison Declaration") (Mar. 15, 2010) [Dkt. No. 27-2].

In light of those positions, Foulger-Pratt is correct in arguing that, if the Panel intended to postpone all Exterior Skin issues to a second phase, it would have used more definitive language, as Paragraph 17 (c) was already ripe for consideration.

Because Madrigal's argument rests squarely on its claim that the Panel deferred <u>all</u> Exterior Skin issues to the second phase, its claim to being deprived of a full and fair hearing must fail. A far more accurate and reasonable reading of the alleged "bifurcation" language in the May 26, 2009 Order is that the Panel delayed hearing those Exterior Skin issues which were raised in Madrigal's May 13, 2009 letter to the tribunal [Dkt. No. 27-9], but did not postpone consideration of those Exterior Skin issues which were ripe, contained in the Gale Report, and covered by the Item 6 Carve-Out.[22]

---

[21](...continued)
contradicting Brasco's statement.

[22] The Panel's statement during post-hearing argument, set forth below, further supports the conclusion that it did not definitively "bifurcate" the proceeding and postpone all Exterior Skin issues to a second hearing. The Panel's statement also belies Madrigal's claim that the Panel had not made "clear to the parties that they consider[ed] [the] issue to be under submission . . . ." Madrigal Mot. to Vacate 33:

(continued...)

With regard to its second argument, Madrigal fails to demonstrate that it was prejudiced by the Panel's failure to consider "critical evidence" about Paragraph 17(a)-(c). In deciding whether the Panel denied Madrigal a fair hearing, the Court is "neither required nor authorized to comb the record for technical errors in the receipt or rejection of evidence by arbitrators." Bolton, 954 A.2d at 960 (internal quotations and citations omitted). Rather, the Court's review is "restricted to determining whether the procedure was fundamentally unfair." Id. See Lessin v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 481 F.3d 813, 818 (D.C. Cir. 2007)("[E]very failure of an arbitrator to receive relevant evidence does not constitute misconduct requiring vacatur."); Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997)("[E]xcept where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary

_____

[22](...continued)
    Arbitrator Ness: I think both sides addressed from an evidentiary standpoint, I think there were three exceptions to the Gale report that you're talking about and both sides addressed those in some detail and I remember we noted your request to not rule on those three pending, the CSC report, and dealing with it in phase II and we agreed that we would take those under consideration. We may rule on those we may not rule on those. That's where that stands.

Parties' Arbitration Hearing (Sept. 21, 2009)[Dkt. No. 31-8 ], Arb. Tr. 3659:12-22. (emphasis added).

review.").[23]

In general, it is within the arbitrator's discretion to decide whether or not "additional evidence is necessary or would simply prolong the proceedings." Tempo Shain, 120 F.3d at 19. However, "although not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument." Id. (internal quotations and citation omitted). Courts may vacate an award "only if the Panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." Lessin, 481 F.3d at 818 (internal quotations and citations omitted).

Madrigal's claim focuses on several pieces of evidence which it asserts were central to its allegations regarding the Exterior Skin issues, but which it was prevented from submitting to the Panel. They are: (1) an expert report; (2) rebuttal expert witnesses on the Section 08911 issue; (3) fact witnesses with personal knowledge of Exterior Skin issues; and (4) general evidence on how the Exterior Skin claims were interrelated.

_____

[23] The Court of Appeals for the District of Columbia has noted that federal court decisions construing and applying the FAA may be regarded as "persuasive authority in construing and applying the corresponding provisions of the District of Columbia arbitration act . . . ." Bolton, 954 A.2d at 960 n.5 (D.C. 2008)(internal quotations and citations omitted). Although this case involved the D.C. Uniform Act, the DCRAA also shares a number of identical provisions with the FAA.

Madrigal Mot. to Vacate 25-26; Madrigal Reply 12.

Madrigal fails to demonstrate how these evidentiary materials are "pertinent and relevant" to the Panel's consideration of the specific, ripe Gale Report items contained in Paragraph 17. Instead, Madrigal offers rather vague and conclusory statements that "[a]ll of this testimony would be highly relevant to the issues addressed in Paragraph 17 of the Interim Award" and that the evidence would "show that none of the elements [of the Exterior Skin] can be understood without reference to the others . . . in order for the Contract to be properly interpreted."[24] Madrigal Mot. to Vacate 26. Such statements alone, however, do not demonstrate sufficient prejudice, if any at all, to justify vacating the Panel's decision.

Similarly, Madrigal has not established how it was prejudiced

---

[24] By and large Madrigal's argument on the evidentiary issue boils down to a claim that because it had evidence it believes related to the items contained in Paragraph 17 and because it did not have an opportunity to present this evidence, it is therefore a foregone conclusion that Madrigal was prejudiced in the hearing of its case. See Madrigal Reply 13-14 ("Had the Panel advised Madrigal that it had changed its mind regarding the deferral of exterior skin issues and that it would, notwithstanding its May 26, 2009 Order, proceed to decide the exterior skin issues addressed in Interim Award ¶ 17, Madrigal would have presented the testimony of its expert and other witnesses on these issues during Phase I. Thus, the Panel's disregard of the procedural ground rules it established resulted in a denial of fundamental fairness to Madrigal."). However, as noted in case law above, arbitration Panels are empowered to exclude evidence and the mere fact that such evidence may have been relevant is insufficient on its own to trigger judicial vacatur of an award.

by the Panel's failure to consider this purportedly relevant evidence during the hearing that was held. Madrigal does not challenge the Panel's substantive holding on the three Gale Report items or demonstrate how its decision would have been altered by the pieces of evidence the Panel did not consider. Instead, Madrigal's claim appears to be that the Panel's decisions on Paragraph 17 "significantly undercut Madrigal's ability to pursue its exterior claims in Phase II." Id. at 27. See id. at 28 ("[T]he Panel's rulings in Paragraph 17 eliminating Foulger-Pratt's obligations to perform the disputed Gale Report items and stating that Section 08911 does not apply to the exterior metal Panels will significantly undermine Madrigal's ability to prevail on its exterior skin claims in Phase II."). Madrigal had no reason or right to assume, for the reasons already discussed, that there would be a Phase II hearing. Its concerns about the results of a second hearing which was not even guaranteed to occur are not sufficient to justify vacatur under DCRAA § 16-4423(a)(3), and Madrigal does not present any case law that would suggest otherwise.[25] In the absence of a showing that the evidence excluded

_____

[25] In fact, the Panel's statement in the Interim Award suggests that it would be sensitive to Madrigal's concerns about the impact of a first hearing award on any subsequent hearing before the Panel: "[N]othing in this Interim Award is intended to affect Madrigal's ability to assert the Reserved Exterior Skin Claim." Interim Award ¶ 14(a). Although Madrigal argues that the Panel's Paragraph 17 findings directly contradict this statement, it offers vague and
(continued...)

from the first hearing prejudiced Madrigal's case, vacatur under this provision is not merited with respect to the Gale Report items contained in Paragraph 17.

Madrigal does, however, make a stronger showing regarding the relationship between the Panel's ruling on the Section 08911 issue and evidence related to this issue which was excluded from the hearing. The Panel's decision on the Section 08911 issue specifically states that "Specification Section 08911 [] is not applicable to the exterior metal panels." Interim Award ¶ 17. In its Motion, Madrigal alleges that it planned to call a rebuttal witness in the second hearing, who "would rebut the claims by Foulger-Pratt . . . that Specification Section 08911 does not apply to the exterior metal spandrel panels, column and slab covers at the Project." Madrigal Mot. to Vacate 26.

In <u>Tempo Shain</u>, the Second Circuit held that an arbitration Panel had denied a party a full and fair hearing by refusing to hear testimony from a rebuttal witness. 120 F.3d at 20-21. The witness in question was the "only person who could have testified in rebuttal" to the opposition's claims, and the documentary evidence before the Panel "did not adequately address such testimony." <u>Id.</u> at 21. While Foulger-Pratt points to places in the

<hr />

[25] (...continued)
unspecific arguments as to how the Panel's decisions on the Gale Report items will adversely impact Madrigal's ability to pursue its Reserved Exterior Skin Claims. Madrigal Mot. to Vacate 27-28.

record where Madrigal incidentally raised Section 08911 in connection with its arguments on other issues, Foulger-Pratt does not point to any place in the record, which demonstrates that Madrigal had been given the chance to rebut Foulger-Pratt's claim regarding Section 08911's inapplicability to the exterior panels. Foulger-Pratt Opp'n 27-28.

While this may suggest that Madrigal has been denied a full and fair hearing on the Section 08911 issue, Madrigal does not meet its burden on this claim, as it has failed to demonstrate that the Panel definitively postponed this issue to a second hearing. Madrigal has not presented any other credible grounds for its assertion that the Panel took actions affirmatively denying it an opportunity to rebut Foulger-Pratt's argument on this point.[26]

The Court, therefore, **denies** Madrigal's claim that it did not receive a full and fair hearing on the Paragraph 17 issues.

### c. Remaining Claims

Madrigal grounds its other claims for vacatur of portions of

---

[26] For example, Madrigal states that during the first hearing the Panel accepted its expert report on those Exterior Skin issues reserved for the second hearing, but expressly stated that it would not consider the report in rendering its first award. Madrigal Mot. to Vacate 25 n.14. While Madrigal claims that the Panel's refusal to consider the expert report in Phase I was fundamentally unfair, Madrigal at no point suggests that the Panel's consideration of this report, which contained determinations regarding Section 08911, during the first hearing would have specifically rebutted Foulger-Pratt's claims on the Section 08911 issue. Id. at 26-27; Madrigal Reply 13.

the Interim Award upon the DCRAA's provisions on "excess authority" and "other reasonable ground." According to Madrigal, the "other reasonable ground" provision includes review for "arbitrary and capricious" action by the arbitration Panel. Foulger-Pratt challenges application of this evidentiary standard, while also arguing that, in any event, Madrigal fails to demonstrate anything arbitrary or capricious about the Panel's rulings.

As with the D.C. Uniform Act, the DCRAA's provision on "excess authority" is accorded "the narrowest of readings." Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1180 (D.C. Cir. 1991). The provision does not "confer on courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral one; rather, where the interpretation of a contract is at issue, it is the arbitrator's construction which was bargained for, and not that of the courts." Chevy Chase Fin., 667 F.2d at 165. (internal quotations and citation omitted). In order to obtain relief under this provision, claimant "must clear a high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010).

An arbitrator's decision may be unenforceable only when she or he "strays from interpretation and application of the agreement and effectively dispenses [her or his] own brand of industrial justice." Id. Because arbitration is a matter of contract, arbitrators are "permitted to decide only those issues that lie

within the contractual mandate. . . . [A]n arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such an award." <u>Chevy Chase Fin.</u>, 667 F.2d at 165.

As the D.C. federal and local courts have held, an arbitration award can only be set aside or vacated on clearly specified statutory grounds. <u>Stern v. Stern Co. of Washington, D.C.</u>, 200 F.2d 364, 364 (D.C. Cir. 1952). <u>See</u> <u>Shaff v. Skahill</u>, 617 A.2d 960, 963 (D.C. 1992)(dismissing motion to vacate arbitration award for failure to raise statutory grounds for vacatur). While there is little case law addressing the scope of judicial review under the DCRAA's "other reasonable ground" provision, D.C.'s highest court recently held that the subsection does not substantially expand judicial authority to vacate an arbitration award beyond what existed under the D.C. Uniform Act. <u>A1 Team USA Holdings, LLC v. Bingham McCutchen, LLP</u>, 998 A.2d 320, 326 (D.C. 2010). In that case, the court concluded that this subsection does not dramatically expand the court's review powers and that <u>de novo</u> review of an arbitrator's award remains prohibited. <u>Id.</u> at 323-34. As a result, the court's review of an arbitration award is still "extremely limited." <u>Id.</u> at 326.

In reaching these conclusions, the court in <u>A1 Team</u> engaged in an extensive review of the DCRAA's legislative history and found no evidence to suggest that the drafters intended the statute to

alter the existing judicial standard for reviewing an arbitration award. Id. at 324-26. Rather, the court concluded that the DCRAA's creation was prompted by limitations under the previous code, which "no longer provided answers to many modern-day issues in the arbitration process . . . such as . . . the use of electronic information and other modern means of technology . . . ." Id. at 324. Because of the decided absence of explicit language in the statute, as well as in the legislative history, defining the scope of "other reasonable ground," the court held that the DCRAA did not expand established D.C. law for judicial review of arbitration awards. Id. at 325-36.

In light of A1 Team, Madrigal's expansive reading of the DCRAA's "other reasonable ground" clause must be rejected. Given that Madrigal has failed to raise any other plausible statutory basis for applying the arbitrary and capricious standard, vacatur cannot be granted based on this erroneous standard of review.

### i. Pre-Award Interest

Madrigal challenges the Panel's decision to grant Foulger-Pratt pre-award interest on its final three payment applications: Payment Applications 27, 28, and 29. In awarding Foulger-Pratt $2,837,772 on these outstanding invoices, the Panel calculated the unpaid amount for the three payment applications while also adding

$171,312[27] in pre-award interest assessed at a rate of 6% from June 15, 2008 until the award date. Interim Award at ¶¶ 13, 14(g).

Madrigal charges that the Panel "manifestly exceeded its authority by acting contrary to the unambiguous provisions of the APS . . . regarding the Payment Applications." Madrigal Mot. to Vacate 29. As already noted, during the arbitration, the Panel found in favor of Foulger-Pratt on its claim that Madrigal had breached the parties' Contract by delaying final completion of the project. Interim Award ¶ 12. The Panel also sustained most of Foulger-Pratt's claim that it was "entitled to Final Payment, or alternatively that any outstanding prerequisites for Final Payment have been excused, waived, or prevented by Madrigal's action or inaction." Id. ¶ 13. It was in connection with these findings of contractual breach that the Panel awarded Foulger-Pratt payment on its three outstanding payment invoices, including pre-award interest. Madrigal's "excess authority" argument centers on its contention that the pre-award interest awards violate APS ¶¶ 2-5.2. Madrigal Mot. to Vacate 29.

As to Payment Application 29, Madrigal's claim focuses on APS ¶ 5.2, which sets out the parties' agreed payment schedule as to

_____

[27] The Panel divided the interest payment between the three payment applications as follows: (1) $2,294.53 in interest with respect to Payment Application 27; (2) $26,005.96 in interest with respect to Payment Application 28; and (3) $143,011.78 in interest with respect to Payment Application 29. Interim Award ¶ 14(g).

the Items 1-8 Punch-List. In Paragraph 5.2, the parties agreed to a price of $1,194,000 for this work, payable to Foulger-Pratt upon completion, provided that it otherwise complied "with all other terms of this APS."[28]

As is clear from APS ¶ 11, the Panel was empowered to decide issues relating to Foulger-Pratt's right to payment under the APS and the parties' underlying agreements:

The arbitration shall determine the Madrigal Claims and

---

[28]  Paragraph 5.2 of the APS states, in part:

> Upon the execution of a Certification of Completion of the Items 1-8 Punch-List Work by the Development Manager, Project Architect and Lender Architect, and Foulger-Pratt's delivery of all of the close-out documents specified and required in Agreement Section 12.2.6 and General Conditions Section 9.10.2 . . . . Foulger-Pratt shall submit an Application for Payment for said Items 1-8 Punch-List Work. Foulger-Pratt and Madrigal agree that the "retainage value" of the Items 1-8 Punch List Work is set as $1,064,000. The Parties further agree that upon Completion of the [I]tems 1-8 Punch-List Work and Foulger-Pratt's compliance with its obligations set forth above, Foulger-Pratt shall submit an Application for Payment for the sum of $1,194,000, inclusive of the $130,000 adjustment provided for in paragraph 12 of this APS (i.e. $1,064,000, "retainage value" of Madrigal Outstanding Items 1-8 plus the $130,000 reduction from Outstanding Items 9-10). Provided that Foulger-Pratt and Travelers have complied with all other terms of this APS, Madrigal shall certify said Application for Payment and shall process it for payment in accordance with the Contract procedure . . . offset by any amount awarded to Madrigal in the arbitration as provided in paragraph 11 of this APS. Madrigal shall pay the sum of $1,194,000, as it may be adjusted pursuant to paragraph 11, to Foulger-Pratt for the Application for Payment for Items 1-8 Punch-List Work in accordance with the Contract terms and the provisions of this APS.

the claims of Foulger-Pratt and Travelers that, upon satisfaction of its obligations under this APS, Foulger-Pratt is entitled to full payment of the balance of the Contract Sum and Madrigal's contention that Foulger-Pratt's right to such payment is subject to: (a) the provisions of the Contract; (b) compliance with this APS, including, without limitation, the provisions in paragraph 5; (c) the Madrigal Claims set forth in the February 2, 2009 "Madrigal Outstanding Items" list; (d) Foulger-Pratt's performance of the Condo Association and Unit Owners Punch-Lists; and (e) submission of the Contract close-out documents.

In light of APS ¶ 11, Madrigal fails to demonstrate how APS ¶ 5.2 has been violated by the Panel's decision to grant pre-award interest on Payment Application 29. That award was based on the Panel's conclusion that "any outstanding prerequisites" for final payment to Foulger-Pratt had been voided by Madrigal's contractual breach. Madrigal does not dispute the Panel's overall ruling on the issue, nor can it under the terms of the APS.[29] The Panel operated within its authority under Paragraph 11 of the APS by holding that Madrigal's behavior nullified some of the prerequisites, including those found in Paragraph 5, for final payment to Foulger-Pratt.

Furthermore, nothing in Paragraph 5.2 appears to prevent the Panel from granting pre-award interest. Paragraph 5.2 primarily serves to establish the value of the Items 1-8 Punch-List. It says nothing about, and certainly does not restrict, interest awards on

---

[29] Indeed, APS ¶ 17 states that "[t]he Parties further agree that this APS extends only to those disputes expressly addressed herein and the Parties expressly reserve their rights pertaining to any disputes not covered by this APS."

amounts arising from a party's breach of the contract.

As to Payment Application 28, Madrigal's use of "excess authority" to challenge the pre-award interest also fails for similar reasons.[30] Madrigal argues that pre-award interest granted on this application conflicts with the terms of APS ¶ 4. Paragraph 4 establishes Application 28's payment price ($131,693), as well as certain prerequisites to payment, such as Foulger-Pratt's release of a mechanic's lien on the property. However, as with Paragraph 5.2, this provision does not prevent the Panel from awarding interest on Paragraph 4's pre-set payment amount, based on the Panel's findings regarding the parties' conduct vis a vis the underlying agreements.

In fact, Madrigal's claims regarding pre-award interest for both Payment Applications 28 and 29 appear to focus more on the merits of the Panel's decision than on any conflict with the Contract or the APS. <u>See</u> Madrigal Mot. to Vacate 30 ("By ordering payment of the entire amount of Application 29 before Foulger-Pratt had satisfied the requirements under APS ¶ 5.2 for even a partial payment, the Panel nullified the parties' settlement agreement embodied in the APS."); <u>Id.</u> at 32 ("Indeed, <u>to this day</u>, Foulger-

---

[30] As to Payment Application 27, Madrigal's "excess authority" challenge appears only in a short footnote. Madrigal Mot. to Vacate 32 n.22. As with Applications 28 and 29, Madrigal's claims regarding Application 27 fail to demonstrate that the Panel's award conflicted with the APS or the parties' underlying agreements or otherwise exceeded its authority in any way.

Pratt still has failed to meet the lien release requirements for [payment of] Application 28.")(emphasis in original).

In the most direct challenge to the merits of the Panel's award, Madrigal attacks the Panel's decision to calculate pre-award interest from June 15, 2008 (a few days after the June 1, 2008 date for which the project was certified as "substantially complete") to the date of the award on November 30, 2009. Madrigal claims, in part, that interest could not have accrued before February 3, 2009, as the parties had "expressly" agreed in the APS that, as of February 2, 2009, Foulger-Pratt had not met the pre-requisites for payment on all three applications. Madrigal Reply 18-19. However, in deciding whether and to what extent Madrigal was responsible for delays in the project's final completion, the Panel in its merits-based determination as to when breach occurred, and when final payment in effect became due, would be fully authorized to decide the interest issue. And, indeed, nothing in the APS prevents the Panel from doing otherwise.

This Court, therefore, **denies** Madrigal's claim for vacatur of the Panel's decision on pre-award interest in its entirety.

### ii. Warranties and Close-Out Requirements

Madrigal also challenges the Panel's decision to excuse Foulger-Pratt from some of its obligations to cure remaining deficiencies in subcontractor/supplier warranties. Madrigal Mot. to Vacate 36-41. In urging vacatur of this portion of the Panel's

award, Madrigal argues that the Panel exceeded its authority by rendering a decision that conflicts with the APS and the parties' underlying agreements. Id. Based on these claims, Madrigal urges this Court to "partially vacat[e] [Paragraph 14(d)] and remand[] for further consideration in accordance with the requirements that Foulger-Pratt provide all warranties." Id. at 41.

Madrigal also contests the Panel's conclusion that Foulger-Pratt's obligations to provide certain close-out documents and "any other contract deliverables" have "either been satisfied or excused, and Foulger-Pratt has no further obligations to provide any such items." Interim Award ¶ 14(f). Specifically, Madrigal claims that Foulger-Pratt was to provide "As Built" Drawings, as part of the "close-out documents" it was required to produce under the APS and the Contract. Madrigal Mot. to Vacate 41-42.

While Madrigal concedes that Foulger-Pratt previously provided such drawings, it claims that the Project Architect rejected those documents in August 2009 "because of various deficiencies, such as a failure to 'mark up' the drawings." Id. at 42. Based on this rejection, Madrigal argues that the Panel exceeded its authority by absolving Foulger-Pratt from providing these documents and thereby nullifying Foulger-Pratt's obligations under the APS and the Contract.[31] Id.

_____

[31] The Panel's full ruling on this issue is as follows:

(continued...)

Madrigal also asserts that the Panel's ruling with respect to "other contract deliverables" effectively "nullified Foulger-Pratt's contractual obligation to deliver extra materials" for the building. Id. Again, Madrigal claims that Foulger-Pratt was contractually required to provide these items and that the Panel exceeded its authority in failing to enforce this obligation. Id. at 42-43

As with its claims regarding pre-award interest payments, Madrigal's arguments for vacatur of the Panel's decisions on warranties and close-out documents are essentially an attack on the merits of the Panel's award. Much of Madrigal's proffered claims on the warranties issue focuses on the manner in which Madrigal and the unit owners in the project building would be adversely affected by deficient or missing warranties. See Madrigal Mot. to Vacate 36 ("Anyone who has paid for [an] expensive car or home repairs knows just how valuable an enforceable warranty can be.").

---

[31] (...continued)

> With respect to all other items alleged by Madrigal to be incomplete or deficient and to preclude Final Completion and/or Final Payment(including other close-out documents, certified Cost of the Work, future Unit Owner Punchlists, Condo Association Punchlist(s) and any other contractor deliverables alleged by Madrigal), the Panel concludes that all such requirements have either been satisfied or excused, and Foulger-Pratt has no further obligation to provide any such items.

Interim Award ¶ 14(f).

Madrigal's arguments about the close-out documents similarly emphasize the importance of these materials to Madrigal and the unit owners. See id. at 42 ("Having proper As-Built Drawings is particularly important to the unit owners and the Condominium Association because the drawings are most likely to become necessary years into the future."); Id. at 43 ("Although these [extra materials] might appear to be relatively insignificant, they are in fact important to ongoing repairs in both the common areas and individual units. Because creating a color match with custom-mixed paint is nearly impossible, having paint on hand for touch-ups is important.").

Again, in assessing the breach of contract claims brought by Madrigal and Foulger-Pratt, the Panel was fully authorized to determine the parties' continuing contractual obligations or lack thereof. Madrigal fails to point to any provision of the APS or the parties' agreements that restricts the Panel on this issue.

Consequently, and in light of its extensive efforts to convince this Court of its demonstrated need for these items, Madrigal's claims regarding warranties and close-out documents amount to little more than an attempt to re-litigate these issues on the merits and thereby fail to justify vacatur under the applicable case law. Stolt-Nielsen, 130 S. Ct. at 1767; A1 Team USA Holdings, LLC, 998 A.2d at 326; Kanuth, 949 F.2d at 175; Chevy Chase Fin., 667 F.2d at 165. Madrigal's claims on these issues are,

therefore, **denied.**

### iii. Costs Associated with Punch-Lists

Madrigal also urges vacatur of the Panel's decision to award Foulger-Pratt fees for Punch-List work it failed to complete. Madrigal Mot. to Vacate 43-44. Madrigal claims that the Panel's decision on this matter exceeded its authority, because Madrigal is entitled to retain these amounts under the APS and because the award reduced Foulger-Pratt's scope of work under the parties' Contract. Id. at 44.

Specifically, Madrigal contends that the parties agreed in the APS ¶ 12 that it was entitled to hold back a total of $530,000 from the contract price until Foulger-Pratt completed work associated with Condo Association and Unit-Owners Punch Lists. Id. at 43. Moreover, Madrigal argues that "[t]wo of the significant disputes regarding Madrigal's Outstanding Items List that were resolved in the APS were the parties' disputes regarding the Condominium Association Punch List and the Unit-Owners Punch List." Id.

Foulger-Pratt, however, is correct in noting that the APS expressly reserved a number of specific disputes about the Punch-Lists for arbitration. See APS ¶ 12 ("It is Madrigal's position that Foulger-Pratt shall complete the [Punch-Lists] Work in accordance with the Contract terms, whether the cost of the Work is greater than or less than these hold-back values. Foulger-Pratt contends that its obligation to complete said Work is not unlimited

in time. <u>The Parties hereby agree that these issues shall be decided as part of the arbitration process . . . .</u>")(emphasis added); <u>Id.</u> ¶ 11 (noting the parties' disputes concerning Foulger-Pratt's performance of the Condo Association and Unit Owners Punch-Lists, in specifying the subjects covered by the arbitration). In light of this clear language, Madrigal's claim that the Panel's decision on the two Punch-Lists violates APS ¶ 12's "express completion requirements" lacks merit.[32] Madrigal Mot. to Vacate 44. Consequently, Madrigal's claims regarding the Punch-Lists fail as an attack on the merits of the award and are **denied**.

### iv. Attorneys' Fees

Madrigal objects to the Panel's denial of its request for attorneys' fees relating to the December 2008 TRO action it brought in D.C. Superior Court. <u>Id.</u> at 34-35. Madrigal claims that under the Contract it is entitled to fees that result from Foulger-Pratt "filing a lien or failing to bond off a Subcontractor lien." <u>Id.</u> at 34 (internal quotations and citation omitted). The Contract, however, contains an exception to this prohibition for liens filed by Foulger-Pratt "for amounts <u>certified for payment by the Development Manager and Architect</u> and which remain unpaid by the Owner." <u>Id.</u> (internal quotations and citation omitted) (emphasis in

---

[32] In addition to establishing the parties' intention to arbitrate matters associated with the Punch-Lists, Paragraph 12 sets out payment prices for this work. Madrigal does not allege that the Panel's decision altered these prices in any way.

brief). Madrigal asserts that Foulger-Pratt's December 2008 lien of $2,636,469 was not covered by this exception, because it was based primarily on Payment Application 29, which "was never certified for payment." Id. Consequently, Madrigal claims entitlement to attorneys' fees of $62,840 relating to its efforts in D.C. Superior Court to remove the lien. Id. Madrigal argues that the Panel's failure to grant its request for attorneys' fees contradicts the "express terms of the Contract" and was therefore in excess of its authority. Id. at 35

Again, Madrigal's claim appears to simply relitigate the underlying merits issue. The parties disagreed over whether Foulger-Pratt's December 2008 lien fell into the exception noted above, and therefore submitted the issue to the Panel for resolution. Madrigal's challenge to the Panel's decision on this matter, once again, focuses on its disagreement with the merits of the Panel's award. Madrigal Reply 20 ("[T]he parties expressly agreed in Paragraphs 3,4,and 5.2 of the APS that Foulger-Pratt had not yet met the terms required for any of these payments as of the execution of the APS. . . . Thus, there was no basis for the Panel to conclude that Madrigal had wrongfully failed to certify Payment Applications 28 and 29 in December 2008, when Foulger-Pratt filed the mechanic's lien against the Project.")(emphasis in original). There is nothing in any of the APS provisions cited by Madrigal that would prevent the Panel from considering claims that Madrigal

had wrongfully failed to certify final payment applications and, for that reason, denying its request for attorneys' fees in the Superior Court case. Consequently, this Court **denies** Madrigal's claim that the Panel exceeded its authority by declining to award attorneys' fees on this issue.

## III. Conclusion

According to DCRAA § 16-4423(e), "[i]f the court denies a motion to vacate an award, it shall confirm the award unless a motion to modify or correct the award is pending." Having **denied** Madrigal's Motion to Vacate portions of the arbitration award, this Court will **confirm** the Interim Award in its entirety.

In response to Foulger-Pratt's request, the Court will **grant** Foulger-Pratt "reasonable attorney's fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award," pursuant to DCRAA § 16-4425 (c). Foulger-Pratt Opp'n 44 n.21. Furthermore, the Court **orders** that funds deposited by the parties into the Registry of this Court, pursuant to its March 3, 2010 order [Dkt. No. 26], be disbursed according to the terms of the Interim Award. An Order will accompany this Memorandum Opinion.

April 27, 2011                    /s/
                                  _____
                                  Gladys Kessler
                                  United States District Judge

**Copies via ECF to all counsel of record**